

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.

*Barbara J. Houser*

**Signed December 12, 2008**                    **United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| THE HERITAGE ORGANIZATION, | § | CASE NO. 04-35574-BJH-11 |
| L.L.C., | § | |
| | § | |
| Debtor. | § | |
| | § | |
| DENNIS FAULKNER, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADV. PRO. NO. 06-3377-BJH |
| | § | |
| - against - | § | |
| | § | |
| GARY M. KORNMAN, et al., | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is the Trustee's Motion for Partial Summary Judgment Against the

Kornman Supplier Defendants for Single Business Enterprise Liability, and Brief in Support (the

"Trustee Motion"), Defendants' Omnibus Motion for Summary Judgment, and Brief in Support (the

"Kornman Defendants' Motion"), Defendant Vickie Walker's Motion for Final Rule 56 Summary

Judgment and Brief in Support Thereof (the "Walker Motion") (the Kornman Defendants' Motion

and the Walker Motion will be referred to collectively as the "Defendants' Motions" and all of the

motions will be referred to collectively as the "Motions"). The Trustee's Motion is opposed by the

remaining defendants and the Defendants' Motions are opposed by the Trustee. The Court heard

the Motions on November 12 and 14, 2008. The Court has jurisdiction over the parties and the issues

raised in the Motions in accordance with 28 U.S.C. §§ 1334 and 157, either because the issues are

core issues or because the parties have consented to the Court's entry of a final judgment. This

Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law in

accordance with Federal Rule of Bankruptcy Procedure 7052.

## I.     Factual and Procedural Background

The Heritage Organization, L.L.C. (the "Debtor" or "Heritage") is a Delaware limited liability

company formed in 1994. Prior to Heritage's bankruptcy filing, Heritage provided various estate

and tax planning strategies to extremely high net-worth individuals for a fee. Heritage

commenced this bankruptcy case on May 17, 2004 by filing its voluntary petition under Chapter 11

of the United States Bankruptcy Code. On August 13, 2004, the Court entered an order directing the

appointment of a Chapter 11 trustee. On August 16, 2004, the U.S. Trustee appointed Dennis S.

Faulkner as the Chapter 11 trustee (the "Trustee"), which appointment was confirmed by order

entered on August 18, 2004.

On May 16, 2006, the Trustee commenced the above-captioned adversary proceeding ("the

"Adversary Proceeding") by filing a complaint (the "Complaint") against 31 defendants, most of

whom are affiliated in some manner with Gary M. Kornman ("Kornman"), the former chief executive officer and president of the manager of the Debtor. Over time, the Trustee has settled with all of those parties except (i) Kornman; (ii) Kornman & Associates, Inc., a Tennessee corporation of which Kornman was the president, director and chief executive officer ("K&A"); (iii) Tikchik Investment Partnership, L.P., a Delaware limited partnership of which Kornman was the director and president ("Tikchik"); (iv) GMK Corp., a Delaware corporation that served as the general partner of Tikchik ("GMK Corp."); (v) GMK Family Holdings, L.L.C., a Delaware limited liability company that was the managing member of the Debtor ("GMK"); (vi) the Ettman Family Trust I ("Ettman"); (vii) Heritage Organization Agency, Inc. ("Heritage Agency"); (viii) the Oak Group, LP ("Oak Group"); (ix) Steadfast Investments, L.P., a Delaware limited partnership that was a member of the Debtor ("Steadfast"); (x) Leasecorp, Inc., a Delaware corporation of which Kornman was resolved to be an authorized signatory ("Leasecorp"); (xi) Strategic Leasing L.P., a Delaware limited partnership of which Leasecorp was the general partner ("Strategic"); (xii) Valiant Leasing, L.L.C., a Delaware limited liability company of which K&A was the managing member ("Valiant"); (xiii) Executive Aircraft Management, L.L.C., a Delaware limited liability company of which K&A was the managing member ("Executive Aircraft"); (xiv) Executive Air Crews, L.L.C. , a Delaware limited liability company of which K&A was the managing member ("Executive Crews"); (xv) Heritage Advisory Group, L.L.C., a Delaware limited liability company of which K&A was the managing member ("Heritage Advisory"); (xvi) Heritage Properties, L.L.C., a Delaware limited liability company of which K&A was the managing member ("Heritage Properties"); (xvii) Vehicle Leasing, L.L.C., a Delaware limited liability company of which K&A was the managing member ("Vehicle Leasing"); (xviii) Financial Marketing Services, Inc., a Texas corporation of which Kornman was the

vice president and Vickie Walker was the president ("Financial Marketing" and together with Leasecorp, Strategic, Valiant, Executive Aircraft, Executive Crews, Heritage Advisory, Heritage Agency, K&A, Heritage Properties and Vehicle Leasing, will be referred to collectively as the "Supplier Defendants") (Kornman, GMK, GMK Corp., Tikchik, Steadfast, Ettman, Oak Group and the Supplier Defendants will be referred to collectively as the "Kornman Defendants") and (xix) Vickie Walker, a longtime employee of various Kornman-controlled entities ("Walker") (the Kornman Defendants and Walker will be collectively referred to as the "Remaining Defendants").

On October 16, 2006, pursuant to Court order, *see* Case No. 06-3377, Docket No. 74, the Trustee amended the Complaint (the "First Amended Complaint"). After a tortured history leading to this point in the Adversary Proceeding, including the substitution of at least four (4) law firms as counsel for various of the Remaining Defendants, the Motions were filed, along with the Trustee's motion for leave to file a second amended complaint and *Daubert* motions by the Kornman Defendants.[1]  The *Daubert* motions, directed against the Trustee's solvency expert, were heard on September 10, 2008.  At the conclusion of that hearing, the Court granted the *Daubert* motions, finding the Trustee's solvency expert's testimony unreliable and excluding his testimony.

Because the Motions should have been substantially narrowed by the exclusion of the testimony of the Trustee's solvency expert, the Court directed the parties to file a stipulation advising the Court as to which portions of the Motions remained to be decided by the Court.  That stipulation was filed on September 22, 2008.  *See* Docket No. 437.[2]

---

[1]*Daubert* motions were also filed by certain other defendants with whom the Trustee settled after the Court granted those motions.

[2]The Trustee's motion for leave to file a second amended complaint ("Motion for Leave") has not been heard, *see* Docket No. 328, although the Court recently directed that it be set for hearing promptly if agreement on amendment could not be reached.  All references in this Memorandum Opinion and Order to the "Proposed Second

The Defendants' Motions address all of the Trustee's remaining claims against them.  In other words, the Remaining Defendants seek a summary judgment on all of the Trustee's remaining claims.  In contrast, the Trustee's Motion seeks only a partial summary judgment on one of his claims against the Supplier Defendants – *i.e.*, his claim that each of the Supplier Defendants is liable for Heritage's debts because they were all part of a single business enterprise.

## II.    Summary Judgment Standard

In deciding a motion for summary judgment, a court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).[3]  In deciding whether a fact issue has been raised, the facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party.  *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007).  A court's role at the summary judgment stage is not to weigh the evidence or determine the truth of the matter, but rather to determine only whether a genuine issue of material fact exists for trial.  *Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001) ("the court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence.") (citing *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 135 (2000)); *see also U.S. v. An Article of*

---

Amended Complaint" are to the one attached to the Trustee's Motion for Leave as Exhibit A.  The Court notes that after this Memorandum Opinion and Order was substantially drafted, the Trustee filed an *Amended* Motion for Leave to File Second Amended Adversary Complaint, and Brief in Support.  *See* Docket No. 472 (filed December 8, 2008) (the "Amended Motion for Leave").  The Amended Motion for Leave is currently set for hearing on December 18, 2008.  Attached to the Trustee's Amended Motion for Leave is yet another version of a proposed second amended complaint.  The differences between this newest version and the one which the Court refers to herein as the Proposed Second Amended Complaint are not material for purposes of this Memorandum Opinion and Order.

[3] Federal Rule of Civil Procedure 56 is made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056.

*Food Consisting of 345/50 Pounds Bags*, 622 F.2d 768, 773 (5th Cir. 1980) (holding district court

erred in "discounting evidentiary value." When determining whether a genuine issue of any material

fact exists, the court "should not proceed to assess the probative value of any of the evidence . . . .").

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Pylant v. Hartford Life and Acc. Ins. Co.*, 497 F.3d 536, 538 (5th

Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

If the moving party makes an initial showing that there is no evidence to support the non-

moving party's case, the non-moving party must come forward with competent summary judgment

evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.,* 475 U.S. 574, 586-87 (1986).

## III.    Legal Analysis

### A.    The Defendants' Motions

#### 1.    Intentional Fraudulent Transfer Claims

The Trustee seeks recovery of various transfers pursuant to section 544(b) of the Bankruptcy

Code and section 24.005(a)(1) of the Texas Uniform Fraudulent Transfer Act ("TUFTA").

Specifically, the Trustee asserts these intentional fraudulent transfer claims against three of the

Kornman Defendants – GMK, Tikchik, and Steadfast.  The Trustee alleges that in the four years prior

to Heritage's bankruptcy filing,[4] specifically between 2001 and 2003, Heritage transferred millions

of dollars to GMK, Tikchik and Steadfast with the actual intent to hinder, delay or defraud Heritage's

---

[4]A cause of action under subsection 24.005(a)(1) is extinguished by TUFTA's statute of limitations unless it is brought within "four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." TEX. BUS. & COM. CODE § 24.010(a)(1) (Vernon 2002 & Supp. 2008). Pursuant to section 108 of the Bankruptcy Code, the Trustee benefits from a two-year extension of time on underlying statutes of limitations, *e.g.*, the Trustee's TUFTA claims. 11 U.S.C. § 108(a).

creditors. As with the other claims upon which the Remaining Defendants seek summary judgment, GMK, Tikchik, and Steadfast assert that the Trustee has failed to adduce summary judgment evidence to support one or more elements of the Trustee's *prima facie* case.

Section 544(b) of the Bankruptcy Code grants the Trustee the power to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 . . . ." 11 U.S.C. § 544(b)(1). The Trustee relies on TUFTA as his "applicable law," alleging that the transfers made to GMK, Tikchik and Steadfast were made "with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1).

In the Kornman Defendants' Motion, GMK, Tikchik, and Steadfast contend that the Trustee's intentional fraudulent transfer claims fail because the Trustee lacks standing to bring the claims. *See* Defendants' Brief in Support of Omnibus Motion for Summary Judgment, p. 57. For section 544(b)/TUFTA claims, standing is a threshold issue that must be addressed first, "because it determines the court's fundamental power even to hear the suit." *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647 (S.D. Tex. 2007) (citing *Rivera v. Wyeth-Ayerst Labs.,* 283 F.3d 315, 319 (5th Cir. 2002)).

A trustee's right to avoid a transfer is derivative of an actual unsecured creditor's right and, therefore, to establish standing under section 544(b), the Trustee must show the existence of an actual unsecured creditor holding an allowable claim that could avoid the challenged transfer. *See Ries v. Wintz Props., Inc. (In re Wintz Cos.)*, 230 B.R. 848, 858-59 (B.A.P. 8th Cir. 1999) (citing *Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996)); *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 659 (S.D. Tex. 2007). While the Trustee must demonstrate the existence of this "golden

creditor," *see Turner v. Phoenix Fin., LLC (In re Imageset, Inc.)*, 299 B.R. 709, 715 (Bankr. D. Me. 2003), the Trustee need not specifically identify the creditor by name; as long as the Trustee establishes that unsecured creditors exist, he can assume the mantle of any one of them. *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Inc.)*, 139 F.3d 574, 577 (7th Cir. 1998); *see also Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593 (B.A.P. 8th Cir. 2003). Moreover, the unsecured creditor need not exist at the time the avoidance action is filed, so long as that creditor existed on the date the bankruptcy petition was filed. *See, e.g., In re DLC, Ltd.*, 295 B.R. 593, 605 (B.A.P. 8th Cir. 2003) ("we hold, as have other courts analyzing this issue, that the trustee must identify a creditor with an allowable unsecured claim who had an allowable claim against the debtor on the date the bankruptcy petition was filed." (citing *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 807 (9th Cir. 2004)).

In response to this standing argument, the Trustee points to the Internal Revenue Service ("IRS"), various former clients of Heritage, and Ralph Canada ("Canada"), as his unsecured creditors holding allowable claims that could avoid the challenged transfers. *See* Brief in Support of Plaintiff's Response to Defendants' Omnibus Motion for Summary Judgment, pp. 53-55. The earliest transfer the Trustee seeks to avoid occurred on April 16, 2001, when Heritage distributed $5,000,000 to its members, GMK and Steadfast. *See* Brief in Support of Plaintiff's Response to Defendants' Omnibus Motion for Summary Judgment, p. 54. The IRS claims upon which the Trustee relies are Claim #70-1, which asserts that FICA taxes are owed for a tax period beginning March 31, 2001, and Claim #72, amending Claim #70. *See* Case No. 04-35574, Claims #70, 72; *see also*, Ex. 1, Plaintiff's

Supplemental Exhibit List for the November 12, 2008 Hearing.[5]  The Trustee argues that this claim alone gives him standing as it is a claim in existence prior to the first alleged fraudulent transfer that remained unpaid on the Petition Date.

In response, GMK, Tikchik, and Steadfast assert that the IRS is not an appropriate triggering creditor here because (1) the Trustee has objected to the IRS claim, and (2) the IRS claim is for unassessed taxes.  While the Trustee did file an objection to Claim #72, *see* Docket No. 1324, Case No. 04-35574, this objection has been settled pursuant to a Motion, Docket No. 1375, and an Order entered on November 14, 2008, Docket No. 1380.[6]  Accordingly, the Trustee's objection has been resolved, resulting in an allowed IRS claim against Heritage in the amount of $730,000.

Second, despite these defendants' assertion that a claim for unassessed taxes is not sufficient to render the IRS a triggering creditor for purposes of section 544(b), the Trustee has cited the Court to several cases where the IRS served as such. *See Cambridge Meridian Group, Inc. v. Connecticut Nat'l Bank (In re Erin Food Servs., Inc.)*, 117 B.R. 21, 25 (Bankr. D. Mass. 1990) ("The Trustee has established that there was at least one unsecured creditor with a § 502 allowable claim who could bring a fraudulent conveyance action . . . The IRS [and three other creditors] all had and still have unsecured claims, that are, at least in part, all allowable claims under 11 U.S.C. § 502."); *see also Coleman Community Trust Bank (In re Coleman)*, 299 B.R. 780, 794 (W.D. Va. 2003), *rev'd on other grounds*, 426 F.3d 719 (4th Cir. 2005).

---

[5]The parties have each identified exhibits in a different fashion.  The Trustee has numbered and lettered exhibits, accompanied by appendix number and Bates-numbered identification.  The Defendants have their exhibits denoted by appendix number (there are three) and Bates number.  Walker has separately numbered exhibits.  For clarity, the Court refers to the exhibit as identified by the party submitting such, and if necessary, the document to which the exhibit relates.

[6]No party-in-interest objected to the Trustee's proposed settlement with the IRS.

**Memorandum Opinion and Order**                                                                 **Page 9**

After reviewing these and other cases, the Court agrees with the Trustee. A tax assessment is not a prerequisite to tax liability, *Matter of Saxe*, 14 B.R. 161, 164-65 (Bankr. N.Y. 1981), and:

> [a] claim under the Bankruptcy Code is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A). The unassessed taxes, due and owing, fall within the concept of a claim in bankruptcy.

*In re Davidson*, 156 B.R. 600, 603 (Bankr. E.D.Ark. 1993); *see also In re Goldston*, No. 94-1279, 1995 WL 41687, at *3 (D. Kan. 1995) ("If an assessment is void, the IRS is prohibited from proceeding administratively and must resort to pursuing the matter through a civil suit. An improper assessment, however, does not negate the taxpayer's liability. In other words, a valid assessment is not a prerequisite to tax liability.") (citing *Davis v. Columbia Constr. Co., Inc.*, 936 F.2d 771, 774 (4th Cir. 1991), *superceded by statute on unrelated issue as stated in Branch v. F.D.I.C.*, 223 B.R. 605 (D. Mass. 1998); *U.S. v. Chila*, 871 F.2d 1015, 1018-19 (11th Cir.), *cert. denied*, 492 U.S. 975 (1989)). Moreover, an unassessed tax obligation is a claim that entitles the United States to set aside a fraudulent transfer under state fraudulent conveyance law. *See, e.g., U.S. v. Thomassen*, 610 F.Supp. 386, 391-92 (D. Neb. 1985) (under Nebraska fraudulent conveyance statute).

Based on this case law and Bankruptcy Code definitions, the Court finds that there is sufficient evidence in the summary judgment record to raise a genuine issue of material fact regarding the existence of an unsecured creditor holding an allowable claim that could avoid the challenged transfers.[7]

---

[7]In their briefing, these defendants also attempt to strip the Trustee of his "golden creditor" status by alleging that the Trustee's TUFTA claims are time barred, and are barred by defenses of judicial estoppel and *in pari delicto*. *See* Brief in Support of Defendants' Reply Brief to Plaintiff's Response to Defendants' Omnibus Motion for Summary Judgment, pp. 24, 28-29; Defendants' Brief in Support of Omnibus Motion for Summary Judgment, pp. 46-48, 58-59. Because a trustee's right to avoid a transfer is derivative of the actual unsecured creditor's right, "[i]f the creditor is estopped or barred from recovery, so is the trustee. The trustee is also subject to defenses that could be

GMK, Tikchik, and Steadfast further argue that the Trustee failed to offer sufficient evidence of Heritage's actual fraudulent intent as required by TUFTA in order to avoid the challenged transfers. To survive the Kornman Defendants' Motion, the Trustee must point to sufficient evidence in the summary judgment record that raises a genuine issue of material fact as to whether Heritage made the challenged transfers with the actual intent to hinder, delay or defraud its creditors, and "[i]ntent to hinder, delay or defraud may be established by circumstantial evidence." *In re GPR Holdings, L.L.C. v. Duke Energy Trading and Marketing, LLC (In re GPR Holdings, L.L.C.)*, No. 03-3430, 2005 WL 3806042, at *9 (Bankr. N.D. Tex. May 27, 2005) (citing *Sherman v. FSC Realty, LLC (In re Brentwood Lexford Partners, LLC)*, 292 B.R. 255, 262-63 (Bankr. N.D. Tex. 2003)); *see also In re Reed*, 700 F.2d 986, 991 (5th Cir. 1983). Circumstantial evidence of actual fraudulent intent under TUFTA, "commonly known as 'badges of fraud,'" *see In re Soza*, 542 F.3d 1060, 1066 (5th Cir. 2008), are codified in a non-exclusive list set forth in section 24.005(b) of the Texas Business and Commerce Code, which provides:

> In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:
>
> (1) the transfer or obligation was to an insider;

---

asserted against the unsecured creditor. The burden is on the trustee seeking to avoid the transfer to demonstrate the existence of an actual creditor with a viable cause of action against the debtor, which is not time-barred or otherwise invalid." *Smith*, 365 B.R. at 659 (citing *In re Marlar*, 267 F.3d 749, 753 (8th Cir. 2001); *In re G-I Holdings, Inc.*, 313 B.R. 612, 632-33 (Bankr. D.N.J. 2004); *In re Wingspread Corp.*, 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995)); *see also ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 325-26 (S.D. Tex. 2008) ("The trustee's rights are derivative of an actual unsecured creditor's rights, meaning that the trustee steps into the shoes of the creditor. The trustee is subject to the same defenses as the creditor would be (but not those defenses available only against the debtor).") (citing *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 659 (S.D. Tex. 2007)). The defendants' judicial estoppel and *in pari delicto* arguments are raised against the Trustee's assertions that Canada and the client claimants serve as proper triggering creditors. Because the Court has concluded that the Trustee has standing based upon the IRS's claim against Heritage, the Court need not address the judicial estoppel and *in pari delicto* arguments here. As noted in footnote 4, TUFTA's limitations period is four years. The Trustee's complaint, filed on May 16, 2006, falls within the extension granted by section 108(a) of the Bankruptcy Code. Therefore, the defendants' statute of limitations defense fails.

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE ANN. § 24.005(b) (Vernon 2002 & Supp. 2008).

GMK, Tikchik, and Steadfast support their position that the Trustee failed to raise a genuine issue of material fact regarding Heritage's actual fraudulent intent by arguing that any circumstantial evidence of actual intent – *i.e.*, badges of fraud found in the record, fails to meet the Trustee's summary judgment burden of proof. The Court disagrees for the reasons explained more fully below.

First, there is evidence of at least three badges of fraud in the summary judgment record. Specifically, the Trustee has evidence that the challenged transfers were made to insiders. Moreover, Heritage had been sued or threatened with suit at the time of the challenged transfers. Finally, as

**Memorandum Opinion and Order**                                              **Page 12**

these defendants have admitted, there was no reasonably equivalent value given in exchange for the transfers. *See* Defendants' Reply Brief to Plaintiff's Response to Defendants' Omnibus Motion for Summary Judgment, p. 27. And, because these three badges of fraud give rise to an inference that Heritage acted with actual fraudulent intent, the Trustee has raised a genuine issue of material fact in the summary judgment record regarding Heritage's actual intent to hinder, delay and defraud its creditors.

Second, GMK's, Tikchik's, and Steadfast's reliance on statements made in *In re Missionary Baptist Foundation of America, Inc.*, 24 B.R. 973 (Bankr. N.D. Tex. 1982) is misplaced. In *Missionary Baptist*, the court noted that:

> [a]lthough actual intent to hinder, delay, or defraud creditors is essential to sustain findings of fraudulent conveyance under § 548(a)(1) [the Bankruptcy Code's fraudulent transfer statute], the finding of the requisite intent may be predicated upon the concurrence of facts which, while not direct evidence of actual intent, lead to the ***irresistible conclusion*** that the transferor's conduct was motivated by such intent. *4 Collier on Bankruptcy*, § 548.02, pp. 548-33 (15th ed. 1982). While actual fraud may be inferred from the circumstances surrounding a particular transaction or series of transactions, the facts supporting such an inference ***must preclude any reasonable conclusion other than*** that the purpose of the transfer was to defraud the transferor's creditors.

24 B.R. at 976 (emphasis added). According to these defendants, as the circumstantial evidence offered by the Trustee does not lead to a conclusive presumption of fraud, the Trustee's evidence does not raise a genuine issue of material fact of Heritage's actual fraudulent intent. However, the above-quoted statement remains an outlier in the law of fraudulent transfer; no court since 1982 has relied upon this construction of fraudulent transfer law. *See, e.g., In re Oliver*, 38 B.R. 407, 410 (Bankr. D. Mass. 1084); *Sommers v. Sorce (In re Major Funding Corp.)*, 126 B.R. 504, 508 (Bankr.

S.D. Tex. 1990)[8]; *In re Old Naples Securities, Inc.*, 343 B.R. 310, 319 (Bankr. M.D. Fla. 2006).

Third, comments to the Uniform Fraudulent Transfer Act further convince the Court that GMK, Tikchik, and Steadfast raise the bar too high for the Trustee in the summary judgment context. In comment 5, the drafters remarked:

> Proof of the existence of any one or more of the factors enumerated in subsection (b) may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer or incurred a fraudulent obligation. . . The fact that a transfer has been made to a relative or to an affiliated corporation has not been regarded as a badge of fraud sufficient to warrant avoidance when unaccompanied by any other evidence of fraud. The courts have uniformly recognized, however, that a transfer to a closely related person warrants close scrutiny of the other circumstances, including the nature and extent of the consideration exchanged.

UFTA § 4, cmt. 5. The drafters continued in comment 6, "[i]n considering the factors listed in § 4(b) a court should evaluate all the relevant circumstances involving a challenged transfer or obligation. Thus the court may appropriately take into account all indicia negating as well as those suggesting fraud . . . ." UFTA § 4, cmt. 6.

Fourth, GMK's, Tikchik's, and Steadfast's assertion that the Trustee's evidence of three badges of fraud is insufficient as a matter of law to establish actual fraudulent intent is simply incorrect. The badges of fraud are evidentiary tools used by courts to determine if fraudulent intent is present based on circumstantial evidence. *See, e.g., Jennings v. Maxfield (In re B.L. Jennings, Inc.)*, 373 B.R. 742, 765 (Bankr. M.D. Fla. 2007) (factors do not create a "mathematical formula," and the "list of factors is meant to provide guidance to the trial court, not compel a finding one way or

---

[8]*In re Major Funding*, 126 B.R. 504, the bankruptcy court held that actual intent must be proven by clear and convincing evidence. *See id.* at 508 (citing *In re Missionary Baptist Found., Inc.*, 24 B.R. 973 (Bankr. N.D. Tex. 1982)). Following the United States Supreme Court's holding in *Grogan v. Garner*, 298 U.S. 279 (1991), that the preponderance standard is the correct quantum of proof in dischargeability actions, this court has held that preponderance of the evidence is the correct standard in determining actual intent to hinder, delay or defraud. *Mancuso v. T. Ishida USA, Inc. (In re Sullivan)*, 161 B.R. 776, 779-80 (Bankr. N.D. Tex. 1993).

the other."); *Frierdich v. Mottaz*, 294 F.3d 864, 869 (7th Cir. 2002) (affirming grant of summary judgment to trustee on actual intent established by circumstantial evidence; "We find nothing wrong with the bankruptcy judge's conclusion that there was no dispute that [the debtor] transferred the proceeds with actual intent to defraud. Direct proof of actual intent to defraud is not required - indeed, it would be hard to come by . . . ."); *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1271 (11th Cir. 1998) (summary judgment against trustee reversed because proof of actual intent is rarely accomplished by direct proof and "the evidence adduced creates genuine issues of material fact as to whether or not there was actual intent to hinder, delay, or defraud creditors."). As stated by the *In re B.L. Jennings* court, "[t]here is no minimum number of factors that must be present before the scales tip in favor of finding actual intent to defraud." 373 B.R. 742, 766 (internal citations omitted). Further, as stated by the Eleventh Circuit in *In re XYZ Options, Inc.*, "[a]lthough the presence of one specific 'badge' will not be sufficient to establish fraudulent intent, the 'confluence of several can constitute conclusive evidence of an actual intent to defraud.'" 154 F.3d 1262, 1271 n.17 (quoting *In re Sherman*, 67 F.3d 1348, 1354 (8th Cir. 1995)). As recently stated by the Fifth Circuit:

> When analyzing facts under TUFTA, this court has noted that "[s]ince direct proof of fraud often is not available, courts may rely on circumstantial evidence to establish the fraudulent intent." Not all, or even a majority, of the "badges of fraud" must exist to find actual fraud. Indeed, "[w]hen several of these indicia of fraud are found, they can be a proper basis for an inference of fraud."

*In re Soza*, 542 F.3d 1060, 1067 (quoting *Roland v. U.S.*, 838 F.2d 1400, 1402-03 (5th Cir. 1988)).

Finally, GMK, Tikchik, and Steadfast argue that many of the challenged transfers were made for legitimate business reasons, namely pass-through tax benefits, and that the transfers were required to be made by the Restated Limited Liability Company Agreement of The Heritage

Organization, L.L.C. (the "Heritage Operating Agreement"). While the defendants' evidence explaining why the transfers occurred may convince the Court at trial that Heritage made the challenged transfers without the requisite actual fraudulent intent, the Court cannot come to that conclusion without attempting to determine the truth of the matter or evaluating or weighing the evidence. In the summary judgment context, that is improper. *See Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986) ("At the summary judgment stage, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter."). Rather, the Court is only permitted to determine if the Trustee has raised a genuine issue of material fact regarding Heritage's actual fraudulent intent. *See id.* at 1377 ("Rather, the court's function is to determine whether a dispute about a material fact is genuine, that is, whether a reasonable jury could return a verdict for the nonmoving party based on the evidence."). Given the evidence of at least three badges of fraud, this Court concludes that the Trustee has raised such an issue of fact.

Accordingly, summary judgment is not proper regarding the Trustee's actual fraudulent transfer claims and the Kornman Defendants' Motion must be denied as to those claims. The Trustee's intentional fraudulent transfer claims will proceed to trial.

### 2. Preference Claims

The Trustee contends that certain transfers made to Walker, Kornman, and the Supplier Defendants were preferential payments avoidable under section 547(b) of the Bankruptcy Code. In response, Walker, Kornman, and the Supplier Defendants contend that the challenged payments were not preferential, or that they have defenses to the Trustee's recovery of such preferences. Specifically, regarding their contention that summary judgment on the Trustee's preference claim

is appropriate, Walker, Kornman, and the Supplier Defendants contend that the Trustee has not carried his burden of proof regarding the insolvency element of his preference claim. *See* 11 U.S.C. § 547(b)(3). Moreover, these defendants contend that the Trustee may not avoid the challenged transfers because: (i) the transfers were a contemporaneous exchange for new value; (ii) the transfers were made in the ordinary course of business, and/or (iii) the transferee gave new value to Heritage thereafter. *See* 11 U.S.C. § 547(c)(1), (2), and/or (4).

Turning first to the Trustee's preference claim under section 547(b), to prevail, the Trustee must prove that: (1) there was a transfer of an interest of the Debtor in property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt owed by the Debtor before such transfer was made, (4) made while the Debtor was insolvent, and (5) the transfer enables the creditor to receive more than such creditor would receive (i) if the Debtor filed under chapter 7, and (ii) the transfer had not been made. *See* 11 U.S.C. 547(b); *see also Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.)*, 437 F.3d 457, 459 (5th Cir. 2006). As noted previously, for purposes of the Defendants' Motions, Walker, Kornman, and the Supplier Defendants focus on the insolvency element of the Trustee's preference claim.

It is undisputed that the Bankruptcy Code requires "that a debtor be insolvent at the time of an allegedly preferential transfer in order for that transfer to be avoided by the bankruptcy trustee." *Cage v. Baker Hughes Oilfield Operations, Inc. (In re Ramba, Inc.)*, 416 F.3d 394, 403 (5th Cir. 2005). However, section 547(f) of the Bankruptcy Code provides that "[f]or the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). This "presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the

presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion." *Herod v. Louis Dreyfus Natural Gas Corp. (In re Gasmark Ltd.)*, 158 F.3d 312, 315 (5th Cir. 1998) (quoting FED. R. EVID. 301). In other words, the "effect of this presumption is to shift the burden to the transferee to produce evidence of the debtor's solvency as of the transfer date." *In re Ramba, Inc.*, 416 F.3d 394, 403 (5th Cir. 2005) (citing *Gasmark*, 158 F.3d at 315); *see also Smith v. KKM P'ship (In re Quality Woodwork Interiors, Inc.*), Nos. 06-3032, 3033, 2007 WL 1662635, at *2 (Bankr. S.D.Tex. June 4, 2007) (the defendant is required to "prove solvency with respect to transfers made during the 90-days preceding the petition date."). However, "mere speculative evidence is not enough." *Gasmark*, 158 F.3d at 315.

Initially, the Trustee sought to avoid transfers both within and without the 90-day period preceding the filing of Heritage's bankruptcy case. However, following this Court's *Daubert* ruling (finding the testimony of the Trustee's solvency expert unreliable and therefore excluding such testimony), the Trustee agreed that he can only proceed with his preference claims for transfers that occurred during the 90 days preceding the filing of Heritage's bankruptcy case. Accordingly, the Trustee has the benefit of the evidentiary presumption of insolvency provided by section 547(f) for his remaining preference claims.

In the Defendants' Motions, Walker, Kornman, and the Supplier Defendants contend that they have provided sufficient evidence in the summary judgment record to rebut the presumption of insolvency, thus shifting the burden back to the Trustee to produce evidence of Heritage's insolvency on each of the applicable transfer dates. And, of course, these defendants contend that the Trustee has failed to produce sufficient evidence in the summary judgment record to raise a genuine issue of material fact regarding Heritage's insolvency on those dates. For the reasons

explained more fully below, the Court concludes that Walker, Kornman, and the Supplier Defendants failed to rebut the statutory presumption of insolvency.

The Bankruptcy Code defines "insolvent" as "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ." 11 U.S.C. § 101(32)(A). Thus, in order to rebut the statutory presumption of insolvency, Walker, Kornman and the Supplier Defendants were required to produce non-speculative evidence in the summary judgment record that would support a finding that the value of Heritage's assets (at a fair valuation) exceeded Heritage's liabilities on the relevant transfer dates.

So, what types of evidence have been found to be sufficient to rebut the statutory presumption of insolvency? In *In re Gasmark Ltd.*, 158 F.3d at 315-17, the Fifth Circuit found three items of evidence too speculative to rebut the statutory presumption of insolvency: (1) expert testimony that a potential purchaser would have attributed value to the debtor in excess of liabilities, (2) a third party memo stating that the debtor produced a return on an investment, and (3) an investment banker's letter noting that the debtor's equity had a positive value in the merger market. Unpersuaded by such "solvency" evidence, the court affirmed a finding that the debtor was insolvent at the time of the transfer. *Id*.

Similarly, in *Cage v. Baker Hughes Oilfield Operations, Inc. (In re Ramba, Inc.)*, 416 F.3d 394 (5th Cir. 2005), the court held that an income statement showing positive operating income and an expenditures summary showing a small net loss does "not address [the debtor's] overall balance of debts and assets, and thus, [does] not raise genuine questions of fact as to [the debtor's] solvency." *Id*. at 403. Further, regarding positive balance sheets for periods of time prior to the transfer date, such evidence "does not create a genuine issue of fact as to whether a debtor was

insolvent as of the transfer date." *Id.*

Conversely, the Eighth Circuit, on appeal from a judgment in favor of the preference defendant, found a "financial statement showing positive net worth [] sufficient to rebut the presumption of insolvency." *Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.*, 83 F.3d 253, 258 (8th Cir. 1996) (citing *Chaitman v. Paisano Auto Liquids, Inc. (In re Almarc Mfg., Inc.)*, 60 B.R. 584, 586 (Bankr. N.D.Ill. 1986)); *see also Silverman Consulting, Inc. v. Hitachi Power Tools, U.S.A. Ltd. (In re Payless Cashways, Inc.)*, 290 B.R. 689, 698 n.10 (Bankr. W.D. Mo. 2003) (citing *Jones Truck Lines*, 83 F.3d 253, 258). However, unaudited financial statements do not rebut the presumption because unaudited statements "do not reflect the 'fair valuation' of assets and do not include contingent liabilities." *Katz v. Wells (In re Wallace's Bookstores, Inc.*), 316 B.R. 254, 259 (Bankr. E.D.Ky. 2004) (citing cases) (holding that the financial statements offered by the preference defendant "are insufficient *per se* to rebut the presumption of insolvency").

Here, Walker, Kornman, and the Supplier Defendants rely upon several pieces of evidence in the summary judgment record to support their contention that they have successfully rebutted the presumption of insolvency including: (1) the Declaration of Vickie Walker (the "Walker Declaration"), Ex. 1, Walker Motion (the "Walker Declaration"); (2) the testimony of their solvency rebuttal witness, Gary Durham ("Durham"), APPX3 - 000001-000006; and (3) Heritage's schedules as filed in the underlying bankruptcy case, where Heritage scheduled $9,571,996.42 in liabilities and $51,087,966.97 in assets, *see* Case No. 04-35574, Docket No. 21.[9] The Court will analyze each piece of summary judgment evidence in turn, starting with Heritage's schedules.

---

[9]Walker, Kornman, and the Supplier Defendants also point to the testimony of Todd Burchett ("Burchett"), the Trustee's solvency expert, whose testimony was excluded as unreliable after a hearing on the defendants' *Daubert* motion. Having excluded Burchett's testimony, the Court cannot consider any portion of it here.

**Memorandum Opinion and Order** **Page 20**

While a court may look to a debtor's schedules as rebuttal evidence, *see, e.g., Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d 1319, 1322 (9th Cir. 1989), without other evidence explaining the source of the values assigned to the debtor's assets in the schedules – *i.e.*, book value versus fair market value,  the scheduled value is not necessarily consistent with the Bankruptcy Code's "fair valuation" requirement.   Moreover, the value assigned to the debtor's debts is equally important to the solvency analysis. As stated in *Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.)*:

> Unlike assets, debts are measured at their face value and not at market value.  Debts are measured at face value because the language 'at fair valuation' in section 101(32)(A) applies only to the valuation of assets; it does not apply to the valuation of debts . . . Contingent liabilities must be included in total debt.

281 B.R. 535, 545-46 (Bankr. D. Del. 2002) (internal quotations omitted); *see also Hoffinger Indus., Inc. v. Leesa Bunch and McMasker Enters., Inc. (In re Hoffinger Indus., Inc.)*, 313 B.R. 812, 819-20 n.4 (fair market value of assets compared to face value of liabilities); *Silverman Consulting, Inv. v. Hitachi Power Tools, U.S.A., Ltd. et al. (In re Payless Cashways, Inc.)*, 290 B.R. 689, 700 n. 29 (Bankr. W.D. Mo. 2003) (same).   Here, Heritage valued most of its contingent liabilities at zero on Schedule F.[10]   Without further evidence in the summary judgment record explaining: (i) that Heritage's assets were "fairly valued" at in excess of $51 million in its schedules, and (ii) that Heritage properly valued its contingent liabilities at zero in its schedules, Walker, Kornman, and the Supplier Defendants have failed to rebut the statutory presumption of insolvency.

Moreover, Durham's testimony is also problematic in this context.  As Walker, Kornman,

---

[10]Heritage's Schedule F, the schedule of unsecured nonpriority claims, is 183 pages long.  Almost every claim is marked as contingent and the vast majority of the claims are listed at $0.  The $9,571.996.42 in scheduled debt is comprised primarily of the $6,161,270.08 Canada claim, the $1,766,947.21 "unliquidated" Valiant claim, the $346,293.53 "unliquidated" Strategic claim, and the $850,000 Steadfast claim.

**Memorandum Opinion and Order**                                                                    **Page 21**

and the Supplier Defendants concede, Durham, who was hired as a rebuttal witness to the Trustee's

solvency expert, did not perform a formal solvency analysis; rather, he relied on unaudited financial

statements to support his informal conclusions.   Moreover, Durham testified in his deposition as

follows:

> Q.  Well, for purposes of your – for purposes of your solvency testimony, for periods
> outside the bankruptcy fraudulent conveyance period, what definition of debt did you
> use?
>
> A.  My definition of debts is what would be considered in doing a fair market value
> of a company's equity at a particular point in time.
>
> Q.  Okay.
>
> A.  Which would be the debts that would be considered by a potential buyer of the
> business.
>
> Q.   And what is your authority for that definition for fraudulent conveyance of
> solvency analysis?
>
> A.  Well, it's the definition that Mr. Burchett used.
>
> Q. I understand that.  And you're saying that you're relying on Mr. Burchett as your
> authority for that definition?
>
> A.  No.   But to the extent this [sic] he equates fair market – to the extent that his
> analysis is a fair market value – is based on a fair market value premise, I'm assessing
> his calculations under the definition of what fair market value is.
>
> Q.  Okay.  But you had testified earlier that you might have indications of solvency,
> the debtor may have been solvent.  What definition of solvency were you using for
> reaching your conclusion that the debtor may have been solvent?
>
> A.  I'm reaching that based on what the fair market value of the assets would be
> compared to their liabilities.  And liabilities that a willing buyer would consider in
> evaluating whether or not to purchase the equity of The Heritage Organization.

APPX3 - 000001, 22:13 - 23:21.

This testimony, without more, is insufficient to rebut the statutory presumption of insolvency

for at least two reasons. First, the deposition testimony is unclear – *i.e.*, it is difficult to understand exactly what he is testifying to and the basis for his testimony. Second, his admitted reliance on unaudited financial statements is legally problematic, as unaudited financial statements are insufficient to rebut the statutory presumption. *See, e.g., In re Wallace's Bookstores, Inc.*, 316 B.R. 254, 259 (Bankr. E.D.Ky. 2004) (citing cases); *Hoffinger*, 313 B.R. at 812. As stated in *Devan v. The CIT Group ( In re Merry-Go-Round Enters., Inc.)*:

> The balance sheets do not satisfy [the plaintiff]'s burden for two reasons . . . First, the balance sheets do nor [sic] purport to value the Debtor's assets according to the fair valuation standard required by 11 U.S.C. [§] 101(32)(A). Second, the balance sheets do not value all of the Debtor's debts to the extent that some of the Debtor's contingent liabilities are not assigned a dollar value. Without evidence of the fair valuation of the Debtor's assets and of the sum of the Debtor's debts as defined by 11 U.S.C. § 101(12), the court cannot find either that there is no genuine issue of material fact or that [the defendant] is entitled to a judgment as a matter of law.

229 B.R. 337, 342 (Bankr. D. Md. 1999).

Finally, Walker, Kornman, and the Supplier Defendants point to the Walker Declaration to rebut the presumption of insolvency. Walker, Heritage's former chief financial officer, testified in the Walker Declaration that "Heritage was meeting all of its financial obligations all the way up until the time it declared bankruptcy." Walker Declaration, ¶ 5. However, the fact that Heritage was meeting all of its financial obligations up until the time it declared bankruptcy does not address the required solvency issue under 11 U.S.C. § 101(32)(A) – *i.e.*, did Heritage's assets at a fair valuation exceed its liabilities? Moreover, the Trustee pointed to other evidence in the summary judgment record that casts doubt upon the accuracy of Walker's testimony as set forth in the Walker Declaration. Specifically, in a letter to Daniel Koshland dated May 13, 2004 (shortly before Heritage's bankruptcy filing), Walker states:

Inasmuch as Heritage is not in a financial position to make the awarded [arbitration]

payment [to Canada] much less the potential additional award to Bird in his case, it has been determined that the proper course of action is to begin the process of dramatically reducing the operations of The Heritage Organization, L.L.C. We have reduced staff to a bare minimum and do not see any way to continue the operations of Heritage at its former level. . . .While Heritage is filing legal action to vacate the arbitration award, the chances of that being successful are remote.

Ex D., APPX1 – 000053-55.

After carefully considering the summary judgment evidence and the applicable legal standards, the Court concludes that Walker, Kornman, and the Supplier Defendants have failed to rebut the statutory presumption of insolvency. Accordingly, these defendants are not entitled to summary judgment on the Trustee's preference claims under section 547(b).

Turning next to their alleged defenses to avoidance of the challenged transfers under section 547(c), the Court must first decide if these defendants have carried their burden to produce evidence to support a *prima facie* case on their defenses, as they have the "burden of proving the nonavoidability of a transfer" under section 547(c). *See* 11 U.S.C. § 547(g). As the court in *Official Committee of Unsecured Creditors v. Columbia Forest Prods., Inc. (In re Hardwood P-G, Inc.)*, No. 06-5278, 2007 WL 1728653 (Bankr. W.D. Tex. June 12, 2007) noted, "[w]hen defendant moves for summary judgment on an affirmative defense, the positions are reversed; defendant bears the burden of producing evidence to make its prima face case, whereupon plaintiff bears the burden of producing or identifying evidence in the record placing in doubt the facts underlying the affirmative defense." *Id*. at *1.

To prevail on their section 547(c)(1) contemporaneous exchange for new value defense, Walker, Kornman, and the Supplier Defendants must prove that the challenged transfer was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially

contemporaneous exchange." 11 U.S.C. § 547(c)(1); *see also* 11 U.S.C. § 547(g) . In other words, to prevail on this defense, these defendants must prove, with respect to each challenged transfer, that: (1) both Heritage and the transferee defendant intended the transfer to be a contemporaneous exchange, (2) the exchange was in fact contemporaneous, and (3) the exchange was for new value given to Heritage. *Stevenson v. Leisure Guide of Am., Inc. (In re Shelton Harrison Chevrolet, Inc.),* 202 F.3d 834 (6th Cir. 2000)*; In re Paradise Valley Holdings, Inc.*, 347 B.R. 304, 309 (Bankr. E.D. Tenn. 2006).

After carefully considering the summary judgment record, the Court concludes that Walker, Kornman, and the Supplier Defendants have failed to produce evidence in the summary judgment record regarding each of these three elements with respect to the challenged transfers.[11]

To prevail on their section 547(c)(2) ordinary course of business defense, Walker, Kornman, and the Supplier Defendants must prove that the challenged transfer was:

> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms.

---

[11] One of the asserted grounds for the Kornman Defendants' Motion is that all of the Trustee's claims of improper transfers "are without merit since they were made for one or more of the following reasons and any or all such reasons serve as a bar to the Trustee's claim of improper transfer, and the Trustee has not produced and/or cannot produce evidence to the contrary." Defs.' Br. In Supp. Of Omnibus Mot. For S.J., p. 6. The list of reasons which follows this statement includes the statutory preference defenses. Similarly, the Walker Motion asserts that the trustee's claims fail because the payments were (i) made in the ordinary course of business; (ii) intended to be a contemporaneous exchange for new value, (iii) supported by new value given subsequently by Walker, and/or (iv) were undertaken in good faith. Walker Motion, pp. 14-15. The Court notes that the burden to prove the defenses rests with the Defendants, not the Trustee. 11 U.S.C. § 547(g). Yet the Kornman Defendants do not even address these defenses in their briefing and do not point the Court to any evidence in support of these defenses. Walker briefly addresses the defenses in her briefing but does not support her claims with citations to the summary judgment record. While it is possible that there is *some* evidence, someplace in the summary judgment record, which may support the existence of one or more of the asserted defenses, Rule 56 does not impose a duty on the Court to sift through the record to try to find it; rather, the parties must direct the Court's attention to such evidence in the record. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Rhodes v. Curascript Inc.*, No. G-07-192, 2008 WL 4449905 (S.D. Tex. Sept. 30, 2008).

11 U.S.C. § 547(c).[12]  *See also Matter of Gulf City Seafoods, Inc.*, 296 F.3d 363 (5th Cir. 2002).  Once again, the creditor/transferee bears the burden of proof with respect to all three elements.  *See* 11 U.S.C. § 547(g).

After carefully considering the summary judgment record, the Court concludes that these defendants have failed to produce evidence in the summary judgment record regarding at least the third element of their ordinary course of business defense – *i.e.*, whether the payments were made according to ordinary business terms.  Without such evidence, they are not entitled to a summary judgment on this defense.[13]

To prevail on their section 547(c)(4) subsequent new value defense, Walker, Kornman, and the Supplier Defendants must prove that after the transfer, the creditor "gave new value to or for the benefit of the debtor – (A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor."  11 U.S.C. § 574(c)(4); *see also* 11 U.S.C. § 547(g).

After carefully considering the summary judgment record, the Court concludes that these defendants have failed to produce evidence in the summary judgment record with respect to these elements.  Without such evidence, they are not entitled to a summary judgment on this defense.[14]

Accordingly, summary judgment is not proper regarding the Trustee's preference claims and the Defendants' Motions must be denied as to those claims.  The Trustee's preference claims will

---

[12]This case is governed by the pre-Bankruptcy Abuse Prevention and Consumer Protection Act version of the Bankruptcy Code because the Heritage bankruptcy case was filed on May 17, 2004, prior to the effective date of the reform act.  *See Chase Manhattan Mtg. Corp. v. Shapiro (In re Lee)*, 530 F.3d 458, 463 n.1 (6th Cir. 2008)(stating, regarding section 547, "[b]ecause the Debtor filed his bankruptcy case prior to the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), the pre-amendment law applies.").

[13] *See* n. 11, *supra*.

[14] *See* n. 11, *supra*.

proceed to trial.

### 3. Breach of Fiduciary Duty/Gross Negligence Claims

Walker and Kornman seek summary judgment on the Trustee's breach of fiduciary duty/gross negligence claims. As with the other claims upon which certain of the Remaining Defendants seek summary judgment, Walker and Kornman assert that the Trustee has failed to adduce summary judgment evidence to support one or more elements of the Trustee's *prima facie* case. Specifically, Walker and Kornman assert that the Trustee has failed to establish the existence of a predicate duty, a breach of that duty, and any resulting harm to Heritage.

The Trustee alleges that Walker and Kornman, as officers of Heritage, owed fiduciary duties to Heritage, which they then breached through their acts and conduct, thus rendering themselves liable to the Heritage bankruptcy estate. In addition, the Trustee asserts that Walker and Kornman acted in a grossly negligent fashion, thus rendering themselves liable to the Heritage bankruptcy estate. As noted previously, in response, Walker and Kornman argue that the Trustee's fiduciary duty/gross negligence claims fail because neither of them owed any duty to Heritage.[15] Specifically, Walker and Kornman contend that under the terms of the Heritage Operating Agreement, they owed no fiduciary duty to Heritage; and, absent a duty, no breach of duty and resulting harm could have occurred.

The parties agree that Heritage is a Delaware limited liability company and that the Heritage

---

[15]Although the Trustee attempts to state a separate gross negligence claim against Walker and Kornman, under Delaware law, a claim against an officer or director for gross negligence is synonymous with a claim that the officer or director breached the duty of care, as the Trustee's counsel admitted at the hearing on the Motions. *See, e.g.*, *Official Comm. Of Unsecured Creditors of TEU Holdings, Inc. v. Kemeny (In re TEU Holdings, Inc.).*, 287 B.R. 26, 32 (Bankr. D. Del. 2002) (citing *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)); *Continuing Creditors' Committee of Star Telecomm, Inc. v. Edgecomb*, 385 F.Supp.2d 449, 464 (D. Del. 2004). Accordingly, the Trustee's gross negligence claim will be addressed with the other breach of fiduciary duty claims asserted by the Trustee.

Operating Agreement contains a Delaware choice of law provision. Texas follows the internal affairs doctrine – that is, "the internal affairs of the foreign corporation, including but not limited to the rights, powers, and duties of its board of directors and shareholders and matters relating to its shares are governed by the laws of the jurisdiction of incorporation." *Hollis v. Hill*, 232 F.3d 460, 464-64 (5th Cir. 2000) (internal citations omitted). Thus, Delaware law applies to the Trustee's breach of fiduciary duty claims.

A claim for breach of fiduciary duty relies upon proof that the defendant officer or director, in reaching his or her challenged decision, breached any one of the triads of their fiduciary duty – *i.e.*, good faith, loyalty or due care. *In re TEU Holdings, Inc.*, 287 B.R. 26, 32 (Bankr. D. Del. 2002); *see also Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). The Trustee alleges several actions purportedly taken by Walker and Kornman that constitute a breach of duty – *i.e.*, paying improper business expenses and compensation, diverting or transferring money and resources, diverting employees and clients to a new entity to carry on business under a new name, paying for improper "consulting services," converting assets into cash, failing to collect promissory notes, and conducting Heritage's business in a manner known to be unlawful and excessively risky. For the reasons explained more fully below, the Court concludes that it need not address whether the Trustee has raised genuine issues of material fact on the breach and/or harm elements of his *prima facie* case because the Court concludes that neither Walker nor Kornman owed Heritage a fiduciary duty. Without a duty, no breach of duty (or resulting harm) can occur as a matter of law.

Under Delaware law, a limited liability company may restrict or wholly eliminate any duties that might otherwise be owed to that company, including fiduciary duties. Specifically, section 18-

1101(e) of the Delaware limited liability company act provides:

> a limited liability company agreement may provide for the elimination of any and all liabilities for breach of contract or breach of duty (including fiduciary duties) of a member, manager or other person to a limited liability company.

DEL. CODE ANN. tit. 6, § 18-1101(e). So, the relevant question becomes, are Walker and Kornman protected from the Trustee's breach of fiduciary duty claims pursuant to the terms of the Heritage Operating Agreement? As noted previously, Heritage was a manager-managed limited liability company. Its members were GMK and Steadfast, and GMK was its manager. Walker and Kornman were among its officers. Walker served as its treasurer and chief financial officer, while Kornman served as its president or, at other times, its executive vice president.

The Heritage Operating Agreement provides a liability shield to Heritage's Manager by way of an exculpation clause.[16] Specifically, section 6.03(A) of the Heritage Operating Agreement, entitled "Duties and Obligations of the Manager," provides:

> The Manager shall not be required to exercise any particular standard of care, nor shall he owe any fiduciary duties to the Company or the other Members. Such excluded duties include, by way of example, not limitation, any duty of care, duty of loyalty, duty of reasonableness, duty to exercise proper business judgment, duty to make business opportunities available to the company, and any other duty which is typically imposed upon corporate officers and directors, general partners or trustees. The Manager shall not be held personally liable for any harm to the Company or the other Members resulting from any acts or omissions attributed to him. Such acts or omissions may include, by way of example but not limitation, any act of negligence, gross negligence, recklessness, or intentional misconduct.

APPX1 - 000001-000033.

Walker and Kornman initially argue that the Heritage Operating Agreement's broad

---

[16]The Certificate of Formation of the Heritage Organization, L.L.C. provides for a similar exculpation of liability for both Heritage's Members and Manager when it provides that "No Member or Manager of the Limited Liability Company shall be liable to the Limited Liability Company, its Members or Managers for monetary damages for any act or omission in such Member's or Manager's capacity as a Member or Manager of the Limited Liability Company." Certificate of Formation of The Heritage Organization, L.L.C., at Tenth paragraph. APPX3 - 000134-000136.

exculpation clause applies to the breach of fiduciary duty claims asserted against them because when they acted, they acted as agents of the Manager, GMK. According to Walker and Kornman, Heritage contractually chose to insulate its management – including them – from liability for the type of claims asserted by the Trustee because the Heritage Operating Agreement contemplates that the Manager may imbue officers or agents of Heritage with the Manager's same rights and duties (or, as relevant here, lack of duties). *See* Defendants' Brief in Support of Omnibus Motion for Summary Judgment, p. 51; Defendants' Reply Brief to Plaintiff's Response to Defendants' Omnibus Motion for Summary Judgment, p. 34. Conversely, the Trustee asserts that the exculpation clause contained in the Heritage Operating Agreement does not apply to Walker and Kornman because the language of the clause limits its benefit to Heritage's Manager – *i.e.*, GMK.

The Court finds Walker's and Kornman's initial argument – *i.e.*, that when they acted, they acted as agents of the Manager, GMK, and are thus protected by the exculpation clause contained in the Heritage Operating Agreement – unpersuasive at this juncture. On the summary judgment record currently before it, fact questions exist regarding the capacity in which Walker and Kornman acted. Stated most simply, on this record, it is not possible to tell whether Walker and Kornman acted as officers of Heritage or whether they acted as agents of Heritage's Manager, GMK, and thus should be protected pursuant to the terms of the exculpation clause itself. However, that conclusion does not end our analysis; rather, the Court must analyze the duties imposed on Heritage's officers pursuant to the terms of the Heritage Operating Agreement.

Section 6.01 of the Heritage Operating Agreement provides that "[t]he ordinary and usual decisions concerning the business affairs of the Company shall be made by the Manager in his sole, unlimited and absolute discretion." Heritage Operating Agreement, § 6.01. In accordance with

section 6.04(AI) of the Heritage Operating Agreement, the Manager has the power "[t]o *delegate any duties* or powers for such periods and *upon such terms as may be designated in a written instrument* and the Manager so delegating any duties or powers hereunder shall have no further responsibility with respect to the exercise of such duties or powers so long as such delegation shall remain in effect; and any such delegation shall be revocable by a similar instrument so delivered at any time provided." Heritage Operating Agreement, § 6.04(AI) (emphasis added). Moreover, section 7.01 of the Heritage Operating Agreement provides that "[t]he Manager may appoint a president, one or more vice presidents, a secretary, a treasurer and such other officers as the Manager, in the exercise of his sole, absolute and unlimited discretion, may deem desirable." Heritage Operating Agreement, § 7.01. Finally, section 7.04 of the Heritage Operating Agreement provides that "[o]fficers shall have such authority and *perform such duties* in the management of the Company *as are provided in this Agreement*." Heritage Operating Agreement, § 7.04 (emphasis added).

Kornman served as Heritage's president for a time and as an executive vice president at other times, while Walker served as Heritage's treasurer and chief financial officer. Section 7.06 of the Heritage Operating Agreement applies to the president and provides that:

> [t]he president shall be the chief operating and administrative officer of the Company, and shall have charge of the actual day to day management of the Company *subject to the same duties* and powers *granted to the Manager in Article VI*.

Heritage Operating Agreement, § 7.06 (emphasis added). Section 7.07 of the Heritage Operating Agreement further provides that "*[e]ach vice president shall have the* powers and *duties as may be prescribed* from time to time *by the president* . . . ." Heritage Operating Agreement, § 7.07 (emphasis added). Section 7.08 of the Heritage Operating Agreement provides that "*[t]he treasurer*

*shall perform such other duties as may be delegated* from time to time *by the Manager or* as may be delegated from time to time by *the president*." Heritage Operating Agreement, § 7.08 (emphasis added). Finally, section 7.09 of the Heritage Operating Agreement provides that "*[t]he secretary shall perform such other duties as may be prescribed* from time to time *by the Manager or as may be delegated* from time to time *by the president*." Heritage Operating Agreement, § 7.09 (emphasis added).

Taken together, these provisions of the Heritage Operating Agreement set up a duty delegation structure – *i.e.*, a pass-down that begins with Heritage's Manager. And, as noted previously, the Manager had no duties pursuant to the terms of the Heritage Operating Agreement; rather, the Heritage Operating Agreement expressly exculpated the Manager from duties to Heritage or Heritage's other Member, Steadfast. *See* Heritage Operating Agreement, § 6.03. Moreover, as applicable to Heritage's officers, the Heritage Operating Agreement expressly limited their duties to those "as are provided in this Agreement." Heritage Operating Agreement, § 7.04. And, while Heritage's president had the "same duties . . . granted to the Manager in Article VI, Section[] 6.03 . . . of this Agreement . . . ," Heritage Operating Agreement, § 7.06, that is a hollow provision given the express exclusion of any duties to the Manager in section 6.03. Finally, with respect to all of the other Heritage officers – *i.e.*, vice presidents, treasurer, and secretary – they only had those duties that were either prescribed or delegated by the president or the Manager.

So, the question becomes, what evidence exists in the summary judgment record regarding either the Manager's grant of duties to the president, or the president or Manager's delegation or prescription of duties to any other Heritage officer? As conceded by the Trustee's counsel at the hearing on the Motions, there is no such evidence in the summary judgment record. Thus, the Court

is left with the Heritage Operating Agreement that directs the reader to the agreement itself for the existence of duties for Heritage officers and no evidence in the summary judgment record of a delegation or prescription of duties from either the Manager or president as required by the terms of that agreement.

In response to this literal reading of the Heritage Operating Agreement, the Trustee's counsel argued at the hearing on the Motions that the officers owed common law fiduciary duties to Heritage. The Court disagrees. Under Delaware law, a limited liability company is a creature of contract. *See Bernstien v. TractManager, Inc.*, 953 A.2d 1003, 1007-08 (Del. Ch. 2007) (rules that govern the interpretation of statutes and contracts apply to the interpretation of LLC operating agreements). As recently explained by the Delaware Chancery Court:

> To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company, or to another person that is a party to or otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement . . . .

*Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1150 (Del. Ch. 2006) (citing DEL. CODE ANN. tit. 6 § 18-1101).

Here, the Heritage Operating Agreement plainly states that the "[o]fficers shall . . . perform such duties in the management of the Company as are provided in this Agreement." Operating Agreement, § 7.04. From this Court's perspective, the Heritage Operating Agreement clearly contemplates that Heritage's officers only owed those duties to Heritage that were either delegated or prescribed by Heritage's Manager or president. No such delegation or prescription is evident in the summary judgment record.

Accordingly, Walker and Kornman are entitled to summary judgment on the Trustee's

breach of fiduciary duty/gross negligence claims.    The Trustee has failed to demonstrate the existence of any fiduciary duties owed by either Walker or Kornman.  Without a duty, there can be no breach of duty or resulting harm.

### 4.    Veil Piercing Claims, Including Single Business Enterprise

In essence, the Trustee asserts that the business of Heritage and the Kornman Defendant entities operated as a single entity under the ultimate control of Kornman.  The Trustee further asserts that the business of Heritage and the Kornman Defendant entities was generally operated from a single set of offices, with a single set of management personnel, and that the entities engaged in unfair self-dealing transactions, while ignoring conflicts of interest.   The Trustee asserts that this multiple entity "sham" was used "for the purpose and effect of perpetrating a fraud or injustice on Heritage, its clients and creditors, and the public."  Proposed Second Amended Complaint, ¶ 76.[17] According to the Trustee, "[s]uch nominal Kornman Entities were part of an overall scheme to make large amounts of money through the risky 752 [tax] strategy; to strip Heritage of money though [sic] distributions, wasteful expenses, sham business arrangements with the Kornman Entities; and then to leave Heritage inadequately capitalized with insufficient assets to pay its creditors."  *Id*.  The Trustee further asserts that Kornman and Walker "operated the Kornman Entities and Heritage as alter egos of Kornman.  Defendants operated such entities as a single economic entity, and with the overall purpose and effect of injustice and unfairness."  *Id*.  at ¶ 78.  The upshot of the Trustee's allegations is that each of the Kornman Defendants should be held liable for Heritage's debts under one or more of the following theories: (i) single business enterprise, (ii) alter ego, and/or (iii) sham

---

[17]While leave to amend has not been granted, the Court relies on the characterization of these claims from the Proposed Second Amended Complaint because it reflects the Trustee's most current thinking with respect to these claims.  However, these allegations are substantially similar to those in the live complaint – *i.e.*, the First Amended Complaint.

**Memorandum Opinion and Order**                                                                                        **Page 34**

to perpetrate injustice.

The Kornman Defendants seek summary judgment on all of the Trustee's veil piercing claims, including the related but somewhat different single business enterprise theory, contending that the Trustee failed to raise a genuine issue of material fact regarding an underlying fraud or injustice that constitutes a distinct wrong or actual misuse of the various entities' structures.  The Kornman Defendants argue that: (i) proof of a "distinct wrong and misuse of the corporate structure" is a required element of the Trustee's alter ego, sham to perpetrate injustice, and/or single business enterprise claims, and (ii) the Trustee cannot "bootstrap his veil-piercing claims merely by alleging the underlying causes of action constitute the distinct wrong and misuse of the corporate structure."[18] Defendants' Brief in Support of Omnibus Motion for Summary Judgment, pp. 61-63.

The Court will begin its analysis with the requirements for each veil-piercing theory under the relevant state law.  Bankruptcy courts apply the choice-of-law rules of the forum in which they sit.  *ASARCO LLC v. Am. Min. Corp.*, 382 B.R. 49, 60-61 (S.D. Tex. 2007).  In Texas, when deciding which state's law to apply in determining the liability of an interest holder – *i.e.*, a veil piercing claim, the court looks to the law of the jurisdiction of formation.  *See Alberto v. Diversified Group Inc.*, 55 F.3d 201, 203 (5th Cir. 1995); *The Richards Group, Inc. v. Brock*, No. 06-0799, 2008 WL 2787899, at *2 (N.D. Tex. 2008); *ASARCO LLC v. Am. Min. Corp.*, 382 B.R. 49, 64-65 (S.D. Tex. 2007).  As noted previously, Heritage and most of the Kornman Defendant entities were formed in Delaware;

---

[18]In the Complaint, the Trustee's claims for sham to perpetrate injustice, alter ego, and single business enterprise are set out as separate counts.  In the proposed Second Amended Complaint, sham to perpetrate injustice and alter ego are combined in the ninth cause of action, and single business enterprise is asserted as the eighth cause of action. As the Kornman Defendants have moved for summary judgment on all of these claims, the Court will address them together.

therefore, the Court will apply Delaware law.[19]

While the Trustee argues that his claims for alter ego and sham to perpetrate injustice are recognized under "Delaware, Texas and other law applicable in this case," for the reasons explained below, that is inaccurate. *See* Brief in Support of Plaintiff's Response to Defendants' Omnibus Motion for Summary Judgment, p. 83. A review of Delaware and non-Delaware cases applying Delaware law reveals that courts applying Delaware law have not separately recognized "sham to perpetrate injustice" or "sham to perpetrate fraud" as a separate veil piercing theory. Rather, courts applying Delaware law use the term "sham" when analyzing the alter ego theory. *See, e.g., Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. Supr. 2003) ("To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors."); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, (Del. Ch. 1999) ("Piercing the corporate veil under the alter ego theory 'requires that the corporate structure cause fraud or similar injustice.' Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.") (quoting *Outokumpu Eng'g Enter., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (1996)).

Tennessee is the state of incorporation for K&A. Like Delaware, the term "sham" is used when analyzing an alter ego veil-piercing claim in Tennessee. *See, e.g., Boles v. Nat'l Development Co., Inc.*, 175 S.W.3d 226, 244-45 (Tenn. Ct. App. 2005) ("Our courts will disregard the corporation as a separate entity upon a showing that the corporation is a sham or dummy or such action is

---

[19]The Court notes that two of the Kornman Defendant entities are not Delaware entities: K&A is a Tennessee corporation and Financial Marketing is a Texas corporation. Based upon this Court's review of veil-piercing law in both Tennessee and Texas, some of which is discussed *infra*, the Court is satisfied that the outcome is unchanged under either state's law.

necessary to accomplish justice," and "[n]o one factor is conclusive in determining whether or not to disregard a corporate entity; rather, courts should rely upon a combination of factors in deciding such an issue.") (citing *VP Buildings, Inc. v. Polygon Group.*, No. M2001-00613, 2002 WL 15634, at *4-5 (Tenn. Ct. App. Jan. 8, 2002)).

And, as noted previously, Texas is the state of incorporation for Financial Marketing.  In contrast to Delaware and Tennessee law, the "sham to perpetuate injustice" or "sham to perpetrate a fraud" theory has been recognized in Texas as a distinct method by which to pierce the corporate veil.  *See* 20 TEX. PRAC. BUSINESS ORGANIZATIONS § 26.17 (2d ed.) (citing Texas cases); *see Castleberry v. Branscum*, 721 S.W.2d 270, 273 (Tex. 1986), *superceded by statute as recognized in Western Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 68 (5th Cir. 1994)).  Under Texas law, the sham theory "is an equitable doctrine, and Texas courts take a 'flexible fact-specific approach focusing on equity.'  The Texas Supreme Court has also noted that the variety of shams is infinite, and that the purpose of the doctrine should not be thwarted by adherence to any particular theory of liability." *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643-44 (5th Cir. 1991) (internal citations and quotations omitted);  *see also Mims v. Brunswick Homes, LLC (In re Moore)*, 379 B.R. 284, 294 (Bankr. N.D. Tex. 2007) (Jernigan, B.J.) (discussing post-*Castleberry* Texas case law and noting Texas's recognition of sham to perpetrate a fraud as a separate theory).

Because all of the Kornman Defendant entities, except Financial Marketing, are Delaware or Tennessee entities, requiring the application of Delaware or Tennessee law, and neither Delaware nor Tennessee appears to recognize a separate "sham to perpetrate injustice" theory of liability, the Court will address the Trustee's alter ego theory and "sham" theories together as a single veil-piercing claim

with respect to those entities.[20]  With respect to Financial Marketing, Texas law governs and each theory will be separately addressed.

In contrast to veil piercing, single business enterprise is an equitable doctrine of joint and several liability based upon the concept of partnership law.  In *Flourine On Call, Ltd. v. Flourogas Ltd.*, 380 F.3d 849, 861 (5th Cir. 2004), the Fifth Circuit explained the theory as follows: "when corporations are not operated as separate entities but rather integrate their resources to achieve a common business purpose, each constituent corporation may be held liable for debts incurred in pursuit of the business purpose." Or, as stated by this Court previously, "[single business enterprise] recognizes the corporate shields of the two companies but treats the two as partners given their common business purpose and thereby subjects each 'partner' to the liabilities of the 'partnership' formed by their relationship." *In re JNS Aviation, LLC*, 376 B.R. 500, 528 (Bankr. N.D. Tex. 2007) (Jones, B.J.).

With this background firmly in mind, and taking the easiest of the theories for imposing liability on the Kornman Defendants first – *i.e*, single business enterprise, the Court notes that neither the parties nor the Court have found a single Delaware case, or a non-Delaware case applying Delaware law,[21] where the single business enterprise theory was used to impose liability on third parties for another's debts.  Faced with the apparent reality that Delaware has never separately

---

[20]It appears that even the Trustee recognizes that these two theories are quite similar.  In fact, in the Proposed Second Amended Complaint, the Trustee asserts alter ego and sham to perpetrate injustice in a single count.

[21]Nor have the parties cited the Court to a single Tennessee case, or a non-Tennessee case applying Tennessee law, that has applied the single business enterprise theory as such.  The Court has not found such a case either.  However, in the context of analyzing an alter ego veil piercing claim, the first prong of the test under Delaware law is whether the entities in question operated as a "single economic entity."  Tennessee's factors, while distinct from both Texas and Delaware, are not different.  So, while "single business enterprise" may not have been applied as a stand-alone theory in either Delaware or Tennessee, the fact that the entities operated as one is relevant to a veil piercing claim. *See infra* at pp. 39-41.

recognized this legal theory for imposing liability on another, at the hearings on the Motions, the Trustee urged the Court to apply Texas law, where the theory has been recognized as a basis for imposing liability on third parties.

However, after the hearings on the Motions, the Texas Supreme Court announced its decision in *SSP Partners v. Gladstrong Investments (USA) Corp.*, No. 05-0721, 2008 WL 4891733 (Tex. Nov. 14, 2008), where it both explained, and then rejected, the theory. Specifically, the Texas Supreme Court noted that "[t]he 'single business enterprise' liability theory . . . does not entail the level of agreement required for joint enterprise liability or the abuse required before the law disregards the corporate structure to impose liability. The theory . . . applies whenever two corporations coordinate operations and combine resources in pursuit of the same business purpose." *Id.* at *4. However, in rejecting the theory the court further stated:

> Creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace. We have never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances. There must also be evidence of abuse, or as we said in *Castleberry*, injustice and inequity. By 'injustice' and 'inequity' we do not mean a subjective perception of unfairness by an individual judge or juror; rather, these words are used in *Castleberry* as shorthand references for the kinds of abuse, specifically identified, that the corporate structure should not shield-fraud, evasion of existing obligations, circumvention of statues, monopolization, criminal conduct, and the like. Such abuse is necessary before disregarding the existence of a corporation as a separate entity. Any other rule would seriously compromise what we have called a 'bedrock principle of corporate law'-that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations.

*Id.* at * 7.

While this Court does not believe that Texas law applies here (except with respect to Financial Marketing), even assuming it did as the Trustee contends, the Trustee's single business enterprise theory of liability fails, as that theory of liability is no longer valid in Texas. Accordingly,

**Memorandum Opinion and Order**                                                **Page 39**

the Kornman Defendants are entitled to summary judgment on the Trustee's claim based upon the single business enterprise theory.

Turning to the Trustee's other theory for imposing Heritage's liabilities on the Kornman Defendants – *i.e.*, alter ego, for the reasons explained more fully below, the Court concludes that this claim survives the Kornman Defendants' Motion.[22] As noted previously, under the alter ego veil piercing theory, the Court disregards the limited liability company or corporate entity to impose liability on a third party. However, "persuading a Delaware Court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears." *Mason v. Network of Wilmington, Inc.*, No. 194340NC, 2005 WL 1653954, at *3 (Del. Ch. 2005) (citing *David v. Mast*, 1999 WL 135244, at * 2 (Del. Ch. March 2, 1999) (internal quotations omitted)). And, while Heritage is a Delaware limited liability company, not a corporation, "[g]iven the similar liability shields that are provided by corporations and LLCs to their respective owners, [e]merging case law illustrates that situations that result in a piercing of the limited liability veil are similar to those that warrant piercing the corporate veil." *NetJets Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (internal quotations omitted) (citing J. Leet, J. Clarke, P. Nollkamper & P. Whynott, *The Limited Liability Company,* § 11.130, at 11-7, 11-9 (rev. ed. 2007) ("Every state that has enacted LLC piercing legislation has chosen to follow corporate law standards and not develop a separate LLC standard.")).

While it may be a "difficult task" to convince a court applying Delaware law to actually pierce the veil at trial, in the summary judgment context, the Trustee must simply produce sufficient evidence in the summary judgment record to raise a genuine issue of material fact with respect to

---

[22]Or, as applied to Financial Marketing , both of the Trustee's theories – *i.e.*, alter ego and sham to perpetrate injustice, survive the Kornman Defendants' Motion.

each of the elements of his veil piercing claim. Delaware law provides clear requirements for veil piercing, and the case law reveals that to pierce the corporate veil based upon an alter ego theory, a plaintiff must demonstrate a misuse of the corporate form along with an overall element of injustice or unfairness. *NetJets Aviation*, 537 F.3d at 176 (citing *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)). However, the plaintiff need not prove actual fraud – "the standard may be restated as whether the two entities operated as a single economic entity such that it would be inequitable for the Court to uphold a legal distinction between them." *Id.* at 177 (internal quotations omitted) (citing *Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, No. 8578, 1990 WL 44267, at *5 (Del. Ch. Apr. 12, 1990)). In short, the test applied under Delaware law is two pronged: (i) whether the entities in question operated as a single economic entity, and (ii) whether there was an overall element of injustice or unfairness. *See id.*; *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, 2004 WL 415251, at *7 (Del. Ch. 2004) (citing *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp 260, 265 (D. Del. 1989)); *Cf. Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205-06 (5th Cir. 1995)).[23]

In finding summary judgment improper because of the existence of fact questions, this two pronged test has been recently described by the Second Circuit as follows:

> Stated generally, the inquiry initially focuses on whether those in control of a corporation did not treat the corporation as a distinct entity; and, if they did not, the court then seeks to evaluate the specific facts with a standard of fraud or misuse or some other general term of reproach in mind, such as whether the corporation was used to engage in conduct that was inequitable, or prohibited, or an unfair trade

---

[23]In *Alberto v. Diversified Group, Inc.*, the Fifth Circuit stated that "Delaware law makes clear that to pierce the corporate veil on an alter ego theory, a plaintiff must demonstrate a 'misuse' of the corporate form **or** 'an overall element of injustice or unfairness.'" 55 F.3d 201, 205-06 (emphasis added) (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 989 (Del. Ch. 1987) and *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1131, 1989 WL 110537, at *5 (Del. Ch. Sept. 19, 1989)). While the Fifth Circuit stated the test as disjunctive, both Delaware cases relied upon by the Fifth Circuit applied the test in the conjunctive. Based upon this Court's review of current Delaware law, and those cases applying it, the test is conjunctive. *See, e.g., NetJets Aviation,* 537 F.3d at 175-178.

practice, or illegal.

*NetJets Aviation*, 537 F.3d at 178 (internal citations and quotations omitted) (citing and quoting *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 269 (D. Del. 1989); *David v. Mast*, No. 1369-K, 1999 WL 135244, at *2 (Del. Ch. Mar. 2, 1999); and *Martin v. D.B. Martin Co.*, 88 A. 612, 615 (1913)).

To determine if a plaintiff has raised a genuine issue of material fact on the first prong of the veil piercing test, courts look to a number of factors, including: (1) whether the entity was adequately capitalized for the corporate undertaking; (2) whether the entity was solvent; (3) whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (4) whether the dominant interest holder siphoned corporate funds; and (5) whether, in general, the corporation simply functioned as a facade for the dominant interest holder. *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205 (5th Cir. 1995) (citing *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1131, 1989 WL 110537, at *5 (Del. Ch. Sept. 19, 1989)); *see also NetJets Aviation*, 537 F.3d at 177-78. No single factor can justify a decision to disregard the corporate entity, *see Harco*, 1989 Wl 110537, at *5, and Delaware law requires a "strong case to induce a court of equity to consider two corporations as one." *Alberto v. Diversified Group, Inc.*, 55 F.3d at 205 (citing *Martin v. D.B. Martin Co.*, 102 A. 373 (1913) and *Harco*, 1989 WL 110537, at *4). In applying an alter ego veil piercing analysis when one of the entities in question is a LLC, "somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required." *NetJets Aviation*, 537 F.3d at 178 (citing Delaware Limited Liability Company Act, DEL. CODE. ANN. tit. 6, § 18-101, *et seq*.). But, "if two entities with common ownership 'failed to follow legal formalities *when contracting with each other* it would be

tantamount to declaring that they are indeed one in the same.'" *Id.* (quoting *Trustees of Village of Arden v. Unity Constr. Co.*, No. C.A. 15025, 2000 WL 130627, at *3 (Del. Ch. Jan. 26, 2000)).

And, with respect to the second prong of the alter ego veil piercing test, the "'underlying cause of action, at least by itself, does not supply the necessary fraud and injustice'." *Trevino v. Merscorp, Inc.*, – F.Supp.2d –, 2008 WL 4427275, at * **7** (D. Del. Sept. 20, 2008) (quoting *In re Foxmeyer Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2008)). The party seeking to pierce the corporate veil "need not prove that the corporation was created with fraud or unfairness in mind. It is sufficient to prove that it was so used." *NetJets Aviation*, 537 F.3d at 177 (also stating that the "corporate form may be disregarded 'when used as a shield for fraudulent or other illegal acts, though it does not appear that the arrangement was originally intended to perpetrate a fraud.'" *Id.* (quoting *Sonne v. Sacks*, No. CIV.A 4416, 1979 WL 178497, at *2 (Del. Ch. June 12, 1979)). As explained by the Second Circuit in *NetJets Aviation*:

> the claimed injustice must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit: The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless. This proposition has been endorsed by the Delaware courts. But nothing prevents a court, in determining whether there is sufficient evidence of fraud or unfairness, from taking into account relevant evidence that is also pertinent to the question of whether the two entities in question functioned as one.

537 F.3d at 183 (internal citations and quotations omitted).

Here, the Trustee argues that he has produced the necessary evidence to defeat the Kornman Defendants' Motion on the veil-piercing claims. As to the first prong of the test, the Trustee contends that the summary judgment record is rife with evidence raising a genuine issue of material fact that the Kornman Defendant entities and Heritage were operated as alter egos of Kornman. The Court agrees; genuine issues of material fact have been raised. The Supplier Defendants had no

offices; few, if any, employees; few, if any, non-Heritage customers; and mostly common sets of officers and directors. *See* Trustee's Motion for Partial Summary Judgment Against the Kornman Supplier Defendants for Single Business Enterprise, Exhibits 1-16. Additionally, Kornman himself testified that these entities existed to serve his estate planning goals:

> Q. Okay. We've just been discussing a number of business transactions between entities that you control, right?
>
> A. Yes.
>
> Q. Okay. I want to understand, if I can, how the business terms of those arrangements were arrived at, whether they were negotiated, whether you just decided them on your own or how. I can go through them individually, but if you can give me a general answer, that might save some time.
>
> A. I'll give you a general answer.
>
> Q. Okay. Please do so.
>
> A. All these entities were set up with the goal of minimizing payments to outside parties and keeping profits in my estate plan.
>
> \*\*\*
>
> It was designed because at this point in time Howard Jenkins had sued Heritage under RICO, and we were talking about setting up a new company to avoid the taint of the RICO litigation.
>
> \*\*\*

Ex. 34, pg. 572: 19--573: 15. Kornman's testimony also shows that the business arrangements between Heritage and certain of these defendants were generally terminable at will and oral; for example:

> Q. (By Mr. Bryant) I'm asking whether it existed in writing as of August 2003.
>
> A. Okay. Whether what existed in writing? I'm just trying to –
>
> Q. A sublease between Heritage and the Heritage Organization Agency, Inc. for

office space that Heritage used.

    A.  Yes, it was an oral sublease terminable at will basically.

    Q.  Okay.  Was that ever made into a written document.

    A.  No.

Ex. 37, pg. 557:8-19.  Kornman also testified that "I controlled – I haven't made a secret of this, I

basically controlled all of these companies."  Ex. 41, pg. 575:24 - 576:1; *see also* Ex. 40, Ex. 41, Ex.

42. .  As further clarified by Michael Kornman's deposition testimony,[24] the negotiations between

entities was less than informal:

> Q: When you say that you were negotiating the lease on behalf of The Heritage Organization Agency, Inc., who were you negotiating with?
>
> A: Trammell Crow or – I think it was Trammell Crow.
>
> Q:  Okay.  Did you also negotiate with the Heritage Organization, L.L.C.?
>
> A: No.  That would have been kind of weird because stand over here and talk to myself and stand over there and talk to myself.  I just agreed that – Gary and I agreed that this would be okay, Gary as Heritage and me as the Heritage Organization Agency, Inc.
>
> Q: And was that the verbal agreements that's referred to on this page?
>
> A: I don't know if that specifically was but it could have been.  It was a general understanding.

Ex. 22, pg.190:9-24.  Kornman also characterized an office space lease between Heritage and

Heritage Agency as "an oral sublease terminable at will."  Ex. 37, pg. 557: 15-16.

    Based upon this and other evidence in the summary judgment record, the Court finds that

the Trustee has raised a genuine issue of material fact on the first prong of the alter ego veil-piercing

---

[24]Michael Kornman is Kornman's son and was originally named as a defendant.  The Trustee has settled his claims against Michael Kornman.

test. Because the first prong requires the Court to look at numerous factors, and the legal test "cannot be reduced to a single formula that is neither over-nor-under-inclusive," *Irwin v. Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 989 (Del. Ch. 1987), the deposition testimony of the Kornmans, coupled with evidence in the summary judgment record offered in support of the Trustee's Motion, raises a genuine issue of material fact on whether the Kornman Defendant entities and Heritage operated as a facade for Kornman's interests. Additionally, the above-quoted deposition testimony establishes that at least certain agreements between Heritage and some of the Kornman Defendant entities were made without legal formalities. According to the Second Circuit in *NetJets Aviation*, when entities with common ownership contract in that way, it is "tantamount" to "declaring that they are indeed one in the same. *NetJets Aviation*, 537 F.3d at 178. The Court thus finds the summary judgment record sufficient to raise a genuine issue of material fact on the first prong of the veil piercing test.

As to the second prong of the alter ego veil piercing test, the Trustee argues that there is evidence in the summary judgment record that raises a genuine issue of material fact on whether the Kornman Defendants were used to effectuate a fraud or for an unfair or inequitable purpose with respect to Heritage and its creditors. The Court agrees. First, this Court may, in determining whether there is sufficient evidence of fraud or unfairness to defeat a summary judgment motion, take into account the evidence supporting the first prong of the veil-piercing test. *See NetJets Aviation*, 537 F.3d at 183.

Second, the summary judgment record contains additional evidence raising a genuine issue of material fact regarding fraud or unfairness. Specifically, the summary judgment record contains evidence that between 2000 and 2004, the relevant veil-piercing period, Heritage's principal business

was providing high risk estate and tax planning strategies to high net-worth individuals for a fee. The summary judgment record also contains evidence that as early as February, 2001, the IRS notified Heritage that it was concerned about the legality of certain of the tax strategies being sold to Heritage clients. *See* Ex. G, E, DD, VV; *see also* Memorandum Opinion Confirming Second Amended Plan (the "Memorandum Opinion"), Case No. 04-35574, Docket No. 1266, p. 2.[25] These IRS letters place additional evidence in the summary judgment record that the IRS had asked Heritage to identify the clients to whom it had sold the allegedly abusive strategies. *See id.* Despite their knowledge of the IRS's inquiry, neither Kornman nor Heritage (nor any other Heritage officer) ever told prospective clients that the IRS had identified Heritage as a provider of allegedly abusive tax shelters or that the IRS had requested the names of Heritage's clients who had implemented those strategies. *See* Memorandum Opinion, pp. 15-16 and p. 15, n.27. Moreover, there is evidence in the summary judgment record that after February 21, 2001 (the date of the IRS notice), Heritage made almost $22 million in distributions to its members, GMK and Steadfast, *see* Ex. CC, XX, as well as to Koshland and Tikchik. Ex. MM. Moreover, there is evidence in the summary judgment record that following the filing of multi-million dollar claims against Heritage between 2002 and 2004, Heritage continued to make distributions to GMK, Steadfast, Tikchik and Koshland. *Id.* Because the Trustee need not prove that the Kornman Defendant entities and Heritage were created for the express purpose of perpetrating a fraud, or that the corporate structures were used to perpetrate an actual fraud, the Court finds that the summary judgment record contains sufficient evidence to raise a genuine issue of material fact on the second prong of the alter ego veil piercing test. Taken together, the summary

---

[25]This Court may *sua sponte* take judicial notice of information in the docket, including orders and opinions issued by the Court. *Missionary Baptist*, 712 F.2d 206, 211 (5th Cir. 1983) ("A court may take judicial notice of the record in prior related proceedings, and draw reasonable inferences therefrom."); *In re Antonious*, 373 B.R. 400, 403 (Bankr. E.D. Pa. 2007) (citing cases); *see also In re Indian Palms Associates, Ltd.*, 61 F.3d 197, 204-07 (3d Cir. 1995); *In re Stathatos*, 163 B.R. 83, 86 n.3 (N.D. Tex. 1993).

**Memorandum Opinion and Order** **Page 47**

judgment evidence suggests that at a time when Heritage knew that the IRS believed its 752 tax savings strategy was invalid and demanded a list of Heritage's clients who had used such a strategy, Heritage (i) continued to sell the challenged strategies without disclosure of those facts to its clients, thereby subjecting itself to potential claims from those clients, and (ii) earned fees from those clients which were then distributed out of Heritage to GMK, Steadfast, Tikchik and Koshland. In other words, when the summary judgment evidence is viewed in the light most favorable to the Trustee, there is sufficient evidence to raise a genuine issue of material fact that Kornman used these defendants' structures to, at a minimum, unfairly prejudice Heritage's clients and other creditors.

Accordingly, the Court will deny the Kornman Defendants' Motion on the alter ego veil piercing claims.

### B. Trustee's Motion

#### 1. Single Business Enterprise Claim

The Trustee seeks a partial summary judgment with respect to his claim that the Supplier Defendants were all operated as a single business enterprise, such that each of their assets is responsible for Heritage's debts. As noted above, the Trustee relies on Texas law to support this claim. And, as noted above, the Texas Supreme Court recently rejected single business enterprise as a theory to impose one corporation's liability on an affiliated corporation. *See SSP Partners and Metro Novelties, Inc. v. Gladstrong Invs. (USA) Corp.*, No. 05-0721, 2008 WL 4891733 (Tex. Nov. 18, 2004). Because this theory of liability is no longer available under Texas law, the Trustee's motion for summary judgment must be denied.

### IV. Conclusion

The Trustee's Motion is denied. The Defendants' Motions are granted in part and denied in

part. Specifically, the Defendants' Motions are granted with respect to the Trustee's breach of fiduciary duty/gross negligence claims and the Kornman Defendants' Motion is further granted with respect to the Trustee's single business enterprise and sham to perpetuate injustice claims against all of the Kornman Defendants except Financial Marketing. The Defendants' Motions are denied with respect to the Trustee's intentional fraudulent transfer and preference claims and the Kornman Defendants' Motion is further denied with respect to the Trustee's alter ego, and, with respect to Financial Marketing, sham to perpetuate injustice claims. Those claims will proceed to trial.

**SO ORDERED**.