Bryan J. Wick
State Bar No. 24003169
Brant C. Martin
State Bar No. 24002529
Wick Phillips, LLP
2100 Ross Avenue, Suite 950
Dallas, TX 75201
(214) 692-6200
(214) 692-6255 fax
bryan.wick@wickphillips.com
brant.martin@wickphillips.com

J. Robert Forshey
State Bar No. 07264200
Matthew G. Maben
State Bar No. 24037008
Forshey & Prostok, L.L.P
777 Main Street, Suite 1290
Fort Worth, TX 76102
(817) 877-8855
(817) 877-4151 fax
bforshey@forsheyprostok.com
mmaben@forsheyprostok.com

Counsel for Defendants Gary M. Kornman, Kornman &
Associates, Inc., Steadfast Investments, L.P. GMK
Family Holdings, L.L.C., Tikchik Investment
Partnership, L.P., GMK Corp., Ettman Family Trust I,
Strategic Leasing, L.P., Leascorp., Inc., Valiant Leasing,
L.L.C., Executive Aircraft Management L.L.C.,
Executive Air Crews, LLC, Vehicle Leasing, LLC, The
Heritage Organization Agency, Inc., Heritage Properties
LLC, Financial Marketing Services, Inc., The Oak
Group, L.P., Heritage Advisory Group, L.L.C.

Special Bankruptcy Counsel to Gary M. Kornman,
Kornman & Associates, Inc., Steadfast Investments, L.P.
GMK Family Holdings, L.L.C., Tikchik Investment
Partnership, L.P., GMK Corp., Ettman Family Trust I,
Strategic Leasing, L.P., Leascorp., Inc., Valiant Leasing,
L.L.C., Executive Aircraft Management L.L.C.,
Executive Air Crews, LLC, Vehicle Leasing, LLC, The
Heritage Organization Agency, Inc., Heritage Properties
LLC, Financial Marketing Services, Inc., The Oak
Group, L.P., Heritage Advisory Group, L.L.C.

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| THE HERITAGE ORGANIZATION, L.L.C., | § | CASE NO. 04-35574-BJH-11 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

| | | |
|---|---|---|
| DENNIS FAULKNER, Trustee | § | |
| | § | |
| v. | § | ADVERSARY NO. 06-03377 |
| | § | |
| GARY M. KORNMAN, et. al. | § | |

### DEFENDANTS' TRIAL BRIEF

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Defendants Gary M. Kornman, Kornman & Assoc., Inc., Steadfast

Investments, L.P., GMK Family Holdings, L.L.C., Tikchik Investments Partnership, L.P., GMK

Corp., Ettman Family Trust I, Strategic Leasing, L.P., Leasecorp, Inc., Valiant Leasing, L.L.C.,

Executive Aircraft Management, L.L.C., Executive Air Crews, LLC, Vehicle Leasing, LLC, The Heritage Organization Agency, Inc., Heritage Properties LLC, Financial Marketing Services, Inc., the Oak Group, LP, and Heritage Advisory Group, L.L.C. (collectively, "Defendants"), and hereby respectfully submit Defendants' Trial Brief in support of the evidence and arguments relied upon in the defense of the Trustee's claims.

# TABLE OF CONTENTS

I.  FRAUDULENT TRANSFER CLAIMS – SECTION 24.005(a) ........................................5

    A.  Intent to Hinder, Delay and Defraud ........................................................5

    B.  As a matter of law, a distribution is not fraudulent if made for a legitimate business purpose ........................................................12

    C.  Heritage Received Value for the Distributions to Members ................................15

    D.  Badges of Fraud ........................................................16

        1.  Transfers made to insiders ........................................................17

        2.  Transfers not made after threat of a suit ........................................18

        3.  Debtor received reasonably equivalent value ........................................19

        4.  The Debtor did not retain control of the transferred property ....................20

        5.  The Debtor had not absconded or concealed and removed the transferred assets ........................................................20

        6.  The Debtor was not engaged in unfair and fraudulent conduct ................21

    E.  Who Did Heritage Intend to Defraud? ........................................................22

    F.  The Trustee's claims regarding the April 2001 Distributions are barred by the Delaware Statute of Limitation ........................................................23

II. PREFERENCE CLAIMS ........................................................24

    A.  Overview of Preference Claims ........................................................24

    B.  The Insolvency Element of Section 547(b) ........................................26

    C.  The Timing of the Solvency Evidence ........................................................29

    D.  Definition of "Insolvency" ........................................................29

        1.  The Testimony of an Owner/Officer Rebuts the Presumption of Insolvency ........................................................30

        2.  Documentary Evidence Which Rebuts the Presumption of Insolvency ........................................................32

|  |  | 3. | The Standard for Determining "Insolvency" .............................................36 |
|  |  | 4. | The Requirements of the "Balance Sheet Test" .........................................36 |
|  | E. |  | Ordinary Course of Business Defense ...................................................................38 |

III.     ALTER EGO ........................................................................................................................44

A.   Delaware Law Requires a Two-Step Analysis of Alter Ego – Single
     Economic Entity and Evidence of Fraud or Similar Injustice ................................44

     1.   The Trustee Does Not Have Sufficient Evidence of a Single
          Economic Entity .........................................................................................46

     2.   There is No Underlying Fraud or Similar Misconduct ...............................47

     3.   Texas and Tennessee Law ...........................................................................49

     4.   The Trustee's "Siphoning" Theory Bars His Fraudulent
          Conveyance Claims ....................................................................................49

## I.  FRAUDULENT TRANSFER CLAIMS – SECTION 24.005(a)

In order to prevail on his claims under section 24.005(a)(1) of the TUFTA, the Trustee must prove that Heritage made the distributions to members "with actual intent to hinder, delay, or defraud any creditor" of Heritage. *See*, TEX. BUS. & COM. CODE §24.005(a)(1).

In order to prevail on his claims under section 24.005(a)(2) of the TUFTA, the Trustee must prove that Heritage made the challenged transfers without receiving reasonably equivalent value *and* either: (a) Heritage was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction *or* (b) Heritage intended to incur or believed or reasonably believed that Heritage would incur debts beyond its ability to pay as they became due. *See*, TEX. BUS. & COM. CODE §24.005(a)(2).

In all events, the issue of actual intent at the time of each distribution is a critical element upon which the Trustee carries the burden of proof.

Even if the Trustee could put forth evidence sufficient to establish the essential element of intent – which he cannot, based upon, among other things, the fact that Heritage had sufficient assets to satisfy all known and suspected creditors at the time each distribution was made – the Trustee's claims fail because each of the challenged distributions was made for a legitimate business purpose.

### A.  Intent to Hinder, Delay and Defraud

Pursuant to 11 U.S.C. 544(b), the Trustee steps into the shoes of an unsecured creditor holding an allowable claim.[1]  The Trustee has the burden of proof to establish the existence of

---

[1] *See Traina v. Whitney Nat'l Bank*, 109 F.3d 244, 246 (5th Cir. 1997) (In bringing an avoidance action under section 544(b), the trustee may avoid transfers "by stepping into the shoes of an unsecured creditor."); *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 809 (9th Cir. 1994), *citing In re Agric. Research & Tech. Group, Inc.*, 916 F.2d 528, 534 (9th Cir. 1990); *Sheffield Steel Corp. v. HMK Enter., Inc. (In re Sheffield Steel Corp.)*, 320 B.R. 423,

each triggering creditor. If a creditor is shown to exist, the Trustee can only exercise the avoiding rights that would have been available to the triggering creditor under applicable non-bankruptcy law, here the TUFTA. That is, the Trustee must be able to establish each element that the triggering creditor would be required to establish in order to avoid the transfer in question.

Here, the Trustee relies upon section 24.005(a)(1) of the TUFTA, which in relevant part reads as follows:

> A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made ... , if the debtor made the transfer ... : (1) with the actual intent to hinder, delay or defraud any creditor of the debtor; ...

This requires the Trustee to establish a triggering creditor whose claim arose before or within a reasonable time after each transfer in question, and to demonstrate that each such transfer was made with actual intent to hinder, defraud or delay some creditor of the debtor. The requisite intent to hinder, delay or defraud must be established as of the date of the transfer.[2] Proof of fraudulent intent at some later or other date is not sufficient. *See United States v. Chapman*, 756 F.2d 1237, 1241 (5th Cir. 1985)(for a conveyance to be fraudulent, it is necessary for the intent to exist at the time of the conveyance). The upshot of this is that, while the triggering creditor may be one whose claim arose a reasonable time thereafter, the intent to

---

446 n. 14 (Bankr. N.D. Okla. 2004) ("The trustee's Section 544(b) power to avoid a transfer under state fraudulent transfer law is derived from 'stepping into the shoes' of an actual creditor who has standing to avoid the transfer under the applicable state law.").

[2] *See United States v. Chapman*, 756 F.2d 1237, 1241 (5th Cir. 1985) ("In order for a conveyance to be held fraudulent as to one who became a creditor subsequent to the transaction, 'it is necessary that the intent exist at the time [of the conveyance] to shield the property from debts thereafter to be incurred.'") *quoting Cates v. Clark*, 24 S.W.2d 450, 453 (Tex.Civ.App. 1930); *United States v. Evans*, 513 F.Supp.2d 825, 836 (W.D. Tex. 2007) (same); *see also Roland v. United States*, 838 F.2d 1400, 1402 (5th Cir. 1988) ("A subsequent creditor could reach a grantor's interest in property conveyed to others if that transfer was made with intent to defraud that particular creditor.").

hinder, defraud or delay some creditor must be demonstrated as of the time of each allegedly fraudulent transfer.

Fraudulent intent may be established through circumstantial evidence.[3] However, under the circumstances of this case, Defendants believe it fair to pose two questions regarding Heritage's allegedly fraudulent intent in making the distributions to the members. First, what were the circumstances, existing at the time of the various distributions, which tend to establish fraudulent intent? Second, who were the creditors that Heritage intended to defraud? That is, the Trustee must establish that, at the time the various transfers were made, Heritage acted with intent to defraud some creditor. Under the circumstances existing at the times the distributions were made, Heritage had no basis or reason to act in fraud of any creditor.

For example, the first triggering creditor which the Trustee attempts to use is the Internal Revenue Service for a claim for unassessed taxes in the approximate amount of $50,000.00 which the Trustee alleges arose March 31, 2001. The IRS did not assert this claim, which the IRS admits was for <u>unassessed</u> taxes, and which the Trustee challenged, until several years later and after Heritage filed for bankruptcy in 2004. Consequently, Heritage's management was not even aware of the existence of the claim at the time when the distributions were made to the members, and could not have acted with actual intent to hinder, defraud and delay a creditor which management had no knowledge existed and which did not even make a claim until years later. Moreover, the amount of the IRS's claim, approximately $50,000.00, is small in the context of Heritage's business, especially in terms of the seven figure distributions to members and the remaining value retained by Heritage after making each distribution. It is impossible to believe that Heritage's management acted to hinder, delay and defraud a small creditor at a

---

[3] *Roland*, 838 F.2d at 1402-03; *Sherman v. FSC Realty LLC (In re Brentwood-Lexford Partners, LLC)*, 292 B.R. 255, 263 (Bankr. N.D. Tex. 2003).

period when Heritage was distributing millions of dollars in excess cash to its members and continued to retain substantial net worth following each distribution.

The other triggering creditor relied upon by the Trustee is Ralph Canada, whose claim arose in July, 2002. Canada's claim arose out of an alleged breach of an oral promise in relation to an employment agreement which contained an integration clause and expressly stated that no oral modification would be valid or binding upon the parties. Indeed, Canada's entire claim was based upon the rather implausible assertion that, because he had made a trip to the northeast on short notice to visit with one of Heritage's clients, something which he was arguably obligated to do anyway, Mr. Kornman had orally promised him a large bonus if the client implemented an investment strategy presented by Heritage. Canada's claims were disputed by Heritage on a factual basis and legally because they contravened the terms of the employment contract which negated oral modifications. Consequently, Heritage's management believed, not surprisingly, that the case had little merit and that, in the unlikely event that Canada prevailed, any resulting liability would be well within Heritage's ability to pay based upon its assets and cash flow. Until the arbitration award was made to Canada during early 2004, more than a year after the last distribution to the members in January 2003, Heritage's management believed, in good faith and based on the objective facts available to them, that Heritage had no liability to Canada or, in the unlikely event that it did, that this liability was for a limited amount which Heritage could reasonably pay if so required. Until the arbitration award was rendered, there is no rational basis to argue that Heritage's management, in making distributions which were contractually required by the Company Agreement, and which were necessary for tax purposes, was acting with intent to hinder, defraud or delay Canada. This is especially true in view of Heritage's cash position and assets at the time when the distributions were made, as well as the lack of any substantial

debts owed by Heritage.

Consequently, the circumstances existing at the time of the distributions to members, the last of which was in January 2003, do not support any inference that Heritage's management acted with actual intent to hinder, defraud and delay either the IRS or Canada.[4] Heritage's management was unaware of the existence of the IRS claim, which was not asserted until years later, and its small amount makes it absurd to suggest that distributions were made with intent to defraud such a small creditor. Similarly, Heritage had a strong basis to dispute Canada's claim, both factually and legally. Management had a good faith belief that the claim was without merit and, based upon Heritage's balance sheet and cash flow, had no reason to suspect that Heritage would not be able to pay any liability Heritage was ultimately determined to have to Canada. Consequently, until Canada's arbitration award early in 2004, there is no logical basis to assert that Heritage was acting with actual intent to defraud Canada. In both cases, especially given Heritage's cash position, assets and lack of other substantial debt, management had no logical reason to believe that the contractually mandated distributions to members were in fraud of the rights of Canada or the IRS.

Who then, were the creditors which Heritage intended to defraud when making the distributions to the members? As reflected in its schedules,[5] Heritage had very little trade debt which was not material to Heritage's balance sheet or operations, and there is no rational basis to suggest that the member distributions were made in fraud of this small body of trade creditors. The small IRS claim, like the trade debt, was not material to Heritage's business or balance sheet.

---

[4]     More importantly, there is no "intent to defraud" because even if Heritage had known about the IRS and Canada claim, Heritage retained sufficient assets following each distribution to satisfy both the IRS and Canada claims. Also, the Trustee does not dispute that Heritage did not know about the IRS claim until post-petition and that Heritage did not know about Canada's assertion of a claim until July 2002 (when the arbitration proceeding was filed). Accordingly, as a matter of law, the April 2001 and July 2001 distributions could not have been made with "intent to defraud" these potential creditors.

[5] Heritage's schedules reflect approximately $5,100.00 in trade debt.

As set forth above, at least up through the arbitration award to Canada, Heritage had no basis to believe it was acting in fraud of Canada's rights. Consequently, by elimination, the only possible creditors which Heritage would have intended to defraud through the member distributions are potential client claimants. As analyzed below, this contention simply will not have merit.

First, the client agreements contain multiple provisions exculpating Heritage from many client claims which might result from implementation of the investments that included a 752 tax strategy. This includes assumption of risk clauses, releases, acknowledgement of risks, and indemnity provisions.[6]  These types of provisions have been upheld by district courts in this district as precluding a claim for fraudulent inducement.[7]  Heritage's management had every reason to believe, in complete good faith, that these provisions protected Heritage from the assertion of claims by clients.

Significantly, the only tax client to assert a claim against Heritage before the bankruptcy case was filed was Howard Jenkins. The Jenkins lawsuit was commenced on May 9, 2003, several months after the last distribution. Thus, at all times germane to the distributions to the members, not a single client had asserted a claim against Heritage. Indeed, other than Jenkins, no claims or demands were made upon Heritage prior to the filing of the bankruptcy case.

The Trustee may attempt to establish fraudulent intent by Heritage by eliciting testimony regarding the facts surrounding the investment strategies involving a Section 752 strategy. However, at all times material, Heritage relied upon the release language in each client agreement and no claims had been asserted by a client at the time of the distributions. Therefore, the dominant inference is that Heritage did not intend to defraud the clients.

---

[6] These are set forth and discussed at length in Defendants' Proposed Findings of Fact and Conclusions of Law, pages 24-27, and have been discussed at length in other pleadings.

[7] *Steinberg v. Brennan*, No. 3:03-CV-0562-N, 2005 U.S. Dist. LEXIS 15638 (N.D.Tex. July 29, 2005); *Jacuzzi, Inc. v. Franklin Elec. Co.*, No. 3:07-CV-1090-D, 2008 U.S. Dist. LEXIS 4414 (N.D.Tex. January 22, 2008).

As none of the client claimants have been designated as witnesses, there will be no such testimony from a Heritage client. Therefore, the Court cannot speculate as to what testimony might have been offered by the various client claimants who made no claims against Heritage until after the distributions were made. The known circumstances at the time of the distributions, and which will be established by evidence, are that Heritage was contractually bound to make the distributions to the members, had been doing so for several years, that no demands or claims had been asserted by any tax client and that, in any event, such claims would be barred by the client agreements, and that Heritage was experiencing no financial difficulties.

The Trustee also cites *Sun Sport, Inc.*, 260 B.R. 88 114-15 (Bankr. E.D.Nev. 2000)[8] for the principle that the allegedly improper conduct of Heritage's principals during bankruptcy is evidence of fraudulent intent in connection with the distributions made to the members. Assuming this case is applicable law, there are two problems in the factual context of this case. First, the alleged litigation misconduct by Defendants, if any occurred, was in the bankruptcy case, and not in this lawsuit. The Federal Rules of Civil Procedure give the Court more than ample resources to deal with any alleged litigation misconduct by the Defendants in this lawsuit. Indeed, this Court has denied Trustee's motion for sanctions based upon alleged misconduct in this lawsuit. Second, the alleged litigation misconduct presumably occurred in late 2004 and thereafter, after the Trustee was appointed. The Trustee establishes no factual nexus, and no logical relation between, conduct during this later period (mid-2004 and thereafter) and the time when the distributions were made to the members from April, 2001 through January, 2003. This certainly provides no circumstantial evidence that acts taken years later, in a completely different

---

[8] *Sun Sport* is also factually different from the current case. There, the company was experiencing substantial financial difficulties. There was no valid business reason underlying the transactions, and the company had large debts it was unable to pay. A lawsuit was pending against the debtor for infringement and breach of contract. The transfer attacked took place only four months before the bankruptcy and the principals acted to conceal the transfer.

context, establish that Heritage was acting to defraud any creditor when it made the distributions.

## B. As a matter of law, a distribution is not fraudulent if made for a legitimate business purpose

In cases involving claims of fraudulent transfer under both state law and the Bankruptcy Code, a number of courts have recognized that when a transfer is supported by a legitimate business purpose, the element of intent is negated. In a recent opinion, the District Court for the Southern District of Texas acknowledged this, stating:

> Once a plaintiff puts forth sufficient evidence that the defendant had the requisite intent, the defendant may avoid liability by demonstrating a "legitimate supervening purpose" for the transfer. *In re Harris*, Case No. 02-05803, 2003 Bankr. LEXIS 1757, at *5 (Bankr. D. Del. Dec. 30, 2003). Some courts have held that once the plaintiff introduces a "confluence of the badges of fraud," a presumption of fraudulent intent arises, and the burden shifts to the defendant to rebut the presumption by showing a legitimate business purpose supports the transfer. *Kelly v. Armstrong*, 206 F.3d 794, 801 (8th Cir. 2000). Thus, even though Plaintiff proved that AMC had the requisite intent, AMC may still prevail on this claim if it can prove that there was a legitimate supervening purpose for the transaction.[9]

The same rule has also been applied in the context of actions brought under section 727(a)(2) of the Bankruptcy Code, under which a bankruptcy court must deny a debtor's discharge if the debtor, "with intent to hinder, delay, or defraud a creditor . . . has transferred,

---

[9] *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 391 (S.D. Tex. 2008); *see also Fed. Refinance Co., Inc. v. Klock*, 352 F.3d 16, 29 (1st Cir. 2003) (affirming trial court's rejection of actual fraud claim where trial court was free to choose between two versions of the truth and found that the "limited partnerships were created and funded for a legitimate business purpose rather than to hinder, delay, or defraud creditors"); *Kelly v. Armstrong*, 206 F.3d 794, 799 (8th Cir. 2000) (affirming judgment in favor of defendants on actual fraud claim under section 548 of the Bankruptcy Code where "[e]ven if a confluence of the badges of fraud were present, [defendants] presented a 'legitimate supervening purpose'" for the challenged transactions) (alterations added); *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1354 (8th Cir. 1995) (confluence of several badges of fraud can constitute evidence of actual intent to defraud, absent a legitimate supervening purpose for the challenged transfer); *In re Cushman Bakery*, 526 F.2d 23, 33 (1st Cir. 1975) (affirming district court decision that secured transactions were not fraudulent transfers where lender had "legitimate business purposes" for structuring the transactions as it did and where debtor was "primarily interested in promoting its own legitimate business interests" in entering into the transactions) *cert. denied*, 425 U.S. 937 (1976); *Lippe v. Bairnco Corp.*, 249 F.Supp.2d 357, 382-83 (S.D.N.Y. 2003) ("No reasonable jury could find that there was anything suspicious or questionable about the transfers here. Although the transfers were not in the ordinary course of business, there were legitimate business reasons for them.") *aff'd*, 99 Fed. Appx. 274 (2d Cir. 2004).

removed, destroyed, mutilated, or concealed . . . (A) property of the debtor, within one year before the date of the filing of the petition . . . ." 11 U.S.C. § 727(a)(2)(A). In one such case, Judge Robert L. Jones stated:

> If Womble transferred the $ 71,000 for a legitimate business purpose, the court may not deny discharge on the basis of this transfer. *See Moreno v. Ashworth (In the Matter of Moreno)*, 892 F.2d 417, 420-21 (5th Cir. 1990) . . . . Factors that the court may look to in determining whether the transfer of the $ 71,000 was for a legitimate business purpose include: (1) whether the transfer was pursuant to a standard business practice; (2) whether the transfer was an arm's length transaction; (3) whether the debtor transferred the funds fully voluntarily, or whether the situation effectively forced the transfer upon the debtor; and (4) whether the debtor received proper consideration for the transfer.[10]

In this case, a legitimate business reason existed for making each of the challenged distributions. Section 5.02 of the Company Agreement provides:

> A. From time to time (but at least once each calendar quarter) the Manager shall determine in the exercise of his sole, unlimited and absolute discretion, to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve. If such an excess exists, *the Manager shall cause the Company to distribute to the Members, in accordance with their Sharing Ratios, an amount in cash equal to that excess.* (emphasis added)

The requirement for distributions of net income to Heritage's members was necessary for Heritage, a limited liability company, to facilitate pass-through taxation treatment and to permit its members access to the funds on which they would be required to pay taxes. Thus, not only was there a legitimate business reason for making each distribution, Heritage's manager was

---

[10] *Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 854-55 (Bankr. N.D. Tex. 2003) *aff'd*, 108 Fed. Appx. 993 (5th Cir. 2004); *see also Benmark Supply Co., Inc. v. Abbott (In re Abbott)*, No. 99-60353-7, 2000 Bankr. LEXIS 2102, *10-11 (Bankr. N.D. Tex. Nov. 13, 2000) (denying claim under section 727(a)(2)(A) of Bankruptcy Code where court found that "payments to other suppliers or creditors in this case was done for a legitimate business purpose").

*required* to make the distributions to members pursuant to the Company Agreement. Furthermore, three of the factors[11] cited in *In re Womble* as relevant to determining whether a legitimate business purpose exists are present in this case: (i) the distributions to members were made according to Heritage's standard business practice, (ii) the distributions to members were not "forced" transfers that were made as a result of any adverse "situation" existing at the time of the transfers and (iii) Heritage received proper consideration for the distributions.[12]

At least one court has found that the fact that distributions were made for tax purposes similar to those present in this case negated any basis to find actual intent to hinder, delay, or defraud. In *Flanigan v. Defeo (In re De Feo Fruit Co., Inc.)*, 24 B.R. 220, 222-23 (Bankr. W.D. Mo. 1982), the court stated that:

> Evidence was additionally adduced by the defendants to the effect that the debtor corporation was a subchapter S corporation and that it was of benefit tax-wise to the corporation to ensure that all profits or excess funds were periodically paid out, and that it was for this purpose, rather than any intent to hinder, delay or defraud creditors, that these payments were made.

The Court then noted that "[i]nasmuch as evidence to this effect, combined with other evidence of absence of actual intent to hinder, delay or defraud any creditor, is sufficient to negative any such actual intent, the nature of this evidence need not be further enlarged upon in this memorandum."[13]

Based on the foregoing authorities, the Trustee cannot prevail on his claims under section 24.005(a) of the TUFTA. Even if the Trustee could present evidence of enough badges of fraud to convince the Court that Heritage acted with actual intent to hinder, delay, or defraud any

---

[11] Because the sort of distribution requirements in the Company Agreement are inherent in any business that is a pass-through entity for tax purposes, the additional factor of whether the transfers were arm's length transactions is simply inapplicable to the case at bar.

[12] The fact that Heritage received proper consideration for the distributions is discussed in detail below.

[13] *Id.* at 223, n.6.

creditor in making the distributions to members – something the Trustee cannot accomplish in the first instance – any such showing of intent is fully negated by the fact that each of the challenged distributions was supported by a legitimate business purpose. The distributions to members were (i) required by the Company Agreement, (ii) made to facilitate pass-through taxation treatment, (iii) not transfers that Heritage was forced to make due to any sort of adverse "situation" existing at the time the transfers were made, (iv) made in accordance with the standard business practice of Heritage and (v) supported by proper consideration received by Heritage. There is no basis for any conclusion other than that the distributions to members were fully supported by and served a legitimate business purpose. Therefore, the distributions are unassailable as intentional fraudulent transfers.

## C.     Heritage Received Value for the Distributions to Members

As a result of the valid business purpose behind the distributions to the members, and which were contractually required by the Company Agreement,[14] under the circumstances, and given the pass-through structure of Heritage, it received value for these distributions. Heritage is a Delaware limited liability company. Heritage's taxable income is allocated to its members pursuant to section 5.01 of the Company Agreement. For purposes of federal income taxation, Heritage acts as a pass-through entity. To the extent that Heritage's operations generate taxable income, the tax obligation is passed through to the members, who are responsible to report taxable income and to pay any resulting taxes. Heritage itself will have no income tax liabilities.

Section 5.02(a) of the Company Agreement requires the Manager to determine, in the exercise of its sole discretion, whether there is excess cash and, if there is excess cash, to distribute it to the members according to the respective ownership interests. Pursuant to section 3.25 of the Company Agreement, Heritage's members are creditors to the extent that they are

---

[14] See section 5.02(a) of the Company Agreement.

entitled to receive a distribution of excess cash. As a consequence, once they become entitled to distributions, the members are also creditors of Heritage. Under section 24.004(a) of the TUFTA, payment of an antecedent debt constitutes value. As a consequence, since the members are creditors of Heritage to the extent that they are entitled to receive a distribution of excess cash, these payments were made to creditors and Heritage received full value for the payment.

The Trustee will doubtlessly point to a statement in Defendants' Reply Brief to Plaintiff's Response to Defendants' Omnibus Motion for Summary Judgment (Docket no. 372) at pages 27 to 28 where Defendants state that distributions to shareholders never provide reasonably equivalent value. While this may be true in an ordinary subchapter C corporation, it would not be true in this instance where the Company Agreement itself expressly requires such distributions and Heritage receives the full benefit of the pass-through status, *i.e.* no liability for income taxes. Consequently, in this context, the statement in the Defendants' prior brief is simply incorrect. The Trustee cannot claim that this constitutes an admission against interest when the terms of the Company Agreement and applicable tax law are clearly to the contrary. Moreover, summary judgment briefing does not fall under the definition of "pleading." *See, Zaidi v. Ehrlich*, 732 F.2d 1218, 1219-20 (5th Cir. 1984). Therefore, a statement made in various summary judgment briefing to the Court may not be used as a judicial admission. *See, Mullins v. Testamerida, Inc.*, No. 02-CV-0106-K, 2006 W.L. 2167401, at *5 (N.D. Tex. 2006).

### D. Badges of Fraud

The application of the badges of fraud does not support a finding that the distributions to members were made with the intent to hinder, defraud or delay any creditor of Heritage. The usual fact pattern for fraudulent transfers made to insiders involves a company which is experiencing serious financial problems and which is usually insolvent as well. In this case,

Heritage was not experiencing financial problems, and there is no proof that Heritage was insolvent at or near the time any of the distributions were made to members. Defendants believe that the evidence will establish that, at the time the distributions were made to the members, Heritage had few unsecured creditors and, because it was a pass-through entity, no income tax debt to the Government. After each distribution was made, Heritage had sufficient cash and assets to pay its debts and cover its ongoing expenses. Heritage was not a financially distressed company being pressed by creditors for payment, but a highly profitable entity generating substantial profits for its owners.

Moreover, the transfers to the members were all made pursuant to a valid business purpose in accordance with the Company Agreement. Distributions of excess cash to the owners are an inherent and essential part of the structure of any pass-through entity. Otherwise, the owners would be presented with huge tax bills arising from the entity's operations and without any corollary income to satisfy these taxes.

Finally, none of the tax claimants had made any claims against Heritage. Management had every reason to believe that the client agreements insulated Heritage from any such claims.

Viewed against this backdrop, given the Trustee's lack of evidence, the alleged badges of fraud asserted by the Trustee quickly collapse:

### 1.        **Transfers made to insiders:**

The transfers were made to the members based on a valid business purpose as evidenced by the terms of the Company Agreement at a time when Heritage was experiencing no financial difficulties. The Trustee cannot tie this alleged badge of fraud to an intent to defraud any creditor at the time the various distributions were made to the members.

### 2. __Transfers not made after threat of a suit:__

The Trustee argues that a threat of a suit existed from Heritage's tax clients in view of the IRS's investigation of Heritage's tax strategy. As with many of the Trustee's other allegations, this requires the Court to engage in significant speculation unsupported by any evidence. At the time the distributions were made to the members, no claims had been made by Heritage clients, and Heritage's management had an entirely reasonable belief that the client agreements protected Heritage from any such claims. Indeed, the client agreements include a provision in which the various clients acknowledge that, in order to achieve the benefit of the tax strategy related to their investments, they may have to engage in litigation with the IRS.[15] Moreover, this entirely speculative, potential wave of claims by Heritage's clients, if they ever came to pass, would only have been made years in the future after the process of completing the IRS audits and contesting the issue with the IRS. This process would have taken many years (if it ever happened). The objective fact is that, as of the date of the distributions, no such claims had been made by any of the clients and Heritage's management had a good faith belief that such claims were precluded by the client agreements.

Here, the Trustee is not really asserting that there was a threat of suit in the sense that a creditor had made a demand upon, or threatened to sue, Heritage. At best, the Trustee's position amounts to a highly speculative argument that conditions existed at the time the distributions were made which, with the passage of some unspecified period of time, might possibly have led to suits by some of the clients against Heritage, assuming that such claims are not precluded by the exculpations contained in the client agreements, and assuming that every client lost its tax case. This is very different from a pending suit, or a threat of suit, as set forth in the badges of fraud. Since the Trustee has not designated any of the clients as witnesses and, since no such

---

[15] *See* Defendants' Findings of Fact and Conclusions of Law, pages 24-25.

client claims were actually asserted prior to the last distribution to the members, this argument is entirely speculative. It becomes no less speculative based on the IRS's investigation of Heritage without some evidence from the clients themselves that this might have generated claims, the terms of the client agreements notwithstanding, within some time frame relevant to the distributions. Consequently, there is nothing to connect this factor to any alleged intent to defraud the clients at the time the various distributions were made.

The Trustee correctly notes that Canada had commenced an arbitration case in July, 2002. However, up until the arbitration award was actually made in early 2004, Heritage's management had a good faith belief that Canada's claims were without merit or, at worst, had limited merit. In any event, the evidence is clear that Heritage had sufficient assets to deal with Canada's claim, even in the amount ultimately awarded by the arbitrators. However, the arbitration award was not rendered until approximately a year after the last distribution to the members and, until that point, there is nothing in the evidence which could even arguably establish any logical reason for Heritage's management to have acted in fraud of Canada.

### 3. Debtor received reasonably equivalent value:

The payments to the owners were made in furtherance of a valid business purpose pursuant to the terms of the Company Agreement and adopted in 1998. Heritage received reasonably equivalent value in two ways. First, it received the benefit of the overall pass-through structure which allowed it to shift income tax liability downstream to its owners. Second, it was contractually required to make the distributions to the owners who were constituted as creditors in the Company Agreement. A payment on account of a debt is, by definition, value.[16] Likewise, the Trustee does not tie this factor to any intent by Heritage to defraud any creditor as of the date of any of the distributions.

---

[16] *See* section 24.004(a) of UFTA.

#### 4. The Debtor did not retain control of the transferred property:

One badge of fraud is that the debtor retained possession or control of the property after the transfer. Here, it is undisputed that the funds were paid to the owners and that Heritage did not retain control of the funds. The Trustee argues that, since Mr. Kornman allegedly controlled some of the owners, he maintained control over the funds. However, that is not the thrust of this badge of fraud which is designed to address sham transfers where the transferor retains possession of the property. The argument that it was Mr. Kornman moving the funds from one pocket to another is simply a bootstrap argument which begs the validity of the argument to pierce the corporate veil made by the Trustee. If accepted as true, it still fails to tie into any proof that, as of the date of any of the distributions to the members, Heritage acted in fraud of any creditor.

#### 5. The Debtor had not absconded or concealed and removed the transferred assets:

The Trustee's basis for this appears to be allegations that Mr. Kornman and others under his direction frustrated the Trustee's efforts in administering the estate by failing to turn over the assets and allegedly "stonewalled" the Trustee in discovery. If this is a reference to post-bankruptcy conduct in the main bankruptcy case, then there is absolutely no nexus between these alleged misdeeds and prepetition conduct years earlier relating to the distributions to the members. If it is an argument relating to discovery in this lawsuit, then the Court has recently denied a motion to strike and certainly has more than sufficient procedural tools to address such issues. In the end, this argument likewise fails to tie into any demonstration that, on the date any of the distributions were made to the members, Heritage was acting with the intent to defraud any creditor.

### 6.    The Debtor was not engaged in unfair and fraudulent conduct:

Apparently, the Trustee asserts that Mr. Kornman and others affiliated with Heritage acted in a manner which was fraudulent toward the client claimants. The Trustee further asserts, based on a single bankruptcy court opinion, *Nat'l Audit Def. Network*, 367 B.R. 207 (Bankr. D.Ed 2007)[17] that this is a badge of fraud. However, this alleged fraudulent conduct, as with most of the Trustee's case, is entirely speculative. First, it begs the question of whether the investment strategies in question were invalid under then applicable federal tax law. Second, if there was unfair and fraudulent conduct as to the investments that included a 752 strategy, something Defendants deny, it was at the expense of the clients. Heritage's tax clients were hardly gullible citizens. They were highly sophisticated individuals with eight and nine figure net worth and with access to their own legal, tax and accounting advisors. These people, however, made no claims against Heritage prior to the distributions. Thus, the Trustee has established no nexus between this alleged "unfair conduct" and the assertion of any claims by the alleged victims. The Trustee likewise fails to explain how this establishes any fraudulent intent as to any creditor on the various dates that the distributions were made.

However, the Trustee has not designated any of the clients as witnesses in this case. None of the clients asserted claims against Heritage until long after the distributions. Thus, the issue of whether Heritage acted fraudulently as to the clients, a claim which is directly contrary to the terms of the client agreements themselves, remains entirely speculative as the Trustee has not chosen to designate the claimants as witnesses. Thus, all that can be said with certainty is

---

[17] The facts and circumstances of the *National Audit* case are substantially different than here. *National Audit Defense Network* was a boiler room operation. *Id.* at 214. Both the evidence and the court viewed this as a Ponzi scheme. *Id.* at 214 and 222. The principals invoked their Fifth Amendment rights against testifying at trial (*Id.* at 216). There was no evidence of any valid business purpose underlying the transactions and the evidence established that *National Audit Defense Network* was insolvent at the time of the transfers. The boiler room operation in *National Audit* is far different from Heritage which dealt with a relatively small number of highly sophisticated, very wealthy individuals who had their own legal, tax and accounting advisors. Here, there is undisputed proof of a valid business purpose and no evidence of insolvency at the time the transfers were made.

that the claimants, themselves highly sophisticated people, had all executed client agreements fully exculpating Heritage and had made no claims against Heritage as of the date of the respective distributions to the members.

### E. Who Did Heritage Intend to Defraud?

Given Heritage's history of producing excess cash flow, as well as its assets and limited debts, there is no reasonable basis to argue that, prior to the Canada arbitration award in early 2004, over a year after the last distribution to members, that any transfer to the members was made with actual intent to hinder, defraud or delay any creditor. At best for the Trustee, no rational incentive existed to make fraudulent transfers until after the Canada arbitration award was rendered. However, even then, Heritage had more than sufficient assets available to pay Canada. Through January 2003, when the last distribution to the members was made, Heritage's financial condition was strong enough to negate any rational intent to hinder, defraud or delay either the IRS or Canada based upon his disputed arbitration claim.

Consequently, in the end, the Trustee's argument for fraudulent intent has to turn on some form of the assertion that Heritage was acting in a fraudulent manner to the claimants. However, the Trustee has, for his own reasons, chosen not to designate any of these individuals as witnesses. Therefore, for purposes of this record, the Court is left with the undisputed fact that a number of extremely wealthy men and women entered into client agreements with Heritage. These wealthy clients entered into agreements which exculpate Heritage from any claims based on implementing the tax strategies. Indeed, in these agreements, the claimants, who are themselves surrounded by their own legal, tax and accounting advisors, expressly acknowledge that any decision to implement the tax strategies will be based upon the advice of their own advisors and that, to secure the benefit of these strategies, they may have to litigate with the IRS.

There is no evidence that any fraud was practiced by Heritage upon these wealthy, sophisticated client claimants. There is also no basis in the evidence to establish that Heritage had any rational basis to act to hinder, defraud and delay these individuals up through the last distribution to members in January, 2003, none of whom asserted claims against Heritage prior to the distributions. This leaves the Court to speculate, without foundation, based on the IRS investigation of Heritage, that Heritage acted with intent to defraud these holders of unasserted claims, whose unasserted claims management in good faith believed to be precluded by the client agreements.

F. **The Trustee's claims regarding the April 2001 Distributions are barred by the Delaware Statute of Limitation**

This Court has previously determined that Delaware law would apply to Heritage, which is a Delaware limited liability company. Delaware law provides:

> Unless otherwise agreed, a member who received a distribution from a limited liability company *shall have no liability under this chapter **or other applicable law** for the amount of the distribution **after the expiration of 3 years from the date of the distribution** unless an action to recover the distribution from such member is commenced prior to the expiration of the said 3-year period and an adjudication of liability against such member is made in the said action.

DEL. CODE ANN. §18-607(c)(emphasis supplied).

It is undisputed that the first two distributions made the subject of the Trustee's claims were made in April 2001, which was more than three years prior to the date of the Petition. Accordingly, the Trustee's claims regarding the April 2001 distributions are barred, as a matter of law.

## II.  PREFERENCE CLAIMS

### A.  Overview of Preference Claims

In order to prevail on the preference claims[18] alleged against the Defendants pursuant to

section 547(b), the Trustee must prove the following:

> (a)  that there was a transfer of an interest of the Debtor in property;
> (b)  to or for the benefit of a creditor;
> (c)  for or on account of an antecedent debt owed by the Debtor before such transfer was made;
> (d)  made while the Debtor was insolvent; and
> (e)  the transfer enables the creditor to receive more than such creditor would receive
>
>> (i)  if the Debtor filed under chapter 7; and
>> (ii)  the transfer had not been made.

11 U.S.C. § 547(b).

With regard to each alleged preferential transfer, the Trustee has the burden of proving

each element of section 547(b), as set forth above, by preponderance of the evidence.[19]

The Trustee cannot meet this burden.  Specifically, the Trustee is unable to carry his

burden in connection with the insolvency requirement necessary to prove the Trustee's

asserted preference claims.  The Trustee cannot prove that the Debtor was insolvent as of

the date of the allegedly preferential transfers.[20]  This is true even with the benefit of the

---

[18] Although the Trustee originally sought to recover numerous allegedly preferential claims, due to the Court's ruling relating to the exclusion of the testimony of the Trustee's solvency expert, the only preference claims which the Trustee continues to pursue are those which occurred within 90 days of Heritage's bankruptcy filing.

[19] 11 U.S.C. § 547(g); *ABB Vecto Gray, Inc. v. First Nat'l Bank of Bethany Oklahoma (In re Robinson Brothers Drilling, Inc.)*, 9 F.3d 871, 874 (10th Cir. 1993).

[20] Heritage filed bankruptcy on May 17, 2004.  The commencement of the 90 day period prior to bankruptcy, therefore, was February 17, 2004.

---

presumption of insolvency provided by section 547(f) of the Bankruptcy Code to aid the Trustee.[21]

At trial, the Defendants will present sufficient and non-speculative evidence that Heritage was solvent on the date of the transfers at issue. Such evidence will be presented through the testimony of, among others, Gary Kornman, the former chief executive officer of Heritage[22] and/or the testimony of Vickie Walker, the former chief financial officer of Heritage.[23] Mr. Kornman and/or Ms. Walker will testify relating to the assets and liabilities of Heritage at the time of the transfers. The testimony concerning the assets, liabilities and thus, the value of Heritage, is sufficient to rebut the section 547(f) presumption of insolvency. The presumption having been rebutted, the Trustee, therefore, is required to come forward with evidence to prove insolvency by a preponderance of the evidence.[24] Based on the Court's *Daubert* ruling, which excluded the participation of the Trustee's solvency witness,[25] along with at least one exhibit identified by the Trustee, the Trustee clearly cannot prove the Debtor was insolvent by a preponderance of the evidence and thus, falls

---

[21] *See,* 11 U.S.C. §547(f).

[22] Mr. Kornman was also the president of the manager of Heritage.

[23] Both Mr. Kornman and Ms. Walker are intimately familiar with the finances of the Debtor and are well-qualified to testify concerning the assets and liabilities of the Debtor. The testimony of Mr. Kornman and Ms. Walker constitutes evidence sufficient to rebut the section 547(f) presumption as discussed herein. The Defendants may also rely on other evidence to rebut the presumption of insolvency.

[24] *Sandoz v. Fred Wilson Drilling Co., (In the Matter of Emerald Oil Co.),* 695 F.2d 833, 838-39 (5th Cir. 1983)(stating that section 547(f) and Federal Rule of Evidence 301 interact so that the burden of proof relating to insolvency remains with the party originally having the burden of proof- i.e. the Trustee); *See, Akers v. Koubourlis (In re Koubourlis),* 869 F.2d 1319, 1322 (9th Cir. 1989)(stating the "presumption requires the party against whom the presumption exists, here [the defendant] to come forward with some evidence to rebut the presumption, although the burden of proof remains on the party in whose favor the presumption exists"); *Devan v. The CIT Group/Commercial Services, Inc. (In re Merry-Go-Round Enterprises),* 229 B.R. 337, 341 n. 2 (Bankr. D. Md. 1999)("A presumption in favor of one party imposes on the other party the burden of production, i.e. the burden of going forward with evidence, but it does not alter the ultimate burden of persuasion.").

[25] The Court excluded the testimony of the Trustee's solvency witness, S. Todd Burchett, as unreliable. *See,* Order Granting Motion to Disqualify Testimony of S. Todd Burchett (Docket No. 453).

---

Defendants' Trial Brief

Page 25

short of one of the required elements under section 547(b). The Trustee's assertion of preferential transfers against the Defendants, therefore, fails.

## B.     The Insolvency Element of Section 547(b)

In order for a transfer to be preferential, the debtor must have been insolvent at the time of the transfer.[26] A transfer cannot be avoided as preferential if the transfer was made at a time that a debtor was solvent.[27] In proving insolvency, a trustee is aided by the presumption provided in section 547(f) of the Bankruptcy Code.[28] Section 547(f) provides that "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition."[29] This presumption, however, is rebuttable.[30]

The presumption works to require the party opposing the assertion of a preference to present *some evidence* of solvency.[31] The party rebutting the insolvency presumption does not have to prove by a *preponderance* of the evidence that the debtor was solvent, but instead is required to come forward with *some* evidence demonstrating the debtor's solvency as of the date in question.[32] Although the rebutting party has "the burden of going forward

---

[26] 11 U.S.C. §547(b); *Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba, Inc.)*, 416 F.3d 394, 402-03 (5th Cir. 2005)(holding debtor must be insolvent in order to avoid a preferential transfer).

[27] *Baker Hughes Oilfield Operations*, 416 F.3d at 402-03.

[28] *See*, 11 U.S.C. §547(f).

[29] 11 U.S.C. §547(f).

[30] *Baker Hughes Oilfield Operations*, 416 F.3d at 403.

[31] *GasMark Ltd. Liquidating Trust v. Louis Dreyfus Natural Gas Corp. (In re GasMark)*, 158 F.3d 312, 315 (5th Cir. 1998)(stating "[t]he party seeking to rebut the presumption must introduce some evidence to show that the debtor was solvent at the time of the transfer..." (emphasis in original omitted)(citing *Sandoz v. Fred Wilson Drilling Co. (In the Matter of Emerald Oil Co.)*, 695 F.2d at 839)).

[32] *Campbell v. Cannington (In re Economy Milling Co., Inc.)*, 37 B.R. 914, 919 (Dist. S.C. 1983)(The party opposing the alleged transfers "would not have had to prove by a preponderance of the evidence that the debtor's assets exceeded his liabilities at the time of the transfer to rebut the presumption; he would have had only to present

with evidence to rebut or meet the presumption [the burden] does not shift to such party...in the sense of the risk of nonpersuasion ..."[33] Therefore, the ultimate burden of proof is not shifted to the rebutting party based on the presumption and the burden to prove insolvency remains with the party seeking to avoid the transfers, here, the Trustee.[34]

Therefore, in order to rebut the presumption of insolvency, the Defendants, must present some evidence of Heritage's solvency.[35] The evidence required has been defined as "substantial" evidence[36] or "sufficient" evidence.[37] However, the Defendants are not

---

*some* evidence to that effect to overcome §574(f).")(emphasis in original); *GasMark Ltd. Liquidating Trust,* 158 F.3d at 315 (citing FED. R. EVID. 301). Federal Rule of Evidence 301, which applies to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 9017, provides:

> In all civil actions and proceedings not otherwise provided for by
> an Act of Congress or by these rules, a presumption imposes
> on the party against whom it is directed the burden of going forward
> with evidence to rebut or meet the presumption, *but does not shift to
> such party the burden of proof in the sense of the risk of nonpersuasion,
> which remains throughout the trial upon the party on whom it was
> originally cast.*

FED. R. EVID. 301 (emphasis added). *See also, Baker Hughes Oilfield Operations,* 416 F.3d at 403.

[33] *GasMark Ltd. Liquidating Trust,* 158 F.3d at 312 (citing FED. R. EVID. 301).

[34] *Sandoz v. Fred Wilson Drilling Co.,* 695 F.2d at 838-39 (stating that section 547(f) and Federal Rule of Evidence 301 interact so that the burden of proof relating to insolvency remains with the party originally having the burden of proof- i.e. the Trustee); *Akers v. Koubourlis,* 869 F.2d at 1322 (stating the "presumption requires the party against whom the presumption exists, here [the defendant] to come forward with some evidence to rebut the presumption, although the burden of proof remains on the party in whose favor the presumption exists"); *Devan v. The CIT Group/Commercial Services, Inc.,* 229 B.R. at 341 n. 2 ("A presumption in favor of one party imposes on the other party the burden of production, i.e. the burden of going forward with evidence, but it does not alter the ultimate burden of persuasion.").

[35] *GasMark Ltd. Liquidating Trust,* 158 F.3d at 315 (holding that the "party seeking to rebut the presumption must introduce some evidence to show the debtor was solvent"); *Sierra Steel, Inc. v. Totten Tubes, Inc., (In re Sierra Steel, Inc.),* 96 B.R. 275, 277 (B.A.P. 9th Cir. 1989)(holding that once "substantial evidence of solvency [is presented], the presumption vanishes and the plaintiff must come forward with sufficient evidence in order to [meet] its burden of proving the insolvency."); *Rand Energy Co. v. Del Mar Drilling Co., Inc. (In re Rand Energy Co.),* 2000 Bankr. LEXIS 1607, *7 (Bankr. N.D. Tex. July 28, 2000)(requiring "substantial" evidence).

[36] *Sierra Steel,* 96 B.R. at 277.

[37] *Silverman Consulting, Inc. v. Hitachi Power Tools, USA, Ltd. (In re Payless Cashways, Inc.),* 290 B.R. 689, 697 (Bankr. W.D. Mo. 2003)(requiring "sufficient" evidence).

---

required to prove by a preponderance of the evidence that Heritage was solvent.[38] Further, the evidence is not required to be a "well-documented analysis of the debtor's assets and liabilities".[39] Yet, the courts have recognized that speculative evidence is insufficient to rebut the section 547(f) presumption.[40] The testimony of Mr. Kornman and/or Ms. Walker constitutes sufficient, substantial and non-speculative evidence of the Debtor's financial condition in the 90 days prior to the bankruptcy proceeding of Heritage. Both Mr. Kornman and Ms. Walker held positions with Heritage requiring them to have intimate familiarity with the operations and finances (including assets and debts) of Heritage. In fact, Mr. Kornman and Ms. Walker are the individuals most familiar with the assets and liabilities of Heritage and are in the best position to testify as to the same.

---

[38] *Campbell v. Cannington,* 37 B.R. at 919.

[39] *Orix Credit Alliance Inc. v. Harvey (In the Matter of Lamar Haddox Contractor, Inc.),* 40 F.3d 118, 122 (5th Cir. 1994)(citing *Porter v. Yukon Nat'l Bank,* 866 F.2d 335, 356-57 (10th Cir. 1989). The Defendants recognize *Porter* addressed the evidence required to demonstrate insolvency but see no reason for the requirement to differ concerning solvency.

[40] *GasMark Ltd. Liquidating Trust,* 158 F.3d at 315 (citing *Sandoz v. Fred Wilson Drilling Co. (In the Matter of Emerald Oil Co.),* 695 F.2d at 839).

## C.    The Timing of the Solvency Evidence

In order for the evidence of a debtor's financial condition to effectively rebut the presumption of insolvency, the evidence must show that the debtor was solvent *as of the date of the transfer*.[41]   Only evidence contemporaneous to the transfer at question is sufficient to shift the burden concerning insolvency back to the party asserting the preference, in this case, the Trustee.[42]   The testimony of Mr. Kornman and Ms. Walker will cover the time period of February through May 2004, the time period relevant to the preference claims.

## D.    Definition of "Insolvency"

In order to demonstrate solvency, a party has to demonstrate that its assets exceed its liabilities.[43]   Pursuant to the Bankruptcy Code, insolvency is defined as "the financial condition in which 'the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation.'"[44]   The testimony of Mr. Kornman and/or Ms. Walker will establish the assets and liabilities of Heritage at the time the allegedly preferential transfers took place and that Heritage's assets exceeded its debts at that time, at a fair valuation.

---

[41] *GasMark Ltd. Liquidating Trust,* 158 F.3d at 316; *Baker Hughes Oilfield Operations,* 416 F.3d at 403 (holding a balance sheet dated 17 months prior to the transfer at issue is not sufficient evidence to rebut the section 547(f) presumption).

[42]  *GasMark Ltd. Liquidating Trust,* 158 F.3d at 316; *Baker Hughes Oilfield Operations,* 416 F.3d at 403 (a balance sheet dated 17 months prior to the transfer at issue is not sufficient evidence to rebut the section 547(f) presumption because of the length of the passage of time from the date of the balance sheet to the date of the alleged preferential transfer).

[43] *Orix Credit Alliance Inc. v. Harvey,* 40 F.3d at 121 (citing section 101(32)(A) of the Bankruptcy Code.

[44] *Baker Hughes Oilfield Operations,* 416 F.3d at 403 (citing section 101(32)(A) of the Bankruptcy Code for the definition of "insolvency").

**1.     The Testimony of an Owner/Officer Rebuts the Presumption of Insolvency**

The Fifth Circuit has allowed an officer of a corporation to testify to the value of a corporation's assets. In *South Central Livestock Dealers, Inc. v. Security State Bank of Hedley, Texas*, the Fifth Circuit affirmed a lower decision accepting the testimony of a corporation's financial officer concerning the corporation's assets and liabilities in the context of determining a claim for damages against a bank wrongfully offsetting against the assets of the corporation.[45] In allowing the testimony of the financial officer, the court held that such testimony was "closely akin to the testimony of an owner of a business about the business's value[46]... and the financial officer of the [corporation] was a witness qualified to testify to value by knowledge and experience just as an owner is such a witness...."[47]

The allowance of the financial officer's testimony in *South Central Livestock Dealers*, is analogous to the testimony of Mr. Kornman and Ms. Walker in the context of rebutting the presumption of insolvency. In *South Central Livestock Dealers*, the financial officer of the corporation testified as to the value of the corporation's assets.[48] Here, Mr. Kornman and Ms. Walker, as officers of Heritage, will testify as to the assets, liabilities and ultimate value of Heritage. This testimony will demonstrate that Heritage was solvent at the time the challenged transfers were made. The testimony by Mr. Kornman and Ms.

---

[45] 614 F.2d 1056, 1058-59 (5th Cir. 1980).

[46] The Fifth Circuit has long held that "[a]n owner is competent to give his opinion on the value of his property (under the Federal Rules of Evidence)." *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 698 (5th Cir. 1975); *LaCombe v. A-T-O-, Inc.*, 679 F.2d 431, 433 (5th Cir. 1982)("[T]he general principle [is] acknowledged in this circuit... that the owner of property is qualified by his ownership alone to testify as to its value.")

[47] *South Central Livestock Dealers, Inc. v. Security State Bank of Hedley, Texas*, 614 F.2d 1056, 1061-62 (5th Cir. 1980).

[48] *Id.* at 1061.

Walker concerning the valuation of Heritage, as officers of Heritage, is sufficient to rebut the presumption of insolvency.

The Defendants' position that the testimony of Mr. Kornman and Ms. Walker is adequate to rebut the insolvency presumption is supported by case law. Specifically, the Sixth Circuit has held in an unpublished opinion, that an owner's testimony relating to his corporation's assets and debts was sufficient to rebut the insolvency presumption under section 547(f).[49] In *Carmack v. Construction Systems, Inc. (In re Hunt)*, the debtor, Hunt, operated a drywall business and ultimately filed for bankruptcy protection.[50] The trustee sought to recover payments made to one of Hunt's suppliers, Construction Systems.[51] At trial, the bankruptcy court determined that Hunt was solvent at the time the payments were made to Construction Systems.[52] On appeal, the Sixth Circuit considered the evidence presented to the bankruptcy court concerning Hunt's financial condition at the time of the questioned transfers.[53] This included the testimony of Hunt himself.

At trial, Hunt's "financial schedule" demonstrated he was insolvent by $60,000 at the time the challenged transfers were made.[54] However, on cross-examination, Hunt admitted being entitled to payment on certain contracts in the amount of $110,000 at the time the

---

[49] *Carmack v. Construction Systems, (In re Hunt)*, 754 F.2d 374, 372 It is not clear whether Hunt's business was operated as a corporation or other legal entity or as a dba of Hunt. In this case, such should be considered as a difference without a distinction since the court accepted Hunt's testimony concerning the valuation of the business assets.

[50] *Id.* at 372.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

transfers were made to Construction Systems.[55] After considering Hunt's testimony, the bankruptcy court determined that his testimony rebutted the insolvency presumption by demonstrating the solvency of Hunt on the date of the challenged transfers.[56]

*In re Hunt,* therefore, stands for the proposition that an owner's testimony may serve to rebut the presumption of insolvency.[57] *South Central Livestock Dealers* stands for the proposition that an officer's testimony is sufficiently similar to an owner's testimony in the context of valuation of the assets of a corporation. Coupling the two propositions, the testimony of an officer of a corporation may stand in for the testimony of the owner of a corporation. Mr. Kornman and Ms. Walker were officers of Heritage. Under the holdings of *In re Hunt* and *South Central Livestock Dealers,* Mr. Kornman and Ms. Walker's testimony is authorized to establish the value of the Debtor and is sufficient evidence serving to rebut the presumption of insolvency.

## 2. Documentary Evidence Which Rebuts the Presumption of Insolvency

Various courts have determined that certain types of documentary evidence are sufficient to rebut the presumption of insolvency under section 547(f), while other types of such evidence are not. Moreover, what evidence is sufficient for one court in a certain circumstance has been insufficient for another court. The Defendants may seek to utilize the financial statements of Heritage in connection with Mr. Kornman and Ms. Walker's testimony. In *Jones Truck Lines, Inc. v. Full Services Leasing Company,* the court determined that "[a] financial statement showing positive net worth is sufficient evidence to

---

[55] *Id.*

[56] *Id*

[57] *Id.*

rebut the presumption of insolvency".[58]  In *Jones*, the court held that financial statement dated two weeks before the transfers asserted to be preferential sufficiently rebutted the insolvency presumption and shifted burden back to plaintiff to prove insolvency.[59]

However, an unaudited financial statement, accompanied by nothing more, was held to be insufficient evidence of solvency in *Katz v. Wells*.[60]  In *Katz*, a liquidating trustee of the debtor's estate brought a preference action against a creditor seeking to avoid three payments made in the 90 day period prior to bankruptcy filing of the debtor.[61]  The trustee sought summary judgment on its claims, relying on the insolvency presumption under section 547(f).[62]  The creditor from whom recovery of the transfers was sought, submitted an unaudited financial statement indicating that the debtor was solvent on the day before the first of the three transfers at issue in order to rebut the presumption of insolvency.[63]  The court determined that the unaudited financial statement was insufficient to rebut the presumption of insolvency.[64]  The court based its reasoning on several factors.  First, although the financial statement, which was dated two weeks before the first transfer, showed assets in excess of $130 million, in the six weeks following the first transfer, the

---

[58] *Jones Truck Lines, Inc. v. Full Services Leasing Co.,* 83 F.3d 253, 258 (8th Cir. 1996)(citing *In re Almarc Mfg., Inc.,* 60 B.R. 584, 586 (Bankr. N.D. Ill. 1986). The Defendants acknowledge that the Court determined the financial statements alone to be insufficient to rebut the presumption in the context of summary judgment. The Defendants believe, however, that the testimony of Mr. Kornman and Ms. Walker, cure the issues with the financial statements concerning in the Court.

[59] *Jones Truck Lines, Inc.,* 83 F.3d at 258.

[60] *Katz v. Wells (In re Wallace Bookstores, Inc.),* 316 B.R. 254, 259 (Bankr. E.D. Ky. 2004).

[61] *Id.* at 257-58.

[62] *Id.* at 259.

[63] *Id.* at 260.

[64] *Id.*

assets reflected on the debtor's financial statement had dropped by 90%.[65]   Thereafter, debtor's financial condition continued to deteriorate such that within one week of the last transfer, the debtor was insolvent to the extent of $13,000.[66]  Second, the court chose not to rely on the unaudited financial statements to rebut the insolvency presumption based on the fact that the unaudited financial statements might be unreliable.[67]  Third, the court stated that the "assets and liabilities listed on a financial statement may not be valued in accordance with the Bankruptcy Code's definition of 'insolvency'".[68]

The factual situation and context in which the instant case arises, however, is significantly different and distinguishable from *Katz.*  In *Katz,* the court considered unaudited financial statements in the context of a motion for summary judgment.[69]  The fact that the admission of the financial statements was considered in such a context is significant.  Because the insolvency issue was considered on a motion for summary judgment, the court had only the written financial statements before it, without the benefit of any live testimony to support, explain or corroborate the financial statements.[70]

Here, however, the Court may be asked to consider the Debtor's financial statements at trial along with the testimony of Mr. Kornman and/or Ms. Walker.  Mr. Kornman was the chief executive of the Debtor, while Ms. Walker was its chief financial officer.  Both Mr. Kornman and Ms. Walker are intimately familiar with the assets and liabilities of the Debtor at the time the

---

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.* at 257.

[70] *Id.*

challenged transfers were made. Mr. Kornman and Ms. Walker will be able to answer any questions that the Court has concerning the Debtor's financial condition at the time of the transfers as well as any questions the Court has relating to the Debtor's financial statements.

In addition, the Defendants' ability to corroborate the financial statements with live testimony will alleviate the concern of the *Katz* court in relation to the unreliability, in general, of financial statements.[71] The Defendants' witnesses will be available to testify as to the basis for the determination and calculation of the value of the Debtor's assets and establish a foundation and the reliability of the financial statements. The accompanying foundation for the financial statements was completely lacking in *Katz*. The foundation for the Heritage financial statements will be provided by accompanying oral testimony by former officers of Heritage.

Further, in *Katz*, the financial statements which the court was asked to consider, unquestionably demonstrated a downward trend concerning the debtor's financial condition, including a 90% decrease in assets approximately six weeks prior to the bankruptcy filing.[72] This downward trend coupled with a $13,000 deficiency just a week after the last transfer, constituted grounds in the court's consideration, for the rejection of the financial statements as summary judgment evidence.[73]

A significant downward trend in the Debtor's financial situation as was present in *Katz* is not the situation concerning Heritage. While Heritage's assets diminished during the 19 days period in advance of bankruptcy, the diminution was nowhere as significant as the

---

[71] The Defendants note, as a practical matter, most companies and businesses have only unaudited financial statements. Financial statements are a standard business record used to track a company's financial condition. A *per se* rule, therefore, that unaudited financial statements are not competent evidence to rebut the presumption of insolvency appears overly harsh especially when coupled with testimony laying the foundation for the financial statement.

[72] *Katz,* 316 B.R. at 260.

[73] *Id.*

90% loss the *Katz* debtor experienced. The factual context of *Katz* is sufficiently dissimilar to the instant case so that the Court may consider the Debtor's financial statements in connection with its solvency determination.

### 3. The Standard for Determining "Insolvency"

The standard for determining insolvency under the Bankruptcy Code is referred to by courts as a "balance sheet test" requiring courts to engage in a "fair valuation" of the debts and property reflected on a debtor's balance sheet or financial statement.[74] The test is applied to determine insolvency at the time the transfer at issue was made, not as of the date of the debtor's bankruptcy filing.[75]

Valuation as an "active unit" is appropriate if the debtor was a going concern at the time of the alleged preferential transfer.[76] Heritage was a going concern at the time of the transfers as will be established by the testimony of Mr. Kornman and Ms. Walker.

### 4. The Requirements of the "Balance Sheet Test"

Although referred to as a "balance sheet test", a fair valuation of a debtor's assets and debts for purposes of determining insolvency is not necessarily equivalent to the book values assigned to assets and liabilities on a debtor's balance sheet.[77] In conducting a fair valuation of

---

[74] *Orix Credit Alliance v. Harvey (In re Lamar Haddox Contractor, Inc.)*, 40 F.3d 118, 121 (5th Cir. 1994); *Network Staffing Servs., Inc. Liquidating Trust v. Jenkens & Gilchrist (In re Network Staffing Servs., Inc.)*, No. 02-35608-SAF-11, 2005 Bankr. LEXIS 1288, *8 (Bankr. N.D. Tex. June 30, 2005); *Sherman v. FSC Realty LLC (In re Brentwood-Lexford Partners, LLC)*, 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003).

[75] *Hoffinger Indus., Inc. v. Bunch (In re Hoffinger Indus., Inc.)*, 313 B.R. 812, 821 (Bankr. E.D. Ark. 2004); *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants (In re WRT Energy Corp.)*, 282 B.R. 343, 368 (Bankr. W.D. La. 2001); *Hunter v. Soc'y Bank & Trust (In re Parker Steel Co.)*, 149 B.R. 834, 844 (Bankr. N.D. Ohio 1992).

[76] *In re Taxman Clothing Co.*, 905 F.2d 166, 170 (7th Cir. 1990).

[77] *In re Lamar Haddox*, 40 F.3d at 121; *In re Network Staffing*, 2005 Bankr. LEXIS 1288 at *8; *In re Brentwood-Lexford*, 292 B.R. at 268; *Mancuso v. T. USA, Inc. (In re Sullivan)*, 161 B.R. 776, 783 (Bankr. N.D. Tex. 1993)("[T]he debtor's own balance sheets are not conclusive on the issue of insolvency, and values shown therein should be adjusted in light of testimony presented at trial."); *Floyd v. Price (In re Titanis, Inc.)*, No. 05-30548-H5-7, 2008 Bankr. LEXIS 1385, *6 (Bankr. S.D. Tex. May 1, 2008; *In re WRT Energy*, 282 B.R. at 369.

---

assets and debts, a court is not bound to follow Generally Accepted Accounting Principles, commonly known as "GAAP".[78] Instead, the test consists of a two-step analysis. The first step requires the court to determine whether the debtor was a going concern or whether it was "on its deathbed" at the time of the transfer.[79] For a debtor that was on its deathbed, i.e. inoperative, defunct, financially dead or mortally wounded, a liquidation analysis is applied to determine a fair valuation of the debtor's assets and debts.[80]

If the debtor was not "on its deathbed" at the time the transfers were made, the court should value the debtor's assets and debts on a going concern basis.[81] In *In re Brentwood-Lexford*, Judge Felsenthal described the going concern valuation method as follows:

> For a debtor that was a going concern, the court would "determine" the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time." As a going concern, the debtor would not likely face a forced sale. Accordingly, a fair market valuation best determines a fair market price.

> The Fifth Circuit has instructed that the fair value of property is Determined "…by 'estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions.'" The assets may be valued if sold individually or if packaged in groups based on business considerations.

> Accordingly, even if the willing seller, willing buyer methodology is not the per se test for a going concern valuation, the court must apply a market analysis. The court must determine the value of a going concern's property based on the current

---

[78] *Brandt v. nVidia Corp. (In re 3DFX Interactive, Inc.)*, No. 02-55795-RLE, 2008 Bankr. LEXIS 1516, *42-55 (Bankr. N.D. Cal. May 1, 2008)(noting that courts have generally rejected the argument that GAAP dictates solvency determinations by bankruptcy courts and stating that GAAP will not determine what constitutes and asset or the fair market value thereof); *EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 358 (Bankr. D. Del. 2008)("GAAP does not deal with the true market value of assets or the determination of what are legal liabilities of a company."); *In re Parker Steel*, 149 B.R. at 845 (holding that GAAP are relevant, but not controlling, in valuing debtor's liability with respect to a pending lawsuit for purposes of balance sheet test); *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 278 (B.A.P. 9th Cir. 1989)("[A]lthough GAAP are relevant, they are not controlling in insolvency determinations.").

[79] *In re Network Staffing*, 2005 Bankr. LEXIS at *8; *In re Brentwood-Lexford*, 292 B.R. at 268; *In re Hoffinger*, 313 B.R. at 818.

[80] *In re Hoffinger Indus.*, 313 B.R. at 818; *In re WRT Energy*, 282 B.R. at 369.

[81] *In re Taxman Clothing Co.*, 905 F.2d at 169-70.

market, involved a prudent sale within a reasonable time, whether the sale be on an asset or business unit basis. The determination requires a market analysis.

*In re Brentwood-Lexford,* 292 B.R. at 268 (citations omitted).[82]

A court must also, of course, perform a fair valuation of the Debtor's debts at the time of the transfers as well.[83] Based on the established standard, the Court should evaluate the "fair value of the Debtor's assets if sold in a prudent manner in current market conditions."[84] Following the testimony of Mr. Kornman and Ms. Walker, the Court will value Heritage as a going concern and will determine that Heritage was indeed solvent during the relevant preference period. Because the Trustee is then required to prove by a preponderance of the evidence the insolvency of Heritage for which the Trustee has no expert witness, the Trustee's preference actions fail.

### E.    Ordinary Course of Business Defense

Preferential transfers may not be avoided when they are made in the ordinary course of business.[85] The party asserting the ordinary course defense has the burden of proving the

---

[82] *See also In re Lamar Haddox,* 40 F.3d at 121 ("The fair value of property is not determined by asking how fast or by how much it has been depreciated on the corporate books, but by 'estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions.'")(quoting *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n,* 124 B.R. 398, 402 (Bankr. D.S. Fla. 1991)); *In re Network Staffing,* 2008 Bankr. LEXIS at *13; *In re Hoffinger Indus.,* 313 B.R. at 818 ("Fair valuation refers to the amount of cash that a company could realize from a sale of its property during a reasonable time period.").

[83] *In re Hoffinger Indus.,* 313 B.R. at 819 ("To fairly determine whether the debtor was solvent or insolvent at the time of the transfers, the Court must assess the value of both assets and liabilities."); *see also In re Network Staffing,* 2005 Bankr. LEXIS at *10 (in determining insolvency, court accepted testimony of accountant that liabilities reflected on debtor's balance sheet required no adjustment because liabilities were all supported by payables and notes).

[84] *In re Brentwood-Lexford,* 292 B.R. at 268 (citing *In re Taxman Clothing Co.,* 905 F.2d at 169-70).

[85] 11 U.S.C.§ 547(c)(2); *See, GasMark Ltd. Liquidating Trust v. Louis Dreyfus Nat'l Gas Corp. (In re GasMark),* 158 F.3d 312, 317 (5th Cir. 1998)("A creditor can defend against avoidance of an alleged preference payment by proving that the debtor made the payment in the ordinary course of business…"); *GPR Holdings, L.L.C. v. Duke Energy Trading and Marketing, L.L.C. (In re GPR Holdings),* 2005 Bankr. LEXIS 1059, *26 (Bankr. N.D. Tex. May 25, 2005).

elements of the defense.[86]  In order to carry the burden, the party must satisfy the three prongs of

the defense as set forth in section 547(c)(2) of the Bankruptcy Code by a preponderance of the

evidence.[87]

Section 547(c)(2) of the Bankruptcy Code provides:

> The trustee may not avoid under this section a transfer:
>
> > (2) to the extent that such transfer was-
> >
> > > (A)  in payment of a debt incurred by the debtor in the
> > > ordinary course of business or financial affairs of the debtor and
> > > the transferee;
> > >
> > > (B)  made in the ordinary course of business or financial affairs of the
> > > debtor and the transferee; and
> > >
> > > (C)  made according to ordinary business terms.

11 U.S.C. §547(c)(2).[88]

The purpose of the ordinary business defense must be taken into consideration.    The

purpose to be accomplished is to "leave undisturbed normal financial relations, because it does

not detract from the general policy of the preference section to discourage unusual action by

either the debtor or his creditors during the debtor's slide into bankruptcy."[89]    The Fifth Circuit

has stated the purpose is to weed out those transfers which "represent collusive arrangements

---

[86]  *Estate of SPW Corp. v. A.P.V. Equip., Inc. (In re SPW Corp.)*, 96 B.R. 676, 678 (Bankr. N.D. Tex. 1989); *Mims v. Compaq Computer Corp. (In re PC Service Source, Inc.)*, 2004 Bankr. LEXIS 1992, *15 (Bankr. N.D. Tex. Dec. 3, 2004); *Mossay v. Hallwood Petroleum, Inc.*, 1997 U.S. Dist. LEXIS 16553, *10 (N.D. Tex. Apr. 28, 1997).

[87]  11 U.S.C. § 547(c)(2). *See, In re SPW Corp.*, 96 B.R. at 678; *Kaye v. Watson Sysco Foodservice (In re Cafeteria Operators, L.P.)*, 2005 Bankr. LEXIS 3240, * 7 (Bankr. N.D. Tex. Nov. 8, 2005)(stating ordinary course defense must be proven by a preponderance of the evidence).

[88]  This section was revised by BAPCPA in 2005.  Because the transfers occurred prior to 2005, reference is made to the version of §547 in effect prior to the amendment.

[89]  *In re SPW Corp.*, 96 B.R. at 679 (quoting H.R. Rep. No. 95-595, 95th Cong., 1st. Sess. 373 (1977) *reprinted in* 5 U.S. Code Cong. & Admin. News 5787, 6329 (1978)).

---

designed to favor the particular creditor during the debtor's slide into bankruptcy" from those transfers which represent ordinary payments.[90]

In order to satisfy the first prong or element of the ordinary course test, the party asserting the defense must prove that the debtor incurred the debt in the ordinary course of the debtor's and the defending parties' business or financial affairs.[91] To satisfy this prong, therefore, the Defendants must prove that Heritage incurred the debt in the ordinary course of Heritage's business with the Defendants.[92]

In order to meet the second prong of the ordinary business test, the Defendants must establish that the *payments* were made in the ordinary course of business between Heritage and the Defendants.[93] A "precise legal test" for whether payments are made in ordinary course of business has not been established.[94] Generally, "the analysis focuses on the time within which the debtor ordinarily paid the creditor[]… and whether the timing of the payments during the 90-day period reflected 'some consistency' within that practice."[95] This prong, therefore, dictates that the court "compare the prior dealings between the debtor and creditor with their dealings during the preference period to determine whether the challenged dealings were ordinary."[96]

---

[90] *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co. (In re Gulf City Seafoods, Inc.)*, 296 F.3d 363, 367 (5th Cir. 2002).

[91] *Mims v. Compaq Computer Corp.*, 2004 Bankr. LEXIS 1992 at *15.

[92] *Id.*

[93] *Id.* at *15-16.

[94] *GasMark Ltd. Liquidating Trust v. Louis Dreyfus Nat'l Gas Corp.*, 158 F.3d at 317 (citing *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991)(quoting *In re Fulghum Const. Corp.*, 872 F2d 739, 743 (6th Cir. 1989)); *see, In re GPR Holdings*, 2005 Bankr. LEXIS 1059 at *42.

[95] *GasMark Ltd. Liquidating Trust v. Louis Dreyfus Nat'l Gas Corp.*, 158 F.3d at 317 (citing *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991)(quoting *In re Fulghum Const. Corp.*, 872 F2d 739, 743 (6th Cir. 1989)); *See, In re GPR Holdings*, 2005 Bankr. LEXIS 1059 at *42.

[96] *Mossay v. Hallwood Petroleum, Inc.*, 1997 U.S. Dist. LEXIS 16553, *13 (N.D. Tex. Apr. 28, 1997)(citing *Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery)*, 178 B.R. 426, 440 (Bankr. W.D. Tex. 1995)(citing *Fred Hawes Org. v. Basic Distribution Corp., (In re Fred Hawes)*, 957 F.2d 239, 244 (6th Cir. 1992)).

This necessitates that the court evaluate the "timing of the payment, the amount and manner in which the transaction was paid and the circumstances under which the transfer was made."[97] Stated differently, "courts typically consider the following factors when comparing pre-preference period transfers with preference period transfers: (i) the length of time the parties were engaged in the transaction at issue; (ii) whether the amount or form of tender differed from past practices; (iii) whether the debtor or creditor engaged in any unusual collection or payment activity; and (iv) the circumstances under which the payment was made."[98]

In order to determine whether a transfer constitutes an ordinary course transaction, the defendant must establish a "baseline of payment history between the debtor and the defendant that spans a length of time and includes a significant number of transactions."[99] In establishing the payment history, generally the entire history of transactions between the parties should be considered or "at least a material segment of it".[100] Further, the baseline of payments should be taken from a period in advance of the preference period prior to the time when the debtor's financial problems started.[101]

---

[97] *Mossay v. Hallwood Petroleum, Inc.,* 1997 U.S. Dist. LEXIS 16553 at 13; *see, In re GPR Holdings,* 2005 Bankr. LEXIS 1059 at 42; *El Paso Refinery,* 178 B.R. at 440 (citing *Fred Hawes,* 957 F.2d at 244); *Cunningham v. T&R Demolition, Inc. (In re ML & Assoc., Inc.),* 301 B.R. 195, 204 (Bankr. N.D. Tex. 2003)(citations omitted).

[98] *Plan Administrative Agent v. National Shelter Prods. (In re Kevco, Inc.),* 2004 Bankr. LEXIS 332, *14 (Bankr. N.D. Tex. Mar. 22, 2004)(citing *Payne v. Clarendon Nat'l Ins. Co. (In re Sunset Sales, Inc.),* 220 B.R. 1005, 1020-21 (10th Cir. BAP 1998)).

[99] *Plan Administrative Agent v. Coastal Indus., Inc. (In re Kevco, Inc.),* 2005 Bankr. LEXIS 1249, *39 (Bankr. N.D. Tex. Jun. 30, 2005)(citing *Manty v. Miller & Holmes, Inc. (In re Nation-Wide Exch. Servs., Inc.),* 291 B.R. 131 (Bankr. D. Minn. 2003)).

[100] *Brown v. Shell Canada Ltd., (In re Tennessee Chem. Co.),* 112 F.3d 234, 237 (6th Cir. 1997)(stating in general that the entire course of dealings is examined); *Plan Administrative Agent v. Coastal Indus., Inc.,* 2005 Bankr. LEXIS 1249 at *40 (citations omitted).

[101] *In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029, 1032 (7th Cir. 1993).

---

"Within a limited range, the timing of a contested payment may vary from the timing of a previous payment" and still qualify as an ordinary business transaction.[102] Even though a transaction only happens occasionally, it may still be "ordinary".[103] Further, the ordinary course defense may exist "even if there is no prior history of dealings and the transactions is the first to take place between the creditor and the debtor."[104]

"Even in an instance in which a debtor has not engaged in previous transactions similar to the one at issue, the 'ordinary course' defense under section 547(c)(2) is available if the transaction in question is a normal financial relationship and is not an 'unusual action' undertaken during the 'slide into bankruptcy'".[105]

The final prong of the ordinary course defense to preferences requires the Defendants to prove that their payments to Heritage were made "according to ordinary business terms."[106] The Fifth Circuit has adopted an "objective" test as followed by the majority of the circuits in determining the meaning of "ordinary business terms" in relation to the ordinary business course exception to preference claims.[107] Thus, "ordinary business terms" must be determined by examining practices in the debtor's industry as opposed to by examining the parties' interactions with each other.[108] The determination of "ordinary business terms" rests with the bankruptcy

---

[102] *Plan Administrative Agent v. Coastal Indus., Inc.,* 2005 Bankr. LEXIS 1249 at *37.

[103] *In re SPW Corp.,* 96 B.R. at 681 (citing *In re Economy Milling Co., Inc.,* 37 B.R. 914, 922 (D. S.C. 1983)); *see, Windsor Communications Group v. Freedom Greeting Card Co. Inc.,* 63 B.R. 770 (E.D. Penn. 1986).

[104] *Plan Administrative Agent v. National Shelter Prods.,* 2004 Bankr. LEXIS 332 at *14 (citing, *Hovis v. Aerospace Solutions, Inc. (In re Air South Airlines, Inc.),* 247 B.R. 153, 163 (Bankr. S.D.C. 2000)).

[105] *Plan Administrative Agent v. National Shelter Prods.,* 2004 Bankr. LEXIS at 332 at *14 (citing, *Gosch v. Burns (In re Finn),* 909 F.2d 903, 908 (6th Cir. 1990)).

[106] 11 U.S.C. §547(c)(2).

[107] *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co.,* 296 F.3d at 368-69.

[108] *Id.* at 369; *See, Mims v. Compaq Computer Corp.,* 2004 Bankr. LEXIS 1992 at *17 (citation omitted).

judge and the court "must satisfy [itself] that there exists some basis in the practices of the industry to authenticate the credit arrangement at issue. Otherwise the practice cannot be considered an 'ordinary way' of dealing with debtors".[109] The business terms are not required to be "identical", however, but instead, "consistent".[110] In summary, the standard in the Fifth Circuit is "whether a particular arrangement is so out of line with what others do that it fails to be 'according to ordinary business terms'".[111]

The Fifth Circuit has recognized that determining the "industry standard should be used by comparison is not always a simple task",[112] but has stated that in order "for an industry standard to be useful as a rough benchmark, the creditor should provide evidence of a credit arrangement of other debtors and creditors in a similar market, preferably both geographic and product."[113]

Therefore, in order for the Defendants to prevail on the third prong of the ordinary course of business defense, the Defendants are required to produce evidence demonstrating that the transactions between Heritage and the Defendants are not out of line with standard industry practice.[114]

---

[109] *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co.,* 296 F.3d at 369. *See, Tolona Pizza,* 3 F.3d at 1033 (stating "'ordinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope [of ordinary business terms].")

[110] *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co.,* 296 F.3d at 368.

[111] *Id.* at 369. *See, Plan Administrative Agent v. National Shelter Prods.,* 2004 Bankr. LEXIS 332 at *18-22 (recounting appropriate language for various circuits, i.e Sixth Circuit (whether transfer was an aberration in the relevant industry); Third and Fourth Circuits (gross departure from the industry norm); Seventh Circuit (so idiosyncratic as to... be extraordinary); and Eighth Circuit (if the transfers were particularly unusual in the relevant industry)(citations omitted).

[112] *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co.,* 296 F.3d at 368 (citing *Tolona Pizza,* 3 F.3d at 1033).

[113] *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co.,* 296 F.3d at 369.

[114] *Gulf City Seafoods, Inc. v. Ludwig Shrimp Co.,* 296 F.3d at 368-69.

In this case, the Defendants expect to present evidence as to each prong to establish that the payment alleged by the Trustee as preferences were made in the ordinary course of business.

## II.    ALTER EGO

The alter ego claims for the Kornman Entities are governed by Delaware law, except as to Financial Marketing (Texas law) and K&A (Tennessee law). *See, Asarco LLC. v. Americas Mining Corp.*, 382 B.R. 49, 65 (S.D. Tex. 2007). Essentially, the Trustee seeks to pierce the corporate veil of Heritage and the Kornman Entities and impose liability upon each of the Kornman Entities, as well as the owners, officers and directors of the Kornman Entities, for the debts of Heritage as the "alter ego" of Heritage.

The shareholders of a corporation and the members of an LLC generally are not liable for the debts of the entity, and a plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces, "a difficult task." *Mason v. Network of Wilmington*, 2005 WL 1653954 (Del.Ch.).

### A.    Delaware Law Requires a Two-Step Analysis of Alter Ego – Single Economic Entity and Evidence of Fraud or Similar Injustice

"Under Delaware law, an alter ego analysis must start with an examination of factors which reveal how the corporation operates and the particular defendants' relationship to that corporation. The factors to be considered as to whether the companies operated as a single economic entity are as follows: (a) whether the corporation was adequately capitalized for the corporate undertaking; (b) whether the corporation was solvent; (c) whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (d) whether the dominant shareholder siphoned funds; and (e) whether, in general, the corporation simply functioned as a facade for a dominant shareholder. *U.S. v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D.Del.1988). In addition, Delaware courts have

built on this analysis and require an element of fraud: "Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice. Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Wallace ex. Rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).

Further, the alleged fraud or inequity must be distinct from the tort alleged in the complaint. *In re Foxmeyer Corp.*, 290 B.R. 229, 234 (Bkrptcy. Del. 2003); see also *Sears, Roebuck & Co. v. Sears, plc*, 744 F.Supp. 1297, 1305 (D.Del. 1990). The fraud or similar injustice that must be demonstrated must, in particular, "be found in the defendants' use of the corporate form. **The underlying cause of action, at least by itself, does not supply the necessary fraud or injustice.** To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." *In re Foxmeyer Corp.*, 290 B.R. at 234 (emphasis added, citations omitted); see also *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 268 (D.Del. 1989); *Richmond v. Indalex, Inc.*, 308 F.Supp.2d 648, 659 (M.D.N.C. 2004)(analyzing Delaware law).

Moreover, the burden of proof under Delaware law to prove alter ego is not by preponderance of the evidence. Instead, there is a greater burden of proof that entails, "if not a clear and convincing evidence standard, at least somewhat greater than merely a preponderance of the evidence standard." *In re Foxmeyer*, 290 B.R. at 237; see also *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del.Ch. 1999)("Persuading a Delaware court to disregard the corporate entity is a difficult task."); *HarcoNational Insurance Co. v. Green Farms, Inc.*, 1989 WL 110537 at *4 (same).

## 1. **The Trustee Does Not Have Sufficient Evidence of a Single Economic Entity**

Defendants have stipulated that Mr. Kornman had some level of control over all of the entity Defendants. However, just because Mr. Kornman was an officer and/or owner of multiple entities does not mean that alter ego has been proven. Just because someone is the sole owner of separate legal entities, even when they are housed in the same office building and possessing the same phone number, does not constitute a sham that "exists for no other purpose than as a vehicle for fraud." *See, Mason v. Network of Wilmington*, 2005 WL 1653954 (Del. Ch.). Merely exercising control over multiple entities, without more, is not enough.

Similarly, mere dominion and control is not enough. *Outokumpu Engineering Enterprises, Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (Del. Ch. 1996). "Under Delaware law to pierce the corporate veil and demonstrate that one entity is the alter ego of another, it must be shown that the other entity exerts 'complete domination and control. The degree of control required to pierce the veil is exclusive domination and control...to the point that...[the dominated entity] no longer has legal or independent significance of its own.'" *Wallace v. Wood*, 752 A.2d 1175, 1183-84 (Del.Ch. 1999); *Lucent Technologies, Inc. v. Gateway, Inc.*, 2007 WL 2900484 at 8 (S.D.Cal.). "It must also be shown that the dominated entity is a 'sham and exists for no other purpose than as a vehicle for fraud.'" *Sunstates Corporation Shareholder Litigation*, 788 A.2d 530, 534 (Del.Ch. 2001)("Plaintiffs' brief simply ignores this more difficult standard...on the contrary, the record shows that each of those entities was engaged in substantial business operations and was formed or acquired by Sunstates for purposes relating to the pursuit of normal business operations."); *see also, Lucent Technologies, Inc.*, 2007 WL 2900484 at *8.

Accordingly, it is expected that the Trustee will fail to present at trial sufficient facts to establish that Heritage and the Kornman Defendants operated as a single economic unit, considering the factors stated above.

## 2. There is No Underlying Fraud or Similar Misconduct

It is clear that the Complaint fails to state exactly what the underlying fraud or similar misconduct is that the Trustee alleges. As stated above, the alleged fraud or inequity must be distinct from the tort alleged in the complaint. *In re Foxmeyer Corp.*, 290 B.R. 229, 234 (Bkrptcy. Del. 2003); *see also, Sears, Roebuck & Co. v. Sears, plc*, 744 F.Supp. 1297, 1305 (D.Del. 1990). The fraud or similar injustice that must be demonstrated must, in particular, "be found in the defendants' use of the corporate form. **The underlying cause of action, at least by itself, does not supply the necessary fraud or injustice**. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." *In re Foxmeyer Corp.*, 290 B.R. at 234 (emphasis added, citations omitted); *see also, Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 268 (D.Del. 1989); *Richmond v. Indalex, Inc.*, 308 F.Supp.2d 648, 659 (M.D.N.C. 2004)(analyzing Delaware law).

But bootstrapping is precisely what the Trustee is attempting to do here. In the Second Amended Complaint, the only factual allegations under Count 10 of the Complaint, "Alter Ego and Sham to Perpetrate Injustice" are found in paragraph 79:

> Defendants Kornman, Walker and the Kornman Entities conducted the business of Heritage and the Kornman Entities as a sham and for the purpose and effect of perpetrating a fraud or injustice on Heritage, its clients and creditors, and the public. Such nominal Kornman Entities were part of an overall scheme to make large amounts of money through the risky 752 strategy; to strip Heritage of money through distributions, wasteful expenses, sham business arrangements with the Kornman Entities; and then to leave Heritage inadequately capitalized and with insufficient assets to pay its creditors.

Thus, the Trustee has plead what amounts to a "siphoning" theory – that the Kornman Entities were dominated and controlled by Kornman, and that such entities were used by Kornman to deliberately siphon off money from Heritage. However, that theory has no basis in the evidence. The evidence will show at trial that each of the so-called "Kornman Entities," as stated above, had separate business and kept separate records, that intercompany transfers were well-documented, that payments to the Kornman Entities were checked against third party service providers to determine what should be charged, as if it were an open-market transaction. Moreover, and more importantly, **other than the money that went to each of these corporations for the services they rendered,** the Trustee has no evidence that there were any other amounts. This is telling for one simple reason – why go through the trouble of siphoning off money in small amounts when all that would otherwise need to be done is to distribute the money in larger amounts through a distribution? The Trustee has sued on the Distributions, alleging that they were intentional fraudulent transfers. But if the Trustee is to be believed, then the alter ego theory is a secondary, and far less efficient, way to accomplish the same objective.

This not only is contradicted by the documents in this case, it flies in the face of logic itself. The intercompany transfers were all documented, and the invoices between the various defendants alone take up thousands of pages. Vickie Walker will testify that one of her main duties was making sure that all of the transfers, invoices, services, and payments by and between the various companies were thoroughly documented.

Accordingly, it is expected that the Trustee will fail to present at trial sufficient facts to establish that Heritage and the Kornman Defendants operated in a manner that unfairly prejudiced Heritage's clients and other creditors or was used to effectuate a fraud.

### 3. Texas and Tennessee Law

The analysis of "alter ego" and "piercing the corporate veil" under Tennessee law is similar to that required under Delaware law. *See Southeast Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 676 (6th Cir 2006). Accordingly, the analysis provided above would also apply to K&A in this proceeding.

The analysis of "alter ego" and "piercing the corporate veil" under Texas law is also similar to that required under Delaware law. *Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317, 325 (5th Cir. 2006). However, Texas law provides that "for the alter ego doctrine to apply against an individual under [the] test, ***the individual must own stock in the corporation***." *Id.* (citing *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643 (5th Cir. 1991)(emphasis supplied).

Texas does recognize a claim for "sham to perpetuate a fraud" which would apply to Financial Marketing "if recognizing the separate corporate existence would bring about an inequitable result." *Bollore*, 448 F.3d at 326. However, for the reasons stated above, it is expected that the Trustee will fail to present at trial sufficient facts to establish that Financial Marketing operated in a manner that unfairly prejudiced *its* creditors or was used to effectuate a fraud.

### 4. The Trustee's "Siphoning" Theory Bars His Fraudulent Conveyance Claims

Under Delaware law, there can be fraud or injustice sufficient to pierce the corporate veil of a subsidiary or subsidiaries if a parent drains assets out of the same. *In re Foxmeyer Corp.*, 290 B.R. at 242. However, the Trustee must be careful what he wishes for when asking for this relief. If the trustee wishes to pierce all of the corporate veils of all of the corporate defendants,

which is what he asks for in his pleadings, ***then there can be no fraudulent conveyance***. <u>See</u> *In re Foxmeyer Corp.*, 290 B.R. at 242.

In the *Foxmeyer* case, the Delaware bankruptcy court reached this very conclusion. In that case, three separate companies were in play: Fox Drug, which was owned by Fox Corp., which was in turn owned by Avatex. Fox Drug and Fox Corp. transferred $575 million to the Defendant banks in the case, and transferred another $198 million to the ultimate parent, Avatex. The Trustee sued to recover that $198 million, arguing that Avatex did not confer reasonably equivalent value for the transfer of the money. In part of the case, the Trustee was advancing an alter ego theory against Fox Drug, trying to show that it and Fox Corp., its immediate parent, were alter egos. The court stated as follows:

> The decision in *Smoothline* can properly be cited for the proposition that fraud or injustice suffice it to pierce the corporate veil of a subsidiary or subsidiaries exists if a parent drains assets out of the same. However, in the instant matter evidence does not exist to the effect that Fox Corp. drained assets out of Fox Drug. Instead, the evidence establishes that Avatex, the parent to Fox Corp. and, thus, ultimately the parent to Fox Drug as well, is the entity that drained assets out of both Fox Drug and Fox Corp. via the June 19, 1996 Transactions. Therefore, such drain of assets provides an injustice for veil piercing but only if the corporate veils of both Fox Drug and Fox Corp. are pierced – i.e., all the way up to Avatex; such drain of assets does not provide an injustice that would support only the corporate veil of Fox Drug and leaving intact the corporate veil of Fox Corp. Of course, the Court does not understand the Trustee to desire to pierce the corporate veils of both debtors all the way up to Avatex ***because to do so would destroy all of the Trustee's fraudulent conveyance claims against the Defendants, which observation the Court makes because (a) such claims rely for their viability upon the adverse effect to the Debtors of the Dividend to Avatex, and (b) the effect of such Dividend disappears or is ignored if the corporate separateness of Fox Drug and Fox Corp. via-a-vis Avatex is no longer respected via veil piercing all the way up to Avatex.***

*In re Foxmeyer Corp.*, 290 B.R. at 242 (citing *Smoothline Ltd. V. North American Foreign Trading Corp.*, 2002 WL 31885795 (S.D.N.Y. 2002))(emphasis supplied).

In the present case, the Trustee has not plead fraudulent conveyance with alter ego as an alternative claim. The Trustee must choose whether the transfers to the Kornman entities were fraudulent or that the Kornman Entities were operated as the alter ego of Heritage. The Trustee may not choose both, as a matter of law.

Dated:  January 2, 2009

Respectfully submitted,

/s/ Bryan J. Wick
Bryan J. Wick
State Bar No. 24003169
Brant C. Martin
State Bar No. 24002529
Wick Phillips, LLP
2100 Ross Avenue, Suite 950
Dallas, TX 75201
(214) 692-6200
(214) 692-6255 fax

Counsel for Defendants Gary M. Kornman, Kornman & Associates, Inc., Steadfast Investments, L.P., GMK Family Holdings, L.L.C., Tikchik Investment Partnership, L.P., GMK Corp., Ettman Family Trust I, Strategic Leasing, L.P., Leascorp., Inc., Valiant Leasing, L.L.C., Executive Aircraft Management L.L.C., Executive Air Crews, LLC, Vehicle Leasing, LLC, The Heritage Organization Agency, Inc., Heritage Properties LLC, Financial Marketing Services, Inc., The Oak Group, L.P., Heritage Advisory Group, L.L.C.

and

J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthew G. Maben
State Bar No. 24037008
Forshey & Prostok, L.L.P

777 Main Street, Suite 1290
Fort Worth, TX 76102
(817) 877-8855
(817) 877-4151 fax

Special Bankruptcy Counsel to Gary M.
Kornman, Kornman & Associates, Inc.,
Steadfast Investments, L.P. GMK Family
Holdings, L.L.C., Tikchik Investment
Partnership, L.P., GMK Corp., Ettman
Family Trust I, Strategic Leasing, L.P.,
Leascorp., Inc., Valiant Leasing, L.L.C.,
Executive Aircraft Management L.L.C.,
Executive Air Crews, LLC, Vehicle
Leasing, LLC, The Heritage Organization
Agency, Inc., Heritage Properties LLC,
Financial Marketing Services, Inc., The Oak
Group, L.P., Heritage Advisory Group,
L.L.C.

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of January, 2008, a true and correct copy of the above and foregoing document was served via ECF electronic notice, where available, and via electronic mail on the parties listed below:

M. David Bryant, Jr.
Cox Smith Matthews Incorporated
1201 Elm Street, Suite 3300
Dallas, TX 75270
dbryant@coxsmith.com

Deborah D. Williamson
Cox Smith Matthews Incorporated
112 E. Pecan Street, Suite 1800
San Antonio, TX 78205
dwilliamson@coxsmith.com

United States Trustee *(via U.S. first class, postage, prepaid mail)*
1100 Commerce Street
Room 976
Dallas, TX 75242-1496

/s/ *Bryan J. Wick*
Bryan J. Wick