Bryan J. Wick
State Bar No. 24003169
Brant C. Martin
State Bar No. 24002529
Wick Phillips, LLP
2100 Ross Avenue, Suite 950
Dallas, TX 75201
(214) 692-6200
(214) 692-6255 fax
bryan.wick@wickphillips.com
brant.martin@wickphillps.com

Jeffrey W. Hellberg, Jr.
Law Office of Jeffrey W. Hellberg, P.C.
State Bar No. 00796738
2100 Ross Avenue, Suite 950
Dallas, TX 75201
(214) 720-1010
(214) 720-1018 fax
jhellberg@hellberglaw.com

Counsel for Defendants

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| THE HERITAGE ORGANIZATION, L.L.C., | § | CASE NO. 04-35574-BJH-11 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

| | | |
|---|---|---|
| DENNIS FAULKNER, Trustee | § | |
| | § | |
| v. | § | ADVERSARY NO. 06-03377 |
| | § | |
| GARY M. KORNMAN, et. al. | § | |

## DEFENDANTS' POST-TRIAL BRIEF

# TABLE OF CONTENTS

I.    Limitations Bar the Trustee's Claims under TUFTA for the April 2001 Distributions ......4

II.   The Trustee Has Not Proven His Claims Under The TUFTA ............................................6

    A.    Standing ...................................................................................................................6

           1.    Dan Koshland and/or the Koshland Family Limited Partnership
                 Are Not a Triggering Creditor As A Matter of Law......................................7

           2.    Any Intent as to the Koshlands Should Not Be Used to Extrapolate
                 Intent to Other Creditors ..............................................................................8

    B.    No Evidence of Fraudulent Intent as to Any of the Alleged Creditors .................10

           1.    The Trustee Cannot Show That There Was Any Intent to Defraud
                 the IRS ........................................................................................................10

           2.    The Trustee Cannot Show That There Was Any Intent to Defraud
                 Ralph Canada..............................................................................................11

           3.    The Client Claimants, including Howard Jenkins, Were Unknown
                 Creditors At the Time of Distributions......................................................14

           4.    The Trustee Cannot Show That There Was Any Intent to Defraud
                 the Koshlands.............................................................................................18

                 a.    The Trustee's Alleged "Direct Evidence" of Fraudulent
                     Intent Toward the Koshlands is Fatally Compromised .................18

                 b.    The "Badges of Fraud" that May Be Attributable to the
                     Koshlands Do Not Satisfy the Trustee's Burden..........................20

    C.    There is No "Confluence" – The Distributions Sued Upon Are Not
         Related to the Alleged Badges of Fraud ...............................................................21

            1.    What is a Confluence?.................................................................................23

            2.    The Distributions Were Made to Equity Owners on a Pro Rata
                 Basis, Not Just to Insiders..........................................................................26

            3.    Consideration Was Provided in the Operating Agreement and The
                 Distributions Were Required .......................................................................26

            4.    There Was No Concealment Related to the Distributions at Issue............28

5. Heritage Was Not Sued or Threatened With Suit..................................30

    a. The Defendants Believed that the 752 Transactions Were Valid.........................................................................................34

6. The Cumulative Course of Conduct Has No Bearing on the Distributions ...........................................................................................34

7. Other Indicia of Fraudulent Intent ............................................................35

D. The Defendants Have Provided Sufficient Evidence of a Legitimate Supervening Purpose ................................................................................38

III. Preferences.............................................................................................................42

A. Rebutting the Presumption – Standard of Proof.....................................42

B. Rebutting the Presumption – Evidence Presented at Trial ...................44

C. Ordinary Course Defense ..........................................................................48

IV. Veil Piercing Causes of Action..........................................................................49

A. Delaware Law - Single Economic Entity ................................................50

B. Delaware Law – Overall Element of Injustice or Unfairness................53

C. Alter Ego – Texas Law – Ownership is Required ..................................54

V. Financial Marketing Services, Inc. ("FMS")....................................................55

VI. A Fraudulent Conveyance Claim is Incompatible with Piercing the Corporate Veil........57

# TABLE OF AUTHORITIES

## Cases

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800(9th Cir. 1994).....................6

*Akers v. Koubourlis (In re Kouborlis)*, 869 F.2d 1319 (9th Cir. 1989).....................43

*Alberto v. Diversified Group Inc.*, 55 F.3d 201 (5th Cir. 1995).................................4, 5

*Aptix Corp. v. Quickturn Design Sys., Inc.*, 148 Fed. App'x 924
    (Fed. Cir. 2005).........................................................................................22

*ASARCO LLC v. Am. Mining Corp.*, 382 B.R. 49 (S.D. Tex. 2007).........................4, 49

*ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008)..........................39

*Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317 (5th Cir. 2006).........................54

*Burtch v. Dent (In re Circle Y of Yoakum, Texas)*, 354 B.R. 349
    (Bankr. D. Del. 2006) ..............................................................................6

*Campbell v. Cannington (In re Econ. Milling Co., Inc.)*, 37 B.R. 914
    (Dist. S.C. 1983) ....................................................................................43

*Cates v. Clark*, 24 S.W.2d 450 (Tex.Civ.App. 1930).....................................................7

*Chicago Daily News v. Siegel*, 72 N.E. 810 (Ill. 1904) ..................................................9

*Connell v. Connell*, 889 S.W.2d 534 (Tex. App.—San Antonio 1994) ...................22, 25

*Devan v. The CIT Group/Commercial Servs., Inc.*, 229 B.R. 337
    (Bankr. D. Md. 1999) ..............................................................................43

*Dime Sav. Bank v. Butler*, No. CV 930349247S, 1997 WL 112776
    (Conn. Super. Ct. Feb. 21, 1997).......................................................31, 32

*Estate of SPW Corp. v. A.P.V. Equip., Inc.* (In re SPW Corp.), 96 B.R. 676
    (Bankr. N.D. Tex. 1989)..........................................................................48

*Fed. Refinance Co., Inc. v. Klock*, 352 F.3d 16, 29 (1st Cir. 2003)...............................39

*Flanigan v. Defeo (In re De Feo Fruit Co., Inc.)*, 24 B.R. 220, 222-23
    (Bankr. W.D. Mo. 1982)..........................................................................40

*Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex. 2008) ......................................17, 47

# TABLE OF AUTHORITIES

*Freeland v. Enodis Corp.*, 540 F.3d 721 (7th Cir.2008) ................................................................22

*GasMark Ltd. Liquidating Trust v. Louis Dreyfus Natural Gas Corp.*
    *(In re GasMark)*, 158 F.3d 312 (5th Cir. 1998)..........................................................42, 43

*Harco Nat'l. Ins. Co. v. Green Farms, Inc.*, No. Civ. A. No. 1131, 1989
    WL 110537 (Del. Ch. Sept. 19, 1989)..................................................................................51

*Hoffinger Indus., Inc. v. Bunch (In re Hoffinger Indus., Inc.)*, 313 B.R. 812
    (Bankr. E.D. Ark. 2004) ........................................................................................................46

*In re Acequia*, 34 F.3d 800 (9th Cir. 1994) ...................................................................................21

*In re Agric. Research & Tech. Group, Inc.*, 916 F.2d 528 (9th Cir. 1990) ......................................6

*In re Brentwood Lexford Partners, LLC*, 292 B.R. 255
    (Bankr. N.D. Tex. 2003)........................................................................................................22

*In re Connell Chevrolet*, No. 01-94-00595-CV, 1994 WL 525902
    (Tex. App.–Houston [1st Dist.] 1994) ..................................................................................31

*In re Cushman Bakery*, 526 F.2d 23 (1st Cir. 1975).....................................................................39

*In re Foxmeyer Corp.*, 290 B.R. 229 (Bankr. Del. 2003).....................................50, 51, 53, 57, 58

*In re Heartland Chem., Inc.*, 103 B.R. 1012 (Bankr. N.D. Ill. 1989)...............................................9

*In re Jacobs*, 394 B.R. 646 (Bankr. E.D.N.Y. 2008)....................................................................22

*In re Keenen*, 19 B.R. 724 (W.D. Mo. 1982) ...............................................................................22

*In re Kempker*, 104 B.R. 196 (W.D. Mo. 1989)......................................................................24, 25

*In re Klutts*, 216 B.R. 558 (Bankr. W.D. Tex. 1997) ...................................................................11

*In re Maronde*, 332 B.R. 593 (Bankr. D. Minn. 2005)..................................................................22

*In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, (E.D.N.Y. 2006).........................................13

*In re Reed*, 700 F.2d 986 (5th Cir. 1983)......................................................................................22

*In re Sherman*, 67 F.3d 1348 (8th Cir. 1995) .........................................................................21, 39

*In re Sissom*, 366 B.R. 677 (Bankr. S.D. Tex. 2007) ...................................................................22

# TABLE OF AUTHORITIES

*In re Soza*, 542 F.3d 1060 (5th Cir. 2008) ................................................................22

*In re Stanley*, 384 B.R. 788 (Bankr. S.D. Ohio 2008) ...............................................41

*In re Teknek*, 343 B.R. 850 (Bankr. N.D. Ill. 2006) ..................................................22

*In re Unglaub*, 332 B.R. 303 (Bankr. N.D. Ill. 2005) ................................................22

*Katz v. Wells (In re Wallace's Bookstores, Inc.)*, 316 B.R. 254
    (Bankr. E.D. Ky. 2004) ..........................................................................................47

*Kelly v. Armstrong*, 206 F.3d 794 (8th Cir. 2000) ....................................................39

*Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R.
    535 (Bankr. D. Del. 2002) ....................................................................................46

*Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357 (S.D.N.Y. 2003) ................................39

*Lucent Tech., Inc. v. Gateway, Inc.*, Nos. 02-2060-B (CAB), 03CV0699-
    B(CAB), 03CV1108-B(CAB), 2007 WL 2900484
    (S.D.Cal. Oct. 1, 2007) ...................................................................................51, 52

*Martineau v. Arco Chem. Co.*, 25 F. Supp. 2d 762 (S.D. Tex. 1998) ........................27

*Mason v. Network of Wilmington*, No. Civ. A. 19434-NC,
    2005 WL 1653954 (Del.Ch. July 1, 2005) ....................................................49, 51

*Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del.
    1989) ................................................................................................................50, 53

*NetJets Aviation, Inc. v. LHC Comm'ns, LLC.*, 537 F.3d 168
    (2nd. Cir. 2008) .....................................................................................................57

*Nick Corp. v. JNS Aviation, Inc. (In re JNS Aviation, LLC)*, 376 B.R. 500
    (Bankr. N.D. Tex. 2007) ........................................................................................49

*Oakes v. Spalding (In re Oakes)*, 7 F.3d 234 (6th Cir. 1993) ....................................47

*Official Unsecured Creditors' Comm. of Long Dev., Inc. v. Oak Park
    Village Ltd P'ship*, 117 F.3d 1420 (table), 1997 WL 377055
    (6th Cir. 1997) .......................................................................................................42

*Outokumpu Eng'g Enterp., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d
    724 (Del. Ch. 1996) ...............................................................................................51

*Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643
(5th Cir. 1991) ..................................................................................54

*Rand Energy Co. v. Del Mar Drilling Co., Inc. (In re Rand Energy Co.)*,
2000 Bankr. LEXIS 1607 (Bankr. N.D. Tex. July 28, 2000) ...........................44

*Richmond v. Indalex, Inc.*, 308 F. Supp. 2d 648, 659 (M.D.N.C. 2004) .................50, 53

*Roland v. United States*, 838 F.2d 1400 (5th Cir. 1988) ...............................7

*Sandoz v. Fred Wilson Drilling Co. (In re Emerald Oil Co.)*, 695 F.2d
833, 839 (5th Cir. 1983) ...................................................................42, 43

*Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997)........................17

*Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435
S.W.2d 854 (Tex. 1968) ....................................................................26

*Sears, Roebuck & Co. v. Sears, plc*, 744 F. Supp. 1297 (D.Del. 1990)...................50, 53

*Sheffield Steel Corp. v. HMK Enter., Inc. (In re Sheffield Steel Corp.)*, 320
B.R. 423 (Bankr. N.D. Okla. 2004) ...........................................................6

*Sherman v. FSC Realty LLC*, 292 B.R. 255 (Bankr. N.D. Tex. 2003) .........................27

*Sierra Steel, Inc. v. Totten Tubes, Inc., (In re Sierra Steel, Inc.)*, 96 B.R.
275 (B.A.P. 9th Cir. 1989)...................................................................44

*Silverman Consulting, Inc. v. Hitachi Power Tools, USA, Ltd. (In re
Payless Cashways, Inc.)*, 290 B.R. 689 (Bankr. W.D. Mo. 2003) ........................44

*Smith v. Am. Founders Fin. Corp.*, 365 B.R. 647 (S.D.Tex. 2007)...........................7, 8

*Smoothline Ltd. V. N. Am. Foreign Trading Corp.*, No. 00 Civ 2798 DLC,
2002 WL 31885795 (S.D.N.Y. 2002)............................................................58

*SSP Partners v. Gladstrong Investments*, ---S.W.3d---, 52 Tex. Sup. Ct. J.
95, 2008 WL 4891733 (Tex. Nov. 14, 2008) .................................................55

*Sun Sport, Inc.*, 260 B.R. 88 114-15 (Bankr. E.D.Nev. 2000) ..............................29

*Sunstates Corp. S'holder Lit.*, 788 A.2d 530, 534 (Del.Ch. 2001)..........................52

# TABLE OF AUTHORITIES

*Sw. Holdings, LLC v. Kohlberg and Co. (In re Sw. Supermarkets, LLC.)*,
   315 B.R. 565 (Bankr. D. Az. 2004), vacated in part,
   376 B.R. 281 (2007) ..................................................................................49, 57

*Taylor v. Bonilla*, 801 S.W.2d 553 (Tex. App.—Austin 1990, writ denied)................................27

*Tex. Gas Util. Co. v. Barrett*, 460 S.W.2d 409 (Tex. 1970).........................................................27

*The Richards Group, Inc. v. Brock*, No. 06-0799, 2008 WL 2797899
   (N.D. Tex. 2008).................................................................................................4

*Toy King Distr., Inc. v. Liberty Sav. Bank, FSB (In re Toy King
   Distributors, Inc.)*, 261 B.R. 1 (Bankr. M.D. Fla. 2000).......................................44, 45, 48

*Traina v. Whitney Nat'l Bank*, 109 F.3d 244, 246 (5th Cir. 1997).................................................6

*U.S. v. Chapman*, 756 F.2d 1237, 1241 (5th Cir. 1985)...................................................................7

*U.S. v. Evans*, 513 F. Supp. 2d 825, 836 (W.D. Tex. 2007).................................................7, 14, 22

*U.S. v. Executive Auto Haus, Inc.*, 234 F. Supp. 2d 1253 (M.D. Fla. 2002) .....................11, 13, 14

*U.S. v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D. Del.1988).............................................50

*Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).......................................................50, 51

**Statutes**

Del. Code Ann. §18-607(c) ...........................................................................................................4

Tex. Bus. & Com. Code §24.005(a)(1) .........................................................................................6

Tex. Bus. & Com. Code §24.005(a)(2) .........................................................................................6

Tex. Bus. Corp. Act. Ann. §8.02 ................................................................................................5, 6

Tex. Bus. Corp. Act. art. 2.21 ....................................................................................................55

**Rules**

FED. R. EVID. 301.........................................................................................................................43

## DEFENDANTS' POST-TRIAL BRIEF

TO THE HONORABLE BARBARA J. HOUSER, U.S. BANKRUPTCY JUDGE:

COME NOW, Defendants Gary M. Kornman, Kornman & Associates, Inc., Steadfast Investments, L.P. GMK Family Holdings, L.L.C., Tikchik Investment Partnership, L.P., GMK Corp., Ettman Family Trust I, Strategic Leasing, L.P., Leascorp., Inc., Valiant Leasing, L.L.C., Executive Aircraft Management L.L.C., Executive Air Crews, LLC, Vehicle Leasing, LLC, The Heritage Organization Agency, Inc., Heritage Properties LLC, Financial Marketing Services, Inc., Heritage Advisory Group, L.L.C. (collectively, "Defendants"), hereby file Defendants' Post-Trial Brief, as follows:

### Summary of Argument

In this case, the Trustee primarily seeks to avoid distributions from April 2001 until January 2003 (the "Distributions") made to the equity owners and investors in The Heritage Organization, L.L.C. ("Heritage"). The Trustee has brought what can, at best, be described as a circumstantial case. Instead of a unified, single theory of one or more actual intentional fraudulent transfers, as is almost always seen in cases of this nature, the Trustee has chosen to string together a series of episodes of supposedly "bad conduct", most of which is totally unrelated to the Distributions at issue, to allegedly prove that Defendants were fully aware from 2001, 2002 and 2003 of all of the following facts:

    (a)     there were creditors that would arise from Heritage's business practices *and,*

    (b)     all of those creditors would bring claims, against Heritage *and*

    (c)     all of those claims would be successful even though all of the present creditors had executed written documents invalidating any claims against Heritage, *and*

(d)     the Distributions were intended to hinder, delay or defraud these "creditors".

The fact of the matter is that Heritage was in the business of providing educational services about information related to estate planning, business planning, tax planning and asset planning. Heritage was in the business of providing this information to extremely wealthy and sophisticated business owners – persons and/or entities with net worth in the hundreds of millions, and sometimes billions, of dollars. These clients, who make up the vast majority of the creditors in this case and stand to be the beneficiaries of any recovery, voluntarily implemented 752 transactions with the full knowledge of what they were doing and the risks involved. The only other major creditor in this case, Ralph Canada, is the former President of Heritage, one if its three Principals from 1995 until 2002, and served as outside legal counsel from 1985-1995. Canada personally engaged in the exact same conduct and behavior as that which the Trustee now complains of against the Defendants. Now, Canada wants this Court to believe that he has clean hands and should be a primary beneficiary of any recovery from these Defendants.[1]

The Trustee cannot carry his burden to prove that the Distributions alleged in the complaint were made with the actual intent to hinder, delay or defraud any creditors. This is because either:

(a)     the Defendants did not know that the creditors existed, thus precluding any finding that there was an actual intent to hinder, delay, or defraud any creditors; and/or

(b)     the claims of the alleged creditors were and are so tenuous, and the lack of proof in this action cannot prove them; and/or

(c)     the Distributions were clearly justified by the fact that Heritage was a pass-through taxable entity and therefore had to distribute to its owners

---

[1] The Trustee also claims that the IRS is a creditor that Defendants were trying to hinder, delay or defraud, even though the claim was unknown to anyone at the time. Finally, the Trustee claims that the Defendants intended to hinder, delay or defraud Dan Koshland and his family partnership, who were members of Heritage and who never brought a lawsuit and never filed a claim. Each of these creditors will be dealt with in turn below.

sufficient cash distributions for its owners to pay their income tax liabilities on the taxable profits from Heritages operations; and/or

(d)    Heritage's Operating Agreement required it to distribute Heritage's excess cash to its owners.

The Court should not reasonably find that the Trustee has carried his burden by a preponderance of the evidence.

In conjunction with the Trustee's tenuous circumstantial case as it relates to the Distributions, he has also brought claims of preferences and alter ego. As with the fraudulent transfer action, however, the Trustee has failed to prove his case. The preference case fails because the Trustee has admitted that it has no evidence of insolvency, and Defendants have adequately rebutted the presumption of insolvency within the 90-day period. Moreover, the Defendants have established the ordinary course of business defense with respect to payments to THO Agency and Heritage Properties. Defendants have provided financial statements, testimony of other assets, and testimony regarding liabilities, all of which are sufficient to rebut the presumption under applicable case law. Without any evidence of insolvency, therefore, the Trustee's claim fails because the Trustee retains the burden of proof on that issue.

As for the Trustee's alter ego case, these claims fail for many of the same reasons that the fraudulent transfer case fails. That is, the evidence is wholly circumstantial, and the Trustee cannot make the connections necessary to prove that the corporate structure of the various Defendant entities was abused to the detriment of creditors. In short, there is no evidence of a separate underlying tort, or the abuse of the corporate structures, that can support a finding of alter ego.

This Court is all too familiar with the issues surrounding this bankruptcy, and the delays that have attended this particular adversary action because of Mr. Kornman's other pending

matters. But whatever delays may have occurred, the procedural history of this case does not forgive or forego the Trustee's burden of proof. As this Court has previously noted, the Trustee's case is built with "a piece from here, and a piece from there", and the Trustee wants this Court to make the connections that he has failed to prove. Defendants submit that it is neither appropriate, nor possible, for this Court to do so.

## I. Limitations Bar the Trustee's Claims under TUFTA for the April 2001 Distributions

There is no dispute that $10,000,000 of the Distributions made the subject of the Trustee's claims were made in April 2001, more than three years before Heritage filed bankruptcy. There is also no dispute that Heritage is a Delaware limited liability company.

Bankruptcy courts apply the choice-of-law rules of the forum in which they sit. *ASARCO LLC v. Am. Mining Corp.*, 382 B.R. 49, 60-61 (S.D. Tex. 2007). In Texas, when deciding which state's law to apply in determining the liability of an interest holder, the court looks to the law of the jurisdiction of formation of the entity which is involved. *See Alberto v. Diversified Group Inc.*, 55 F.3d 201, 203 (5th Cir. 1995)(the substantive law of Delaware should be applied to determine liability of under alter ego theory); *The Richards Group, Inc. v. Brock*, No. 06-0799, 2008 WL 2797899, at *2 (N.D. Tex. 2008); *ASARCO*, 382 B.R. at 64-65.

Delaware law provides the following with respect to the liability of an interest holder concerning distributions to members of a limited liability company:

> Unless otherwise agreed, a member who received a distribution from a limited liability company *shall have no liability under this chapter or other applicable law* for the amount of the distribution *after the expiration of 3 years from the date of the distribution* unless an action to recover the distribution from such member is commenced prior to the expiration of the said 3-year period and an adjudication of liability against such member is made in the said action.

DEL. CODE ANN. §18-607(c)(emphasis supplied).

The Trustee argues that the limitations period imposed by Delaware law on a Delaware limited liability company does not apply and that Texas law, which provides for a four year statute of repose, should govern. *See*, Trustee's Brief in Support of Closing Argument, pp. 3-4. This argument ignores the plain language of the Delaware statute applying the limitation of a claim for the return of the distribution to any "other applicable law," which, in this instance, would include the TUFTA, and the Trustee has provided this Court with no authority to establish that the four-year limitations period he seeks to utilize supersedes the time set forth under Delaware law.

Moreover, the Trustee refers to the Delaware "internal affairs" doctrine. However, because this Court sits in Texas and because this Court must apply the Texas' conflict rule on choice of law, it is the Texas "internal affairs" doctrine that controls the determination. *See Alberto*, 55 F.3d at 203-04(the district court had to apply the conflict of laws rule of the state in which is sits to determine which state's substantive law should be applied); TEX. BUS. CORP. ACT. ANN. §8.02("only the laws of the jurisdiction of incorporation of a foreign corporation shall govern (1) the internal affairs of the foreign corporation…and (2) the liability, if any, of shareholders of the foreign corporation for the debts, liabilities, and obligations of the foreign corporation for which they are not otherwise liable by statute or agreement.")

Section 18-607(c) governs because: (i) the Trustee seeks to declare prior ***distributions*** from Heritage to its members as fraudulent (as contrasted with other types of transfers); (ii) the Delaware statute expressly limits the liability for ***distributions*** to three years; and (iii) a ***distribution*** from an entity to its owners is a matter falling under "the internal affairs of the foreign corporation, including but not limited to, the rights, powers, and duties of its board of

directors and shareholders **and matters related to its shares**...." *See* Tex. Bus. Corp. Act. Ann. §8.02 (emphasis supplied); *Burtch v. Dent (In re Circle Y of Yoakum, Texas)*, 354 B.R. 349, 359 (Bankr. D. Del. 2006)(Delaware Court applied Texas applicable limitations period as debtor was Texas corporation and internal affairs doctrine applied to claim for breach of fiduciary duty).

## II.    The Trustee Has Not Proven His Claims Under The TUFTA

### A. Standing

In order to prevail on his claims under section 24.005(a)(1) of the TUFTA, the Trustee must prove that Heritage made the Distributions to members "with actual intent to hinder, delay, or defraud any creditor" of Heritage. *See,* Tex. Bus. & Com. Code §24.005(a)(1).[2]

Pursuant to 11 U.S.C. 544(b), the Trustee steps into the shoes of any unsecured creditor holding an allowable claim.[3] It is the Trustee's burden to establish the existence of such a triggering creditor. If a triggering creditor is shown to exist, the Trustee can only exercise the avoiding rights that would have been available to that creditor under applicable non-bankruptcy law, here the TUFTA. That is, the Trustee must be able to establish each element that the triggering creditor would be required to establish in order to avoid the transfer in question.

Here, the Trustee relies upon section 24.005(a)(1) of the TUFTA, which in relevant part

---

[2] In the Complaint, the Trustee also plead causes of action under section 24.005(a)(2) of the TUFTA, requiring that Heritage made the challenged transfers without receiving reasonably equivalent value **and** either: (a) Heritage was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction **or** (b) Heritage intended to incur or believed or reasonably believed that Heritage would incur debts beyond its ability to pay as they became due. *See,* Tex. Bus. & Com. Code §24.005(a)(2). However, that cause of action was not included in the Trustee's pre-trial brief, and no evidence was adduced at trial as to either of these elements. Therefore, judgment for the Defendants on this claim is required as a matter of law.

[3] *See Traina v. Whitney Nat'l Bank,* 109 F.3d 244, 246 (5th Cir. 1997) (In bringing an avoidance action under section 544(b), the trustee may avoid transfers "by stepping into the shoes of an unsecured creditor."); *Acequia, Inc. v. Clinton (In re Acequia, Inc.),* 34 F.3d 800, 809 (9th Cir. 1994), *citing In re Agric. Research & Tech. Group, Inc.,* 916 F.2d 528, 534 (9th Cir. 1990); *Sheffield Steel Corp. v. HMK Enter., Inc. (In re Sheffield Steel Corp.),* 320 B.R. 423, 446 n. 14 (Bankr. N.D. Okla. 2004) ("The trustee's Section 544(b) power to avoid a transfer under state fraudulent transfer law is derived from 'stepping into the shoes' of an actual creditor who has standing to avoid the transfer under the applicable state law.").

---

reads as follows:

> A transfer made … by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made … , if the debtor made the transfer … : (1) with the actual intent to hinder, delay or defraud any creditor of the debtor; …

This requires the Trustee to establish a triggering creditor whose claim arose before or within a reasonable time after each transfer in question, and to demonstrate that each such transfer was made with actual intent to hinder, defraud or delay some creditor of the debtor. The requisite intent to hinder, delay or defraud must be established as of the date of the transfer.[4] Proof of fraudulent intent at some later or other date is not sufficient. *See United States v. Chapman*, 756 F.2d 1237, 1241 (5th Cir. 1985)(for a conveyance to be fraudulent, it is necessary for the intent to exist at the time of the conveyance). The upshot of this is that, while the triggering creditor may be one whose claim arose a reasonable time thereafter, the intent to hinder, defraud or delay some creditor must be demonstrated as of the time of each allegedly fraudulent transfer.

    1. Dan Koshland and/or the Koshland Family Limited Partnership Are Not a Triggering Creditor As A Matter of Law

As a threshold matter, the Trustee cannot rely on Dan Koshland, or the Koshland Family Limited Partnership (collectively, the "Koshlands"), as a triggering creditor. A person or entity can only qualify as a triggering creditor if such person or entity has an "allowable" unsecured claim. To have an allowable unsecured claim, a creditor must satisfy the requirements of the

---

[4] *See United States v. Chapman*, 756 F.2d 1237, 1241 (5th Cir. 1985) ("In order for a conveyance to be held fraudulent as to one who became a creditor subsequent to the transaction, 'it is necessary that the intent exist at the time [of the conveyance] to shield the property from debts thereafter to be incurred.'") *quoting Cates v. Clark*, 24 S.W.2d 450, 453 (Tex.Civ.App. 1930); *U.S. v. Evans*, 513 F.Supp.2d 825, 836 (W.D. Tex. 2007) (same); *see also Roland v. United States*, 838 F.2d 1400, 1402 (5th Cir. 1988) ("A subsequent creditor could reach a grantor's interest in property conveyed to others if that transfer was made with intent to defraud that particular creditor.").

Bankruptcy Code, including timely filing a proof of claim. *Smith v. Am. Founders Fin. Corp.*, 365 B.R. 647, 658-659 (S.D.Tex. 2007).

The Koshlands have never filed a proof of claim, and cannot file one now under Section 502 since they have released their claims against the Trustee. Testimony of Dennis Faulkner (1/15/09) 130:9-131:4; *see Smith, 365 B.R. at 659* ("To have an allowable unsecured claim, a creditor must also satisfy the requirements of the Bankruptcy Code, including timely filing a proof of claim."). As a matter of law, since the Koshlands could not file a proof of claim now even if they wanted to, they cannot serve as a triggering creditor. The court in *Smith* makes this explicit, that where the unsecured creditor fails to file a proof of claim, the claim is not allowable under the Bankruptcy Code, and the unsecured creditor may not operate as a "triggering" creditor. For this reason, the Trustee has no standing to avoid transfers based on the Koshlands as an unsecured "triggering" creditor.

> 2. Any Intent as to the Koshlands Should Not Be Used to Extrapolate Intent to Other Creditors

The Defendants do not concede that there is any evidence that they acted with intent to delay, defraud or hinder the Koshlands or any related entity. See Section II(B)(4), *infra.* Regardless, should the Court find that there is evidence of intent to defraud the Koshlands, the Defendants also believe that this Court should examine a legal issue that may be one of first impression.

The Trustee asserts that once a triggering creditor is established, any intent as to any other party can be attributed to the Defendants. See Trustee's Brief at 1-2. According to the Trustee, if the Court finds that the Defendants acted with intent to defraud the Koshlands (who do not qualify as triggering creditors), then that actual intent may be bootstrapped onto the other alleged creditors that do qualify as triggering creditors. Id.

While Defendants have been unable to locate a case contravening this statement, it is illogical that in the context of an <u>intentional</u> fraudulent transfer case, actual intent can be bootstrapped from one creditor that cannot serve as a triggering creditor, to another that can. Actual intent either exists or it does not. There is a distinct difference between a case solely brought on an intentional fraudulent transfer basis, such as this one, rather than on theories of both intentional fraudulent transfer and constructive fraudulent transfer. In a constructive fraudulent transfer case, the question of actual intent is not operative and it is not necessarily a contravention of the statute to carryover proof of constructive intent toward one party to another. But in an intentional fraudulent transfer case, the showing has to be actual intent. It is a contradiction of the statutory language to be able to infer actual intent from a creditor that does not qualify under the statute as one that is allowed to recover. Where, as here, there is no constructive fraudulent transfer issue left to determine, then it is a legal impossibility for the Court to find that actual intent as to one person (who is not a creditor) can be attached to another entity that is a creditor.

To allow this would be to confuse the concept of a "triggering creditor" with the burden of proof. The Trustee must still prove that the Defendants made the Distributions sued upon with the requisite intent. Simply because a triggering creditor may exist does not mean that, *ipso facto*, it can be assumed that the Defendants *actually intended to defraud, hinder, or delay* the creditors. *See In re Heartland Chem., Inc.*, 103 B.R. 1012, 1016 (Bankr. N.D. Ill. 1989)("If the conveyance was made before the indebtedness was incurred, then there was no fraud, as there was no design to hinder or delay creditors at the time"), *citing Chicago Daily News v. Siegel*, 72 N.E. 810 (Ill. 1904). The only claims left in this case related to the Distributions are claims for intentional fraudulent transfer – not constructive fraudulent transfer, nor anything else. Simply

because there is a triggering creditor, and even if there is some indicia of intent to defraud a wholly unrelated person[5], that cannot meet the burden for proving <u>actual intent to defraud</u>.

### B. <u>No Evidence of Fraudulent Intent as to Any of the Alleged Creditors</u>[6]

The evidence in this case is clear that that each of the supposed "creditors" claimed by the Trustee either (a) were not creditors known at the time of the Distributions (and thus the Defendants could not as a matter of law or logic have intended to defraud them) or (b) even if they were known, the Defendants believed that they had complete and absolute defenses to each one of them (and thus the Defendants could not have intended to defraud creditors that they believed held worthless claims). Moreover, there was no intent to defraud, as Heritage maintained sufficient assets following each Distribution, and specifically, substantial amounts of cash. *See* Defendant's Exhibit 280. Each of these supposed "creditors" is dealt with in turn below.

1. The Trustee Cannot Show That There Was Any Intent to Defraud the IRS

---

[5] Defendants do not concede any such intent.

[6] Attendant with this discussion, an underlying fallacy must be recognized -- the connection between these creditors and the <u>Distributions upon which the Trustee has brought this lawsuit</u> are simply too tenuous to support a judgment. "While a single badge of fraud may only create a suspicious circumstance, several considered together may allow an inference of fraud. Courts, however, do not determine the presence or absence of actual intent in a vacuum. Rather, courts take all facts surrounding <u>the conveyance</u> into account." *U.S. v. Executive Auto Haus, Inc.*, 234 F. Supp. 2d 1253 (M.D. Fl. 2002)(emphasis added, citations omitted); *see also In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 38-39 (E.D.N.Y. 2006)(allegations of the badges of fraud must be made in the context of the transactions pled, and complaint dismissed where allegedly fraudulent scheme is pled but not the connection between the scheme and the transfers sued upon). It is not enough to show that one or more Defendants have engaged in conduct that the Trustee, or even the Court, may not like. It is the <u>conveyance</u>, and the transferor's intent when it occurred, that is dispositive. Nothing in any of the cases cited by the Trustee indicates that the Court can take judicial notice of conduct wholly unrelated to the transactions at issue, and find actual intent to defraud therefrom.

Instead, the Trustee's cases all follow the more traditional path – the transactions at issue were clearly connected to the intent of the transferor. Here, despite the Trustee's best efforts, that is simply not the case. To use the "badges of fraud" to prove a circumstantial case of actual intent, there still must be a "confluence" between the badges of fraud and the transfers at issue. The Trustee simply cannot bridge that gap in the case at bar because there is no such confluence. <u>See</u> Section II(C), *infra*.

---

The Trustee simply cannot prove that the Defendants intended to defraud the IRS. The IRS' claim is based on <u>unassessed</u> taxes that allegedly accrued years before the claim was made. Pre-Trial Order, Para. 97. The IRS did not even assess the taxes until after the filing of the bankruptcy petition, which is a year and a half after the last Distribution. The Court cannot find that the Defendants intended to defraud a creditor about which they had no knowledge. *See U.S. v. Executive Auto Haus*, 234 F. Supp. 2d 1253, 1257 (M.D. Fl. 2002)(cannot intend to hinder, delay or defraud if there is no knowledge of the IRS claim); *see also In re Klutts*, 216 B.R. 558, 560 (Bankr. W.D. Tex. 1997)(no evidence of fraudulent transfer, especially where no lien was recorded until after the property was transferred).

Simply listing a number of circumstantial badges of fraud, however numerous and tenuous they may be, does not create a fraud case and certainly cannot make one out of whole cloth. Badges of fraud are merely factors which aid the Court in determining whether intent existed. Their presence, or lack thereof, are not determinative of actual intent. *Executive Auto Haus*, 234 F. Supp. 2d at 1257. It is axiomatic that there can be no intent to defraud a creditor when that creditor was unknown to the Defendants. *Id.* at 1257. When circumstances clearly show that an actual intent to defraud is not <u>possible</u>, then the badges of fraud, if not wholly irrelevant, clearly do not carry the weight that the Trustee would like this Court to believe.

2. The Trustee Cannot Show That There Was Any Intent to Defraud Ralph Canada

Ralph Canada was the President of Heritage and participated in the education of clients related to the 752 transactions. Testimony of Ralph Canada (1/15/09) 27:6-14; 88:16-18; Testimony of Gary Kornman (1/12/09) 66:4-10. Between 1999 and 2002, when he left Heritage, Canada was paid approximately $3,000,000 from his activities in conjunction with the Defendants. Testimony of Ralph Canada (1/15/09) 89:4-6. He left Heritage in July 2002, over a

dispute regarding compensation on the Flinn case, and filed an arbitration. Testimony of Ralph Canada (1/15/09) 46:14-47:4; 51:18-52:13.

It cannot be disputed that Ralph Canada was not a "triggering creditor" related to the Distributions prior to his departure in July 2002. While the Trustee attempts to use Canada's testimony to relate the dispute back to August 2000, it is undisputed that Ralph Canada continued to work at Heritage, and receive millions of dollars in compensation, all while supposedly being a "creditor" of Heritage. Testimony of Ralph Canada (1/15/09) 89:25-90:14. If he truly thought he had a claim, why would he work there for another two years before leaving? And after he left, he began suing other firms for providing the same type of services that he performed while at Heritage, and made millions of dollars doing so. Testimony of Ralph Canada (1/15/09) 71:2-9. All of this leaves the Court with this playing field: the Trustee's star witness is the one person that will (a) benefit the most from this litigation if a judgment is recovered, (b) sold the same services that the Trustee now claims was doomed from the start, (c) made millions of dollars doing so but was not sued by the Trustee, (d) sued on an oral promise that contravened an employment agreement that he wrote, and (e) "switched sides" and began suing other firms for the exact same services that he once sold himself.[7]

Moreover, even assuming that Canada's filing of the arbitration claim in July 2002 qualifies as a lawsuit or "threat of suit" under TUFTA, and thus brings into play the Distributions from July 2002-January 2003, it is also undisputed that the Canada claim was hotly disputed up through and including the date of the arbitration award, in April 2004. Further, in hindsight, following each Distribution from July 2002-January 2003, Heritage had sufficient assets to

---

[7] "Will all great Neptune's ocean wash this blood
Clean from my hand? No, this my hand will rather
The multitudinous seas incarnadine,
Making the green one red." William Shakespeare, *Macbeth. Act II, Scene 2.*

satisfy the amount of the Canada award. See Defendants' Exhibit 280. Canada himself admits that his employment agreement contained a "no oral modifications" clause, and that he drafted parts of the agreement himself. Testimony of Ralph Canada (1/15/09) 69:10-20. He also admits that the modification upon which his arbitration claim was based was an oral modification. Testimony of Ralph Canada (1/15/09) 69:24-70:12. Both Gary Kornman and Vickie Walker testified that they were relying on that clause as an absolute defense to the Canada claim, and that they never considered that Canada would prevail on his claims. Testimony of Vickie Walker (1/14/09) 11:19-12:2; Testimony of Gary Kornman (1/12/09) 66:15-22.

Notably missing from the Trustee's proof is any indication that Gary Kornman or any other Defendant had any inkling that Canada would be successful in his claims when the Distributions were made. There is simply no testimony to countervail the intent of the Defendants, and their absolute and unqualified belief that Canada's claim had no merit. Canada himself testified that the litigation was hotly disputed, and he admitted that Gary Kornman thought the "no oral modification" clause presented a complete defense. Testimony of Ralph Canada (1/15/09) 70:6-12. No documentary evidence exists, and no deposition testimony exists, that Gary Kornman did not unshakeably believe that Canada was on the wrong side of the contract, and the wrong side of the law.

Also, the Trustee's purported "badges of fraud" have nothing to do with Ralph Canada at all. There is no indication that any of the alleged bad acts claimed by the Trustee have any temporal or causal connection to the Canada claim. Again, courts do not determine the presence or absence of actual intent in a vacuum. Rather, courts take all facts surrounding the conveyance into account." *Executive Auto Haus, Inc.*, 234 F. Supp. 2d at 1257 (emphasis added, citations omitted); *see also In re Monahan Ford Corp. of Flushing*, 340 B.R. 1, 38-39 (E.D.N.Y.

2006)(allegations of the badges of fraud must be made in the context of the transactions pled, and complaint dismissed where allegedly fraudulent scheme is pled but not the connection between the scheme and the transfers sued upon). Canada's complaints over an employment dispute have no tenable connection to the Distributions, whether before or after his departure in July 2002. No evidence has been presented tending to show that Gary Kornman or any other defendant had any inkling that they needed to declare the Distributions in order for Ralph Canada to not get paid. When combined with the fact that Canada himself was engaged in the same type of "risky behavior" that the Trustee is using against the Defendants in connection with the 752 transactions, and there is simply no connection between the Distributions alleged and anything having to do with Ralph Canada.

### 3. The Client Claimants, including Howard Jenkins, Were Unknown Creditors At the Time of Distributions

The above analysis regarding the FICA taxes and the IRS as a supposed triggering creditor can be applied to all of the Client Claimants as well. It is not possible that the Client Claimants could be seen as a "known creditor" at the time of the Distributions. If the Defendants had no knowledge of the creditors, and did not think they existed, then it is not possible for the Defendants to have the requisite actual intent to defraud, delay or hinder them. *Executive Auto Haus*, 234 F. Supp. at 1257.[8]

None of the Client Claimants, other than Howard Jenkins, made any claims whatsoever until after the bankruptcy petition was filed. Pre-Trial Order, Para. 3. When combined with the

---

[8] The Trustee cites *U.S. v. Evans*, 513 F.Supp.2d 825 (W.D. Tex. 2007) for the proposition that "a transfer made with a fraudulent intent to evade future liabilities is void as to subsequent creditors." See Trustee's Brief at 3, n.5. However, that assumes that the transferor knew about the creditors, or had any reasonable belief that later creditors would ever have a claim. The sheer hurdles that the client claimants, Jenkins, Canada or Koshland would have to jump in order to bring any type of claim lend credence to Mr. Kornman's vehement testimony that he believed the claims, even the ones that were eventually brought after the Distributions, were worthless.

fact that all of the Client Claimants had signed the client agreements containing the releases, indemnities, disclaimers of reliance, etc., it cannot be argued that there could have been any intent to defraud persons who had never made a claim, had released any claims ahead of time, and who were fully apprised of all of the risks.

The Trustee's next argument regarding the Client Claimants, that their claims were not only tenable, but also <u>foreseeable,</u> because the Client Claimants were fraudulently induced into signing the Client Agreements, fails for a complete lack of proof in the record. The Trustee would have this Court believe, on the record before it, that:

    a. The Defendants fraudulently induced clients into signing the Client Agreements; *and*

    b. As a result, the releases and waivers in the Client Agreements were completely unenforceable; *and*

    c. Every client was going to sue; *and*

    d. Every client was going to win; *and*

    e. Every client was going to win damages in excess of the cash that Heritage had on its books; *and*

    f. That every single step in this syllogism was completely foreseeable from April 2001 forward.

Compare the above chain of events, which the Trustee believes is crystal clear, with the actual evidence in this case:

    a. The Defendants fraudulently induced clients into signing the Client Agreements;

       *Fact: There is no evidence of any fraudulent inducement whatsoever. The Trustee did not call any of the Client Claimants as witnesses to provide any evidentiary basis for a fraudulent inducement claim. If the Trustee*

*wanted to rely on the Client Claimants to prove the fraudulent intent, then he should have called some of them, **any of them**, as witnesses, but he chose not to.*

*Moreover, even Ralph Canada[9] stated that the clients "were all big boys," who "knew what they were doing" and had been completely advised of the risks of the transactions. Testimony of Ralph Canada (1/15/09) 75:16-76:3. Canada also testified that Gary Kornman was even more obsessive about walking the clients through the releases and provisions of the Client Agreement than anyone else. Testimony of Ralph Canada (1/15/09) 91:16-25. The Client Claimants themselves were attempting to avoid paying tens of millions of dollars in taxes. For the Trustee to now attempt to paint them as unwitting victims, especially in light of any client's failure to come and testify as to their supposed tribulations, is ludicrous.[10]*

b. As a result, the releases and waivers in the Client Agreements were completely unenforceable;

*FACT: There is no evidence of their unenforceability. Each of the clients was represented by outside counsel, and they all had their own advisors when the Client Agreements were being presented.[11] Testimony of Ralph Canada (1/15/09) 75:16-76:3. Moreover, the Texas Supreme Court has specifically recognized that such releases and disclaimers are enforceable when the subject matter of the releases and disclaimers are*

---

[9] It is hard to imagine any person in this litigation more adverse to the Defendants than Ralph Canada. The fact that even he acknowledged this carries weight that this Court should consider.

[10] "Be innocent of the knowledge, dearest chuck,
Till thou applaud the deed." William Shakespeare, *Macbeth. Act III, Scene 2.*

[11] "I have bought Golden opinions from all sorts of people." William Shakespeare, *Macbeth. Act I, Scene 7.*

specifically discussed, the other party to the contract is represented by counsel, and the agreement is negotiated. *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex. 2008)(reliance waiver enforceable and defeats claim of fraudulent inducement); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997)(contractual disclaimer of reliance enforceable and precludes fraudulent inducement claims). *The Trustee has simply provided no evidence that the Client Claimants, even had they made claims at the time of the Distributions (which they did not) or sued at the time of the Distributions (which they did not) would have had any claim at all.*

c. Every client was going to sue;

*FACT: None of the Client Claimants sued at or near the time of the Distributions, nor had any made a claim or expressed any reservations at all at the time of the Distributions. In fact, of all the clients that implemented the 752 transactions, only nine (9) have even made any claims at all, and all of those claims were filed after the Petition date.*

d. Every client was going to win;

*FACT: There is no evidence in the record of this at all. The only Client Claimant to have filed a lawsuit related to the 752 transactions, Howard Jenkins, did not file until five (5) months after the last Distribution at issue in this case, and that case is still pending and is hotly contested.*

e. Every client was going to win damages in excess of the cash that Heritage had on its books;

*FACT: There is no evidence in the record of this at all.*

    f. That every single step in this syllogism was completely foreseeable from April 2001 forward.

**FACT: There is no evidence in the record of this at all.**

    4. *The Trustee Cannot Show That There Was Any Intent to Defraud the Koshlands*

As discussed above, the lack of any fraudulent intent towards the above-named claimants is borne out by the fact that the Trustee feels the need to bootstrap alleged creditors, creditors without an allowable claim that cannot be a triggering creditor. Namely, the Trustee has been forced by his own lack of evidence to rely on conduct towards the Koshlands as his only hope of proving fraudulent intent.

    a. The Trustee's Alleged "Direct Evidence" of Fraudulent Intent Toward the Koshlands is Fatally Compromised

The Trustee contends that Ralph Canada's testimony that Gary Kornman made the Distributions to "defuse the Koshland situation" is direct evidence of fraudulent intent. Trustee's Brief at 7. The problems with this evidence, however, are legion.

First, it cannot be denied that Ralph Canada has a large financial interest in making sure that the Trustee recovers damages in this action. Testimony of Ralph Canada (1/15/09) 87:18-88:5 (Canada is entitled to the lion's share of the damages in this adversary action); Testimony of Ralph Canada (1/15/09) 88:6-8 (Canada has a veto right of any settlement under $1 million in this action). His bias is nothing less than obvious. Further, all that Canada testified to was a single conversation whereby Gary Kornman allegedly asked Canada about the Koshlands and made this general statement, which could have meant any number of things. In addition, there is no documentary evidence whatsoever that this conversation ever happened, no emails from Canada to anyone indicating that it occurred, and no follow up of any kind. Canada never said or

emailed to Mr. Kornman, "I've thought more about this Koshland situation and here's what I think we should do," or any other indication that the conversation happened at all.

Moreover, even Canada admits that he thought there was <u>no legal obligation</u> to return any of the money invested in Heritage by the Koshlands. Testimony of Ralph Canada (1/15/09) 65:19-21. How can there be an actual intent to defraud when no one, not even Ralph Canada, believed that the Koshlands had (a) a viable claim against Heritage, and b) no claim or lawsuit was ever filed?

Dan Koshland, a properly authorized officer of the general partner, on behalf of the Koshland Family Limited Partnership, had signed a Private Placement Memorandum that stated that:

    (a)     Heritage was not a public company; *and*

    (b)     that Heritage might not go public at all; *and*

    (c)     that he was an "Accredited Investor" and understood the full amount of his investment was at risk.

Defendants' Ex. 23. When combined with the fact that even Ralph Canada did not think there was a legal obligation to pay the Koshlands anything, where is the fraud? Even assuming that the Koshlands were demanding the return of their money, a single undocumented conversation with Ralph Canada about the situation falls woefully short of proving, by a preponderance of the evidence, that Gary Kornman intended to defraud the Koshlands. The Trustee has the burden of proof to prove an <u>actual</u> intent to defraud. Even assuming that the Court completely discounts Mr. Kornman's testimony that the conversation with Canada never occurred, and that there is no extrinsic evidence suggesting otherwise, the Trustee's burden of proof is simply not met.

Finally, it should be noted that the deposition of James Esposto, the CFO of the Koshland Family Partnership, does not provide the factual support that the Trustee believes that it does. Esposto testified that they were receiving the Distributions, that they were cashing the checks, and that they brought no claim against Mr. Kornman or any of the Defendants. Deposition of James Esposto (11/8/06) 28:24-29:10; 61:4-20. For the Trustee to claim that the intent to defraud Koshland can support his entire claim for Distributions, is nothing short of ludicrous. Even if the Koshlands were a triggering creditor, which they are not, the Trustee still could not prove an actual intent to defraud based on the record before this Court. Again, even assuming that the Trustee can use the conduct towards Koshland to prove actual intent to defraud, Defendants submit that the Trustee has failed to prove, by a preponderance of the evidence, that there was any intent to defraud the Koshlands.

> b. The "Badges of Fraud" that May Be Attributable to the Koshlands Do Not Satisfy the Trustee's Burden

In an attempt to further bolster the Trustee's evidence of a fraud towards the Koshlands (who never sued and never made a claim), the Trustee introduced a series of letters between the Koshlands and their representatives, on the one hand, and Heritage and its representatives, on the other. The Defendants do not deny that there is boilerplate language in the Koshland letters, "reserving any causes of action that they may have." That is all that there is. The testimony of James Esposto in his deposition bears this out. They did not sue, and they did not consider suing, Heritage, Gary Kornman, or any of the other Defendants. Deposition of James Esposto (11/8/06) 61:4-20. Esposto testified that they were receiving the Distributions, that they were cashing the checks, and that as far as they were concerned, they were receiving Distributions that they were entitled to. Deposition of James Esposto (11/8/06) 28:24-29:10; 55:20-24; 59:14-16; 65:9-14; 118:10-14.

Were this argument being made in the context of summary judgment, the Court would no doubt have to deny same, as there was clearly a fact issue as to whether or not a dispute between the Koshlands and Heritage existed. However, we are not at summary judgment, we are at the end of trial. The testimony and the documentary evidence does not give rise to a finding of actual intent to defraud the Koshlands, and the testimony of their own Chief Financial Officer bears this out.

C. <u>There is No "Confluence" – The Distributions Sued Upon Are Not Related to the Alleged Badges of Fraud</u>

Having thus failed to produce any direct evidence of an actual intent to defraud, the Trustee then turns to an entirely circumstantial case to attempt to prove various "badges of fraud" to carry his burden. From the evidence and the Trustee's Brief, it is apparent that the strategy is simple: throw enough evidence of questionable business dealings against the wall to see what sticks. The problem, however, is that all of the questionable conduct, even if given full credence (which Defendants do not concede) suffers from the same lack of foundation – there is absolutely no connection to the conduct at issue and the Distributions which are being sued upon in this case. The Trustee cannot obviate his burden of proof by claiming conduct that has nothing to do with the decisions to make the Distributions.

Defendants have searched high and low for case law that can reasonably approximate the fact pattern before the Court. Defendants assume the Trustee has also, and that no one has found a case on point. The Trustee's cases are "classic" fraudulent transfer cases – the transfers are on the eve of bankruptcy, to a family member, are concealed from the Trustee even though they just occurred, etc.[12] The case at bar is anything but typical, if for no other reason than the Trustee is

---

[12] *See, e.g., In re Acequia*, 34 F.3d 800 (9th Cir. 1994)(transfers made on eve of bankruptcy, bankruptcy filing was imminent, lawsuits were pending, and badges of fraud <u>must attend the conveyance</u>); *In re Sherman*, 67 F.3d 1348 (8th Cir. 1995)(transfer all made within months of filing bankruptcy, in the face of foreclosures and lawsuits, and

suing on a number of different transactions, over a period of <u>years,</u> with the final transfer at issue

coming almost a year and a half before the bankruptcy filing. Additionally, there is no logical

connection to any of the claimed triggering creditors. A fraudulent transfer that is sued upon by

a Trustee has to be connected to the intent to defraud in making the particular transfer alleged.

*See Connell v. Connell*, 889 S.W.2d 534, 541 (Tex. App.—San Antonio 1994)(ordinarily,

whether the conveyance was made with intent to defraud creditors or whether the grantee had

knowledge or notice of such intent are fact questions, but, where evidence indisputably shows

that the conveyance was not so made and there is no evidence tending to connect the grantee

with any intent to defraud, the issue becomes one of law); *see also Freeland v. Enodis Corp.,*

540 F.3d 721 (7th Cir.2008)("whether a transfer is fraudulent 'must be judged by the

circumstances existing at the time of the conveyance and not by subsequent events having <u>no</u>

<u>actual connection with the transaction.</u>")(citations omitted).

---

were concealed on schedules); *U.S. v. Evans*, 513 F. Supp. 2d 825 (W.D. Tex. 2007)(transfers made after receiving actual notice of IRS assessment); *Aptix Corp. v. Quickturn Design Sys., Inc.*, 148 Fed. App'x 924 (Fed. Cir. 2005)(debtor was insolvent at the time the transfer was made); *In re McLaren*, 236 B.R. 882 (Bkrptcy. N.D. 1999)(transfer made in anticipation of bankruptcy, and transfer causally connected to the decision to file bankruptcy); *In re Maronde*, 332 B.R. 593 (Bankr. D. Minn. 2005)(same); *In re Brentwood Lexford Partners, LLC*, 292 B.R. 255 (Bankr. N.D. Tex. 2003)(transfers made knowing that it would cause Debtor to be unable to pay an impending loan payment and rendering debtor insolvent, debtor made transfer with intention of forcing creditor to renegotiate); *In re Teknek*, 343 B.R. 850 (Bankr. N.D. Ill. 2006)(transfers made on eve of impending jury verdict and continued after petition was filed); *In re Keenen*, 19 B.R. 724, 730-31 (W.D. Mo. 1982)(transfers made while Debtor was insolvent, without consideration, and subject to secret agreement); *In re Jacobs*, 394 B.R. 646 (Bankr. E.D.N.Y. 2008)(transfers made after involuntary petitions filed against defendants' companies, after confession to a multimillion dollar judgment, and while defendants were being investigated for bank fraud, transferred properties to their spouses); *In re Unglaub*, 332 B.R. 303 (Bankr. N.D. Ill. 2005)(transfer of recording the mortgage made to Defendant's wife after already indebted to creditors); *In re Connell Chevrolet*, No. 01-94-00595-CV, 1994 WL 525902 (Tex. App. – Houston [1[st] Dist.] 1994)(estate planning done after a loan was already in default, and fraudulent transfers made after judgment had been issued against defendant, and transfers themselves were concealed); *Dime Sav. Bank v. Butler*, No. CV 930349247S, 1997 WL 112776 (Conn. Super. Ct. Feb. 21, 1997)(transfers made after loan was already in default, existence of side agreement related to transfer was concealed from the court, and claim was based on "events immediately prior to and subsequent to" the conveyance); *In re Soza*, 542 F.3d 1060 (5th Cir. 2008)(transfers made on eve of bankruptcy, and <u>actual intent to defraud was lacking</u>); *In re Reed*, 700 F.2d 986 (5th Cir. 1983)(transfers made on eve of bankruptcy, and defendant admitted attempting to leave as little as possible for creditors); *In re National Audit Defense Network*, 367 B.R. 207 (Bankr. D. Nev. 2007)(transfers made even though debtor was insolvent at all times, sold no real product and were operating a Ponzi scheme); *In re Sissom*, 366 B.R. 677 (Bankr. S.D. Tex. 2007)(transfers made on eve of bankruptcy, and failed to disclose same).

---

For the most part, the Trustee cites the case law properly – they must prove a "confluence" of the badges of fraud. However, what does or does not constitute a "confluence" is not defined in the case law. As evidenced by the Trustee's own cases, normally the "confluence" is apparent: a debtor, while contemplating bankruptcy, transfers assets to a related party or a party over which it can control, and attempts to move them beyond the reach of creditors.[13] It is normally done on the eve of bankruptcy or close to it, or in the face of a defaulted loan, an impending judgment, or any number of factors that make it obvious what is actually occurring.

But make no mistake. The Trustee does not have that obvious of a case here, and in fact the Trustee is asking this Court to make far larger assumptions than can be gleaned from the cases. Defendants submit to the Court that the Trustee has failed in his initial burden, that is, to prove a "confluence" of the badges of fraud. Instead, the Trustee has cobbled together a series of allegedly bad acts, none of which have anything to do with the Distributions at issue. In short, the Trustee has failed to demonstrate by a preponderance of the evidence that actual fraud has occurred, through the badges of fraud or otherwise.

### 1. What is a Confluence?

To prevail on his case, the Trustee must prove a "confluence" of the badges of fraud. It is not enough for him to simply point out numerous bad acts, wedge them into one badge or another, and then use the multiple badges of fraud to shift the burden. Rather, the badges of fraud must be (a) related to the transactions that have been sued upon, and (b) related to one another.

As stated above, there is a dearth of case law as to what does or does not constitute a confluence for the purposes of using multiple badges of fraud to prove an actual intent case. But

---

[13] See Footnote 12, *supra.*

the case law is clear that there must be a "confluence" of such badges of fraud in order for the Trustee to meet his burden.

Counsel for Defendants have found the following definitions of "confluence":

**Confluence** – 1. The junction of two rivers. 2. An act or process of merging. (Compact Oxford English Dictionary).

**Confluence** – *n.* 1a. A flowing together or union of rivers etc. b. The place where two or more rivers etc. unite. c. A combined flow or flood. 2a. A gathering together or flocking of people etc. b. A numerous concourse or assemblage of people etc.; a multitude. The New Shorter Oxford English Dictionary, Volume I (Oxford University Press, 1993).

**Confluence** – 1. A coming or flowing together, meeting, or gathering at one point. (Merriam Webster's Collegiate Dictionary (10th Ed.1997).

**Confluence** – Flowing or running together; junction. Etymology: latin, *confluentia*, "act of flowing together." Dictionary.com.

Note that in all of these definitions, the operative indicia is a "flowing together" to reach a single point. Thus, a "confluence" is not achieved merely by stacking unrelated conduct, one on top of another. Mere quantity of badges of fraud is not enough if they are not related to the transfers being challenged. The conduct has to be related to each other, and to the ultimate goal. In the context of a fraudulent transfer, this is even more clear, as the conduct that the Trustee complains of has nothing to do with the Distributions that the Trustee is seeking to avoid.

One case that is instructive in this regard is *In re Kempker*, 104 B.R. 196, 201 (W.D. Mo. 1989). In that case, the trustee attempted to obtain a turnover order regarding shop equipment that the Debtor had in his possession, but claimed that it was only leased from his father. The

lease covering the equipment had been entered into years earlier. The court in the *Kempker* case was troubled by certain behavior of the debtor with regard to the property, namely that the debtors disclaimed ownership in the bankruptcy court, but had claimed it previously when applying for a loan, and a statement on debtor's schedules that they did not "hold property for another," when in fact they were holding property for another under the lease. The Court held, however, that even though the Debtors' behavior was "disconcerting", "it is difficult to believe that when [Debtors] entered into this transaction ten years ago – at a time at which they were solvent, they did so with a view towards defrauding their creditors." *In re Kempker*, 104 B.R. at 202.

Compare this to the case at bar. It cannot be questioned that when the Distributions were made, Heritage was remarkably successful, and fully solvent. Trustee's Ex. 287. There were no claims that had been brought, and none threatened. Gary Kornman testified that in deciding to make the Distributions, he would examine the financial statements of Heritage, examine the pipeline of cases and fees that could reasonably be expected to be coming in, and determine the excess cash. Testimony of Gary Kornman (1/12/09) 52:11-21.

It is the roundabout connections and circumstantial leaps that the Trustee is asking this Court to make that cannot be ignored. As the *Connell* court stated in relation to a conspiracy claim brought in the same case, "a vital fact may not be proved by unreasonable inferences from other facts and circumstances. Further, a vital fact may not be established by piling inference upon inference." *Connell*, 889 S.W.2d at 541 (citing *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968))[14]. The vital fact here is that of

---

[14] The quote from *Connell* is in the context of a conspiracy claim, but is no less apt here. The fraudulent transfer claim brought in *Connell* was also dismissed.

intent, and it is a vital fact that cannot be proven by surmise, hindsight, and a creative use of a "demand" by the Koshlands that never became a lawsuit, or even a claim.

The Trustee concedes that "the requisite intent must be found to exist as of the time of the transfer." Trustee's Brief at 3, n. 5. This is the Achilles' Heel in the Trustee's circumstantial case, and must be considered by this Court in evaluating each of the Trustee's "badges of fraud." Defendants submit that there is no evidence of any requisite intent <u>at the time of transfer</u> for any of the badges of fraud listed below:

> 2. The Distributions Were Made to Equity Owners on a Pro Rata Basis, Not Just to Insiders

The transfers were made to the members based on a valid business purpose as evidenced by the terms of the Operating Agreement at a time when Heritage was experiencing no financial difficulties. Moreover, for each of the Distributions, a *pro rata* share was distributed to each of the members, both insiders and non-insiders. <u>See</u> Defendants' Ex. 90 at Section 5.02. The Trustee cannot tie this alleged badge of fraud to an intent to defraud any creditor at the time the various Distributions were made to the members.

> 3. Consideration Was Provided in the Operating Agreement and The Distributions Were Required

The Trustee states in his brief that the transfers were given for no consideration. Trustee's Brief at 8. However, the Trustee is ignoring the specific language in the Operating Agreement. See Defendants' Ex. 90.

Section 5.02(a) of the Heritage Operating Agreement requires the Manager to determine, in the exercise of its sole discretion, whether there is excess cash and, if there is excess cash, to distribute it to the members according to the respective ownership interests. Defendants' Ex. 90. Pursuant to section 3.25 of the Operating Agreement, Heritage's members are creditors to the

extent that they are entitled to receive a distribution of excess cash. As a consequence, once they become entitled to distributions, the members are also creditors of Heritage. Under section 24.004(a) of the TUFTA, payment of an antecedent debt constitutes value. As a consequence, since the members are creditors of Heritage to the extent that they are entitled to receive a distribution of excess cash, these payments were made to creditors and Heritage received full value for the payment.

The Trustee takes the position in his brief that the obligation to distribute the money was done for no consideration, and therefore the Defendants' position that these Distributions were mandated fails. Nothing could be further from the truth. When each of the equity owners of Heritage invested in Heritage and signed the Operating Agreement, consideration passed between them for their mutual obligations. *Martineau v. Arco Chem. Co.*, 25 F. Supp. 2d 762, 767 n.8 (S.D. Tex. 1998); *see also Taylor v. Bonilla*, 801 S.W.2d 553, 556 (Tex. App.—Austin 1990, writ denied)("it is well-established that, where no other consideration is shown, mutual obligations by parties to an agreement will furnish sufficient consideration to constitute a binding agreement"), citing *Tex. Gas Util. Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970). The consideration <u>did</u> pass when the equity investments were made.

The Trustee states that the Defendants' position on "no consideration" is undercut by the fact that the obligation to make the Distributions was to equity owners, and cites *Sherman v. FSC Realty LLC* for the proposition that "distributions made on account of equity ownership in an LLC are not made for reasonably equivalent value." Trustee's Brief at 8, citing *Sherman v. FSC Realty LLC*, 292 B.R. 255 (Bankr. N.D. Tex. 2003). Even assuming that were true, however, that case is not on point. In that case, there was no evidence that the company was <u>required</u> to make the Distributions, as there is in the case at bar. *See Sherman*, 292 B.R. at 263 ("BLP <u>could</u>

make distributions from its excess cash flow provided there was no delinquency in note payments")(emphasis added); *cf.* Defendants' Ex. 90, Operating Agreement, at 5.02(a). Regardless of whether or not the Distributions were made on a regular basis or not, as soon as Mr. Kornman determined that there was excess cash, then the Distributions had to be made.

### 4. There Was No Concealment Related to the Distributions at Issue

This portion of the Trustee's argument is perhaps the greatest red herring of all in the Trustee's entire case. Repeatedly, in motions and at trial in this case, Trustee's counsel focused on the post-petition conduct of the Defendants. Now, after trial, this prong of their attack continues. The Trustee once again raises the specter of records not being turned over, motions to compel having to be filed, and the seemingly-limitless amount of litigation that has occurred in this case and the underlying bankruptcy.

What the Trustee fails to concede with regard to the post-petition conduct is the axiomatic principle cited earlier: "the requisite intent must be found to exist as of the time of the transfer." Trustee's Brief at 3, n. 5. The Distributions in this case were made in 2001, 2002 and 2003. The petition was not filed until 2004. For the Trustee to use the post-petition conduct to prove a badge of fraud, there must be some tenable connection to the Distributions at issue and the post-petition conduct. That connection is utterly lacking here. For the Trustee's theory on this badge of fraud to prevail, this Court must find that the Defendants made the Distributions (a) knowing they were going to file bankruptcy, (b) knowing that upon filing, they were going to conceal assets and the transfers, and (c) having already formed this plan when the Distributions were made. There is simply no evidence that this is the case. Moreover, as will be shown below, the evidence in this case shows that, regardless of the post-petition conduct, the Distributions themselves were not concealed.

The Trustee cites *Sun Sport, Inc.*, 260 B.R. 88 114-15 (Bankr. E.D.Nev. 2000) for the principle that the allegedly improper conduct of Heritage's principals during bankruptcy is evidence of fraudulent intent in connection with the Distributions. Assuming this case is applicable law, there are two problems in the factual context of this case.

As pointed out previously to the Court in Defendants' Pre-Trial Brief, *Sun Sport* is wholly distinguishable from the current case. In *Sun Sport*, the company was experiencing substantial financial difficulties. There was no valid business reason underlying the transactions, and the company had large debts it was unable to pay. A lawsuit was pending against the debtor for infringement and breach of contract. The transfer attacked took place only four months before the bankruptcy and the principals acted to conceal the transfer by not revealing it on the schedules when the petition was filed.

In the case at bar, the alleged litigation misconduct by Defendants, if any occurred, was in the bankruptcy case, and not in this lawsuit. The Federal Rules of Civil Procedure give the Court more than ample resources to deal with any alleged litigation misconduct by the Defendants in this lawsuit. Indeed, this Court has denied Trustee's motion for sanctions based upon alleged misconduct in this lawsuit. Second, the alleged litigation misconduct presumably occurred in late 2004 and thereafter, after the Trustee was appointed. The Trustee establishes no factual nexus, and no logical relation between, conduct during this later period (mid-2004 and thereafter) and the time when the distributions were made to the members from April, 2001 through January, 2003. This certainly provides no circumstantial evidence that acts taken years later, in a completely different context, establish that Heritage was acting to defraud any creditor when it made the Distributions.

Moreover, the testimony of Dennis Faulkner, the trustee in this case, supports the fact that the post-petition conduct had absolutely nothing to do with the Distributions at issue. Mr. Faulkner testified that in the second meeting with Michael Kornman and Vickie Walker, the Heritage Quickbooks file was turned over to him. Testimony of Dennis Faulkner (1/15/09) 127:1-8; 101:13-102:8. The Quickbooks file, which both parties have relied on extensively in this case, showed the Distributions. Testimony of Dennis Faulkner (1/15/09) 141:8-15. So not only is there not a temporal connection between the post-petition conduct and the Distributions at issue (considering the last Distribution occurred almost a year and a half prior to filing), but there was no concealment of the actual Distributions. Whether or not documents or boxes or assets were turned over in a timely manner, or the trouble that the Trustee had in administering this case, has nothing to do with what the Trustee sued on. He immediately received the records detailing the Distributions. Quite simply, there was no concealment of the transfers that the Trustee is seeking to recover and this badge of fraud has no connection to what is at issue in this lawsuit.

5. Heritage Was Not Sued or Threatened With Suit

The Trustee's evidence regarding this alleged badge of fraud is primarily dealt with above, in Section II(B), *supra*. The IRS claim was for unassessed taxes and was not even brought before the filing of the petition, and thus there can be no claim that the Defendants intended to defraud an unknown creditor. The same can be said for all of the Client Claimants, including Howard Jenkins. Even though Jenkins brought a lawsuit related to the 752 transactions prior to the petition date, it is undisputed that he did not file his lawsuit, or present any claim whatsoever, until at least five (5) months after the last Distribution. Therefore, all of the Client Claimants and Mr. Jenkins were unknown creditors at the time of the Distributions.

As for the Koshlands, their demand was for information, it was provided, and they never brought a claim.[15]

It is at this juncture that the Trustee must make his biggest leap of all. Citing the authority of two unpublished cases, the Trustee maintains that "a threat can also be inferred from circumstances existing at the time of transfer." Trustee's Brief at 11, citing *Connell Chevrolet, Inc. v. Carter*, No. 01-94-00595-CV, 1994 WL 525902 (Tex. App.—Houston [1st Dist.] Sept. 29, 1994, no writ) and *Dime Sav. Bank v. Butler*, No. CV-9303492475, 1997 WL 112776 (Conn. Super. Ct. Feb. 21, 1997). Using this as his jumping off point, the Trustee weaves his tale of the "IRS investigation" to attempt to show that, as far back as 2001, the Defendants (a) knew the 752 strategies were invalid, (b) that the implementation of the 752 strategies would result in liabilities, and (c) that the Defendants decided <u>at that time</u> to begin siphoning off all of the assets of Heritage before the walls came crashing down.

As an initial matter, it must be pointed out that even the Trustee's own cases do not support the "inference of a threat existing at the time of transfer." In *Connell Chevrolet*, the Defendant was already in default on a loan before any transfers were even contemplated. *Connell Chevrolet*, 1994 WL 525902 at *5. Similarly, in *Dime Savings Bank*, again the transferor was already in default on obligations when the transfers were made. *Dime Sav. Bank*, 1997 WL 112776 at *2. There was an undisclosed side agreement entered into by the transferor that was not disclosed in the bankruptcy schedules, specifically with regard to the transfer that was at issue. Tellingly, the court in *Dime Savings* pointed out that the claim was based on "events immediately prior to and subsequent to" the conveyance at issue. *Dime Sav. Bank*, 1997 WL 112776 at *1.

---

[15] There is an extensive discussion of the claim brought by Canada, and the alleged claims of the Koshlands in Section II(B), *supra*, and Defendants incorporate same as if set forth in its entirety.