So even under the Trustee's own cases, the "writing on the wall" theory regarding the IRS investigation fails. The Distributions at issue in this case were not done under threat of default or in the face of a judgment. They were not concealed, as they were plainly evident on the Quickbooks records that were turned over. But most importantly, the Trustee puts far more faith in the "IRS investigation" as it was occurring than is warranted.

The testimony of Anthony Ellis, the IRS agent called by the Trustee as a witness, bears this out. Ellis confirmed in his testimony that the first "soft" letter was sent in February 2001 to Heritage. This letter does not threaten suit, and there is no evidence that Gary Kornman or any other officer of Heritage received it. Testimony of Anthony Ellis (1/17/09) 36:12-17; 40:7-18; 79:1-13. In fact, even Ralph Canada testified that had Gary Kornman received that first soft letter, he and Gary would have discussed it. Testimony of Ralph Canada (1/15/09) 66:12-17; 91:4-5. The IRS chose to do nothing for a three month period, until May 2001, when the second soft letter was hand-delivered to Claudia McElwee. Trustee's Ex. 287. Again, this letter does not threaten suit, and there is no evidence that Gary Kornman or any other officer of Heritage other than Claudia McElwee received it. Testimony of Anthony Ellis (1/7/09) 83:22-84:1. Again, even Ralph Canada testified that had Gary Kornman received that second soft letter, he and Gary Kornman would have discussed it. Testimony of Ralph Canada (1/15/09) 66:12-17; 91:4-5. At this point, the IRS waits eight months before taking any further action, when they sent an Information Document Request to Heritage. Trustee's Ex. 287. Notably, this IDR is not a subpoena and is not a lawsuit. See Trustee's Exhibit 287. Vickie Walker talks to the IRS and tells them that they are in the process of engaging tax counsel, and the IRS does nothing to follow up.[16] At this point, nine months later and almost two years after the first soft letter, the

---

[16] Much has been made of the testimony regarding whether or not Heritage was actually pursuing tax counsel at this time. Defendants submit, however, that even if Heritage was not pursuing tax counsel, that makes absolutely no

IRS issues a subpoena for information about the clients of Heritage. Testimony of Anthony Ellis (1/7/09) 89:10-18. Heritage immediately had their tax counsel file powers of attorney, the subpoena was withdrawn, and months and months of negotiation and document production then ensued.

The above sequence of events clearly demonstrates that the "danger" posed by the IRS was at best slow-developing, and at all times uncertain. Simply because the IRS opens an investigation, of which there were many in this timeframe of other companies, means little in and of itself.

Moreover, even the receipt of the IDR in March 2002 does not lead to the inexorable conclusion that Heritage or the Defendants were going to be sued, or that the Distributions after that time were an attempt to hinder, delay or defraud creditors. It is no secret that the IRS does not like structures that allow people to lawfully reduce their taxes. It is no secret that the IRS was investigating these types of structures in the timeframe of the Distributions. Testimony of Anthony Ellis (1/7/09) 79:14-80:4. In the materials presented to Heritage clients, the cases were discussed that showed the IRS was already attempting to fight these structures in court. Testimony of Gary Kornman (1/12/09) 40:11-41:13. Even Ralph Canada testified that clients were made fully aware of the risks, and that Gary Kornman was the most obsessive about letting clients know of the risks. Testimony of Ralph Canada (1/15/09) 91:16-25. Finally, there is no evidence that Gary Kornman did not tell clients about the IDR after receiving it, and Ralph

---

difference as to the "threat" that the IRS posed at this time. There was no lawsuit, there was not even a subpoena. It was no secret that the IRS did not like the 752 transactions, or the business that Heritage was in. But it is also not disputed that Heritage, including Gary Kornman and Ralph Canada, believed that what they were doing was absolutely legal. *See* Section II(C)(5)(a), *infra*. If there was an absolute and undisputed belief that the IRS was wrong, then not responding to a non-compulsory request has no bearing on the decision to make Distributions after this point in time.

Canada admitted on the stand that Gary Kornman would have discussed it with clients. Testimony of Ralph Canada (1/15/09) 91:4-25; 95:4-10.

     a.     The Defendants Believed that the 752 Transactions Were Valid

Even assuming that the IRS investigation presented the "immediate threat" that the Trustee purports, this argument fails to take into account the central, uncontroverted fact in this case – Gary Kornman, and all of the rest of the Defendants, believed that the 752 transactions would withstand IRS scrutiny. Testimony of Gary Kornman (1/12/08) 54:4-12. Based on twenty-five years of case law, Mr. Kornman believed that a short sale was not a "liability" for purposes of Section 752. Testimony of Gary Kornman (1/12/09) 40:24-41:13. He even went so far as to engage in one of these transactions for one of his own trusts, and battled the IRS all the way to the 5th Circuit to prove its efficacy. Testimony of Gary Kornman (1/9/09) 9:19-10:3. The evidence is also clear, from Mr. Kornman and Trustee's witness Daniel Baucum, that different courts have treated 752 transactions differently, and that some have been found valid. Testimony of Daniel Baucum (1/7/09) 192:6-197:5..

Quite simply, the law on the 752 transactions is not, and was not, as "open and shut" as the Trustee would have this Court believe. And, even if it were, the presentations to the clients showed the clients the arguments that the IRS would make, the risks of the transactions, and the possible savings that could be gained. There was a calculated business risk in implementing a 752 transaction, and no one involved in this case thought that the IRS was going to turn a blind eye. In fact, clients were specifically told that the IRS would not, moreso by Gary Kornman than by anyone else. Testimony of Ralph Canada (1/15/09) 91:16-25.

     6.  The Cumulative Course of Conduct Has No Bearing on the Distributions

The Trustee's next argument is that, following the issuance of Notice 2000-44, the decision in *Salina*, the demand by Dr. Koshland, and the IRS letter to Heritage in February 2001, that all of these events together were the impetus for the Distributions to be made. This circumstantial case, however, is a classic example of hindsight and spin, and the amalgamation of a number of completely separate events that had nothing to do with one another. As the Court has noted, the Trustee's entire case requires him to "take a little bit from here, a little bit from there", and attempt to make a multimillion dollar case out of it. But the problem again is that the Trustee's "course of conduct" argument centers wholly on events not plead in the Complaint, and not related to the Distributions at issue. The questions remain: Did the Distributions begin because of the IRS letter? If so, why didn't Canada know about the IRS letter? If Gary Kornman did not know about the IRS until March 2002, then why did the Distributions begin in April 2001 The Trustee, who has the burden of proof, has no answers to these questions.

### 7. Other Indicia of Fraudulent Intent

Sensing the weakness of his theory, the Trustee finally resorts to a "kitchen sink" tactic of relating to the Court every bad act that Gary Kornman or any other Defendant may have ever done, to try and right the ship. First of all, Mr. Kornman testified at length regarding the procedure he used in determining excess cash, based on his experience in thirty (30) years of business, being able to determine what cases were in the pipeline, and determining what cash was available to allow members to pay taxes and receive a return on their investment. What documentation is needed to prove that income taxes exist on a pass-through entity? Apparently, the Trustee's theory would require that all cash be kept in the business in perpetuity.

Second, the Trustee's "evidence" regarding the Private Placement Memorandum (the "PPM") is based solely on the Trustee's own interpretation of that evidence, and Defendants

hotly dispute same.[17] The Trustee is attempting to bootstrap matters related to the PPM without any evidence that his interpretation is actually correct. Quite simply, this lawsuit is not brought by the Koshlands, nor by the Manns, and it is not based on the PPM. Whether or not the risk factor of "Transactions with Affiliates" (which is included in the PPM), is sufficient is simply not before this Court.[18] Besides, none of these acts have anything to do with the Client Claimants, or any of the creditors that have made claims in this case. The testimony from James Esposto was not the "magic bullet" that the Trustee believed it would be, as he testified that they were satisfied with the Distributions they were receiving. Regardless of whether or not financial information was provided to them upon their request, where is their claim? Where is the testimony showing that they were being defrauded?[19]

Similarly, much has been made of Heritage's financial statements not being kept in accordance with GAAP. Heritage was a private company. How it kept its books, or what cash it did or did not keep on hand, was a matter between itself and its owners. There were discussions about taking Heritage public, and then it was decided that because of market conditions, it was not a good idea to do so at that time. Testimony of Gary Kornman (1/8/09) 128:2-4.. By staying a private company, whether or not the books were kept in accordance with GAAP, or whether or not Distributions were made on a scheduled basis, had nothing to do with creditors, since no such creditors existed at that time. The Trustee's theory of this case, that A=B=C=D=E=F=G, is inaccurate. His theory is actually that A=G, and he skips the five steps in between.

---

[17] For example, Defendants believe the description of the calculation of fees is accurate, and regardless, the evidence does not show that it was not accurate.

[18] Notwithstanding the fact that the evidence shows the vast majority of these loans were repaid. See Trustee's Exhibit 280.

[19] Clearly the same can be said for Ted Mann, whose estate received his entire $9 million investment back when he passed away, plus a $3 million return on such investment, pursuant to a previous agreement between Mr. Mann and Mr. Kornman. Testimony of Gary Kornman (1/8/09) 55:9-56:8. If Mr. Kornman was truly the devil incarnate that the Trustee makes him out to be, would he not have defaulted on the obligation to return Mann's investment?

The Trustee's final evidentiary points on these issues, those related to avoiding service of process, and a "pattern of sharp dealing" are nothing more than another attempt to collect disparate, and temporally unrelated, conduct and throw it against the wall. Sales meetings (with people who never became clients), the relationship with Ahrens & DeAngeli (which ended far before any Distributions were made),[20] the case law and Notice 2000-44 (all of which were disclosed to clients) all have very little to do with the fact that everyone in this case, from the Client Claimants to Gary Kornman, were aware of the risks. The Trustee has focused his argument on other practices that he believes that Court would find distasteful: allegedly ducking service of process (even though Gary Kornman personally accepted service of IRS subpoenas in March 2003), not providing financial information to the Koshlands (who never sued or made a claim), and supposedly providing false information to Ted Mann (which Defendants dispute, as Vickie Walker testified that the information provided to Mann was adjusted to more accurately reflect the financial condition of Heritage).

But none of these alleged "sharp practices" have any connection with the Distributions, and the Trustee has failed to provide any such casual link.[21] The Trustee may not like so-called "tax shelters," but that is irrelevant. The Court would have to make a leap that is unwarranted by the evidence in order to find in favor of the Trustee– that all of this, from the very beginning, was part of Gary Kornman's master plan to make millions of dollars, drain it out, engage in a 752 transaction and fight it all the way to the Fifth Circuit, ditch the company into bankruptcy years later, give the Quickbooks evidencing the Distributions to the Trustee, engage in protracted

---

[20] Defendants also submit that the majority of opinion letters were written by law firms other than Ahrens & DeAngeli, and were wholly unrelated to the "royalty fee" issue.

[21] Thus utterly different than the pre-and post-petition conduct in In re Sissom, 366 B.R. 677(Bankr. S.D.Tex. 2007), cited by the Trsutee.

litigation, all the while knowing that it was a doomed effort from the start and that the Distributions were fraudulent.

From the beginning of this counsel's representation of the Defendants in this case, we have stated unequivocally that the Trustee's apparent strategy was to present evidence to the Court that stated, "Gary Kornman is a bad guy." Even assuming the Court believes that evidence, the Trustee has utterly failed to relate the conduct it complains of to the Distributions that the Trustee has brought suit upon.

The "badges of fraud" are not a license to collate disparate evidence, stretching across numerous persons, with no temporal or causal connections, and create an "actual intent to defraud." The case law cited by the Trustee does not deal with the unique facts presented by this case, and in fact, a thorough review of the case law by counsel for Defendants has also proved fruitless. Defendants believe that the reason that you cannot find a case on point with the facts presented at bar is quite simply, no one could have thought that a case this circumstantial, and this attenuated, could survive.

### D. The Defendants Have Provided Sufficient Evidence of a Legitimate Supervening Purpose

Based on the foregoing authorities, the Trustee cannot prevail on his claims under section 24.005(a) of the TUFTA. But even if the Trustee could present evidence of enough badges of fraud to convince the Court that Heritage acted with actual intent to hinder, delay, or defraud any creditor in making the distributions to members – something the Trustee cannot accomplish in the first instance – any such showing of intent is fully negated by the fact that each of the challenged distributions was supported by a legitimate business purpose. At that point, the burden remains on the Trustee to prove otherwise, which he quite simply has failed to do.

In cases involving claims of fraudulent transfer under both state law and the Bankruptcy Code, a number of courts have recognized that when a transfer is supported by a legitimate business purpose, the element of intent is negated. In a recent opinion, the District Court for the Southern District of Texas acknowledged this, stating:

> Once a plaintiff puts forth sufficient evidence that the defendant had the requisite intent, the defendant may avoid liability by demonstrating a "legitimate supervening purpose" for the transfer. *In re Harris*, Case No. 02-05803, 2003 Bankr. LEXIS 1757, at *5 (Bankr. D. Del. Dec. 30, 2003). Some courts have held that once the plaintiff introduces a "confluence of the badges of fraud," a presumption of fraudulent intent arises, and the burden shifts to the defendant to rebut the presumption by showing a legitimate business purpose supports the transfer. *Kelly v. Armstrong*, 206 F.3d 794, 801 (8th Cir. 2000). Thus, even though Plaintiff proved that AMC had the requisite intent, AMC may still prevail on this claim if it can prove that there was a legitimate supervening purpose for the transaction.[22]

In this case, a legitimate business reason existed for making each of the challenged distributions. Section 5.02 of the Company Agreement provides:

> A. From time to time (but at least once each calendar quarter) the Manager shall determine in the exercise of his sole, unlimited and absolute discretion, to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs,

---

[22] *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 391 (S.D. Tex. 2008); *see also Fed. Refinance Co., Inc. v. Klock*, 352 F.3d 16, 29 (1st Cir. 2003) (affirming trial court's rejection of actual fraud claim where trial court was free to choose between two versions of the truth and found that the "limited partnerships were created and funded for a legitimate business purpose rather than to hinder, delay, or defraud creditors"); *Kelly v. Armstrong*, 206 F.3d 794, 799 (8th Cir. 2000) (affirming judgment in favor of defendants on actual fraud claim under section 548 of the Bankruptcy Code where "[e]ven if a confluence of the badges of fraud were present, [defendants] presented a 'legitimate supervening purpose'" for the challenged transactions) (alterations added); *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1354 (8th Cir. 1995) (confluence of several badges of fraud can constitute evidence of actual intent to defraud, absent a legitimate supervening purpose for the challenged transfer); *In re Cushman Bakery*, 526 F.2d 23, 33 (1st Cir. 1975) (affirming district court decision that secured transactions were not fraudulent transfers where lender had "legitimate business purposes" for structuring the transactions as it did and where debtor was "primarily interested in promoting its own legitimate business interests" in entering into the transactions) *cert. denied*, 425 U.S. 937 (1976); *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 382-83 (S.D.N.Y. 2003) ("No reasonable jury could find that there was anything suspicious or questionable about the transfers here. Although the transfers were not in the ordinary course of business, there were legitimate business reasons for them.") *aff'd*, 99 Fed. App'x 274 (2d Cir. 2004).

---

including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve. If such an excess exists, ***the Manager shall cause the Company to distribute to the Members, in accordance with their Sharing Ratios, an amount in cash equal to that excess***. (emphasis added)

The requirement for distributions of net income to Heritage's members was necessary for Heritage, a limited liability company, to facilitate pass-through taxation treatment and to permit its members access to the funds on which they would be required to pay taxes. Thus, not only was there a legitimate business reason for making each distribution, Heritage's manager was ***required*** to make the distributions to members pursuant to the Operating Agreement, once it was determined that excess cash existed.

The Trustee has attempted to distinguish this legitimate business purpose by pointing the Court to the *Sherman v. FSC Realty* case, discussed in Section II(C)(3), *infra*, that states distributions to equity holders is not a legitimate business purpose. As stated above, however, in that case the company was not required, as Heritage was, to distribute excess cash once a determination of same had been made. Similarly, the Trustee's argument that this was not a standard business practice because Distributions were made on an *ad hoc* basis, misses the point. There was no requirement in the Operating Agreement that the determination of excess cash be made on a regular basis. In fact, the Operating Agreement expressly stated otherwise.[23]

Further, there is evidence in the record of the Court that the Distributions were made, at least in part, to achieve pass-through taxation treatment. At least one court has found that the fact that distributions were made for tax purposes similar to those present in this case negated any basis to find actual intent to hinder, delay, or defraud. In *Flanigan v. Defeo (In re De Feo Fruit Co., Inc.)*, 24 B.R. 220, 222-23 (Bankr. W.D. Mo. 1982), the court stated that:

---

[23] As has been discussed numerous times in this case, the parties to the Operating Agreement (including the Koshlands and Ted Mann) knew the terms by which the Company was run.

> Evidence was additionally adduced by the defendants to the effect
> that the debtor corporation was a subchapter S corporation and that
> it was of benefit tax-wise to the corporation to ensure that all
> profits or excess funds were periodically paid out, and that it was
> for this purpose, rather than any intent to hinder, delay or defraud
> creditors, that these payments were made.

The Court then noted that "[i]nasmuch as evidence to this effect, combined with other evidence of absence of actual intent to hinder, delay or defraud any creditor, is sufficient to negative any such actual intent, the nature of this evidence need not be further enlarged upon in this memorandum." Id. at 223, n.6.

Defendants do not dispute that Gary Kornman testified that money is "fungible" and that there was not a Distribution that he could identify that specifically was made so that the members could pay their taxes. Testimony of Gary Kornman (1/12/09) 49:23-50:15. But this does not end the inquiry. It is axiomatic that the Distributions had to be paid at some point so that members could pay their taxes, and Mr. Kornman's testimony buttresses this fact. Even the Trustee testified that his own business distributes money to achieve pass-through taxation. Testimony of Dennis Faulkner (1/15/09) 129:1-10.

Further, it cannot be ignored that Heritage continued operating for three years after the first distributions, and for over a year and a half after the last Distribution. Cash was plentiful, and there is absolutely no evidence that the Defendants, or Heritage, was contemplating bankruptcy. See In re Stanley, 384 B.R. 788, 803 (Bankr. S.D. Ohio 2008)(fact that debtor did not file bankruptcy petition until nearly two years after the transfer bolsters the Defendants' claim that there was a legitimate purpose for the transfer); see also Official Unsecured Creditors' Comm. of Long Dev., Inc. v. Oak Park Village Ltd P'ship, 117 F.3d 1420 (table), 1997 WL 377055, at *7 (6th Cir. 1997)(evidentiary strength of badges of fraud was diluted by defendants' showing that the company continued operating for nearly three years before filing bankruptcy).

Because the Trustee has failed to show actual intent to defraud, delay or hinder creditors, and because there is uncontradicted evidence of a legitimate supervening business purpose, the Trustee's causes of action under Sec. 548 and 550 must fail.

## III.   Preferences

The Trustee acknowledged at trial that he did not present any evidence of insolvency during the 90 days prior to the filing of bankruptcy. *See*, 1/16/09 Trial Transcript, p. 185:8-17 (Trustee acknowledges that the preference claim fails if Defendants rebutted the presumption of insolvency). Therefore, the Trustee correctly stated that the only issue is whether the Defendants rebutted the presumption of insolvency, as provided under section 547(f) of the Bankruptcy Code.

### A.   Rebutting the Presumption – Standard of Proof

The presumption created by section 547(f) of the Bankruptcy Code requires the party opposing the assertion to present some evidence of solvency. *See GasMark Ltd. Liquidating Trust v. Louis Dreyfus Natural Gas Corp. (In re GasMark),* 158 F.3d 312, 315 (5th Cir. 1998)(stating "[t]he party seeking to rebut the presumption must introduce some evidence to show that the debtor was solvent at the time of the transfer..." (emphasis in original omitted)(citing *Sandoz v. Fred Wilson Drilling Co. (In re Emerald Oil Co.),* 695 F.2d 833, 839 (5th Cir. 1983)).

The party rebutting the insolvency presumption ***does not*** have to prove by a *preponderance* of the evidence that the debtor was solvent, but instead is required to come forward with *some* evidence demonstrating the debtor's solvency as of the date in question. *Campbell v. Cannington (In re Econ. Milling Co., Inc.),* 37 B.R. 914, 919 (Dist. S.C. 1983)(The party opposing the alleged transfers "would not have had to prove by a preponderance of the

evidence that the debtor's assets exceeded his liabilities at the time of the transfer to rebut the presumption; he would have had only to present *some* evidence to that effect to overcome §574(f)."")(emphasis in original).

Although the rebutting party has "the burden of going forward with evidence to rebut or meet the presumption [the burden] does not shift to such party...in the sense of the risk of nonpersuasion ..." *GasMark Ltd. Liquidating Trust,* 158 F.3d at 315 (citing FED. R. EVID. 301). Therefore, the ultimate burden of proof is not shifted to the rebutting party based on the presumption and the burden to prove insolvency remains with the party seeking to avoid the transfers, here, the Trustee. *Sandoz,* 695 F.2d at 838-39 (stating that section 547(f) and Federal Rule of Evidence 301 interact so that the burden of proof relating to insolvency remains with the party originally having the burden of proof- *i.e.* the Trustee); *Akers v. Koubourlis (In re Kouborlis),* 869 F.2d 1319, 1322 (9th Cir. 1989) (stating the "presumption requires the party against whom the presumption exists, here [the defendant] to come forward with some evidence to rebut the presumption, although the burden of proof remains on the party in whose favor the presumption exists"); *Devan v. The CIT Group/Commercial Servs., Inc.,* 229 B.R. 337, 341 n. 2 (Bankr. D. Md. 1999)("A presumption in favor of one party imposes on the other party the burden of production, *i.e.* the burden of going forward with evidence, but it does not alter the ultimate burden of persuasion.").

Therefore, in order to rebut the presumption of insolvency, the Defendants' obligation is to present some evidence of Heritage's solvency at the time of each transfer in question. The evidence required has been defined as "substantial" evidence or "sufficient" evidence. *See Sierra Steel, Inc. v. Totten Tubes, Inc., (In re Sierra Steel, Inc.),* 96 B.R. 275, 277 (B.A.P. 9th Cir. 1989)(holding that once "substantial evidence of solvency [is presented], the

presumption vanishes and the plaintiff must come forward with sufficient evidence in order to [meet] its burden of proving the insolvency."); *Rand Energy Co. v. Del Mar Drilling Co., Inc. (In re Rand Energy Co.),* 2000 Bankr. LEXIS 1607, *7 (Bankr. N.D. Tex. July 28, 2000)(requiring "substantial" evidence); *Silverman Consulting, Inc. v. Hitachi Power Tools, USA, Ltd. (In re Payless Cashways, Inc.),* 290 B.R. 689, 697 (Bankr. W.D. Mo. 2003)(requiring "sufficient" evidence).

B.    Rebutting the Presumption – Evidence Presented at Trial

At trial, the Defendants presented the testimony of Ms. Walker and Mr. Kornman, along with documentation from Quickbooks, without objection, establishing the assets and liabilities of Heritage for each day between February 17, 2004 and May 17, 2004. *See*, Trustee's Exhibit 289; Defendants' Exhibit 0281[24]; *Toy King Distr., Inc. v. Liberty Sav. Bank, FSB (In re Toy King Distributors, Inc.),* 261 B.R. 1, 91-92 (Bankr. M.D. Fla. 2000)(financial balance sheets reflecting assets that exceeded liabilities for the time between November 1989 through February 1990, plus testimony of solvency, is sufficient to rebut the presumption of insolvency and require the plaintiff to put on its proof).[25]

There are two distinct periods at issue. The first is the time between February 17, 2004 and April 27, 2004 (the "First Time Period").[26]  The second is the time between April 28, 2004 and May 17, 2004 (the "Second Time Period").

---

[24] Contemporaneously with filing this Brief, the Defendants have provided the Court with a disk containing the electronic version of Defendants' Exhibit 281 on a CD, in Excel format.  The file is named "0281 – Post Trial.xls."

[25] The Court in *Toy King* did not state whether the balance sheets for the period of November 1989 through February 2000 were "audited." *Toy King,* 261 B.R. at 91.  However, it would be reasonable to assume that they were not, as the Court referred to different, prior "audited" financial statements prepared by Touche Ross dated April 21, 1989. *Id.* at 51, 53.

[26] April 28, 2004 was the date when Heritage used the $4 million in cash to pay vendors and others.

With respect to the First Time Period, the evidence presented at trial established that Heritage had "cash" assets in the amount of $4 million, plus additional assets in various amounts. For example, on February 17, 2004, Heritage had "Total Assets" in the amount of $7,304,288.57, including the $4 million in cash. On April 27, 2004, Heritage had "Total Assets" in the amount of $7,142,029.69, also including the $4 million in cash. *See* Defendants' Exhibit 281. During the corresponding time, Heritage had "Total Liabilities" in the amount of $707,572.86 on February 17, 2004 and $3,335,433.30 on April 27, 2004. Therefore, on each of these days, and all days in between, if the Court only considers the cash assets, those assets exceeded the amount of the stated liabilities.[27]

The Trustee first argues that the $4 million in cash was not actually there. However, this unsupported argument is contrary to the testimony of Ms. Walker, who testified that the transfer of the safe deposit box was never accomplished, all of which is further supported by the entry in Quickbooks on January 15, 2003, when Ms. Walker made a general ledger entry placing the $4 million back into the "investment" account and made a liability entry for "Distributions Payable" to Steadfast in the amount of $4 million.[28] *See* Trustee's Exhibit 289. Moreover, the Quickbooks data and Ms. Walker's testimony establish that the $4 million was eventually used by Heritage on April 28, 2004 to pay various vendors and people. *See* Trustee's Exhibit 289 (the money was transferred to the account marked "1020 – Payroll @ Park Cities" and used to purchase cashier's checks as payment).

---

[27] The Defendants recognize, of course, that the Quickbooks data does not include the Canada award or the Notes Receivables. However, this Court is permitted to "adjust" the balance sheets based upon the evidence presented at trial. *See Toy King*, 256 B.R. at 93-94.

[28] The "Distribution Payable" was satisfied when Heritage paid Steadfast $4 million on February 18, 2003. *See* Defendants' Exhibit 280 (the liability designated "Distribution Payable" went from $4 million to zero between February 17, 2003 and February 18, 2003, when corresponding assets were reduced by $4 million).

In addition, the evidence established that Heritage owned several notes receivables with a fair value of approximately $7.5 million, all of which were not reflected in Quickbooks. *See,* Defendants' Exhibits 283-286; Trial Testimony (1/15/09) 138:9-13; Testimony of Gary Kornman (1/16/09) 58:11-15.

Accordingly, the Defendants presented substantial evidence that Heritage had at least $4 million in "cash" assets and $7.5 million in notes receivables, for a total of $11.5 million during the entire First Time Period, without even considering the "fair value" of the other assets.

With respect to the actual liabilities during the First Time Period, the debts were measured at their face value. *See* Defendants' Exhibit 281; *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 545 (Bankr. D. Del. 2002)(unlike assets, debts are measured at their face value and not at market value).

However, the Trustee argues that the Canada and Jenkins contingent claims must be considered in the valuation. To value a contingent liability, it is necessary to discount the liability for the probability that the contingency will occur, and that the valuation after such discounting is made from the debtor's perspective. *See Hoffinger Indus., Inc. v. Bunch (In re Hoffinger Indus., Inc.)*, 313 B.R. 812, 819 (Bankr. E.D. Ark. 2004). After the proper valuation of the contingent liability has been determined, it becomes a factor in the Court's balance sheet insolvency test. *Id.* at 819-20.

With respect to the Canada claim, from Heritage's perspective, those claims were without merit, and were vigorously defended. However, even if the Court included the face amount of the award that was eventually entered in the amount of $6.3 million (rounded up), and included

that amount during the entire First Time Period, at no time did the Canada award plus "Total Liabilities" exceed $11.5 million.[29]

With respect to the Jenkins claims and the other client claims, from Heritage's perspective, those claims were also without merit and not subject to valuation, based upon the existence of the risk disclosure, release, and indemnity language contained in each of the Client Agreements. *See* Defendants' Exhibit 1, 41, 129-132, 134-135. *See Katz v. Wells (In re Wallace's Bookstores, Inc.)*, 316 B.R. 254, 262 (Bankr. E.D. Ky. 2004), citing *Oakes v. Spalding (In re Oakes)*, 7 F.3d 234 (6th Cir. 1993)(to determine the value of a contingent liability under a guarantee, the court should multiply the total debt guaranteed *by the probability that the debtor will be required to fulfill the guarantee*); *Forest Oil Corp.*, 268 S.W.3d at 62 (waiver of reliance clause precluded fraudulent inducement claim). Accordingly, there is no basis to assign any value to such claims prior to the time Heritage filed for bankruptcy relief.

Under the circumstances, considering the Quickbooks data, the testimony regarding the value of the Notes Receivables, the Canada award, and the non-value of the Client claims, the Defendants have presented sufficient evidence to rebut the presumption of insolvency during the First Time Period (February 17, 2004 through April 27, 2004).

With respect to the Second Time Period, using the same chart provided for the First Time Period, Heritage was solvent between April 28, 2004 and May 17, 2004, when taking into account all the assets of Heritage. *See*, green highlighting on "281 – Post Trial.xls"; *Toy King*,

---

[29] For the Court's convenience, the Defendants have submitted to the Court an additional copy of Exhibit 281 in Excel format, with the calculations to show the calculation of "cash" plus "Notes Receivables" less the book liabilities and Canada Judgment. The calculation using only assets represented by cash and the Notes Receivable for each day is shown at the bottom and is highlighted in blue. The calculation using all assets, plus the Notes Receivable is shown at the bottom and is highlighted in green.

256 B.R. at 91-92 ("this evidence and testimony, while ultimately not credited by the court, <u>is sufficient to rebut the presumption of insolvency and require the plaintiff to put on its proof.</u>")

Even assuming the Court does not consider all assets of Heritage, using only cash and notes receivable, Heritage was solvent on April 29, 2004 and May 3, 2004. Thus, the payments made to THO Agency on May 3, 2004, in the amount $71,894.32 (*see*, Pretrial Order, p. 28, ¶121) and the payment made to Valiant on May 3, 2004, in the amount of $85,653.48 (*see*, Pretrial Order, p. 28, ¶121), were not made in preference to other creditors under section 547 of the Bankruptcy Code. *See*, blue highlighting on "281 – Post Trial.xls."

C. Ordinary Course Defense

Preferential transfers may not be avoided when they are made in the ordinary course of business. 11 U.S.C.§ 547(c)(2) The party asserting the ordinary course defense has the burden of proving the elements of the defense. *Estate of SPW Corp. v. A.P.V. Equip., Inc. (In re SPW Corp.)*, 96 B.R. 676, 678 (Bankr. N.D. Tex. 1989). In order to carry the burden, the party must satisfy the three prongs of the defense as set forth in section 547(c)(2) of the Bankruptcy Code by a preponderance of the evidence. 11 U.S.C. § 547(c)(2).

The Trustee asserts that Defendant cannot satisfy the third prong of the test, relating to whether the payments were made according to ordinary business terms. However, Ms. Walker testified that payments made to THO Agency (without objection) and to Heritage Properties (over objection) were made in accordance with terms in the industry. *See*, 1/14/09 Trial Transcript, pp. 107:19-24 (testimony as to THO Agency); 115:13-17 (offer of proof as to all Supplier Defendants); 120:24-121:3 (admission of offer of proof as to Heritage Properties).

The Trustee also challenges the payments made on April 28, 2004 by cashier's check as not in the ordinary course of business. However, none of the payments made by Heritage to

THO Agency and Heritage Properties were made on this particular date. *See* Pretrial Order, p. 27, ¶¶119, 121.

Accordingly, this Court should find that the payments made by Heritage to THO Agency and Heritage Properties were made in the ordinary course of business.

## IV.    Veil Piercing Causes of Action

The veil-piercing claims for the Kornman Entities are governed by Delaware law, except as to Financial Marketing (Texas law) and K&A (Tennessee law). *See Asarco LLC. v. Am. Mining Corp.*, 382 B.R. 49, 65 (S.D. Tex. 2007). Essentially, the Trustee seeks to pierce the corporate veil of Heritage and the Kornman Entities and impose liability upon each of the Kornman Entities, as well as the owners, officers and directors of the Kornman Entities, for the debts of Heritage as the "alter ego" of Heritage.

The shareholders of a corporation and the members of an LLC generally are not liable for the debts of the entity, and a plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces, "a difficult task." *Mason v. Network of Wilmington*, No. Civ. A. 19434-NC, 2005 WL 1653954 at *2 (Del.Ch. July 1, 2005).

It is significant to note that a claim to pierce the corporate veil is not itself a cause of action but rather merely a theory on which someone other than the debtor can be liable on a creditor's claim. *SW Holdings, LLC v. Kohlberg and Co. (In re SW Supermarkets, LLC.)*, 315 B.R. 565, 578 (Bankr. D. Az. 2004), *vacated in part*, 376 B.R. 281 (2007); *Nick Corp. v. JNS Aviation, Inc. (In re JNS Aviation, LLC)*, 376 B.R. 500 (Bankr. N.D. Tex. 2007)(under Texas law, an assertion of veil piercing or corporate disregard does not create a substantive cause of action and presupposes an existing liability).

A.    Delaware Law - Single Economic Entity

"Under Delaware law, an alter ego analysis must start with an examination of factors which reveal how the corporation operates and the particular defendants' relationship to that corporation. The factors to be considered as to whether the companies operated as a single economic entity are as follows: (a) whether the corporation was adequately capitalized for the corporate undertaking; (b) whether the corporation was solvent; (c) whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (d) whether the dominant shareholder siphoned funds; and (e) whether, in general, the corporation simply functioned as a facade for a dominant shareholder." *U.S. v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del.1988).       In addition, Delaware courts have built on this analysis and require an element of fraud: "Piercing the corporate veil under the alter ego theory requires that the corporate structure cause fraud or similar injustice. Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).

Further, the alleged fraud or inequity must be distinct from the tort alleged in the complaint. *In re Foxmeyer Corp.*, 290 B.R. 229, 234 (Bankr. Del. 2003); *see also Sears, Roebuck & Co. v. Sears, plc*, 744 F. Supp. 1297, 1305 (D.Del. 1990). The fraud or similar injustice that must be demonstrated must, in particular, "be found in the defendants' use of the corporate form. ***The underlying cause of action, at least by itself, does not supply the necessary fraud or injustice.*** To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." *In re Foxmeyer Corp.*, 290 B.R. at 234 (emphasis added, citations omitted); *see also Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp.

260, 268 (D. Del. 1989); *Richmond v. Indalex, Inc.*, 308 F. Supp. 2d 648, 659 (M.D.N.C. 2004)(analyzing Delaware law).

Moreover, the burden of proof under Delaware law to prove alter ego is not by preponderance of the evidence. Instead, there is a greater burden of proof that entails, "if not a clear and convincing evidence standard, at least somewhat greater than merely a preponderance of the evidence standard." *In re Foxmeyer*, 290 B.R. at 237; *see also Wallace v. Wood*, 752 A.2d at 1184 ("Persuading a Delaware court to disregard the corporate entity is a difficult task."); *Harco Nat'l. Ins. Co. v. Green Farms, Inc.*, No. Civ. A. No. 1131, 1989 WL 110537 at *4 (Del. Ch. Sept. 19, 1989)(same).

In the present case, the Defendants have stipulated that Mr. Kornman had some level of control over all of the entity Defendants. However, just because Mr. Kornman was an officer and/or owner of multiple entities does not establish, *per se*, a single economic entity. Just because someone is the sole owner of separate legal entities, even when they are housed in the same office building and possessing the same phone number, does not constitute a sham that "exists for no other purpose than as a vehicle for fraud." *See Mason*, 2005 WL 1653954 at *3. Merely exercising control over multiple entities, without more, is not enough.

Similarly, mere dominion and control is not enough. *Outokumpu Eng'g Enterp., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (Del. Ch. 1996). "Under Delaware law to pierce the corporate veil and demonstrate that one entity is the alter ego of another, it must be shown that the other entity exerts 'complete domination and control. The degree of control required to pierce the veil is exclusive domination and control...to the point that...[the dominated entity] no longer has legal or independent significance of its own.'" *Wallace*, 752 A.2d at 1183-84; *Lucent Tech., Inc. v. Gateway, Inc.*, Nos. 02-2060-B (CAB), 03CV0699-B(CAB), 03CV1108-B(CAB),

2007 WL 2900484 at *8 (S.D.Cal. Oct. 1, 2007). "It must also be shown that the dominated entity is a 'sham and exists for no other purpose than as a vehicle for fraud.'" *Sunstates Corp. S'holder Lit.*, 788 A.2d 530, 534 (Del.Ch. 2001)("Plaintiffs' brief simply ignores this more difficult standard...on the contrary, the record shows that each of those entities was engaged in substantial business operations and was formed or acquired by Sunstates for purposes relating to the pursuit of normal business operations."); *see also Lucent Technologies, Inc.*, 2007 WL 2900484 at *8.

At trial, the evidence established that Heritage and the other Defendant entities were not operated as a single business entity, considering the factors set forth above. In particular, the evidence established that: (a) Most of the Supplier Defendants were formed as separate businesses before Heritage came into existence, and years before Heritage or any Defendant had ever heard of a 752 transaction (*See* Defendants' Exhibits 201 (Executive Aircraft Management formed 4/25/95), 202 (Executive Air Crews formed 8/30/94), 203 (Heritage Advisory Group formed 10/1/98), 205 (Valiant Leasing formed 8/30/94), 206 (Vehicle Leasing formed 12/28/94), 207 & 208 (Strategic Leasing formed 12/26/02 and Leasecorp formed 12/11/02)[30] (b) Heritage was adequately capitalized at all times material (*see,* Defendants' Exhibit 280); (c) Heritage was solvent at all times material (*see,* Defendants' Exhibits 280 and 281); (d) Heritage paid dividends, kept corporate records – including a separate Quickbooks file for each entity – and observed corporate formalities; (e) there was no "siphoning" of funds, as Heritage always maintained significant cash and other assets at all times material; and (f) there was no evidence to show that Heritage was used as a façade for Steadfast, its dominant member.

---

[30] It should also be noted that there has been no connection established between Strategic Leasing and Leasecorp, on the one hand, and Gary Kornman, on the other. The evidence was uncontroverted that Michael Kornman owns and operates both of those entities. Testimony of Gary Kornman (1/9/09) at _____.

The Trustee acknowledges that valid agreements existed between Heritage and the Defendant entities. However, the Trustee attempts to attach sinister or fraudulent intent because some of the agreements were oral or terminable at will and because some of the Supplier Defendants owned assets used by Heritage. The Trustee simply ignores the fact that there were valid business reasons for managing the assets in the manner in which it did (i.e. hold the jet in the name of a separate entity to prevent it from falling under particular F.A.A. regulations, estate planning, separate business and revenue sources, passive vs. active heirs engaged in business.). Testimony of Gary Kornman (1/9/09) 139:9-140:15.

B.    Delaware Law – Overall Element of Injustice or Unfairness

As stated above, the alleged fraud or inequity must be distinct from the tort alleged in the complaint. *In re Foxmeyer Corp.*, 290 B.R. at 234; *see also, Sears, Roebuck & Co.*, 744 F. Supp. at 1305. The fraud or similar injustice that must be demonstrated must, in particular, "be found in the defendants' use of the corporate form. The underlying cause of action, at least by itself, does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." *In re Foxmeyer Corp.*, 290 B.R. at 234 (emphasis added, citations omitted); *see also Mobil Oil Corp.*, 718 F. Supp. at 268; *Richmond*, 308 F. Supp. 2d at 659 (analyzing Delaware law).

The Trustee's Second Amended Complaint fails to state exactly what the underlying fraud or similar misconduct is that the Trustee alleges. The Trustee's post-trial brief similarly lacks specific detail of fraudulent use of the corporate forms. The facts the Trustee identifies are related to Heritage's distributions of profits to its members - which is a practice the Trustee himself practices within his own professional corporation (*see*, Testimony of Dennis Faulkner (1/15/09) 128:21 – 129:18) - and the payments by Heritage to the Supplier Defendants for

services rendered, which payments would have been expensed, in all events, if paid to unrelated entities for similar services.

These facts certainly do not establish that each of the Defendant entities was used to commit a fraud or similar injustice, as substantial amounts of cash and other assets remained within Heritage following each distribution (*see*, Defendants' Exhibit 280) and each Supplier Defendant provided services to Heritage for the payments received.

Moreover, there was no evidence presented at trial to show that the alleged fraud or injustice was in the use of the corporate form of any Defendant entity. In particular, there was no showing that the corporate form of each Defendant entity ***was used*** to sell the investment strategies involving Section 752 nor was there any evidence to show that each Defendant entity ***was used*** to engage in the alleged conduct involving Koshland, Bird, Canada or the IRS, which, along with the distributions and payments to the Supplier Defendants, as the only conduct identified by the Trustee in his brief.

C. Alter Ego – Texas Law – Ownership is Required

Under Texas law, "for the alter ego doctrine to apply against an individual under [the] test, ***the individual must own stock in the corporation***." *Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317, 325 (5th Cir. 2006)(citing *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643 (5th Cir. 1991))(emphasis supplied). The Court in *Bollore* further stated that establishing managerial control of an entity is insufficient under Texas law to support an alter ego finding.

In response, the Trustee argues that Kornman had "effective direct or indirect ownership." Trustee's Post Trial Brief, p. 42. However, this ignores the fact that the evidence established that Heritage was owned exclusively by Steadfast, Tikchik, GMK Family and

Koshland, and that, at best, Kornman had managerial control, all of which is insufficient under Texas law to establish alter ego.

## V.      Financial Marketing Services, Inc. ("FMS")

Texas does recognize a claim for "sham to perpetuate a fraud" which would apply to FMS "if recognizing the separate corporate existence would bring about an inequitable result." *Bollore*, 448 F.3d at 326.

As stated by the Texas Supreme Court, "the limitation on liability afforded by the corporate structure can be ignored only 'when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *SSP Partners v. Gladstrong Investments*, ---S.W.3d---, 52 Tex. Sup. Ct. J. 95, 2008 WL 4891733, *4 (Tex. Nov. 14, 2008). The Court further stated that "[e]xamples are when the corporate structure has been abused to perpetrate a fraud, evade an existing obligation, achieve or perpetrate a monopoly, circumvent a statute, protect a crime or justify wrong." *Id.*

This does not mean that corporations are liable for each other's obligations merely because of centralized control, mutual purposes and shared finances, as the creation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace. *Id.* *7. There must also be evidence of abuse, injustice or inequity. *Id.* As stated by the Court, "[s]uch abuse is necessary before disregarding the existence of a corporation as a separate entity. Any other rule would seriously compromise what we have called a 'bedrock principle of corporate law' that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations." *Id.*

Finally, the Texas Supreme Court stated "[i]n *Castleberry*, we held that the corporate structure could be disregarded on a showing of constructive fraud, even without actual fraud.

The Legislature has since rejected that view in certain cases." *Id.* (citing TEX. BUS. CORP. ACT. art. 2.21).

For reasons similar to those state above, the Trustee failed to show that FMS was operated in a manner that unfairly prejudiced *its* creditors or was used to effectuate a fraud on anyone else.

The stipulations and evidence presented at trial establish that FMS was formed years before Heritage was formed. Testimony of Vickie Walker (1/14/09) 75:25-76:5. Heritage paid FMS $1,629,293.61 during the four years prior to the petition date in exchange for the use of the client database. Testimony of Vickie Walker (1/14/09) 172:21-173:6. The Trustee attempts to characterize this agreement and consideration paid thereunder as a sham to drain cash from Heritage. However, there was no evidence presented at trial to show that FMS's conduct in receiving payment prejudiced *its* creditors (in fact, the receipt of payment benefitted its creditors). Moreover, there was no evidence presented at trial to show that FMC was used to effectuate a fraud on any Heritage creditor. At all times material, Heritage received the benefit of the client database, created long before Heritage was ever formed, without which Heritage could not operate its business. The fact that the agreement was terminated in the Spring of 2004 or whether Ms. Walker took the position, post-petition, that the documents in the database were owned by FMS, does not constitute fraud as to any Heritage creditor, and certainly does not support a finding of "abuse" under the test set forth in *SSP Partners*.

## VI. A Fraudulent Conveyance Claim is Incompatible with Piercing the Corporate Veil

As stated above, a claim to pierce the corporate veil is not itself a cause of action but rather merely a theory on which someone other than the debtor can be liable on a creditor's claim. *Sw. Holdings, LLC v. Kohlberg and Co. (In re Sw. Supermarkets, LLC.)*, 315 B.R. 565, 578 (Bankr. D. Az. 2004), *vacated in part*, 376 B.R. 281 (2007). A claim to pierce the corporate veil seeks to ignore the legal distinction between two or more entities based upon the use of the entities as a single economic entity. *See NetJets Aviation, Inc. v. LHC Comm'ns, LLC.*, 537 F.3d 168, 177 (2nd. Cir. 2008)(the standard is whether the two entities operated as a single economic entity such that it would be inequitable for the Court to uphold a legal distinction between them).

In this case, assuming, *arguendo*, that the Court determines that the corporate veil of Heritage should be pierced under the theory of alter ego, the Court would then be required to treat Heritage and that other entity as a single economic entity, thereby disregarding the legal distinction between Heritage and the other entity. If the Court disregarded the legal distinction, there can be no "fraudulent transfer" from Heritage to the other entity because there would be no legal distinction between the transferor and transferee. Essentially, the exchange would be treated as a transfer from the collective "Heritage Entities" to the collective "Heritage Entities," without any distinction of corporate form.

This very issue was identified and addressed by the Court in *In re Foxmeyer Corp.*, 290 B.R. 229 (Bankr. D. Del. 2003). In the *Foxmeyer* case, three separate companies were in play: Fox Drug, which was owned by Fox Corp., which was in turn owned by Avatex. Fox Drug and Fox Corp. transferred $575 million to the Defendant banks in the case, and transferred another $198 million to the ultimate parent, Avatex. The Trustee sued to recover that $198 million, arguing that Avatex did not confer reasonably equivalent value for the transfer of the money.

The Trustee in *Foxmeyer* did not seek to pierce the corporate veil all the way up to Avatex. The Court explained that the reason it believed the Trustee did not attempt to do so was:

> *because to do so would destroy all of the Trustee's fraudulent conveyance claims against the Defendants, which observation the Court makes because (a) such claims rely for their viability upon the adverse effect to the Debtors of the Dividend to Avatex, and (b) the effect of such Dividend disappears or is ignored if the corporate separateness of Fox Drug and Fox Corp. via-a-vis Avatex is no longer respected via veil piercing all the way up to Avatex.*

*In re Foxmeyer Corp.*, 290 B.R. at 242 (citing *Smoothline Ltd. V. N. Am. Foreign Trading Corp.*, No. 00 Civ 2798 DLC, 2002 WL 31885795 (S.D.N.Y. 2002))(emphasis supplied).

Accordingly, the Trustee's claims for fraudulent transfer and to pierce the corporate veil cannot co-exist. The Trustee must either pursue his claims for fraudulent transfer, recognizing the legal distinction between Heritage and the other entities, or pursue his claims to pierce the corporate veil for the purpose of disregarding the legal distinction between Heritage and the other entities. The Trustee may not pursue and recover on both types of claims, as a matter of law.

Dated: January 29, 2009

Respectfully submitted,

*/s/ Bryan J. Wick*
Bryan J. Wick
State Bar No. 24003169
Brant C. Martin
State Bar No. 24002529
Wick Phillips, LLP
2100 Ross Avenue, Suite 950
Dallas, TX 75201
(214) 692-6200
(214) 692-6255 fax

Counsel for Defendants Gary M. Kornman, Kornman & Associates, Inc., Steadfast Investments, L.P., GMK Family Holdings,

L.L.C., Tikchik Investment Partnership, L.P., GMK Corp., Ettman Family Trust I, Strategic Leasing, L.P., Leascorp., Inc., Valiant Leasing, L.L.C., Executive Aircraft Management L.L.C., Executive Air Crews, LLC, Vehicle Leasing, LLC, The Heritage Organization Agency, Inc., Heritage Properties LLC, Financial Marketing Services, Inc., Heritage Advisory Group, L.L.C.

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of January, 2009, a true and correct copy of the above and foregoing document was served via ECF electronic notice, where available, and via electronic mail on the parties listed below:

M. David Bryant, Jr.
Cox Smith Matthews Incorporated
1201 Elm Street, Suite 3300
Dallas, TX 75270
dbryant@coxsmith.com

Deborah D. Williamson
Cox Smith Matthews Incorporated
112 E. Pecan Street, Suite 1800
San Antonio, TX 78205
dwilliamson@coxsmith.com

United States Trustee *(via U.S. first class, postage, prepaid mail)*
1100 Commerce Street
Room 976
Dallas, TX 75242-1496

/s/ *Bryan J. Wick*
Bryan J. Wick