

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.

Signed May 11, 2009

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| THE HERITAGE ORGANIZATION, | § | CASE NO. 04-35574-BJH-11 |
| L.L.C., | § | |
| | § | |
| Debtor. | § | |
| | § | |
| DENNIS FAULKNER, TRUSTEE, | § | |
| Plaintiff, | § | ADV. PRO. NO. 06-3377-BJH |
| | § | |
| - against - | § | |
| | § | |
| GARY M. KORNMAN, et al., | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION</u>

The Court tried this adversary proceeding on January 7-16, 2009. At the conclusion of

the evidence, certain parties asked for the opportunity to file post-trial briefs and revised

proposed findings of fact and conclusions of law. Pursuant to an agreed schedule, the last of

those pleadings was filed on February 5, 2009. Due to scheduling complications with the parties, closing arguments did not occur until February 26, 2009. At the conclusion of closing arguments, the Court took the matter under advisement.

The Court has jurisdiction over the parties and the issues in accordance with 28 U.S.C. §§ 1334 and 157(b). This Memorandum Opinion contains the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## I.    FACTUAL BACKGROUND

### A.    Heritage

The Heritage Organization, L.L.C. ("Heritage") is a Delaware limited liability company formed in 1994. Pretrial Order, docket no. 537 ("Pretrial Order"), Stipulation 1; Defendants' Exhibit ("D.Ex.") 91.[1] After operating for ten years, on May 17, 2004, Heritage filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above bankruptcy case (the "Case"). Pretrial Order, Stipulation 95. Prior to its bankruptcy filing, Heritage advised[2] extremely high net worth individuals regarding estate planning, business planning, tax planning and asset planning. D.Ex. 23, DFT-0872.

The information and strategies about which Heritage advised its clients were enormously complex and individualized. Of particular relevance here, and for certain clients during the

---

[1] Similarly, references to Plaintiff's Exhibits at trial will be indicated by the abbreviation P.Ex. followed by the exhibit number. References to witness testimony at trial will be indicated by the identification of the witness's name, followed by the date of his/her testimony, followed by the page and line number of the relevant trial transcript. Deposition testimony offered at trial will be identified in a fashion similar to live trial testimony.

[2] Kornman prefers the description educate. In other words, according to Kornman, Hertiage merely educated its clients about these various matters. Interestingly, when the one witness at trial who was involved in Heritage's client activities and who does not have a financial interest in the outcome of this litigation was asked if "somebody said to you that during the period that you were at Heritage that all that Heritage ever did was to 'educate' perspective clients about the Section 752 transactions, would you say that that is fully accurate," his response was a simple "no." Testimony of Czerwinski (1/16/09) 38:17-21. However, as relevant here, whether Heritage advised its clients or educated its clients is immaterial.

**Memorandum Opinion**                                                                                 **2**

period 1998 to 2001, Heritage included a version of an investment transaction using a strategy involving § 752 of the Internal Revenue Code (the "752 Transaction") as part of an overall group of estate and tax planning strategies it presented to its clients. [3] According to the Defendants, a 752 Transaction generally worked as follows:

> The client would deposit money into a brokerage account having a margin feature. The client would then utilize margin to make an investment by executing a short sale of treasury notes. The cash proceeds from the short sale would then be combined into the brokerage account with the cash deposited by the client.
>
> At this point in time, the brokerage account would have within it (a) assets consisting of the cash deposited into the account and the proceeds from the short sale, and (b) an obligation consisting of the obligation to return the treasury notes that had been borrowed to execute the short sale.
>
> Once the short sale was executed, the client would then transfer the brokerage account, with its assets and liabilities, to a partnership ("Partnership A"). In return, the client would receive a limited partnership interest in Partnership A. Partnership A would thus be liable for the obligation to return the treasury notes that had been borrowed from the brokerage to execute the short sale.
>
> After the transfer to Partnership A, the client would contribute its limited partnership interest in Partnership A to a second partnership ("Partnership B"). In return, the client would receive a limited partnership interest in Partnership B. Thus, the client would own a partnership interest in Partnership B, which owned a partnership interest in Partnership A, which owned the brokerage account consisting of cash and the obligation to return the property in the form of treasury notes.
>
> Following these transactions, Partnership B would sell its interest in Partnership A to a third party. The third party, thus, would own Partnership A, including the resulting brokerage account with the total amount of cash and the obligation to return the property in the form of treasury notes. The third party would then use the cash from the brokerage account to close the short sale by buying the treasury notes necessary to return them to the brokerage. The third party would then have a profit or loss depending on the fluctuation of the treasury notes which had been sold short.

---

[3] *See, e.g.*, D.Ex. 136 (Heritage Presentation to the Troutt Family dated September 26, 2000); D.Ex. 142 (Heritage Presentation to the Bickell Family dated December 14, 1999); D.Ex. 147 (Heritage Presentation to the Rainwater Family dated August 30, 2000).

Defendants' First Amended Updated Proposed Findings of Fact and Conclusions of Law ("Defendants' Proposed Amended Findings and Conclusions"), docket no. 564, at pp. 14-15. *See also* P.Ex. 73; Testimony of Czerwinski (1/16/09) 22:2-27:21.

According to the Defendants, the tax treatment that Heritage and its Chief Executive Officer, Gary M. Kornman ("Kornman"), believed to be appropriate for a 752 Transaction is generally described as follows:

1. Partnership B has an outside basis in its purchase of Partnership A in the amount that it paid for the interest (the value of the cash in the brokerage account that was Partnership A's only asset).

2. Partnership B sells its interest in Partnership A to the third party, and its basis is the entirety of the amount that it paid for the Partnership A interest, less the amount paid by the third party. Partnership B does not have to offset its basis by the amount necessary to close the short sale and return the property in the form of treasury notes.

3. Partnership B's outside basis in Partnership A would normally have to be adjusted for any liability that is contained with Partnership A – i.e., the obligation to return the property in the form of treasury notes. But Partnership A's obligation was not ascertainable at the time of the sale to the third party. Since the transaction had not yet closed, the amount of the obligation was not ascertainable. *See* I.R.C. Sec. 1233[4]. Therefore, Partnership A's obligation is a "contingent liability" and is not a "liability" for purposes of Section 752. Since it is not a liability, Partnership B does not have to take the liability into account in computing outside basis under that section of the Code.[5]

4. As a result, the outside basis for Partnership B is a great deal larger than the amount it receives from the third party. The net effect is a tax loss for Partnership B that it can then use to offset capital gains in that tax year and in subsequent years.

---

[4] Defendants note that "Section 1233(a) states that, 'gain or loss from the short sale of property shall be considered as gain or loss from the sale or exchange of a capital asset to the extent that the property . . . **used to close the short sale** constitutes a capital asset in the hands of the taxpayer.' I.R.C. § 1233(a)(emphasis added). A corresponding regulation, Reg. 1.1233-1(a)(1), states that 'for income tax purposes, a short sale is not deemed to be consummated **until delivery of property to close the short sale**.' Treas. Reg. 1.1233-3 (emphasis added)." Defendants' Proposed Amended Findings and Conclusions at p. 15 n.64.

[5] Defendants further note that "[a]t the time of the transactions of Heritage's clients, § 752 did not contain a definition of 'liability.' In fact, in 1989, the IRS published proposed regulations under § 752 that contained a definition of 'liability,' but that definition was not adopted. It was not until 2005 that regulations were adopted that actually contained a definition of liability that would definitively apply to these types of transactions and would foreclose the tax benefits of the Heritage transactions. *See* Treas. Reg. 1.752-0 (effective May 26, 2005)." Defendants' Proposed Amended Findings and Conclusions at p.15 n.65.

**Memorandum Opinion**                                                                                    **4**

*Defendants' Proposed Amended Findings and Conclusions,* at pp. 15-16.

The tax returns of many of Heritage's clients who had implemented a 752 Transaction were either audited by the Internal Revenue Service ("IRS") or the clients chose to "unwind" the transactions and settle with the IRS by paying the taxes owed, together with interest and penalties on the unpaid taxes. As a result of the failure of the 752 Transactions (or other strategies) to achieve the desired tax savings (and certain other alleged actions or inactions by Heritage), a number of Heritage's former clients asserted claims against Heritage in the Case (the "Client Claimants").

On the motion of Ralph Canada ("Canada"), a former Heritage employee, and after notice and a hearing, the Court ordered the appointment of a Chapter 11 trustee in the Case. *See* docket no. 151 in 04-35574-BJH-11. On August 16, 2004, the U.S. Trustee appointed Dennis S. Faulkner as the Chapter 11 trustee of Heritage (the "Trustee"), which appointment was confirmed by order entered on August 18, 2004. Pretrial Order, Stipulation 2. On May 16, 2006, the Trustee commenced the above-captioned adversary proceeding.

On March 10, 2007, the Trustee and the Client Claimants jointly proposed a plan of liquidation for Heritage (the "Plan"). *See* docket no. 1020 in Case No. 04-35574-BJH-11. Canada,[6] Kornman and other Kornman affiliates objected to confirmation of the Plan. *See* docket nos. 1139, 1141, 1147 in Case No. 04-35574-BJH-11. Following hotly contested confirmation hearings, the Court confirmed the Plan by Memorandum Opinion and Order entered on September 12, 2007. *See* docket no. 1281 in Case No. 04-35574-BJH-11. Pursuant to the Plan, a creditors' trust was created (the "Plan Trust"). *See* docket no. 1201 in Case No. 04-35574-BJH-11 (the "Confirmed Plan"), Art. 6.1. The Trustee became the trustee of the Plan

---

[6] The proponents of the Plan settled with Canada on the eve of the commencement of the confirmation hearing.

**Memorandum Opinion** **5**

Trust. *Id*., Art. 6.1.7. Various Heritage assets, including the claims asserted in this adversary proceeding, were transferred to the Plan Trust. *Id*., Art. 6.1.2; 1.17; 1.29. Similarly, the claims of various creditors, including the Client Claimants and Canada, were also transferred to the Plan Trust. *Id*., Art. 6.1.3. Those creditors are the beneficiaries of the Plan Trust and any recovery here. *Id*., Art. 4.4.1.

While the Trustee asserted numerous claims against the Defendants in this adversary proceeding originally, through a combination of *Daubert* and summary judgment motions, the claims remaining for trial are more limited. *See* Pretrial Order, pp. 2-6. First, the Trustee seeks to avoid and then recover various distributions that Heritage made to its members from April 2001 through February 2003 as actual fraudulent transfers. Second, the Trustee seeks to avoid and then recover various payments that Heritage made to Kornman and/or the Supplier Defendants during the 90-days prior to Heritage's bankruptcy filing as preferences. Finally, the Trustee seeks to hold Kornman and the Entity Defendants liable to Heritage's creditors through two distinct veil piercing theories – *i.e.*, alter ego and sham to perpetrate injustice.

### B. The Individual Defendant

Kornman is an individual residing in the State of Texas. Pretrial Order, Stipulation 3. Kornman has been in the estate planning, business planning, tax planning and asset planning business for over 40 years. Utilizing various insurance, financial, and tax strategies, Kornman built several businesses over his career, culminating in the formation of Heritage. Kornman has a law degree from the University of Alabama, passed the Alabama bar exam, but has never practiced law. Testimony of Kornman (1/12/09) 6:4-12; *See* Pretrial Order, Stipulation 5. Kornman obtained a B.A. degree from Vanderbilt University, with a double major in business

and economics and psychology. Testimony of Kornman (1/12/09) 6:4-12. At all relevant times, Kornman controlled, directly or indirectly, each of the Entity Defendants, Pretrial Order, Stipulation 32, except Strategic Leasing L.P. and Leasecorp, Inc., which were controlled by his son, Michael Kornman ("Michael"). Testimony of Kornman (1/8/09) 12:13-14:16; Pretrial Order, Stipulation 32.

### C.    The Entity Defendants

#### 1.    Steadfast LP, Tikchik LP, and GMK Family (collectively, the "Member Defendants")

Defendant Steadfast Investments LP ("Steadfast") is a Delaware limited partnership with its principal place of business in Dallas County, Texas. Pretrial Order, Stipulation 7. Steadfast is an investment partnership whose primary investment was a membership interest in Heritage. Testimony of Kornman (1/8/09) 53:13-54:15. From 2001-2003, Steadfast owned 87% of Heritage. *Id*. In turn, 99% of Steadfast was owned by Defendant Ettman Family Trust I ("Ettman Trust") and 1% was owned by Defendant Kornman & Associates, Inc. ("Kornman Associates"). Testimony of Kornman (1/8/09) 63:23-64:23.

Defendant GMK Family Holdings LLC ("GMK Family") is a Delaware limited liability company with its principal place of business in Dallas County, Texas. Pretrial Order, Stipulation 8. GMK Family was the Manager of Heritage beginning in 1998. Pretrial Order, Stipulation 25. Kornman was the Manager of GMK Family, Pretrial Order, Stipulation 31, and thereby controlled it. Testimony of Kornman (1/8/09) 54:23-25. From 2001-2003, GMK Family owned 5% of Heritage. Testimony of Kornman (1/8/09) 54:16-22.

Defendant Tikchik Investments Partnership, LP ("Tikchik") is a Delaware limited partnership with its principal place of business in Dallas County, Texas. Pretrial Order,

Stipulation 9. Tikchik was formed in 1999 by Kornman and Ted Mann ("Mann"), an unrelated third party, for the purpose of holding an interest in Heritage. *See* Pretrial Order, Stipulation 91. At its formation, Tikchik had two general partners – *i.e.*, Defendant GMK Corp., which was the managing general partner, and an entity controlled by Mann. *See* Pretrial Order, Stipulation 27. On January 15, 2001, Mann died, triggering Kornman's obligation to buy out Mann's interest in Tikchik, which he did.[7] *See* Pretrial Order, Stipulation 93. Kornman controls GMK Corp., which controls Tikchik. Pretrial Order, Stipulations 42 & 44.

## 2. GMK Corp. and Ettman Trust

Defendant GMK Corp. is a Delaware corporation with its principal place of business in Dallas County, Texas. Pretrial Order, Stipulation 11. GMK Corp. is the managing general partner of Tikchik. Pretrial Order, Stipulation 44. GMK Corp is owned by Kornman. *See* Testimony of Kornman (1/8/09) 66:1-20.

Defendant Ettman Trust is a trust formed in 1991, Testimony of Kornman (1/8/09) 15:4-6, with its principal place of business in Dallas County, Texas. Pretrial Order, Stipulation 12. Kornman is the Trustee of the Ettman Trust, Testimony of Kornman (1/8/09) 14:17–15:6, which held investments for the benefit of Kornman and his family. Defendants' Proposed Amended Findings and Conclusions, p. 4, ¶ 8.

---

[7] On July 20, 2001 Steadfast loaned Kornman $10.4 million. Pretrial Order, Stipulation 113. On that same day, Kornman wired approximately $12.7 million to Mann Investment Company, L.P. as consideration for the purchase of its interest in Tikchik. Pretrial Order, Stipulation 114. Kornman used the proceeds of the Steadfast loan and some additional funds to make the purchase. Testimony of Kornman (1/8/09) 55:8-56:8. At the conclusion of the transaction, Kornman testified that "basically, Steadfast ended up owning Tikchik." Testimony of Kornman (1/8/09) 56:1-2. Later Kornman testimony elaborated on Tikchik's ownership. Specifically, Kornman testified that Steadfast owned 98% of Tikchik, GMK Corp. owned 1% of Tikchik, and MICC owned 1% of Tikchik. Testimony of Kornman (1/8/09) 65:7-25.

### 3.    The Supplier Defendants

Defendant Leasecorp, Inc. ("Leasecorp") is a Delaware corporation with its principal place of business in Dallas County, Texas.  Pretrial Order, Stipulation 14.  Leasecorp is the Managing General Partner of Strategic Leasing LP ("Strategic").  Pretrial Order, Stipulation 46.  Kornman has no ownership interest in, or control over, Leasecorp or Strategic.  *See* Testimony of Kornman (1/8/09) 12:13-14:16.  As noted previously, Michael controls both entities.

Defendant Strategic is a Delaware limited partnership with its principal place of business in Dallas County, Texas.  Pretrial Order, Stipulation 13.  Strategic leased office equipment, computers, and software to Heritage.  Pretrial Order, Stipulation 45.

Defendant Valiant Leasing, LLC ("Valiant") is a Delaware limited liability company with its principal place of business in Dallas County, Texas.  Pretrial Order, Stipulation 15.  Valiant leased office equipment, software, and furniture to Heritage.  Pretrial Order, Stipulation 45.

Defendant Executive Aircraft Management, LLC ("XAM") is a Delaware limited liability company with its principal place of business in Dallas County, Texas.  Pretrial Order, Stipulation 16.  XAM leased aircraft to Heritage.  Pretrial Order, Stipulation 45.

Defendant Executive Air Crews, LLC ("XAC") is a Delaware limited liability company with its principal place of business in Dallas County, Texas.  Pretrial Order, Stipulation 17.  XAC provided pilot services to Heritage.  Pretrial Order, Stipulation 45.

Defendant Heritage Advisory Group, LLC ("Advisory") is a Delaware limited liability company with its principal place of business in Dallas County, Texas.  Pretrial Order, Stipulation

22.   Advisory was the general partner of, and provided investment advisory services to, two investment funds.  Defendants' Proposed Amended Findings and Conclusions at p. 5, ¶ 14.

Defendant The Heritage Organization Agency, Inc. ("Agency") is a Delaware corporation with its principal place of business in Dallas County, Texas.  Pretrial Order, Stipulation 19. Agency leased real property (office space) from a third party and then subleased that property to Heritage.  *See* Pretrial Order, Stipulation 45.

Defendant Kornman & Associates, Inc. ("Kornman Associates") is a Tennessee corporation with its principal place of business in Dallas County, Texas.  Pretrial Order, Stipulation 10.   Kornman Associates is the general partner of Steadfast, Pretrial Order, Stipulation 44, and the Manager of XAM, XAC, Properties, Valiant, and Vehicle.  Pretrial Order, Stipulation 46.  Kornman owns 100% of the stock of Kornman Associates.  *See* Testimony of Kornman (1/8/09) 54:12-13.

Defendant Heritage Properties, LLC ("Properties") is a Delaware limited liability company with its principal place of business in Dallas County, Texas.  Pretrial Order, Stipulation 20.   Properties owned a building in Tennessee, which it leased to Heritage for office space. Pretrial Order, Stipulation 45.

Defendant Vehicle Leasing, LLC ("Vehicle") is a Delaware limited liability company with its principal place of business in Dallas County, Texas.  Pretrial Order, Stipulation 18. Vehicle leased automobiles to Heritage.  Pretrial Order, Stipulation 45.

Defendant Financial Marketing Services, Inc. ("FMS") is a Texas corporation with its principal place of business in Dallas County, Texas.  Pretrial Order, Stipulation 21.  FMS owned

a database of prospective and current client information that it made available to Heritage for a fee. Pretrial Order, Stipulation 45.

### 4. The Relationships Between the Entity Defendants and Heritage

As found previously, at all relevant times, Kornman controlled, directly or indirectly, each of the Entity Defendants, except for Leasecorp and Strategic, which were controlled by Michael. Kornman also controlled Heritage, through his control of Heritage's Manager, GMK Family. Pretrial Order, Stipulation 31. From 2000 until his resignation on April 23, 2004, Kornman served as Chief Executive Officer and a Vice President of Heritage. Pretrial Order, Stipulation 33. During the four years prior to Heritage's bankruptcy filing, Kornman served as a Director (until April 4, 2002), President, and Chief Executive Officer of Steadfast; Manager (until April 20, 2004) and President of GMK Family (the Manager of Heritage); and Director and President of Tikchik. Pretrial Order, Stipulation 44.

Walker directed the accounting and administrative functions of the Entity Defendants and Heritage. Pretrial Order, Stipulation 43; Testimony of Walker (1/12/09) 179:17-20. From 2000 until April 2004, Walker served as Secretary and Treasurer of Heritage. Pretrial Order, Stipulation 34. Walker was identified as the Chief Financial Officer of Heritage in its Statement of Financial Affairs filed in the Case. Pretrial Order, Stipulation 35. During the four years prior to Heritage's bankruptcy filing, Walker served as a Director, Secretary and Treasurer of Steadfast and Tikchik, and as Treasurer of GMK Family. Pretrial Order, Stipulation 44.

During the four years prior to Heritage's bankruptcy filing, the officers of the Supplier Defendants were, in varying configurations, Michael, Walker, Claudia McElwee ("McElwee," who was also an officer and/or a director of Steadfast and GMK Family), Kornman (with respect

to Agency beginning in July 2002), and Canada (with respect to Agency until July 2002). Pretrial Order, Stipulations 44 & 46.

Other than XAC, none of the Entity Defendants had employees. Pretrial Order, Stipulation 55. The officers and/or employees of Heritage who performed services for the benefit of the Entity Defendants, including the Supplier Defendants, generally did not receive compensation from those other entities, although Michael did. Pretrial Order, Stipulations 47 & 48. Many of the Supplier Defendants had the same office address as Heritage, although certain of them had separate office addresses. Pretrial Order, Stipulations 49-54. For example, XAM and XAC had hangar space separate from Heritage and the other Supplier Defendants. Pretrial Order, Stipulation 49.

According to Kornman and Walker,[8] the Entity Defendants (i) maintained the corporate formalities, Testimony of Kornman (1/12/09) 92:24-93:7 and Testimony of Walker (1/14/09) 68:22-69:17; (ii) maintained separate books and records from Heritage and from each other, Testimony of Kornman (1/12/09) 92:9-23 and Testimony of Walker (1/14/09) 88:1-11; 91:4-12; (iii) prepared their own financial statements, and were not consolidated on Heritage financial statements or on any other consolidated basis, Testimony of Kornman (1/12/09) 92:9-23 and Testimony of Walker (1/14/09) 88:1-11; 91:4-12; and (iv) filed tax returns separate from Heritage and from each other, Testimony of Kornman (1/12/09) 92:9-23 and Testimony of Walker (1/14/09) 88:1-11; 91:4-12. Moreover, according to Walker: (i) Heritage and the Supplier Defendants entered into contracts upon arms-length terms that were double-checked for fairness against terms Heritage would have been able to obtain from a third party, Testimony of

---

[8] Although much of this testimony regarding the manner in which the Entity Defendants' maintained their separateness rings a bit hollow in light of McElwee's testimony. *See* pp. 25-26, n.14, *infra*.

Walker (1/14/09) 69:20-72:16; *see also*, Testimony of Kornman (1/12/09) 91:23-92:8; and (ii) these contractual arrangements between the Supplier Defendants and Heritage were often documented in written contracts, written consents of Heritage and the applicable Supplier Defendant, and/or both, Testimony of Walker (1/14/09) 88:1-91:12. Finally, Walker or Kornman testified that (i) assets owned by the Supplier Defendants were not commingled with the assets of Heritage or each other, Testimony of Walker (1/14/09) 69:6-7; (ii) each of the Supplier Defendants maintained separate bank accounts, Testimony of Walker (1/14/09) 69:7-8; (iii) office equipment and fixtures in Heritage offices that were owned by Strategic or Valiant were marked with inventory stickers denoting that they were assets of Strategic or Valiant, not Heritage, Testimony of Kornman (1/12/09) 86:11-16; and (iv) transfers between Heritage and the Supplier Defendants were documented by detailed invoices, checks, receipts and accounting records.[9]

---

[9] *See, e.g.*, P.Ex. 289; D.Ex. 65 (organizational documents and consents for GMK Family and Heritage); D.Ex. 67 (organizational documents and consents for Agency); D.Ex. 68 (Management and Service Agreement ("MSA") between Heritage and Valiant); D.Ex. 69 (chart evidencing numerous MSAs between Heritage and other companies); D.Ex. 70 (organizational documents of XAC and checks between XAC and Heritage); D.Ex. 75 (corporate documents for Leasecorp and leases between Heritage and Leasecorp); D.Ex. 76 (corporate bid policy requiring 3 competing bids); D.Ex. 99 (invoices between FMS and Heritage); D.Ex. 100 (checks between FMS and Heritage); D.Ex. 101 (consents and corporate documents of Agency); D.Ex. 103 (checks and corporate documents of Properties); D.Ex. 106 (organizational consents of Holdings); D.Ex. 110 (organizational consent of Vehicle); D.Ex. 111 (consent of Directors of Kornman Associates as managing member of Vehicle); D.Ex. 112 (consent of GMK Family, as managing member of Heritage); D.Ex. 113 (checks from Heritage to Agency); D.Ex. 114 (MSA between Heritage and Agency); D.Ex. 115 (consents of directors of FMS); D.Ex. 116 (checks between Heritage and XAC); D.Ex. 117 (consent of Kornman Associates as managing member of XAM); D.Ex. 194-195 (Letters from Heritage to XAC regarding crew requirements); D.Ex. 196 (consent of Kornman Associates as managing member of Vehicle); D.Ex. 197 (consent of Kornman Associates as managing member of XAM); D.Ex. 198 (corporate documents of GMK Family); D.Ex. 199 (release and settlement agreements); D.Ex. 200 (consent of Vehicle); D.Ex. 201 (corporate documents of XAM); D.Ex. 202 (corporate documents of XAC); D.Ex. 204 (corporate documents of Properties); D.Ex. 205 (corporate documents of Valiant); D.Ex. 206 (corporate documents of Vehicle); D.Ex. 207 (corporate documents of Strategic); D.Ex. 208 (corporate documents of Leasecorp); D.Ex. 209 (corporate documents of FMS); D.Ex. 210 (corporate documents of Kornman Associates); D.Ex. 211 (corporate documents of Agency).

## II.     LEGAL ANALYSIS

### A.     Fraudulent Transfer Claims

The largest claims asserted by the Trustee in the amended complaint seek avoidance, under § 544 of the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act ("TUFTA"), of distributions made from April 2001 through February 2003 in the aggregate amount of $46 million to insiders of Heritage (collectively, the "Transfers").  The legal and factual issues before the Court with respect to the TUFTA claims are (1) is there a "triggering creditor" that gives the Trustee standing to pursue claims under TUFTA to avoid and recover the Transfers; (2) does limitations bar avoidance of any of the Transfers; (3) who bears the ultimate burden of persuasion and what is the standard of proof; (4) did the Trustee meet his burden by presenting evidence that the Transfers were made with actual intent to hinder, delay, or defraud any Heritage creditor by either direct evidence or by establishing one or more "badges" or other indicia of fraud as to any of the Transfers; (5) if the Trustee has met his burden of proof, have the Member Defendants met their burden to prove a legitimate purpose for each Transfer and/or otherwise establish, by a preponderance of the credible evidence, the lack of fraudulent intent; and (6) what Transfers, if any, are avoidable and, if any are avoidable, from whom can the Trustee recover.  Each of these issues is addressed in turn below.

### 1.     Standing

Section 544(b) of the Bankruptcy Code grants the Trustee the power to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 . . . ."  11 U.S.C. § 544(b)(1).  The Trustee relies on TUFTA as his "applicable law," alleging that the transfers made to GMK Family, Tikchik and Steadfast were made "with actual

intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1).

A trustee's right to avoid a transfer is derivative of an actual unsecured creditor's right and, therefore, to establish standing under § 544(b), the Trustee must show the existence of an actual unsecured creditor holding an allowable claim that could avoid the challenged transfer. *See Ries v. Wintz Props., Inc. (In re Wintz Cos.)*, 230 B.R. 848, 858-59 (B.A.P. 8th Cir. 1999) (citing *Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996)); *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 659 (S.D. Tex. 2007). While the Trustee must demonstrate the existence of this "golden creditor," *see Turner v. Phoenix Fin., LLC (In re Imageset, Inc.)*, 299 B.R. 709, 715 (Bankr. D. Me. 2003), the Trustee need not specifically identify the creditor by name; as long as the Trustee establishes that such unsecured creditors exist, he can assume the mantle of any one of them. *Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 577 (7th Cir. 1998); *see also Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593 (B.A.P. 8th Cir. 2003), *aff'd*, 376 F.3d 819 (8th Cir. 2004). Only one triggering creditor is required, and the amount of its claim is unimportant. *See Abramson v. Boedeker*, 379 F.2d 741, 748 n.16 (5th Cir. 1967) ("[I]f the transfer is avoidable at all by any creditor, it is avoidable in full for all creditors regardless of the dollar amount of the prevailing claim."); *Acequia, Inc. v. Clinton (In re Acequia)*, 34 F.3d 800, 809-10 (9th Cir. 1994). Moreover, the unsecured creditor need not exist at the time the avoidance action is filed, so long as that creditor existed on the date the bankruptcy petition was filed. *See, e.g., In re DLC, Ltd.*, 295 B.R. at 605 ("we hold, as have other courts analyzing this issue, that the trustee must identify a creditor with an allowable unsecured claim who had an allowable claim against the debtor on the date the bankruptcy petition was filed." (citing *Acequia*, 34 F.3d 800, 807 (9th Cir. 1994)).

So, the question becomes, which Heritage creditor serves as the triggering creditor here?[10] To answer this question, we start with the basics. TUFTA defines "creditor" as "a person . . . who has a claim." TEX. BUS. & COM. CODE § 24.002(4). In turn, TUFTA defines "claim" as "a right to payment . . . , whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *Id*. at § 24.002(3).

The parties have stipulated that the IRS is a creditor of Heritage, holding an allowed unsecured claim in the Case for unassessed social security taxes for tax periods including the first calendar quarter of 2001. Pretrial Order, Stipulations 96 & 97. Thus, the IRS was a creditor of Heritage prior to the time that Heritage made any of the Transfers at issue here, the first of which was made on April 16, 2001 and the last of which was made on February 18, 2003. Thus, the IRS is a triggering creditor with respect to each of the Transfers.

The parties have also stipulated that Canada holds an allowed unsecured claim in the Case. Pretrial Order, Stipulation 98. Canada testified that his claim against Heritage arose in August of 2000 and that Kornman knew about his claim no later than the fall of 2000. Testimony of Canada (1/15/2007) at 46:4-51:14; P.Ex. 266.

However, the Defendants argue that Canada should not be permitted to serve as a triggering creditor until at least July 2002 when his employment with Heritage ended. *See* Defendants' Post-Trial Brief at p. 12 ("It cannot be disputed that Ralph Canada was not a 'triggering creditor' related to the Distributions prior to his departure in July 2002.") The premise of the Defendants' argument is that Canada

---

[10] The Defendants correctly note that Dan Koshland and/or the Koshland Family Partnership, L.P. cannot serve as a triggering creditor as a matter of law, having failed to timely file a proof of claim in the Case. *See* Defendants' Post-Trial Brief at pp. 7-8.

**Memorandum Opinion** **16**

continued to work at Heritage, and received millions of dollars in compensation, all while supposedly being a 'creditor' of Heritage. If he truly thought he had a claim, why would he work there for another two years before leaving?

*Id.*

The Court rejects the Defendants' argument for several reasons. First, remaining employed and earning "millions of dollars in compensation" does not preclude the existence of a dispute over how many more millions of dollars in compensation the employee may be entitled to receive. In other words, having a dispute with your employer and remaining employed are not mutually exclusive. The fact that an employee chooses to remain employed does not suggest that the employee has no claim against his employer. Second, the fact that Canada was well compensated by Heritage does not mean that Canada had no claim for additional compensation, as the arbitrators ultimately concluded. Third, the arbitrators ultimately found that Kornman orally promised Canada additional compensation in connection with the Larry Flinn ("Flinn") 752 Transaction in 2000, which Heritage failed to pay to him. That oral promise, as found by the arbitrators, was made before the first Transfer at issue here was made. Finally, the Defendants' overlook TUFTA's broad definition of "creditor" and "claim."[11] As defined by TUFTA, "claim" includes an unliquidated and disputed right to payment. Canada's alleged right to payment for his involvement in the Flinn 752 Transaction was an unliquidated and disputed "claim" from late summer/early fall 2000 until April 14, 2004, when the arbitrators liquidated Canada's "claim" and resolved the dispute in Canada's favor. *See* Pretrial Order, Stipulation 84 (date of arbitration award). Whether liquidated or unliquidated, and whether disputed or undisputed, Canada clearly

---

[11] This will be a continuing problem for the Defendants, who consistently overlook the fact that a person with even a contingent, unliquidated and disputed right to payment holds a "claim" and is a "creditor" under TUFTA. Another continuing problem is that throughout their briefs, the Defendants focus on whether Heritage/Kornman acted with the actual intent to *defraud* creditors. However, TUFTA is broader than that – it permits the avoidance of transfers where the debtor acted with the actual intent to *hinder* or *delay* a creditor, as well as where the debtor acted with the actual intent to defraud a creditor.

held a "claim" against Heritage within the meaning of TUFTA from late summer/early fall of 2000 through confirmation of the Plan, at which time Canada's allowed claim in the Case was assigned to the Plan Trust.

For all of these reasons, this Court concludes that Canada held a claim against Heritage prior to April 16, 2001 (the date of the first Transfer at issue here), which claim was ultimately allowed in the Case. Thus, Canada is also a triggering creditor with respect to each of the Transfers.

Accordingly, because the Trustee can stand in the shoes of the IRS (with respect to its allowed claim for unassessed taxes) and/or Canada (with respect to his allowed claim for unpaid compensation), this Court concludes that the Trustee has standing to challenge the Transfers under § 544(b) of the Bankruptcy Code and TUFTA.

### 2. Limitations

TUFTA provides a statute of repose of four years. Tex. Bus. & Com. Code §24.010(a)(1). The Defendants argue that the Delaware Limited Liability Company Act reduces the lookback period for fraudulent transfers under TUFTA from four years to three years. *See* 6 Del Code § 18-607(c). While the Delaware statute does limit the liability of a member for wrongful distributions to three years, for the reasons explained more fully below, this Court concludes that the Delaware legislature cannot limit the reach of TUFTA.

Turning first to the Defendants' arguments, citing *ASARCO LLC v. Am. Mining Corp*., 382 B.R. 49, 60-61(S.D. Tex. 2007), they assert that "[b]ankruptcy courts apply the choice-of-law rules of the forum in which they sit." Defendants' Post-Trial Brief at p. 4. The Defendants then assert that "[i]n Texas, when deciding which state's law to apply in determining the liability

of an interest holder, the court looks to the law of the jurisdiction of formation of the entity which is involved," citing, *inter alia*, *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 203 (5th Cir. 1995) and *ASARCO*, 382 B.R. at 64-65. *Id.* In criticizing the Trustee's choice of law analysis, the Defendants argue that it is the "Texas 'internal affairs' doctrine that controls the determination," and that under V.A.T.S. Tex. Bus. Corp. Act, art. 8.02

> only the laws of the jurisdiction of incorporation of a foreign corporation shall govern (1) the internal affairs of the foreign corporation, including but not limited to the rights, powers, and duties of its board of directors and shareholders and matters relating to its shares, and (2) the liability, if any, of shareholders of the foreign corporation for the debts, liabilities, and obligations of the foreign corporation for which they are not otherwise liable by statute or agreement.

*Id.* at p. 5. Thus, according to the Defendants, Del. Code § 18-607 governs here because

> the Trustee seeks to declare prior distributions from Heritage as fraudulent . . . ;
> the Delaware statute expressly limits liability for distributions to three years; and
> . . . a distribution from an entity to its owners is a matter falling under the 'internal affairs of a foreign corporation. . . .

*Id.*

While the Court agrees with the Defendants' starting point – *i.e.*, bankruptcy courts apply the choice of law rules of the forum in which they sit, for the reasons explained more fully below, this Court disagrees with the balance of the Defendants' contentions. First, in making their arguments and in relying on *ASARCO* and *Alberto*,[12] the Defendants ignore the fact that the *ASARCO* court discussed choice-of-law rules in two different contexts – *i.e.*, once in the context of fraudulent transfer claims and then again in the context of alter ego or veil piercing claims. Of significance here, however, with respect to the fraudulent transfer claims before it, the *ASARCO* court stated

---

[12] *Alberto* was an alter ego/veil piercing case as well. We will apply Delaware law when we reach the Trustee's alter ego claim. *See* pp. 96-97, *infra*.

> A claim for fraudulent transfer arises in tort.  Texas choice-of law rules for causes of action in tort apply section 145 of the Restatement (Second) Conflict of Laws, also described as the 'most significant relationship test.'  According to section 145, the local law of the state which has the 'most significant relationship to the occurrence and the parties' will govern the claim.  In applying the Restatement's 'most significant relationship test,' this Court considers the following factors: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship between the parties is centered.  When weighing these four factors, it is not the number of contacts, but the qualitative nature of those particular contacts that determines which state has the most significant relationship to the occurrence and the parties.

*ASARCO*, 382 B.R. at 61-62.  S*ee also De Aguilar v. Boeing Co*., 47 F.3d 1404, 1413 (5th Cir. 1995) (noting the application of these four factors and stating that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue.").

Here, the only connection the Trustee's fraudulent transfer claims have to Delaware is that Heritage and the Member Defendants are Delaware entities (albeit headquartered in Texas).  The other factors point to the application of Texas (or at least, non-Delaware) law.  For example, the uncontroverted evidence is that (i) the principal places of business for Heritage and the Member Defendants are in Dallas County, Texas, and (ii) during the time period in question, all of those entities maintained their offices in the same physical location in Dallas.  Pretrial Order, Stipulation 9, 51.[13]  Moreover, each of the Member Defendants was controlled, directly or indirectly, by Kornman, a Texas resident.  Pretrial Order, Stipulations 3 & 28.  Walker and/or McElwee actually carried out the decision of Heritage's Manager (GMK Family acting through its manager, Kornman) to make the distributions, apparently from their offices at Heritage in Dallas.  *See* Testimony of Walker (1/13/09) 79:15-80:1; Testimony of McElwee (1/15/09) 7:19-8:16.  The July 2001 distribution check to Steadfast was drawn on a Texas bank and deposited

---

[13] Tikchik's principal place of business is in Dallas; there is no evidence in the record as to the physical location of its office.

**Memorandum Opinion**                                                                                     **20**

into a Texas bank.  P.Ex. 5 at 2.  Many of the distributions to GMK Family were also payable by

banks in Texas.  *See, e.g.*, P.Ex. 22 at 22-23.  Finally, there is no evidence to suggest that any of

the relevant decision-making occurred outside of Texas, much less in Delaware.  So, as relevant

here, the injury occurred in Texas; the conduct causing the injury occurred in Texas; the

principal place of business of the Member Defendants and Heritage is in Texas, and the parties'

relationship is centered in Texas.

Second, the Texas "internal affairs" doctrine does not mandate the application of

Delaware law to the Trustee's fraudulent transfer claims.  Notwithstanding the fact that the

Trustee seeks to recover distributions to Heritage's members (and thus, according to the

Defendants' the claims involve a "matter relating to [Heritage's] shares"), fraudulent transfer

claims like those at issue here involve the rights of creditors, and not the internal corporate

governance issues that are the subject of the "internal affairs" doctrine.  *See Stanziale v. Dalmia*

*(In re Allserve Systems Corp.)*, 379 B.R. 69, 79-80 (Bankr. D.N.J. 2007) (interest of New Jersey

in protecting its creditors outweighs interest of Delaware in regulating its entities); *Drenis v.*

*Haligiannis*, 452 F.Supp.2d 418, 425-28 (S.D.N.Y. 2006) (interest of jurisdiction where

fraudulent transfer occurred outweighs interest of partnership in having internal relationships

governed by law of state under which it is organized); *Weinman v. Fidelity Capital Appreciation*

*Fund (In re Integra Realty Resources, Inc.)*, 198 B.R. 352, 360-63 (Bankr. D. Colo. 1996), *aff'd*

354 F.3d 1246 (10th Cir. 2004) (holding that the Texas four-year limitations period applies to a

fraudulent transfer claim for a Delaware entity based in Texas).  The Trustee does not challenge

Heritage's ability to properly pay distributions to its members as a matter of corporate law.  Nor

does the Trustee seek to hold the Member Defendants liable for Heritage's debts, which is the

other purported statutory predicate under the Texas internal affairs doctrine for the application of

Delaware law. *See* p. 6, *supra*. Rather, the Trustee seeks to recover monies Heritage transferred

to the Member Defendants with the alleged actual intent to hinder, delay or defraud its creditors.

For at least these reasons, this Court concludes that Texas law applies and the Delaware

three-year limitation period is simply inapplicable to the Trustee's TUFTA claims.

### 3.      Burden of Proof/Persuasion

In order to prevail on his fraudulent transfer claims, the Trustee must prove that Heritage

made the Transfers "with actual intent to hinder, delay or defraud any creditor" of Heritage, Tex.

Bus. & Com. Code § 24.005(a)(1), and "[i]ntent to hinder, delay or defraud may be established

by circumstantial evidence." *In re GPR Holdings, L.L.C. v. Duke Energy Trading and

Marketing, LLC (In re GPR Holdings, L.L.C.)*, No. 03-3430, 2005 WL 3806042, at *9 (Bankr.

N.D. Tex. May 27, 2005) (citing *Sherman v. FSC Realty, LLC (In re Brentwood Lexford

Partners, LLC)*, 292 B.R. 255, 262-63 (Bankr. N.D. Tex. 2003)); *see also In re Reed*, 700 F.2d

986, 991 (5th Cir. 1983). Circumstantial evidence of actual fraudulent intent under TUFTA,

"commonly known as 'badges of fraud,'" *In re Soza*, 542 F.3d 1060, 1066 (5th Cir. 2008), are

codified in a non-exclusive list set forth in § 24.005(b) of the Texas Business and Commerce

Code, which provides:

> In determining actual intent under Subsection (a)(1) of this section, consideration
> may be given, among other factors, to whether:
>
> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the
> transfer;
>
> (3) the transfer or obligation was concealed;
>
> (4) before the transfer was made or obligation was incurred, the debtor had been
> sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM. CODE ANN. § 24.005(b) (Vernon 2002 & Supp. 2008).

So, as relevant here, the Trustee bears the burden of proof and must show, by a preponderance of the evidence, that the Transfers were made by Heritage with the actual intent to hinder, delay or defraud any Heritage creditor. And, the Trustee may prove actual intent to hinder, delay or defraud through either direct evidence or circumstantial evidence – *i.e.*, by establishing sufficient badges of fraud that the fact-finder is satisfied that the requisite intent has been shown.

But, once sufficient direct evidence or circumstantial evidence has been introduced, who bears the ultimate burden of persuasion? The Eighth Circuit has held that the party seeking to avoid a transfer must establish, by a preponderance of the evidence, the presence of multiple badges of fraud. Once that occurs, the burden shifts to the defendant to show, again by a preponderance of the evidence, that the defendant had a legitimate purpose in making the transfer. *Kelly v. Armstrong*, 141 F.3d 799, 802-03 (8th Cir. 1998). In *Kelly*, the court stated:

> Kelly [the trustee] argues that the district court erred in failing to instruct the jury that, if it were to find multiple badges of fraud with regard to any transfer, the burden would shift to the defendants to establish a legitimate supervening purpose for making that transfer. The district court instructed the jury that it could "give the presence or absence of [badges of fraud] such weight as [the jury thought] the[ir] presence or absence deserve[d]." Kelly contends that the common law of fraudulent conveyances shifts the burden of both production and persuasion to the defendants once multiple badges of fraud have been established, and furthermore, that Federal Rule of Evidence 301 should not be applied to change this allocation of burdens. We agree.

*Id*. at 802 (footnote omitted, bracketed portions in original). As the *Kelly* court further explained:

> The instruction given by the district court-that badges of fraud, if found, could be given whatever weight the jury thought they warranted-could potentially have resulted in the jury's improper allocation of the burden of proof. As the case was submitted, the jury was free to return a verdict in favor of the defendants, despite finding the existence of multiple badges of fraud and disbelieving the defendants' explanations for the transfers. The district court's failure to instruct the jury properly regarding the burden of proof constitutes reversible error.

*Id*. at 803. *See also Acequia*, 34 F.3d at 806 ("once a trustee establishes indicia of fraud in an action under section 548(a)(1), the burden shifts to the transferee to prove some 'legitimate supervening purpose' for the transfers at issue."); *Crawforth v. Bachman (In re Bachman)*, Adv. No. 06-6027, 2007 WL 4355620 at *15 (Bankr. D. Idaho December 10, 2007) (failure "to show a legitimate supervening purpose for the transfers," in the face of multiple badges of fraud means that trustee may avoid transfers). The Fifth Circuit, in an older line of cases, has stated that once there are badges of fraud sufficient to "make out a strong prima facie case of fraud," then the "burden of showing good faith [is] shifted to the parties to such conveyances." *Duncan v. First Nat'l Bank of Cartersville, Ga.*, 597 F.2d 51, 56 (5th Cir. 1979); *U.S. v. Hickox*, 356 F.2d 969, 974 (5th Cir. 1966). Analogously, the Fifth Circuit has held that in determining actual intent under § 727(a)(2)(A) of the Bankruptcy Code, a showing by the plaintiff of a gratuitous transfer by the debtor to his children creates a presumption of intent to defraud and shifts "the burden of

demonstrating that he lacked fraudulent intent" to the debtor/defendant.  *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989).

Thus, as relevant here, this Court concludes that if the Trustee establishes the existence of several badges of fraud by a preponderance of the evidence, the Defendants will bear the burden of persuasion on any "legitimate supervening purpose" for each of the Transfers.  *Kelly*, 141 F.3d at 802-03; *Acequia*, 34 F.3d at 806.  Further, this Court, as the finder of fact, is the sole judge of the credibility of the witnesses[14] and can reject any explanations found to be not credible.  *See*

---

[14] Credibility of various trial witnesses has been called into question by one or more of the parties.  The Court will provide its initial assessments of such witnesses' credibility here.  As a preliminary matter, the Court notes that the Trustee's case relies primarily upon documentary evidence and the testimony of adverse witnesses, since the Trustee was not a party to any of the acts giving rise to his claims.  Kornman is the central figure in the Trustee's claims.  And, Kornman's credibility as a witness has been compromised for several reasons that are addressed in the text beginning on page 53 of this opinion and will not be repeated here.

Other former Heritage employees also testified at trial, including Michael, Walker, McElwee, Czerinski, and Canada.  Several of those parties were initially named as defendants in this adversary proceeding, but have settled with the Trustee.

Michael served as Chief Operating Officer of Heritage for a time and then served as Heritage's Chief Executive Officer (after his father resigned his officer positions shortly before Heritage's bankruptcy filing).  While Michael may be a very nice young man, the Court's impression of him from his testimony here is that he was young, inexperienced, held surprisingly significant titled positions at Heritage (Chief Operating Officer as an example) for his age, education, and experience levels, and was substantially overpaid by Heritage while employed there.  For example, on March 1, 2002 Michael's compensation at Heritage increased from $12,750 a month to $18,083.33 per month because he "was told I was doing a good job."  Deposition Testimony of Michael (7/11/08) 116:8-10.  Michael got another raise on August 6, 2003 and his salary increased to $22,333.33 per month.  *Id.* at 119:1-5.  In addition to these amounts, Heritage paid Michael $9,000 a month for a covenant not to compete, and on October 13, 2003, those payments increased to $11,000 per month.  Michael testified that the covenant not to compete payments were made to him to be consistent company-wide, as he was not likely to go out and compete with Heritage in any event.  *Id.* at 125:21-126:13.  So, Michael was making anywhere from $252,000 to $400,000 a year while employed by Heritage.  Heritage also paid some of his personal expenses and he received compensation from other Kornman-controlled entities as well.  Michael's loyalty to his father is unquestioned.  As he testified, "I did what dad told me and that's probably about as accurate as I can be."  *Id.* at 39:11-12.  When asked who made the decision to take the cash out of Heritage's safe deposit boxes and use it to pay Heritage's bills, *see* pp. 64-66, *infra*, Michael testified that "Dad did," notwithstanding the fact that Kornman had resigned his officer positions with Heritage at that point in time.  *Id.* at 232:13-14.  When asked who made the decision that Heritage would file bankruptcy in May 2004 (after Kornman had resigned his officer positions at Heritage), Michael testified that "[u]litmately I did so at dad's instruction."  *Id.* at 91:7-9.

Walker is obviously a bright woman who, having no formal education beyond high school, taught herself sufficient accounting and bookkeeping skills to ultimately be promoted to the position of Chief Financial Officer of Kornman's multi-faceted empire.  Like Michael, Walker is extremely loyal to Kornman, which causes at least some concern with respect to the objectivity of her testimony.  Or, as characterized by the Trustee, Walker is a "[l]ong time loyal and unquestioning soldier; [a] 'true believer' in everything said by Gary Kornman."  Trustee's Closing Argument powerpoint presentation at p. 3.

While McElwee was completely unimpressive as a witness, the substance of her testimony was shocking.  McElwee was openly hostile to the Trustee and could recall almost nothing at the outset of her testimony.  After

*Freeland v. Enodis Corp.*, 540 F.3d 721, 733-34 (7th Cir. 2008) (applying burden-shifting, and finding no error in trial court's finding of actual fraudulent intent where trial court did not believe defendant's excuse that transfers were made to save taxes); *Aptix Corp. v. Quickturn Design Systems, Inc.*, 148 Fed.Appx. 924, 928-29 (Fed. Cir. 2005) (fraudulent intent not rebutted because the trial court made factual findings that the reasons offered for the transfer were "not as innocent as [defendant] suggests."); *In re Maronde*, 332 B.R. 593, 600-01 (Bankr. D. Minn. 2005) (trustee showed badges of fraud, court did not believe defendant's excuse of an "innocent act of bankruptcy planning," fraudulent intent found); *Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 900-901 (Bankr. D.N.D. 1999) (trustee showed at least three badges of fraud, court did not believe defendants' excuse, fraudulent intent found).

---

being encouraged by the Court to try to be a bit more forthcoming, Testimony of McElwee (1/14/09) 209:12-15, her "recollection" improved, but her testimony reflected a complete submissiveness to Kornman and/or Walker. While McElwee was an officer of Heritage and many of the Defendant Entities, she had no idea what offices she held or how she came to hold them. Testimony of McElwee (1/14/09) 196:7-16; (1/15/09) 11:1-15. And, when asked how she would go about determining what positions she held with those entities, she testified that she would simply ask Walker. Testimony of McElwee (1/15/09) 10:3-9. From her testimony, it appears that McElwee consistently signed checks and other documents as an officer of Heritage or one of the Defendant Entities without having read such documents. *See, e.g.*, Testimony of McElwee (1/15/09) 15:19-18:11. She had no idea of what obligations she owed to any of the entities for which she held an officer position and appeared startled that she might have owed any such obligations. It is clear that she did whatever she was asked to do by Walker and/or Kornman, without question.

Czerinski clearly took action while at Heritage that he now regrets, including having served as the "independent" third party purchaser in connection with the Ettman Trust's implementation of a 752 Transaction ultimately found to be an abusive tax shelter by the Fifth Circuit. Testimony of Czerwinski (1/16/09) 30:10-14. His regret seemed sincere. His only explanation for taking such actions is that he was young and felt that he had to take such actions in order to further his career with the Kornman-controlled companies. Testimony of Czerwinski (1/16/09) 32:12-19. Czerinski is now self-employed and is no longer affiliated with a Kornman-controlled entity. Testimony of Czerwinski (1/16/09) 5:2-6. He has nothing to gain or lose by his testimony here. The Court found his testimony credible.

Canada's credibility as a witness is complicated. He, like Kornman, has a financial interest in the outcome of this litigation. He is a direct beneficiary of any recovery here, while Kornman or a Kornman-controlled entity will be subjected to liability if a judgment is entered in the Trustee's favor. Canada, like Kornman, sold 752 Transactions that have now been found to be completely without merit. D. Ex. 5 (*Kornman & Assoc. v. U.S.*, 527 F.3d 443, 462 (5th Cir. 2008)) (stating that the "transactions have absolutely no economic substance") (King, concurring). After having made millions of dollars selling 752 Transactions while employed by Heritage, after leaving Heritage, Canada switched sides and began suing promoters of such tax strategies, making substantial sums from the prosecution of such suits. As a result of these and other concerns, the Court will carefully consider what weight to afford Canada's testimony here.

**Memorandum Opinion** 26

One final preliminary matter must be addressed. The Defendants assert, without citation to any legal authority, that before the Trustee can prevail here, Heritage must have intended to hinder, delay or defraud one of the triggering creditors instead of some other Heritage creditor. *See* Defendants' Post-Trial Brief at pp. 8-10. In other words, as relevant here, the Defendants argue that actual intent to hinder, delay or defraud a non-triggering creditor – *i.e.*, Koshland Family Partnership, L.P. ("KFP") and/or its principal, Dr. Daniel E. Koshland, Jr. ("Koshland"), should not be "used to extrapolate intent to other creditors." *Id*. at 8. Thus, according to the Defendants, if Heritage was unaware of the triggering creditor's claim – *i.e.*, the IRS' claim for unassessed taxes, or if Heritage believed the triggering creditor's claim was not legally or factually supportable – *i.e.*, Canada's claim for monies due to him under an oral modification to his employment agreement, it is legally impossible for Heritage to have made a transfer with the "actual intent to hinder, delay or defraud" that creditor. *See id*. at pp. 10-13. As a result, the Defendants assert that the Trustee's fraudulent transfer claims fail as a matter of law:

> Where, as here, there is no constructive fraudulent transfer issue left to determine,[15] then it is a legal impossibility for the Court to find that actual intent as to one person (who is not a creditor) can be attached to another entity that is a creditor.

*Id*. at 9.

While the Court has not been able to find any cases addressing this issue either, the Court disagrees with the Defendants' legal contention for at least two reasons. First, the premise of that contention is legally flawed. The Defendants argue that it is a "legal impossibility . . . to find that actual intent as to one person [KFP/Koshland] *(who is not a creditor)* can be attached to another entity [IRS and/or Canada] that is a creditor." *Id*. (emphasis added). What the

---

[15] The Court granted the Defendants' *Daubert* motion regarding the Trustee's solvency expert, the effect of which was to preclude the Trustee from pursuing his constructive fraudulent transfer claims.

**Memorandum Opinion** 27

Defendants overlook in making this argument is that KFP/Koshland is a "creditor" as defined by TUFTA. As noted previously, TUFTA defines "creditor" as "a person . . . who has a claim." TEX. BUS. & COM. CODE § 24.002(4). In turn, TUFTA defines "claim" as "a right to payment . . . , whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *Id*. at § 24.002(3). Contrary to the Defendants' assertion, KFP/Koshland held a "claim" and was a "creditor" of Heritage until the statute of limitations ran on its securities fraud claims, which Heritage was advised by its lawyer was anywhere from three to five years after the sale of securities to Koshland/KFP – *i.e.*, by no later than January 2004. P.Ex. 163. So, at the time of the Transfers, KFP/Koshland was a creditor of Heritage whom Heritage could have been attempting to hinder, delay or defraud in making the Transfers, even though the statute of limitations on KFP/Koshland's claim ran before Heritage filed bankruptcy, thus precluding KFP/Koshland from being a triggering creditor for § 544(b) purposes.

Second, the Defendants' argument is inconsistent with the plain language of the statute itself. As relevant here, § 24.005(a)(1) provides that

> [a] transfer made . . . by a debtor *is fraudulent as to a creditor*, whether the creditor's claim arose before or within a reasonable time after the transfer was made . . ., *if the debtor made the transfer . . . : (1) with the actual intent to hinder, delay or defraud any creditor of the debtor*; . . .

TEX. BUS. & COM. CODE § 24.005(A)(1) (Vernon 2002)(emphasis added). Contrary to the Defendants' argument, the statute provides that a transfer can be fraudulent as to *a* creditor (whose claim does not even have to exist at the time of the transfer), so long as the transfer was made with the "actual intent to hinder, delay or defraud *any* creditor of the debtor." *Id*. (emphasis added). If the Texas legislature intended that the triggering creditor must also be the

creditor who was actually hindered, delayed or defrauded before avoidance of the transfer was possible, the statute should so provide.

For at least these reasons, this Court concludes that if each of the Transfers was made by Heritage with the actual intent to hinder, delay or defraud *any* Heritage creditor, irrespective of whether that creditor can serve as a triggering creditor, the Transfer(s) is avoidable under TUFTA by the Trustee.

### 4.    Evidence of Fraudulent Intent

#### a.    Direct Evidence

The concept of "badges of fraud" developed because it is often difficult to find direct evidence that a transfer was made with the actual intent to "hinder, delay or defraud" a creditor. Here, however, Canada[16] provided just that – *i.e.*, some direct evidence of Heritage's actual intent to at least "hinder" or "delay" KFP from its efforts to recover its original investment in Heritage.

A brief explanation is warranted. Effective January 1, 1999, KFP became a 5% member of Heritage by making a $15 million investment in Heritage. Pretrial Order, Stipulation 85.

---

[16] The Defendants argue that Canada's testimony should be discounted because "the Trustee's star witness is the one person that will (a) benefit the most from this litigation if a judgment is recovered, (b) sold the same services that the Trustee now claims was doomed from the start, (c) made millions of dollars doing so but was not sued by the Trustee, (d) sued on an oral promise that contravened an employment agreement that he wrote, and (e) 'switched sides' and began suing other firms for the exact same services that he once sold himself." Defendants' Post-Trial Brief at p. 12. According to the Defendants, Canada's "bias is nothing less than obvious" and "there is no documentary evidence" supporting Canada's testimony. *Id*. at p. 18. So, while expressing great ire that the Trustee has attempted to "throw enough evidence of questionable business dealings [by Kornman] against the wall to see what sticks," *id*. at p. 21, and commenting that "[s]ensing the weakness of his theory, the Trustee finally resorts to a 'kitchen sink' tactic of relating to the Court every bad act that Gary Kornman or any other Defendant may have ever done, to try and right the ship," the Defendants essentially resort to the same tactics of which they accuse the Trustee. Ironically, the Defendants attack Canada's testimony because of a lack of documentary evidence to corroborate it, when much of Kornman's critical testimony suffers from the same malady. Of course, like their complaint that Canada will "benefit the most" if the litigation is successful, it is axiomatic that Kornman will "benefit the most" if the litigation is unsuccessful, as he controls, directly or indirectly, virtually all of the Defendants from whom the Trustee seeks to recover millions of dollars.

    The good news, if there is any in this case, is that the Court will ignore the parties' rhetoric, focus instead upon the evidence introduced at trial, and evaluate the witnesses' credibility for itself. *See* n.14, *supra*.

Prior to making its investment, Kornman provided KFP (through its principal, Koshland) with a Private Placement Memorandum. D.Ex. 23. Moreover, on April 26, 1999, the terms of KFP's investment were memorialized in a letter drafted by Kornman for Koshland to sign and send to Heritage, which Kornman then signed on behalf of Heritage. P.Ex. 65; Pretrial Order, Stipulation 88. Six months later, on October 26, 1999, Koshland wrote a letter requesting information regarding KFP's investment in Heritage. P.Ex. 77; Pretrial Order, Stipulation 89. Other requests for information were made by KFP/Koshland, but Heritage never responded to the various requests. Deposition Testimony of James Esposto ("Esposto") (11/8/06) 36:19-37:4; 69:21-71:25; 72:16-73:19 & P.Ex. 193.

On December 22, 2000, lawyers representing Koshland and KFP sent a letter to Kornman at Heritage demanding the return of KFP's $15 million investment, together with interest at the rate of 10% from January 27, 1999 (the date KFP's check cleared) until the date of the return of its monies (the "Koshland Demand Letter"). P.Ex. 119. According to the Koshland Demand Letter, Koshland understood his investment to be in an "intermediate Limited Partnership which you [Kornman] represented were to be promptly converted to the common stock of a publically traded company." *Id*. at DFT-1219. Heritage hired Michael Wortley of the Vinson & Elkins law firm ("Wortley") to respond on its behalf and on January 3, 2001, Walker forwarded the Koshland Demand Letter to Wortley. *Id*. at DFT 1218. On January 16, 2001, Wortley received a further letter from Koshland/KFP's lawyers, expressing increasing irritation over the absence of an adequate response by Heritage and reiterating the seriousness of the Koshland Demand Letter. P.Ex. 122.

While it appears that Kornman and Koshland were close for a period of time, as Koshland made Kornman an officer of one of his affiliated entities – *i.e.*, Koshland Investment

Corporation,[17] on March 31, 2001, Koshland removed Kornman from all offices he held with Koshland Investment Corporation and moved its office to California, where Koshland lived. P.Ex. 129; Pretrial Order, Stipulation 90. On June 27, 2001, Kornman received a letter from James Koshland, Koshland's son (who is an attorney), acknowledging receipt of the two $250,000 distribution checks from Heritage and advising that while KFP/Koshland intended to deposit the checks, they did so without waiving their rights to "rescind the pertinent investment or take other action to recover its investment."[18] P.Ex. 140. This letter is written on the letterhead of James Koshland's law firm and further requested an in-person meeting at his law office in Palo Alto, California to "discuss the relationship between my father, the Koshland Family Partnership, L.P. and Koshland Investment Corporation on the one hand and the Heritage Organization and related entities on the other hand." *Id*. That meeting never occurred. Testimony of Kornman (1/8/09) 177: 9-14. *See also* Deposition Testimony of Reposto (11/8/06) 52:19-25.

At trial, Canada testified that Kornman discussed the Koshland Demand Letter with him. Specifically, Canada testified that Kornman asked him if Heritage had any moral or legal obligation to return the monies KFP had invested in Heritage, Testimony of Canada (1/15/09) 29:25-30:11, which obligations Canada did not believe existed. *See* Testimony of Canada (1/15/09) 65:19-21. But, Canada further testified that during their conversation, Kornman asked if it would "look better" if Heritage was making distributions to its members if Koshland chose

---

[17] Comments made by Kornman during his trial testimony suggested a closeness to their relationship as well. Although not responsive to the question asked of him by his counsel, Kornman added the gratuitous comment that "Koshland was one of my favorite people. He reminded me very much of my own father and he was just a great guy." Testimony of Kornman (1/8/09) 72:20-22. It became clear from other testimony, however, that Koshland likely did not continue to view Kornman as a son (assuming he ever did). Deposition Testimony of Reposto (11/8/06) 23:1-6; 52:19-25; 53:6-10.

[18] Kornman minimized the significance of the reservation of rights language in this letter, describing it as "just a cover your ass letter that most lawyers would put in a letter [sic]." Testimony of Kornman (1/8/09) 180:13-14.

**Memorandum Opinion** 31

to institute a lawsuit or take other legal action to try to recover his money. Testimony of Canada (1/15/09) 28:24-29:13. In other words, according to Canada, Kornman thought that making distributions to KFP might "diffuse the Koshland situation." Testimony of Canada (1/15/09) 53:8-13.

Canada's testimony makes sense.[19] Even without his direct testimony, however, it is reasonable to infer Heritage's intent to at least hinder or delay KFP's attempts to recover its $15 million investment from other evidence in the trial record. Specifically, (i) KFP had gone over two years without any return on its $15 million investment, Pretrial Order, Stipulations 85, 86, 102, & 111; (ii) Koshland, KFP's principal, requested financial information so that he could evaluate KFP's investment in Heritage in October 1999, Pretrial Order, Stipulation 89, which Heritage ignored; (iii) KFP's attorney demanded the return of KFP's original investment in Heritage – *i.e.*, $15 million, plus interest—in December 2000, P.Ex. 111, and followed up on that demand in January 2001, P.Ex. 122; (iv) Koshland removed Kornman from all offices Kornman held with an affiliated Koshland entity, Koshland Investment Corporation, in March 2001, Pretrial Order, Stipulation 90; (v) distributions began flowing to KFP in April 2001, Pretrial Order, Stipulation 111; Testimony of Kornman (1/8/09) 59:15-25; (vi) while KFP cashed the distribution checks, it specifically reserved its rights against Heritage by letter dated June 27, 2001, P.Ex. 140; (vii) Kornman received a letter from Wortley at Vinson & Elkins regarding the limitations period on KFP's potential securities fraud claims on March 22, 2002, advising Kornman that the relevant statutes of limitation would expire anywhere from three to five years

---

[19] Canada's testimony in this regard is credible. While there is obviously "bad blood" between Kornman and Canada, and it is true that Canada has a financial interest in the outcome of this litigation as a beneficiary of the Plan Trust, it makes sense that Kornman would discuss the Koshland Demand Letter with Canada, who served as one of Heritage's outside lawyers prior to joining Heritage in a non-legal capacity.

after the sale of securities to Koshland/KFP – *i.e.*, by no later than January 2004, P.Ex. 163;[20] and (viii) Heritage continued its distributions to its members, including KFP, in 2002 and 2003, Pretrial Order, Stipulation 111. A logical inference from just these facts is that Heritage decided to make distributions to its members in April 2001 and thereafter to attempt to defuse KFP/Koshland's growing concerns about its investment in Heritage and to hinder or delay KFP's efforts to recover that investment.

In *In re Bayou Group, LLC*, 372 B.R. 661, 663 (Bankr. S.D.N.Y. 2007), the court concluded that a transfer made merely to buy time by keeping claimants happy while continuing fraudulent conduct could constitute a transfer made with fraudulent intent. Accordingly, this Court concludes that the Transfers made to the Member Defendants – *i.e.*, Steadfast, GMK Family, and Tikchik, were made with the actual intent to hinder or delay KFP from pursuing the recovery of its $15 million investment from Heritage.

---

[20] While Kornman initially testified to the effect that Heritage responded to the Koshland Demand Letter through Wortley and heard nothing further, leaving the Court with the impression that Kornman thought Koshland/KFP had gone away, later testimony revealed continuing concerns and reasons to continue to be concerned about potential litigation with Koshland/KFP. In fact, further letters were received from Koshland/KFP. *See, e.g.*, P.Ex. 122 and 140. And, later in his testimony, Kornman admitted that as of March 2002, he was still concerned enough about the possibility that Koshland/KFP would sue Heritage over the $15 million investment that he asked Wortley for advice regarding the statute of limitations on potential Koshland/KFP securities claims. Testimony of Kornman (1/8/09) 182:12-183:11 ("I guess you'd say with my legal background, I was always concerned with what could happen . . . there's always a possibility [of a threat of claims against Heritage by Koshland]. You can sue anybody for anything.")

**Memorandum Opinion** 33

b.    **Circumstantial Evidence;[21] Badges of Fraud**

Even absent the direct evidence of actual intent to hinder or delay KFP/Koshland just discussed, the Trustee has demonstrated, by a preponderance of the credible evidence, the presence of multiple badges of fraud. The Court will discuss each of the badges of fraud established by the Trustee at trial below.

i.    **Transfers to Insiders**

With respect to this badge of fraud, there is no dispute that the Transfers were made by Heritage to insiders of Heritage. The evidence establishes that Heritage made the Transfers to the following entities on the dates and in the amounts reflected below:

| DATE | AMOUNT | RECIPIENT |
|------|--------|-----------|
| April 13, 2001 | $250,000 | GMK Family |
| " | $250,000 | Koshland Family Partnership |
| " | $4,350,000 | Steadfast |
| " | $150,000 | Tikchik |
| April 25, 2001 | $250,000 | GMK Family |
| " | $250,000 | Koshland Family Partnership |
| " | $4,350,000 | Steadfast |
| | $150,000 | Tikchik |
| July 20, 2001 | $600,000 | GMK Family |
| " | $600,000 | Koshland Family Partnership |

---

[21] The Defendants argue vehemently in their post-trial brief that the Trustee has taken multiple disparate bad acts in his effort to establish a circumstantial case of transfers made with actual intent to hinder, delay or defraud Heritage creditors. *See, e.g.*, Defendants' Post-Trial Brief at p. 21 ("The problem, however, is that all of the questionable conduct, even if given full credence (which Defendants do not concede) suffers from the same lack of foundation – there is absolutely no connection to the conduct at issue and the Distributions which are being sued upon in this case."). The Court rejects this argument for at least two reasons. First, that is, by definition, what a circumstantial case often depends upon. Second, the allegedly disparate acts are not as disparate as the Defendants argue. The common thread running through all of the acts relied upon by the Trustee are Heritage's questionable business practices and the fact that problems with those practices were beginning to come to light, thus prompting the withdrawal of substantial sums of money from Heritage.

| | $10,440,000 | Steadfast |
|---|---|---|
| " | $360,000 | Tikchik |
| July 26, 2002 | $500,000 | GMK Family |
| " | $500,000 | Koshland Family Partnership |
| " | $8,700,000 | Steadfast |
| " | $300,000 | Tikchik |
| January 2, 2003 | $500,000 | GMK Family |
| " | $500,000 | Koshland Family Partnership |
| " | $8,700,000 | Steadfast |
| " | $300,000 | Tikchik |
| February 18, 2003 | $4,000,000 | Steadfast |

*See* P.Ex. 317 (establishing $42 million of the above Transfers); *see also* pp. 64-70, *infra*
(discussing the additional $4 million in U.S. currency in Heritage's safe deposit boxes that was
distributed to Steadfast, and then transferred to Ettman Trust).

Moreover, in the Pretrial Order, the parties stipulated that Steadfast, GMK Family and
Tikchik are "insiders" of Heritage as that term is defined by Tex. Bus. & Com. Code § 24.002(7)
and 11 U.S.C. § 101(31). Pretrial Order, Stipulation 38.

### ii.     Inadequate Consideration

According to the Trustee, Heritage received nothing in exchange for the Transfers to its
members. Alternatively, the Trustee asserts that Heritage did not receive value "reasonably
equivalent to the value of the asset transferred or the amount of the obligation incurred." Tex.
Bus. & Com. Code, § 24.005(b)(8).

In response, the Defendants argue that, in exchange for the Transfers, Heritage's members released their claims of entitlement to a distribution that they contend arose once Kornman made the decision that excess cash was available within Heritage. *See, e.g.*, Testimony of Kornman (1/8/09) at 103:19-25; Defendants' Post-Trial Brief at pp. 26-28. In other words, and according to the Defendants, once Kornman determined that Heritage had excess cash, "then the Distributions had to be made" in accordance with § 5.02(A) of the Heritage Operating Agreement. Defendants' Post-Trial Brief at p. 28. Moreover, according to the Defendants, Heritage's members became creditors "to the extent that they are entitled to receive a distribution of excess cash," and that under TUFTA § 24.004(a)(2), "payment of an antecedent debt constitutes value." *Id*. at pp. 26-27.

For the reasons explained more fully below, this Court rejects the Defendants' arguments. First, the purported "obligation" that was created when Kornman determined that "excess cash" was available within Heritage was completely illusory, and subject to manipulation by Kornman. Under the terms of the Heritage Operating Agreement, Heritage's Manager (GMK Family acting through its manager, Kornman) had "sole, unlimited and absolute discretion" in determining whether excess cash was available within Heritage from which to make such distributions. D.Ex. 90 at DFT-0983-0984; Pretrial Order, Stipulation 26. So, the very duty that the Defendants rely upon to create their "obligation" was only triggered when Kornman decided to trigger it.

The fact that Kornman had the absolute discretion to decide what amount of excess cash, if any, was available for distribution under the Heritage Operating Agreement, coupled with the fact that Kornman ignored (i) the clear requirement of that agreement to make such a determination at least once each quarter – *i.e.*, "[f]rom time to time (but at least once each

calendar quarter) the Manager shall determine . . .", D.Ex. 90, § 5.02(A) at DFT-0983, and (ii) the disputed claims of KFP, Canada, and others when making his "excess cash" determination, causes this Court to conclude that Kornman did not feel "obligated" to cause Heritage to make distributions to its members. Rather, this Court concludes that Kornman is attempting to create consideration for the Transfers when none exists through clever lawyering.

Even assuming, however, that the Transfers retired a Heritage obligation which arose when GMK Family (Heritage's Manager who acted through its manager, Kornman) made its determination that excess cash was available, that "obligation" was created without Heritage receiving "consideration … reasonably equivalent to the … amount of the obligation incurred." Tex. Bus. & Com. Code, § 24.005(b)(8). Thus, in making their argument, the Defendants appear to have overlooked the fact that TUFTA addresses the avoidance of both transfers and obligations. *Id*., § 25.005(a). So, even assuming that Heritage received "value" for the Transfers by the satisfaction of Heritage's "obligation" to pay out the excess cash once Kornman made the required determination that excess cash was available within Heritage for distribution, the simple fact remains that "the value of the consideration received by [Heritage]" was not "reasonably equivalent to the . . . amount of the obligation incurred," at the time that obligation was incurred. *Id*. at § 24.005(b)(8). In other words, Heritage received nothing from its members when the obligation was incurred. *See, e.g*., *Sherman v. FSC Realty LLC (In re Brentwood Lexford Partners, LLC)*, 292 B.R. 255, 267 (Bankr. N.D. Tex. 2003)(holding that distributions made on account of equity ownership in an L.L.C. are not made for reasonably equivalent value); *see also Fisher v. Hamilton (In re Teknek, LLC)*, 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) ("Similarly, a distribution of profits or dividends to L.L.C. members that is not compensation or salary for

services rendered is not a transfer in exchange for reasonably equivalent value under the Uniform Fraudulent Transfer Act.")(citing *Brentwood*).

### iii.    Heritage was Sued or Threatened with Suit

Based upon the credible evidence at trial, Heritage was threatened with multiple suits prior to any of the Transfers at issue here, and Canada and Anthony Bird ("Bird") actually filed suit in July 2002.   Pretrial Order, Stipulation 82 (regarding actual suit).   Turning first to the "threatened" suits, the earliest threat of suit faced by Heritage also relates to claims by Canada and Bird.   Canada testified at trial that Kornman knew no later than the fall of 2000 that Bird and he were asserting, and continued to assert throughout the relevant time period, multi-million dollar claims arising out of Heritage's business dealings with a 752 Transaction client in Connecticut named Flinn.   Testimony of Canada (1/15/2009) at 46:4-51:14.   The fact that Heritage/Kornman disputed their claims and believed them to lack legal merit is irrelevant.   As noted previously, unliquidated and disputed claims are still "claims" under TUFTA, making both Canada and Bird "creditors" as defined under TUFTA by the fall of 2000.

Moreover, there is no question that Kornman knew of a threat of suit by KFP/Koshland no later than December 22, 2000.   As noted previously, on that date, Kornman received a demand letter from Jeffrey W. Shopoff, KFP/Koshland's lawyer, demanding the return of KFP's original investment in Heritage – *i.e.*, $15 million, plus interest.   P.Ex. 111.   These threats alone are sufficient to satisfy this badge of fraud as to each Transfer.   *See, e.g., Daniels v. Keenen*, 19 B.R. 724, 731 n.30 (Bankr. W.D. Mo. 1982) ("The transfer after collection demands, even though those demands may not have explicitly threatened suit, may reasonably be considered as part of the evidence tending to prove an intent to hinder, delay, and defraud creditors.); *In re*

*Jacobs*, 394 B.R. 646, 665 (Bankr. E.D.N.Y. 2008) (badge of fraud due to "Timing and Sequence of the Events" based on, inter alia, "the proximity of the [challenged transfer] to the demand for payment by Congress" on a guarantee about a month before the challenged transfer); *In re Unglaub*, 332 B.R. 303, 318 (Bankr. N.D. Ill. 2005) (there was evidence that the transfer was made shortly after a demand was made by a creditor on the debtor to pay the substantial debt he had incurred personally as a result of the guarantees). A threat can also be inferred from circumstances existing at the time of the transfer. *Connell Chevrolet, Inc. v. Carter*, No. 01-94-00595-CV, 1994 WL 525902 (Tex.App.—Houston [1st Dist.] Sept. 29, 1994) ("A reasonable inference could be made that Connell knew that he would be sued on the underlying note before he set up his estate plan and began transferring assets. . . . the evidence "tends to indicate that Connell began transferring his assets after he had been sued or threatened with suit."); *Dime Savings Bank v. Butler*, No. CV 930349247S, 1997 WL 112776 (Conn. Super. February 21, 1997) (debtor who had defaulted on three mortgage loans "was certainly threatened with suit" at the time of the transfer).

But, another threatened suit is supported by the evidence at trial. Specifically, it can be reasonably inferred that the IRS had threatened Heritage with suit by February 2001.[22] The February 2001 letter to Heritage from the IRS (and the similar letter that followed in May

[22] The Court rejects the Defendants' contention that the February 2001 letter from the IRS was not received by Heritage. While a certified mail receipt – *i.e.*, the "green card," was never returned to the IRS reflecting delivery to Heritage, the original letter and envelop were produced to the Trustee during discovery in the Case. Specifically, the Trustee testified that P.Ex. 2 (the February 2001 letter from the IRS and its original envelop) was turned over to the Trustee in the March 16, 2006 delivery of documents from the Lynn Tillotson law firm, who represented Kornman and various of the Entity Defendants, to the Munsch Hardt law firm, the Trustee's general counsel in the Case. Testimony of Trustee (1/15/09) 119:19-120:3. Of course, the fact that the IRS never received a signed green card back reflecting Heritage's acceptance of its certified letter is explained by Canada's description of Heritage's policy of generally refusing certified mail. *See* n.24 *infra*.

2001)[23] carried the threat of suit. The IRS wrote, "we request that you identify all of those customers of your firm or of any related person . . . who entered into a transaction described above." P.Ex. 287. The testimony of Daniel Baucum, the Trustee's expert, established that upon Heritage's receipt of the February 2001 letter, the best-case outcome for Heritage was the disclosure of the identities of all Heritage 752 Transaction clients. Testimony of Baucum (1/7/09) 177:13-22, 189:12-190:5. Baucum further testified that while the IRS might be slow to get there – *i.e.*, "[i]t oftentimes takes a number of different efforts that I've talked about before," further enforcement action would follow – *i.e.*, "[t]hey may even have to go ask a district judge to enforce a summons. . . . The odds of the IRS being able to gain whatever information the person being summoned has, is very, very good, because they have recourse to the federal district court to do so." Testimony of Baucum (1/7/09) 189:17-190:1. Moreover, Anthony Ellis ("Ellis"), an IRS revenue agent, testified that the failure to respond to the IRS' initial letters, referred to by the parties at trial as "soft letters," would ultimately lead to a "promoter penalty investigation" under §§ 6700 and 6708 of the Internal Revenue Code. Testimony of Ellis (1/7/09) 37:14-21. That is, of course, exactly what happened here. Heritage ignored the IRS'

---

[23] Anthony Ellis, the revenue agent assigned to Heritage's case, testified that because (i) no green card was returned with respect to the February 2001 letter that he mailed to Heritage, and (ii) Heritage had not disclosed its clients' names to the IRS, he hand-delivered the May 2001 letter to McElwee, a Heritage officer, at Heritage's office in Dallas on May 2, 2001. Testimony of Ellis (1/7/09) 40:19-46:12. While Kornman claims that he was never made aware of this letter, the Court finds that testimony incredible. It is undisputed that McElwee informed Walker, Heritage's Chief Financial Officer, of the letter. Testimony of Walker (1/12/09) 238:18-25. The evidence clearly establishes that Walker was a trusted officer of Heritage and the various affiliated Kornman-controlled entities, many of which are Defendants in this action. It is clear that she was one of the few people that Kornman trusted. In fact, Walker and Kornman (and perhaps Michael) are the only individuals who had regular access to the financial records of Heritage (and the other Kornman-controlled entities). From the Court's perspective, nothing of significance happened at Heritage without either Kornman's knowledge and consent or his express direction. Given what the Court has learned about the operations of Heritage and the affiliated Kornman-controlled entities, it is simply incredible to think that a matter of such potential significance to Heritage, which threatened a substantial source of its annual revenues, was not immediately communicated to Kornman by Walker. While the Defendants point to Canada's testimony that he would have expected Kornman to tell him about the "soft letters" if Kornman had known about them as some corroboration of Kornman's denials of knowledge about either "soft letter," the Court is not persuaded that Kornman was unaware of the May 2001 letter from the IRS.

2001 letters,[24] Testimony of Ellis (1/7/09) 40:10-18, 47:1-12, which led the IRS to take further enforcement action by early 2002.

No inference of a threat of suit by the IRS is required by the time of the 2002 Transfers – the threat at that point was explicit. Specifically, on February 14, 2002, the IRS issued an information document request (the "IDR") to Heritage. P.Ex. 287 at IRS-010 ("To date, you have neither responded to our initial letter nor provided the requested information."). In the IDR, the IRS put Heritage on formal notice that

> [o]ur examination may result in further action, including, but not limited to, the imposition of penalties, the filing of a petition to enjoin you from any further such activities, and the issuance of pre-filing notices to participants. Potentially applicable penalties may include the penalty authorized by section 6708 for failure to maintain and provide to the Secretary upon request a list of investors in a potentially abusive tax shelter as required by section 6112 and the penalty authorized by section 6700 for false or fraudulent statements made in connection with the organization or sale of such an arrangement.

P.Ex. 287 at IRS-010.

According to Ellis, after having attempted to reach McElwee twice by phone on March 15, 2002 unsuccessfully, Heritage's initial response to the IDR was a call from Walker, who identified herself as Heritage's Secretary and Treasurer, later that same day. Ellis' notes reflect that Walker told him that Heritage was in the process of seeking counsel to respond and that counsel should be hired within the next 30 days. P.Ex. 287 at IRS-129. Instead, over nine months later, and after being served with an IRS summons, Heritage finally retained the Sutherland, Asbill and Brennan ("Sutherland") law firm in late December 2002/early January 2003 to assist it in its dealings with the IRS. *See* P.Ex. 192 (Power of Attorney and Declaration

---

[24] Canada testified that a common practice at Heritage when he arrived was to refuse to accept service of process and/or certified mail deliveries. *See, e.g.*, Testimony of Canada (1/15/09) 39:23-40:13 (throwing service or certified mail "back in the elevator"). It thus appears that process servers and/or mailmen were informed that officers of Heritage were not in or available if the "delivery" was not expected.

of Representative signed January 7, 2003 appointing Sutherland as Heritage's attorney in fact);

P.Ex. 343 (January 9, 2003 retention letter between Sutherland and Heritage); P.Ex. 344 (January

6, 2003 check drawn on Heritage account for payment of $100,000 to Sutherland). Heritage

finally disclosed client names and began producing documents to the IRS in March 2003, some

two years after the IRS first attempted to get such disclosures.[25]

### iv.    Cumulative Effect of the Course of Conduct.

In *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008), the Fifth Circuit noted that "the

existence or cumulative effect of the pattern or series of transactions or course of conduct after

the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors"

can be relevant to a finding of fraudulent intent. Such a pattern of conduct is apparent here,

giving rise to a further inference of fraudulent intent.

By way of background, Heritage book net income for 2000 was approximately $10.5

million. P.Ex. 114. Heritage had cash on hand at the end 2000 of approximately $22.5 million.

P.Ex. 113. Yet, Heritage made no distribution to its members in 2000 or in the first quarter of

2001. But, starting in April 2001,[26] Heritage began making significant distributions to its

members, including KFP. And, between April 16, 2001 and February 18, 2003, Heritage

distributed $46 million to its members. P.Ex. 317 (establishing $42 million in distributions); *see*

*also* pp. 64-70, *infra* (regarding additional $4 million of cash distributed to Steadfast and then to

Ettman Trust from Heritage safe deposit boxes).

---

[25] In their post-trial brief, the Defendants emphasize the fact that once Heritage had its tax counsel "file powers of attorney, the subpoena was withdrawn, and months and months of negotiation and document production then ensued." Defendants' Post-Trial Brief at p. 33 (emphasis in original). The fact that the subpoena was withdrawn once Heritage's lawyers were cooperating with the IRS is of no particular significance here. The issue is whether Heritage had been threatened with suit at the time of the Transfers. The answer is clearly yes, notwithstanding the withdrawal of the subpoena once Heritage finally began cooperating. Moreover, the fact that the subpoena was withdrawn did not eliminate the threat of a potential promoter penalty suit against Heritage by the IRS.

[26] The Defendants correctly note that the April 16, 2001 distributions (totaling $5 million) were made just after the deadline for the filing of fiscal year 2000 tax returns, and that another $5 million was distributed on April 25, 2001.

So, what happened to cause distributions to begin flowing to Heritage's members? The evidence supports an inference that a series of events caused Heritage to begin to have concerns about (i) its business practices generally, (ii) the long-term viability of that portion of its business relating to 752 Transactions specifically (which had been very lucrative for it), and (iii) the potential for substantial claims against Heritage by a disgruntled investor, disgruntled clients (to whom Heritage had sold 752 Transactions), and disgruntled former employees. Specifically, among other things, (i) in February 2000, the law firm which had introduced Heritage to the 752 Transactions (Aherns & DeAngeli ("A&D")), and to which Heritage was indirectly paying what it described as "royalties" or "licensing or consulting fees,"[27] Testimony of Kornman (1/8/09) 144:24-145:25, informed Heritage that it "was no longer providing opinion letters regarding transactions that included a 752 strategy,"[28] Pretrial Order, Stipulation 69; P.Ex. 94; (ii) the IRS

---

[27] These "royalties" or "licensing or consulting fees" were paid to FWP Technology, Inc. ("FWP"), an entity created by the senior partners of A&D, Edward Aherns ("Aherns") and Darin DeAngeli ("DeAngeli"), pursuant to an oral agreement Kornman reached with Aherns. Testimony of Kornman (1/8/09) 140:3-142:5. According to Kornman, pursuant to this agreement, which Kornman declined to reduce to writing, FWP was entitled to a "fee of five percent of the gross revenues received by Heritage after deducting some certain other expenses . . .." Testimony of Kornman (1/8/09) 140:14-18. Interestingly, Ahrens testified that he "thought he understood at least the general parameters of how [Heritage] computed [the fees], Deposition Testimony of Aherns (5/20/08) 45:1-7, but that he never saw any calculations of the amounts owing to him and that he "simply relied on the good faith in [sic] Mr. Kornman that that was a correct computation." *Id*. at 44:9-10. In addition to Aherns and DeAngeli receiving these "fees" from Heritage (through FWP), A&D simultaneously served as "independent" counsel to certain Heritage clients who implemented 752 Transactions; and thus, A&D also received attorneys' fees for providing legal advice and writing a "more likely than not" opinion letter in favor of the legitimacy of the clients' 752 Transactions. With the possible exception of Jenkins, the existence of FWP and Heritage's payments to it were not disclosed to any of Heritage's clients who were referred to A&D for "independent" tax advice. Of course, because Aherns and DeAngeli were receiving a share of Heritage's fees if the client implemented a 752 Transaction (through their ownership of FWP), A&D's "independence" in advising those same clients with respect to the legitimacy of the 752 Transactions was a farce.

[28] The parties disagree over why A&D decided to stop writing opinion letters. While the Defendants essentially contend that writing those opinions "no longer fitted A&D's business model," Aherns himself testified that the firm "came to the conclusion that we thought there are certain criteria that should be followed or otherwise we would be unwilling to do so." Deposition Testimony of Aherns (5/20/08) 61:5-7. This testimony is consistent with the explanation provided in P.Ex. 94, wherein A&D stated that "[b]ased primarily on the environment as discussed above, we have concluded that we need to be extremely careful about structuring future 752 transactions. We have further concluded that we will not undertake any further loss generation transactions regardless of the situation involved. We have decided that we would need the following elements in order for our law firm to prepare an opinion letter at this time: . . . significant, documented business purposes beyond the hedging purpose we have observed previously and . . . any hedged position must be held open for at least 15 days. . . ." P.Ex. 94 at Tee Priv

**Memorandum Opinion**  43

published Notice 2000-44 on August 10, 2000, Pretrial Order, Stipulations 70 & 71, making it clear what the IRS thought of transactions like the 752 Transactions; (iii) multi-million dollar disputes with Canada and Bird arose in the fall of 2000, *see* pp. 16&37 *supra*; (iv) the decision of the Tax Court in the *Salina Partnership* case was handed down in November 2000, Pretrial Order, Stipulation 73; P.Ex. 302, in which the court ruled against the IRS on the economic substance issue (regarding the basis boost transaction at issue there) and against the taxpayer on the liability issue, holding that a short sale is a liability under § 752 of the Internal Revenue Code, which decision at least undercut the viability of Heritage's 752 Transactions; (v) Koshland/KFP demanded: (a) the return of KFP's $15 million investment plus interest in December 2000, P.Ex. 111, (b) further documents and reiterated the seriousness of its previous demand in January, 2001, P.Ex. 122, and (c) an in-person meeting, which never occurred, in June, 2001, P.Ex. 140; and (vi) the IRS asked Heritage to identify all of its clients who had implemented what the IRS thought to be an abusive tax shelter – *i.e.*, a 752 Transaction, in February 2001 – *i.e.*, a "soft letter," and then again in May 2001 – *i.e.*, a second "soft letter," and then again in February 2002 – *i.e.*, the IDR, and then again in December 2002 – *i.e.*, the summons. P.Ex. 287. The cumulative effect of these events is striking.

Is it simply a "coincidence" then that while Heritage reported taxable ordinary income of approximately $15.1 million from 2001-2003, P.Ex. 117, 157, & 189, it distributed cash to its members totaling over three times that amount – *i.e.*, $46 million, of which $43.9 million went to the Member Defendants?[29] Are Kornman's denials of concern about any of the events outlined

---

000020. Heritage obviously disagreed with A&D's assessment of the "environment" for the 752 Transactions, as it continued to sell them to clients.

[29] Steadfast received $40.54 million; GMK Family received $2.1 million; and Tikchik received $1.26 million. P.Ex. 317; *see also* pp. 64-70, *infra* (regarding additional $4 million distribution to Steadfast). And, from there, at least some of the distributions moved into Defendant Ettman Trust, which contains spendthrift provisions providing at

**Memorandum Opinion**                                                                                                                            **44**

above credible?  Was Kornman so caught up in the Kornman "vortex,"[30] that he did not realize that Heritage's business practices were highly questionable and that by distributing much of Heritage's cash to its members (most of which went to other Kornman-controlled entities), that cash would be out of the immediate reach of Heritage's creditors?  Based upon the credible evidence at trial, this Court concludes that: (i) it was not a coincidence, (ii) Kornman's denials of concern are not credible,[31] and (iii) the Kornman "vortex," if it existed at all, did not prevent Kornman from understanding exactly what was going on – both within Heritage and without.[32]

---

least some asset protection for the beneficiaries of that trust.  *See* Testimony of Kornman (1/8/09) 18:3-8; 85:22-25; 101:16-22.

[30] In attempting to explain why it was possible that Kornman did not know about the IRS letter hand-delivered to McElwee in May 2001, Walker explained that she became aware of the letter from McElwee, but she did not specifically recall what she did once she learned of that letter.  She did testify what her general practice was, however.  According to Walker, her general practice was to make a copy of such things and "put them in an envelope and secure it and mark it Personal and Confidential, GMK and put it on [Kornman's] desk."  Testimony of Walker (1/12/09) 238:18-241:8.  However, later in her testimony, on examination by Defendants' counsel, Walker further testified that she doesn't recall if she put a copy of the May 2001 IRS letter on Kornman's desk.  Walker went on to explain that Kornman traveled extensively, that when he was in the office he was "swarmed" by people and that he often didn't get to all of the documents on his desk.  So, according to Walker, documents were often swept off his desk into multiple briefcases, some of which documents might never be seen again or some of which might be found months if not years later in one of his many briefcases.  Testimony of Walker (1/13/09) 188:2-190:20.  She described this as the "Kornman vortex," and left the impression through her testimony that the "vortex" was well known to other Heritage personnel.  *See id.*  Interestingly, Czerwinski had never heard the term when asked about it during the trial, notwithstanding the fact that he had worked for Heritage for years and continued to work for other Kornman-controlled entities upon Heritage's bankruptcy filing.  Testimony of Czerwinski (1/16/09) 8:4-5.

[31] For example, while Kornman denied that KFP/Koshland had any meritorious claims against Heritage, and explained that Koshland "didn't seem to be playing with a full deck," (Testimony of Kornman (1/8/09) 181:16-25), Kornman sought and received advice from Wortley at Vinson & Elkins regarding the statute of limitations for potential securities fraud claims by KFP against Heritage.  P.Ex. 163.

[32] From the Court's observations of him, Kornman is highly intelligent.  He used both his legal training and his psychology training in his daily business affairs.  His closest allies within Heritage were his son, Michael, who he paid far more generously than a young man of his experience and educational background (not having finished college) could expect to receive elsewhere, and Walker and McElwee.  Walker, while obviously smart, had no formal education beyond high school, making her rise to her positions of trust within Heritage – *i.e.*, Chief Financial Officer, Secretary, and Treasurer – and the other Kornman-controlled entities at least surprising, given the nature and extent of their operations and holdings.  It thus appears that she too achieved a level of business success within Heritage and the other Kornman-controlled entities beyond what would normally be expected of someone with her level of education.  She is extremely loyal to Kornman, who she described as "straightforward and honest . . . I respect him more than anybody I can think of."  Testimony of Walker (1/14/09) 8:1-3.  One has to question whether this loyalty was similarly acquired through compensation levels that she could not attain elsewhere.  Finally, there is McElwee, whose educational background and experience was not adduced at trial.  However, what was established at trial is that McElwee, a Heritage vice-president (and an officer of many of the other Kornman-controlled entities, including many of the Entity Defendants), was an officer of between fifty and a hundred Kornman-controlled

While Kornman offers explanations for the distributions and why no fraudulent intent should be inferred from them, which explanations will be addressed below, *see* pp. 53-63, *infra*; for now, this Court concludes that a reasonable inference from these facts is that the Transfers were made with the intent to at least hinder or delay Heritage creditors.[33]

### v. Other Indicia of Fraudulent Intent

As TUFTA expressly provides, the badges of fraud delineated in the statute are not exclusive; courts can consider other factors in determining whether fraudulent intent has been established. Here, the evidence at trial includes a number of other indicia of fraudulent intent.

---

entities, Testimony of McElwee (1/15/09) 10:13-22, although she wasn't sure which ones or how or why she became such an officer, *see, e.g.,* Testimony of McElwee (1/14/09) 196:7-16 & (1/15/09) 11:1-15 (she would learn that she was an officer or director of the various companies when "Vickie or Gary would tell me."), did what ever she was told, without question and without even bothering to read documents that she signed. *See, e.g.,* Testimony of McElwee (1/15/09) 17:4-18:11 (testifying that she didn't prepare consent statements for the entities that she served as an officer of, but that she signed them without reading them when either Kornman or Walker asked her to sign them, and describing that as "just part of the normal course of business;" (1/14/09) 210:4-215:12 & (1/15/09) 9:1-10:1. When asked what the business of GMK Family was, an entity for which she served as Secretary for the four years prior to Heritage's bankruptcy filing and who was the Manager of Heritage, she responded: "I – I don't know, as far as business, if – if they carried on a day-to-day business operation. I'm – I'm not that familiar with it." Testimony of McElwee (1/15/09) 11:20-23. When asked what her responsibilities were as Secretary of GMK Family, she could only recall having to sign "checks or perhaps an occasional document." *Id.* at 11:24-12:2. Moreover, as Secretary, she couldn't recall a single meeting that she attended with the other officers of GMK Family to discuss its business. *Id.* at 12:3-6. McElwee testified similarly when asked about each of the other Entity Defendants for which she also served as an officer – *i.e.*, she didn't know what its operations entailed, her responsibilities were signing checks and an occasional document, and she never attended any meeting with any other officer to discuss the business of that entity. Testimony of McElwee (1/5/09) 12:7-13:23. When asked by the Court why she would simply sign documents that were put in front of her without question, and whether she thought that fulfilled her obligations as an officer, she simply looked dumbfounded and replied that "I don't – I don't – I honestly don't know how to answer your question." Testimony of McElwee (1/15/09) 18:16-19:23. From the Court's perspective, and based upon the evidence adduced at trial, Kornman surrounded himself with people that he could control and who he expected to do as he wished, without question. It appears that they did just that. Or, in Michael's words, "I did what dad told me and that's probably about as accurate as I can be." Deposition Testimony of Michael (7/11/08) 39:11-12.

[33] In coming to these conclusions, the Court is not focusing on the Client Claimants. Rather, the Court is focused on KFP/Koshland (potential securities fraud claims), Canada (potential compensation claim under his employment agreement), and the IRS (potential promoter penalty claims). It is not necessary to rely upon the Client Claimants here. However, the Court does not find Kornman's denials of concern about potential client claims credible. Heritage had, if fact, refunded fees to 752 Transaction clients who became concerned about the transactions – *i.e.*, the Toll brothers; although, according to Kornman, for reasons related to the Martha Stewart case. Testimony of Kornman (1/9/09) 98:21-102:4. Moreover, Kornman clearly hoped to preclude the assertion of such claims by Heritage's wealthy clients by including waiver, release, indemnity, and no reliance provisions in its agreements with its clients. If Heritage/Kornman were truly unconcerned about potential client claims arising from its sale of risky tax strategies (or educating clients regarding risky tax strategies as Kornman prefers), why did Heritage go to such lengths to attempt to preclude them contractually?

For example, Kornman testified at great length about the information he reviewed and the "back-of-an-envelope or cocktail napkin" estimate he made of "what was likely to come in and what was likely not to, and that's what I used to make these judgments.  And that's exactly what [deciding whether there was excess cash available for distribution] was, was a judgment." Testimony of Kornman (1/9/09) 77:24-80:13.  However, other than the QuickBooks financial records (a summary of which Kornman claimed to be incapable of understanding),[34] no contemporaneous financial calculations of Kornman were produced at trial.  Nor did Kornman attempt to replicate his distribution analysis or his prior calculations at trial, other than to generally describe the process that he went through in deciding that a distribution was appropriate.  And, while Walker attempted to replicate at least the financial information she likely gave Kornman from Heritage's books and records at the time Kornman made the various decisions to cause Heritage to make distributions to its members, Kornman simply could not recall any specifics of his decisions other than the general process that he went through – *i.e.*, he looked at the financial information given to him by Walker, he considered anticipated revenues in the pipeline and anticipated expenses, etc.

In *Acequia*, 34 F.3d at 806, the Ninth Circuit found that the failure to produce documentation of so-called "innocent" explanations for transactions supported "an inference of

---

[34] Specifically, when a demonstrative exhibit containing net income numbers from other Heritage financial records was shown to Kornman to assist the Trustee's counsel in examining him with respect to why distributions were made in specific amounts in specific years, Kornman testified as follows: "I have no idea where these numbers came from.  And I didn't keep the books.  This might as well be Greek to me.  I have no – I'm not trying to be difficult.  I just don't know.  I was out trying to raise revenue, and Ms. Walker, it was up to her.  And she's the only one that can explain this.  I couldn't begin to explain anything about this."  Testimony of Kornman (1/9/09) 71:2-16. Furthermore, when asked why he made the decision to distribute $22 million in 2001, which was more than the combined net income for Heritage in 2000 and 2001, Kornman responded: "You're asking me to deal with these numbers.  I'm not trying to be evasive, but I don't have any knowledge of where these numbers came from, what they mean.  They couldn't be more abstract to me.  I have – I just don't understand them.  If you want to talk about whether these are the distributions that were made, I mean, I can't even – it's like the 2003 distribution was part of possibly 2002 or 2001.  I just don't understand this.  It makes no sense to me.  I'm sorry, I just – this was not my function within the company."  Testimony of Kornman (1/9/09) 72:5-19.  Of course, as he admitted, the decision to make distributions was his alone within Heritage.  Testimony of Kornman (1/8/09) 57:22-25.

**Memorandum Opinion**                                                                                    **47**

actual fraudulent intent." Here, Kornman's inability to recall any specifics of his decisions to distribute millions of dollars to Heritage's members is troubling. Even more troubling and incredible is his apparent inability at trial to understand Heritage's financial records and what they meant in the context of his decisions to distribute millions of dollars to Heritage's members. Thus, the Defendants' failure to produce Kornman's calculations or other documentation supporting his explanations supports an inference of fraudulent intent.

Heritage's/Kornman's entire pattern of conduct also supports an inference of actual intent to at least hinder or delay Heritage creditors when Kornman made the decisions to distribute millions of dollars out of Heritage. In *In re Reed*, 700 F.2d 986, 991 (5th Cir. 1983), the court relied upon the debtor's "whole pattern of conduct" to establish fraudulent intent. *See also Leonard v. Coolidge (In re National Audit Defense Network)*, 367 B.R. 207, 222 (Bankr. D. Nev. 2007) ("the manner in which the defendants ran NADN . . . also demonstrated the requisite intent to hinder, delay or defraud creditors."). Heritage's pattern of questionable or surprising business practices will be discussed more fully below.

For example, the Private Placement Memorandum that Kornman provided to Koshland makes it clear why Kornman was worried about when the limitations period for KFP's potential securities fraud claims would run. D.Ex. 23; Testimony of Kornman (1/12/09) 57:21-58:5. *See also* P.Ex. 163. The Private Placement Memorandum appears to have misrepresented Heritage's 1998-1999 income to Koshland/KFP. *Compare* D.Ex. 23, p. DFT 0904 (Pro Forma Statement of Earnings) and DFT 0906 (Bar Graph) *with* P.Ex. 41. The Private Placement Memorandum also stated that Heritage had "enjoyed profitability since its inception," although Heritage lost money in 1998. *Compare* D.Ex.23, p. DFT 0876 *with* P.Ex. 41, p. DFT 1839. The Private Placement

Memorandum also failed to disclose that transactions with "affiliates" would include millions of dollars of loans to such affiliates. D.Ex. 23, DFT 0890 & DFT 0923.

The Private Placement Memorandum contained other potentially problematic statements. For example, the Private Placement Memorandum states that in "contrast to other firms competing in this area, the Company bases its fees on the amount of assets that are committed by clients in the implementation of the complex tax reduction strategies modeled by the Company." D.Ex. 23 p. DFT 0869. While this may be accurate with respect to "an estate-type or a business-type planning transaction," the fees paid in connection with 752 Transactions were "twenty five percent of the projected tax savings that would have been there without the – their implementation." Testimony of Kornman (1/12/09) 14:16-15:3; *see also* P.Ex. 304, Section 4.01. Moreover, KFP/Koshland was informed in the Private Placement Memorandum that the "Company requires that its clients get independent opinions from legal counsel regarding the tax avoidance strategies that the Company models and explains."[35] D.Ex. 23, p. 6, DFT-0872. As is now clear, however, the "independence" of at least one of those firms was a farce.[36] That firm –

---

[35] An opinion from an independent professional was a key component of the 752 Transaction. This is so because the presence of such an opinion was thought to shield the Heritage client from potential liability to the IRS for penalties in connection with any audit finding taxes due to the IRS. In other words, if the client had an opinion from an independent law firm that the transaction was "more likely than not" to be lawful, the worst thing that should happen to the client from implementation of the 752 Transaction is that it would not be allowed, the taxes would be owed to the IRS along with interest at the statutory rate. However, of significance, the client would not be liable for penalties to the IRS. So, for whatever period of time the client kept its potential tax liability in its coffers instead of the IRS's coffers, the total cost to the client was interest on those funds at the statutory rate. Because the Heritage clients were sheltering millions of dollars of potential tax liability, and because those clients expected to be able to earn substantially more on their investments than the interest they might be required to pay to the IRS, it made business sense to attempt the 752 Transactions even if you assumed you would be audited and the transaction would be disallowed. The difference between the clients' internal rate of return on their investments and statutory interest would be theirs to keep. Or, as Kornman explained it to prospective clients -- how big a loan do you want from the government at 7 or 8% interest? *See, e.g.*, P.Ex.138 at pp. DFT 6040-6043.

[36] Other of those lawyers had relationships with Heritage or Kornman that raise questions about their "independence" as well. For example, Jonathan Blattmachr ("Blattmachr") was another tax lawyer Heritage referred its clients to for "independent" advice in connection with 752 Transactions. Blattmachr was a senior partner at the Milbank Tweed law firm in New York City. Kornman wrote four personal checks in the amount of $10,000 each to the Alaska Trust Company, Trustee of the Jeffrey Blattmachr Trust. According to Kornman, Jeffrey Blattmachr is the disabled son of Blattmachr. Interestingly, however, each of those four checks contained a further

**Memorandum Opinion** 49

Aherns and DeAngeli ("A&D") – was receiving what Kornman called a "royalty" or "licensing or consulting fee" (the Court would call it a "kickback") from Heritage based upon the fees Heritage received from its clients – the same clients for which A&D was simultaneously serving as "independent" counsel. *See* pp. 42-43, *supra*.

Not only did KFP invest $15 million in Heritage based upon what may have been a false or misleading Private Placement Memorandum, the "unfair or fraudulent conduct" continued even in petty ways. For example, KFP did not receive its share of distributions made by Heritage in early 1999, even though it became a member of Heritage effective January 1, 1999 and § 3.25 of the Heritage Operating Agreement provided for a pro rata sharing of distributions by all Heritage members. *See* D.Ex 90, § 3.25; *see also* P.Ex. 173 at p. TRU 05033 (consent document for July 26, 2002 distribution to Heritage's members and directing that "[t]his distribution shall be made among all members in accordance with their pro-rata percentage of ownership pursuant to the terms of said Operating Agreement."). While Walker testified that KFP's $15 million investment in Heritage was not actually received until after the January 1999 distributions were made, thereby explaining why KFP did not receive its share of (i) the $125,000 distributed to GMK Family on January 12, 1999, and (ii) the $2.375 million distributed

---

designation "FBO Jonathan Blattmachr, Betsy Blattmachr (Blattmachr's wife), John Blattmachr (another son), Jeffrey Blattmachr (the disabled son)," *see, e.g.*, P.Ex. 286 at p. ACI-37, which meant for the benefit of the named individual; and, according to Kornman, permitted the named individual to withdraw the funds from the trust within a specified period if they chose to do so. Testimony of Kornman (1/12/09) 134:23-138:23. While these checks may simply reflect Kornman's charitable largess as he claims, it is odd that Kornman felt the need to give money to help support Jeffrey, given the amounts of income one would expect his father to have made as a "top attorney" at Milbank Tweed. *Id*. at 137:12-16. And, of course, these payments were not disclosed to any Heritage client that was referred to Blattmachr for "independent" advice. *Id*. at 138:1-5.

In addition, Heritage had a business relationship with Blattmachr's brother, Douglas, who was the CEO of the Alaska Trust Company. According to Kornman, "Alaska was trying to establish itself as the . . . Delaware of estate planning. And they were constantly doing new documents and new laws, and we paid Douglas Blattmachr consulting fees to keep us up to date on what was going [sic] there because a lot of our estate transactions used Alaska domiciles." *Id*. at 160:23-161:3. The upshot of this testimony is that Blattmachr's brother, who was not shown to have any independent tax knowledge or expertise, was paid $20,000 a month starting December 15, 1999 and ending on January 23, 2004, or over $ 1 million, for these "consulting" services. *See id*. at 162:12-16.

**Memorandum Opinion** 50

to Steadfast on that same date, P.Ex. 317, even Walker could not explain why Tikchik, KFP, and even GMK Family failed to receive their pro rata share when $2.2 million was distributed to Steadfast on February 15, 1999. P.Ex. 317; s*ee also* Testimony of Walker (1/12/09) 206:5-24. To make matters worse, Heritage did not even list KFP as having a claim for its pro rata share of the missed distribution(s) in its bankruptcy schedules (listing it instead as having a zero dollar contingent claim in Amended Schedule F at p. 89).

Of course, and as noted previously, KFP made numerous attempts to get financial information from Heritage with respect to its $15 million investment. No such financial information was ever provided to KFP. *See* pp. 29-33, *supra*.

The pattern of unfair or fraudulent conduct by omission continued with Heritage clients and prospective clients. It appears that Kornman never told a client or prospective client that the IRS was demanding the identity of Heritage clients who participated in a 752 Transaction. Testimony of Kornman (1/8/09) 34:15-37:16 (Kornman does not remember telling clients or prospective clients about the IDR, and disputes having any duty to do so); Deposition Testimony of Kornman (7/21/08) at 178:8-179:7 (Kornman does not remember telling anyone about the IDR); Testimony of Canada (1/15/09) 94:3-18 (Canada did not know about IDR and does not know of any time Kornman disclosed it to a client or prospective client). There is no evidence suggesting that the other Heritage principals selling 752 Transactions to clients – *i.e.*, Canada and Bird, knew about the IRS "soft letters" or the IDR.[37]   In fact, Canada specifically denied knowing about either the IDR or the earlier IRS "soft letters." Testimony of Canada (1/15/09) 31:14-34:22; 94:13-18. However, Canada went on to testify that the IRS' investigation of Heritage should have been disclosed to Heritage clients and prospective future clients for several

---

[37] Obviously, Kornman did not tell Canada or Bird about the "soft letters," as he denies knowing about them.

**Memorandum Opinion**                                                                                                    51

reasons, including because it was directly relevant to the likelihood of an IRS audit of their tax returns – *i.e.*, in his words "they might as well write 'Please audit me' in red ink on the front of their tax return."[38] Testimony of Canada (1/15/09) 36:6-38:20 (quote at 37:17-18).

In addition, in *In re Sissom*, 366 B.R. 677, 700-701 (Bankr. S.D. Tex. 2007), the court found that the debtor's "pattern of sharp dealing" prior to bankruptcy supported an inference of actual fraudulent intent. Clear evidence of sharp dealing was presented throughout the eight days of trial. A few examples include: (i) Heritage's failure to make pro-rata distributions to all of its members in 1999 (after its first non-insider members were admitted) in accordance with the terms of the Heritage Operating Agreement (Pre-Trial Order, Stipulations 85 & 101); (ii) refusing to provide financial information about Heritage to KFP/Koshland as required by the Heritage Operating Agreement, resulting, at least in part, in KFP demanding the return of its $15 million investment; (iii) fostering or ignoring the conflict of interest between A&D and its clients, while knowing that the clients needed an opinion from an "independent" law firm to avoid the payment of penalties to the IRS if the clients' tax returns were successfully challenged by the IRS, *see, e.g.*, P.Ex. 47 (decision of Tax Court in *Heckler, et al v. Commissioner* (holding that reliance on independent professional may be defense, but that reliance on someone with inherent conflict of interest is not)), Testimony of Kornman (1/9/09) at 82:11-88:19 (discussing *Heckler* decision and impact on Heritage); (iv) continued selling of 752 Transactions after

---

[38] Of course, the Court recognizes that it is easy for Canada to now say that he would have disclosed that information to Heritage clients and prospective clients if he had only known about it. Given that he was unaware of the IRS' investigation of Heritage prior to his departure from Heritage, we will never know if he would have made full disclosure or not. In other words, the Defendants' observations about Canada's credibility are not lost upon the Court. However, what is important here is that the person at Heritage who did know about the IRS investigation chose not to tell existing clients or prospective clients about that investigation, claiming that it was unnecessary because he did tell them that they were likely to be audited. However, from the Court's perspective, there is a difference between telling the clients that the 752 Transaction was risky and that the IRS was likely to audit their returns, and telling them that the IRS had demanded that Heritage disclose the identity of every client who had implemented such a transaction. Kornman's apparent inability to see that distinction may explain at least part of the problem here.

receipt of the May 2001 IRS letter without disclosing such letter to prospective clients; (v) telling prospective 752 Transaction clients that the risk of audit was "very low," P.Ex. 138 at DFT-6037, 6043, while believing that Heritage's clients were certain to be audited if their transactions became visible to the IRS, Testimony of Kornman (1/9/09) at 32:2-10); (vi) telling prospective clients that the 752 Transactions could be hidden to reduce the risk of audit, after Heritage had received the IRS demand that Heritage disclose the names of all of its clients who had implemented a 752 Transaction, *see, e.g.*, P.Ex. 138 at DFT-6039-40, 6044-45 ("never shows up on your tax return"); and (vii) telling prospective client Carl Icahn that Heritage was "below [the IRS's] radar screen," after Heritage had received the IRS demand that Heritage disclose the names of all of its clients who had implemented a 752 Transaction, P.Ex. 151 at DFT-2384-85 (transcript of recorded meeting with Icahn).

This conduct or pattern of conduct supports an inference of actual intent to at least hinder or delay Heritage's creditors, if not defraud them, as "creditor" and "claim" are defined under TUFTA.

### 5. The Defendants' Alleged Legitimate Business Purposes and Other Contentions

The Defendants initially argue that there were legitimate business purposes for each of the Transfers. Each purpose advanced by the Defendants is discussed below. However, before reaching those alleged legitimate business purposes, a preliminary matter must be discussed – *i.e.*, the credibility of the witness offering the alleged business purposes. Specifically, Kornman's credibility as a witness is critical with respect to these alleged business purposes, as he is the sole person who made the decision to transfer millions of dollars out of Heritage each time a distribution was made by Heritage to its members, and he is the sole person who decided the timing of those Transfers. Accordingly, the Court will address Kornman's credibility first.

**Memorandum Opinion**									 **53**

Kornman's credibility as a witness is problematic for several reasons. First, "[o]n April 9, 2007, Kornman pled guilty to one aspect of one count alleging false statements to the Securities and Exchange Commission in United States v. Gary M. Kornman, No. 3:05-CR-0298P (N.D.Tex.)." Pretrial Order, Stipulation 4. Specifically, Kornman pled guilty to violating 18 U.S.C. § 1001, and was convicted of making a false statement to the SEC. Testimony of Kornman (1/8/09) 10:22-11:7. In the factual resume that Kornman signed accompanying his plea agreement, he admitted making a false statement to the SEC, that he knew the statement was false when he made it, and that he made the statement intentionally for the purpose of misleading the SEC and its investigation into securities trading activity. Testimony of Kornman (1/8/09) 11:8-22. Kornman's admitted act of lying to the SEC makes it clear that he is capable of lying when it is advantageous for him to do so, a troubling premise here when his testimony is so critical.

Second, irrespective of his criminal conviction, some of Kornman's trial testimony was simply incredible. For example, it is not credible that Kornman was unaware of the IRS investigation of Heritage for promoting abusive tax shelters until February 2002. *See* pp. 39-41, *supra*.

Third, Kornman's memory of events at trial was convenient at best. While he can recall exculpatory facts, or what he perceives to be exculpatory facts, quite well, his recollection of potentially prejudicial events is not nearly so good. While not surprising, Kornman's convenient recollection also casts doubt upon the veracity of his testimony.

With these observations about Kornman's credibility in mind, we turn next to the Defendants' claimed legitimate business purposes for the Transfers. The parties agree that if the Defendants established, by a preponderance of the credible evidence, that a legitimate business

purpose existed for each Transfer, that Transfer is not avoidable. *See, e.g., ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 391 (S.D. Tex. 2008) (where the plaintiff demonstrates several badges of fraud, the burden is on the defendants to demonstrate a legitimate purpose for the transfer); *accord, Flanigan v. DeFeo (In re DeFeo Fruit Co.)*, 24 B.R. 220, 222-23 (Bankr. W.D. Mo. 1982) (burden on defendants). So, two questions must be addressed. First, what legitimate business purposes do the Defendants assert; and second, did they prove any legitimate business purpose by a preponderance of the evidence? According to the Defendants: (1) Heritage was "obligated" to make a distribution to its members under the Heritage Operating Agreement, and (2) the distributions were made so that the members could pay their taxes, given that Heritage was a pass-through entity for tax purposes. For the reasons explained more fully below, this Court concludes that the Defendants failed to carry their burden of proof to establish a legitimate business purpose for each of the Transfers.

### a.     The Alleged "Obligation" to Make Distributions

As noted previously, it is true that the Heritage Operating Agreement required Heritage's Manager (GMK Family acting through its Manager, Kornman) to make a determination of whether to distribute "excess cash" to Heritage's members "at least once each calendar quarter." D.Ex. 90, § 50.2 at p. DFT-0983-0984. However, the Heritage Operating Agreement also provided that Heritage's Manager had "sole, unlimited and absolute discretion" in determining whether excess cash was available within Heritage from which to make such distributions. *Id*. So, the very duty that the Defendants rely upon to create their "obligation" was only triggered when Heritage's Manager – *i.e*, GMK Family, acting through its Manager, Kornman, decided to trigger it.

Moreover, even assuming that the Heritage Operating Agreement created a real "obligation" on Heritage's part to evaluate whether distributions of excess cash were warranted, Kornman was certainly inconsistent in his efforts to fulfill any such "obligation." Kornman did not evaluate Heritage's excess cash on a quarterly basis as the Heritage Operating Agreement required. *See, e.g.,* P.Ex. 317 (showing no regular schedule of distributions). In fact, Kornman admitted that he did not consider whether to make a distribution to Heritage's members on any sort of regular basis when he testified that there was just "no rhyme or reason" or "pattern" to the timing of the Transfers. Testimony of Kornman (1/8/09) 81:22-23; 70:5-9. Rather, according to Kornman, he caused Heritage to make distributions "when we got around to it." Testimony of Kornman (1/8/09) 70:9.

And, as noted previously, Kornman's "back-of-an-envelop" or "cocktail napkin" calculations, which led to his determination that excess cash was available within Heritage, no longer exist. *See* pp. 46-47, *supra*. In fact, there is no contemporaneous documentation supporting Kornman's determination of what excess cash was available within Heritage for distribution at the time of any of the Transfers. And, there seems to be little connection between Heritage's annual net income, the decision to make distributions, and the amount of the distribution. P.Ex. 41, 114, 155, 117, 189, D.Ex. 179.12 at p. WP0006932 (generally showing the lack of connections between income and distributions).

The fact that Heritage's Manager (indirectly Kornman) had the absolute discretion to decide what amount of excess cash, if any, was available for distribution under the Heritage Operating Agreement, coupled with the fact that (i) Kornman ignored the clear requirement of that agreement to make such a determination at least once each quarter, and (ii) simply dismissed the claims that had been asserted against Heritage in making his "calculations," causes this Court

to conclude that Kornman did not feel "obligated" to cause Heritage to make distributions to its members. Rather, this Court concludes that Kornman is attempting to concoct, after the fact, a legitimate business purpose from a contractual provision in the Heritage Operating Agreement that he often ignored and, when it was not ignored, he failed to honor faithfully.

#### b. The Need for Distributions to Pay Taxes

The Defendants next argue that

> [t]he requirement for distributions of net income to Heritage's members was necessary for Heritage, a limited liability company, to facilitate pass-through taxation treatment and to permit its members access to the funds on which they would be required to pay taxes. Thus, not only was there a legitimate business reason for making each distribution, Heritage's manager was **required** to make the distributions to members pursuant to the Operating agreement, once it was determined that excess cash existed.

Defendants' Post-Trial Brief at p. 40 (emphasis in original).

In response, the Trustee argues that the Defendants failed to prove that Heritage's members actually needed Heritage's cash in order to pay their tax liability on Heritage's income. In addition, the Trustee points out that if the Member Defendants really needed Heritage's cash in order to pay their share of the tax on Heritage's reported income, one would have expected to see Kornman cause regular distributions to be made to Heritage's members at the time estimated tax payments were due each year. Finally, the Trustee points to the fact that this purported "legitimate business reason" is inconsistent with the fact that Heritage made no distributions to its members in 2000, when it had over $10 million in book net income. *Compare* P.Ex. 317 *with* P.Ex. 114 at p. 2.

After carefully considering the evidence and the parties' arguments, the Court finds certain of the Trustee's arguments persuasive. While it makes sense that Heritage's members would expect Heritage to distribute sufficient cash to them from which they, in turn, could pay

their tax liability on their share of Heritage's taxable income if Heritage had "excess cash" – *i.e.*, cash it did not need in its business operations and/or to pay its creditors, for the reasons explained more fully below, this Court concludes, once again, that Kornman is attempting to concoct, after the fact, a reason for the Transfers that did not exist at the time of the Transfers.

First, if the actual reason the Transfers were made was to assist Heritage's members in paying their share of the tax on Heritage's taxable income, then one would have expected to see regular distributions of "excess cash" to Heritage's members when those estimated or actual tax payments were due. However, as noted previously, Heritage's financial condition was not evaluated quarterly by Kornman as the Heritage Operating Agreement provided. Rather, as noted previously and as Kornman admitted on cross-examination, there was just "no rhyme or reason" or "pattern" to the timing of those distributions, they were made "when we got around to it." Testimony of Kornman (1/8/09) 81:22-23; 70:5-9.

Second, the Transfers substantially exceeded Heritage's total taxable income in each of the years at issue here – *i.e.*, 2001-2003, which means, of course, that the amounts of the distributions each year were even more out of line with the members' actual tax liability on Heritage's income. In other words, since the members' actual pass-through tax liability would be a fraction of Heritage's total taxable income in any given year, if this purported reason was the real reason for the distribution of funds from Heritage to its members, the distribution should have been substantially less than Heritage's total taxable income in a given year, not more. So, for example, why did Heritage distribute $22 million to its members in 2001, when its ordinary income was less than $10 million (and, of course, the members' actual tax liability on even $10 million of Heritage income would be substantially less than $10 million)? P.Ex. 117 at DFT-11664 (lines 1 & 22). Similarly, why did Heritage distribute $10 million to its members in 2002,

while reporting only $6.7 million of ordinary income?  P.Ex. 157 at DFT 11701 (lines 1 & 22). And, why did Heritage distribute $10 million to its members in 2003, while reporting an ordinary loss of approximately $1.4 million?[39]  P.Ex. 189 at DFT-11740 (lines 1 & 22).  The only credible answer to these questions from the evidence at trial is that the amounts Kornman decided to distribute out of Heritage from 2001-2003 had, in actuality, nothing to do with the members' actual or potential tax liability on Heritage's taxable income.[40]

Finally, the Defendants' reliance on *Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 855 (Bankr. N.D. Tex. 2003), *aff'd* 299 B.R. 810 (N.D. Tex. 2003) to support their contention is misplaced, as that case is distinguishable for the following reasons: (i) there is no evidence of a "standard business practice" with respect to the distributions, as Kornman made distributions when he "got around to it," Testimony of Kornman (1/8/09) 70:5-9; (ii) 95% of the distribution amounts were from Heritage to another Kornman-controlled entity so there is no evidence of an "arms-length" transaction, (iii) other than Kornman's own self-serving testimony, there is no contemporaneous documentary evidence supporting the appropriateness of the distributions or the members' need for the distributions to make tax payments, and (iv) Heritage received nothing in consideration for the distributions.  Applying the *Womble* factors here causes this Court to conclude that there was no legitimate business purpose for the distributions.

---

[39] While the 2003 tax return only shows $10 million in distributions to members in 2003, $14 million was actually distributed.  The $4 million difference relates to the dispute over the $4 million of cash in the safe deposit boxes discussed in detail later in this opinion.  *See* pp. 64-70, *infra*.

[40] Moreover, Kornman could have easily offered evidence of what the Member Defendants' actual tax liability on Heritage's taxable income was in each of the years in question here, as 95% of the distribution amounts were from Heritage to Kornman-controlled entities – *i.e.*, the Member Defendants.  If the actual tax liability of GMK Family, Tikchik and Steadfast bore any real relationship to the amounts distributed, the Court would have expected to see such evidence at trial.  However, the trial record is silent with respect to the Member Defendants' actual tax liability in 2001, 2002, and/or 2003.  Moreover, to the extent that the Defendants argue that the amount of the distributions that exceeded the potential or actual tax liability of Heritage's members was distributed because of the purported "obligation" Heritage had under its Operating Agreement to make such distributions, the Court notes its earlier finding that any such "obligation" was completely illusory as Kornman had the "sole, unlimited and absolute discretion" to make or not make distributions as he wished.

For at least these reasons, the Court concludes that the "need-the-money-to-pay-tax" argument, like the "obligation" argument, is an after-the-fact contrivance by Kornman to attempt to justify the Transfers. The credible evidence contradicts, rather than supports, these alleged legitimate business purposes.

   c.  **Other Reasons Advanced to Establish a Lack of Fraudulent Intent**

The Defendants next argue that certain other facts demonstrate a lack of fraudulent intent on Heritage's part, including the fact that Kornman: (i) denies having actual knowledge of claims against Heritage (such as the IRS claims for withholding taxes or the potential for IRS promoter penalties until February 2002); (ii) asserts that he believed that the claims were completely unfounded and could not be successfully asserted against Heritage (such as Canada's claim or any potential claims by Heritage clients); and/or (iii) asserts that the claimant was "confused," Testimony of Kornman (1/8/09) 72:16-18, thereby explaining why he discounted KFP/Koshland's claim. In other words, according to Kornman, he could not have caused Heritage to make a transfer with the actual intent to hinder, delay or defraud creditors because he either did not know about them or he did not believe that their claims were real. In the alternative, the Defendants assert that even if Heritage knew about the possibility of claims being asserted against it (such as by disgruntled Client Claimants, disgruntled investors like KFP/Koshland, disgruntled former employees like Canada, and the IRS), Heritage (acting through its Manager, GMK Family/Kornman) must have believed that the claims were valid or viable before it could have had the requisite intent under TUFTA when it made the Transfers. And, according to the Defendants, even if the claims turned out to be meritorious (regardless of Kornman's belief to the contrary), until the claims were actually liquidated, Heritage could not have had the requisite intent under TUFTA when it made the Transfers. These arguments, some

**Memorandum Opinion**                        **60**

of which are facially appealing, are not legally sound as they misapprehend the statutory requirements of TUFTA in several material respects.

First, as noted previously, Heritage did not have to act with fraudulent intent with respect to one of the triggering creditors. *See* pp. 27-28, *supra*. All that TUFTA requires is that Heritage have acted with the actual intent to hinder, delay or defraud any of its creditors at the time each Transfer at issue here was made. So, while the IRS's claim for unassessed taxes satisfies TUFTA's triggering creditor requirement, the Trustee does not need to establish that Heritage acted with the actual intent to hinder, delay or defraud the IRS with respect to that claim when it made a Transfer. It is enough that Heritage acted with the actual intent to hinder, delay or defraud any of its creditors at the time of each Transfer. *See* pp. 27-28, *supra*.

Second, Heritage did not need to act with the actual intent to defraud a known creditor with a liquidated claim, it is enough under TUFTA that Heritage acted with the actual intent to hinder or delay a person who held a contingent, disputed and/or unliquidated right to payment. *See* p. 27, *supra*.

Third, with respect to the Defendants' "we-couldn't-believe-we'd-lose" argument regarding Canada and the Client Claimants, that argument runs counter to case law and ignores the plain language of the statutory badges of fraud. As the court held in *Nisselson v. Empyrean Investment Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 408-09 (Bankr. S.D.N.Y. 2007), (relying upon *Shapiro v. Wilgus*, 287 U.S. 348, 354, 53 S.Ct. 142, 77 L.Ed. 355 (1932)), even genuine or well-founded beliefs that "there are defenses to the creditors' claims . . . are not sufficient to protect a scheme otherwise designed to hinder or delay creditors." A court, in determining fraudulent intent, need consider only whether, "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit." Tex. Bus. & Com.

Code § 24.005(b)(4) (emphasis added). In other words, there is simply no requirement under TUFTA that the threatening creditor ultimately file suit or be successful in that suit if one is filed. Again, that is why persons with disputed, unliquidated, and contingent rights to payment hold "claims" and are "creditors" as those terms are defined in TUFTA. *See* pp. 27-28, *supra*.

Similarly, while Kornman asserts that he did not believe that KFP had a right to a return of its $15 million investment, substantial funds were distributed out of Heritage after KFP's lawyer demanded that relief. Moreover, well after Kornman testified that "we sent him the information that showed that what the letter was saying was totally erroneous and . . . they never requested any additional – we never heard from them again," Testimony of Kornman (1/8/09) 13:7-12; 137:13-15, thus suggesting that he thought KFP's claim was resolved, Kornman admitted on cross-examination that (i) Heritage's lawyer, Wortley, had received further correspondence from KFP/Koshland's lawyer, *id*. at 176:5-11, (ii) Heritage received further requests for financial information from Esposto of KFP, *id*. at 175:1-7, and (iii) he remained concerned about potential litigation with KFP/Koshland as late as March 2002, *id*. at 182:12-183:11. Finally, the evidence also established that Kornman received a letter from Heritage's lawyer, Wortley, advising when the limitations period on potential KFP securities fraud claims would run, which indicated that the outside date for the assertion of such claims was January, 2004. P.Ex. 163. The fact that Kornman was concerned enough to ask Heritage's lawyers for advice about the statute of limitations on KFP's potential securities fraud claims suggests that notwithstanding his testimony about Koshland's "confusion" and the lack of any factual basis for KFP's claims, Kornman continued to be concerned about those claims. And, in the meantime, millions of dollars continued to flow out of Heritage to its members.

The Defendants also argue that Heritage could not have made the Transfers with the actual intent to hinder, delay or defraud current or former Heritage clients because, once again, Heritage (acting through its Manager, GMK Family, who acted through its Manager, Kornman) believed that the clients were precluded from pursuing claims against it under the terms of Heritage's agreements with those clients. The only evidence offered for this belief is Kornman's testimony and the content of the client agreements.

It is true that many of the client agreements contain provisions which, if enforceable, would preclude the clients from successfully prosecuting claims against Heritage. However, those provisions would only be enforceable if the clients were unsuccessful in establishing that they were fraudulently induced by Heritage into entering into the client agreements.[41] Moreover, not all of the client agreements had such "no inducement" provisions.[42] And, we know that Heritage settled with certain 752 Transaction clients and returned fees to those clients.[43]

But, irrespective of whether the Client Claimants could successfully assert claims against Heritage or not, the Defendants' arguments miss the basic point of TUFTA. The fact remains that the Client Claimants had "claims" against Heritage and were "creditors" as those terms are

---

[41] Many of the Clients Claimants, with whom the Trustee settled pursuant to the terms of the Plan, defended against the Trustee's objection to the allowability of their claims by asserting fraudulent inducement defenses. Testimony of Trustee (1/15/09) 145:14-148:20; P.Ex. 308.

[42] For example, the Kunau client agreement, executed in November of 1999, did not have a "no inducement" provision. P.Ex. 304 at 6 (Article XI). Neither did the June 2000 Rainwater client agreement. D.Ex. 132 at 6. Interestingly, by October 25, 2000 (and thereafter), a "No Prior Inducements" section appears in the client agreements. *See, e.g.*, P.Ex. 327, § 11.2 at "BURCHETT 06538" (Penske agreement); D.Ex. 130, § 6.2 (Fluharty agreement dated June 2001); P.Ex. 325, § 11.2 (Schuler agreement dated January 2002). Something happened between June and October 2000 to cause Heritage to strengthen its protections against a potential fraudulent inducement claim by its clients.

[43] Two of these clients were the Tolls, who entered into 752 Transactions in 2000 and 2001. The Trustee proved that Heritage paid the Toll brothers over $878,000 as part of a settlement and release arising out of a 752 Transaction. Testimony of Kornman (1/9/09) 98:18-102:4. *See* D.Ex. 182.04 at 65 (Bates WP0012706); P.Ex. 281 (showing that "bet2003" is Bruce E. Toll).

defined under TUFTA, as they held contingent, unliquidated and disputed rights to payment against Heritage. *See* p. 27, *supra*.

Because the Defendants have not met their burden of persuasion (by a preponderance of the credible evidence) with respect to a legitimate business purpose in making the Transfers, the Court concludes that the Transfers are avoidable under § 544(b) of the Bankruptcy Code and TUFTA.

### 6.     Amount of Avoidable Transfers and Recovery

One last issue must be addressed – *i.e.*, what is the amount of the Transfers that are avoidable by the Trustee? In other words, were there $46 million in distributions to Heritage members from April 16, 2001 through February 18, 2003, or just $42 million in distributions during that time period? To answer this question, further explanation is required.

It is undisputed that Heritage made distributions to its members totaling $42 million from April 16, 2001 to February 18, 2003, of which $39.9 million went to the Member Defendants – *i.e.*, Steadfast, Tikchik, and GMK Family. P.Ex. 317. However, there is another $4 million in alleged distributions in dispute between the parties. Specifically, the Court must decide whether $4 million in U.S. currency in Heritage safe deposit boxes was transferred to Steadfast on July 26, 2002 as part of an $8.7 million distribution to Steadfast by Heritage. If Steadfast received the $4 million in U.S. currency, a total of $46 million was distributed to Heritage's members, of which $43.9 million was received by the Member Defendants.

Needless to say, the parties have different perspectives regarding whether Steadfast received the currency in July 2002. According to Walker and Kornman, ownership of the Heritage safe deposit boxes and the $4 million in U.S. currency contained in those boxes was not transferred to Steadfast on July 26, 2002. While they admit that Heritage attempted to transfer

ownership of the safe deposit boxes and the currency on that date, Kornman testified that the bank refused to allow the transfer of the safe deposit boxes from Heritage to Steadfast. Testimony of Kornman (1/8/09) 110:3-16; 114:3-17. So, according to Kornman, the transfer of the safe deposit boxes and the $4 million in U.S. currency contained in the boxes was not concluded, notwithstanding the fact that Kornman signed receipts for the cash on behalf of Steadfast and, ultimately, Ettman Trust, to which Steadfast appears to have further transferred the cash on that same date. *Id*.; P.Ex. 173. Rather, Kornman testified that the $4 million in U.S. currency remained in the safe deposit boxes in Heritage's name at the bank until April 28, 2004, when it was taken out of the safe deposit boxes, was deposited into Heritage's payroll account at the bank, and was used to purchase cashier's checks, which were, in turn, used to pay various Heritage debts. Michael corroborated portions of his father's testimony – *i.e.*, the currency remained in Heritage's safe deposit boxes until March, April or May 2004 (he couldn't recall exactly when it was removed), when it was deposited and used to pay bills. Deposition Testimony of Michael Kornman (7/11/09) 230:10-232:5. While Walker attempted to corroborate Kornman's testimony, her testimony is not helpful, because she had no personal knowledge of what happened, other than what Kornman told her. Testimony of Walker (1/13/09) 86:6-10. At most, Walker had personal knowledge that $4 million in cash was deposited into Heritage's payroll account on April 28, 2004 and was then used to purchase cashier's checks that were used to pay various outstanding Heritage payables.

In response, the Trustee contends that (i) on July 26, 2002, Heritage transferred the safe deposit boxes and their contents ($4 million in U.S. currency) to Steadfast as part of an $8.7 million distribution, P.Ex. 173; (ii) Steadfast, through Kornman, acknowledged receipt of the $4 million in U.S. currency, *id*.; and (iii) Steadfast then transferred the $4 million in U.S. currency

to the Ettman Trust, for which Kornman, Trustee, again acknowledged receipt of the currency in writing on July 26, 2002, *id*. According to the Trustee, (i) the transfer of that $4 million in U.S. currency was completed on July 26, 2002; (ii) Heritage recorded the transfer of that "Investment" to Steadfast on its books and records – *i.e*, in Quickbooks, on that date; and (iii) applicable law provides that a transfer of personal property is complete when a written instrument evidences the transfer and the transferee is effectively in control of the property. Trustee's Brief in Support of Closing Argument at p. 29. And, according to the Trustee, because Kornman admitted in his testimony that there was never any re-transfer of ownership of the $4 million in U.S. currency in the safe deposit boxes from Ettman Trust (or Steadfast) back to Heritage, *see* Testimony of Kornman (1/8/09) 114:8-17, the $4 million in U.S. currency was the property of Ettman Trust as of July 26, 2002 (the date of the transfer) until it was deposited in the Heritage payroll account on or about April 28, 2004. And, according to the Trustee, since the $4 million in U.S. currency deposited in the Heritage payroll account on April 28, 2004 was Ettman Trust property, what occurred on that date can only be characterized as an advance or loan of $4 million by Ettman Trust to Heritage. Trustee's Brief in Support of Closing Argument at p. 31. Thus, the Trustee concludes that: (i) Walker should never have "adjusted" Heritage's QuickBook records to add $4 million as an "Investment" on February 18, 2003; (ii) Walker should have instead recorded a $4 million liability to Ettman Trust when the $4 million in U.S. currency was deposited into the Heritage payroll account on April 28, 2004 (because Ettman Trust must have made a loan to Heritage in that amount on that date); and (iii) the fact that Walker failed to make these accounting entries does not change the reality that Heritage transferred $4 million in U.S. currency to Steadfast on July 26, 2002, who in turn transferred it to Ettman Trust on that same date. *Id*.

Deciding what really happened here is difficult, because the facts and circumstances are unusual and the documents created contemporaneously with the alleged transfer paint a different picture from what Kornman now says happened. The fact that Kornman caused Heritage to place $4 million in U.S. currency in safe deposit boxes is unusual. The thought that $1 million in cash would sit idle in a safe deposit box from late 1999 (shortly before Y2K) until April 28, 2004, and that another $3 million in cash would be added to it and sit idle in safe deposit boxes from shortly after the terrorist attack of September 11, 2001 until April 28, 2004, is also unusual. However, the Court is satisfied from the evidence that Kornman caused a total of $4 million in U.S. currency belonging to Heritage to be placed in safe deposit boxes in Heritage's name and that the cash remained in the boxes throughout that period. But, the fact that the cash remained in safe deposit boxes in Heritage's name does not address ownership of the cash.

Under Texas law, the lessee of a safe deposit box (here, Heritage) is considered for all purposes to be in possession of the box and its contents. Tex. Fin. Code § 59.103 (Vernon 2008). Since ownership is a usual concomitant of possession, possession of personal property raises an inference of ownership, 59 Tex. Jur. Property § 9; *Continental Credit Corp. v. Norman*, 303 S.W.2d 449 (Tex. Civ. App. 1957). However, possession is not dispositive of the question of title to the personal property. 59 Tex. Jur. Property § 11; *Mehan v. WAMCO XXVIII, Ltd.*, 138 S.W.3d 415 (Tex. App. – Fort Worth 2004). Further, title to personal property may pass without a change in possession. *Continental Credit Corp.*, 303 S.W.2d at 454. Under Texas law,

> the common use of the word 'transfer' is to denote the passing of title in property, or an interest in property, from one person to another, and in this sense, the term means that the owner of the property delivers it to another person with the intent of passing the rights that he or she had in it to the latter.

59 Tex. Jur. Property § 12. Texas law recognizes the doctrines of constructive possession, *see Blankenship v. Citizens Nat'l Bank of Lubbock*, 449 S.W.2d 77 (Tex. Civ. App. 1970), and

**Memorandum Opinion** 67

constructive delivery. *Nipp v. Broumley*, No. 10-08-00145-CV, 2009 WL 875537 (Tex. App. – Waco Apr. 1, 2009) (interpreting the "delivery" element of the evidence required to establish a gift and stating that delivery of a gift may be accomplished by actual or constructive delivery).

Constructive possession is defined as

> that possession which the law annexes to ownership of property when there is a right to the immediate and actual possession of such property. Constructive possession is that which exists without actual . . . personal present control over a chattel, but with an intent and capability to maintain control and dominion.

*Blankenship v. Citizens Nat'l Bank of Lubbock*, 449 S.W.2d at 79. Constructive delivery is an "act that amounts to a transfer of title by operation of law when actual transfer is impractical or impossible." Black's Law Dictionary 461 (8th ed. 2004). In fact, the example given to illustrate a constructive delivery is "the delivery of a deposit-box key by someone who is ill and immobile may amount to a constructive delivery of the box's contents even though the box may be miles away." *Id*.[44] No particular form of words or action is necessary to accomplish a constructive delivery. Rather, any act or declaration showing an intention to give effect to an executed conveyance is sufficient; "there must be an intention to deliver and acts sufficient to show a constructive delivery." *Cecil v. Smith*, 790 S.W.2d 709, 711 (Tex. App. – Tyler 1990), *rev'd on other grounds*, 804 S.W.2d 509 (Tex. 1991).

Here, given the Court's previously expressed concerns over witness credibility in this lawsuit, the Court finds contemporaneous documentary evidence most persuasive. And, here, the contemporaneous documentation supports the Trustee's theory of what happened – *i.e.*, that

---

[44] Black's Law Dictionary identifies three traditional types of constructive delivery. One of them is a type of constructive delivery in which mediate possession is transferred while the immediate control or custody remains in the transferor. "Anything may be effectually delivered by means of an agreement that the possessor of it shall for the future hold it no longer on his own account but on account of someone else. If I buy goods from a warehouseman, they are delivered to me as soon as he has agreed with me that he will hold them as warehouseman on my account. The position is then exactly the same as if I had first taken actual delivery of them, and then brought them back to the warehouse, and deposited them there for safe custody." Black's Law Dictionary 332 (8th ed. 2004) (quoting John Salmond, Jurisprudence 306 (Glanville L. Williams Ed., 10th ed. 1947)).

ownership of the contents of the safe deposit boxes (the cash) was transferred – *i.e.*, constructively delivered -- to Steadfast on July 26, 2002, and that Steadfast turned around and immediately transferred ownership of the cash to Ettman Trust on that same date. Kornman's signed written receipts prove as much. P.Ex. 173.

But, Kornman wants this Court to believe his oral testimony, which contradicts his signed written receipts for the cash on behalf of Steadfast and Ettman Trust. According to Kornman, "ownership" of the safe deposit boxes and their contents never transferred because the bank refused to allow Heritage to change the name on the account. From the Court's perspective, however, the right to possess a safe deposit box as lessee and ownership of the contents of that box are two distinct legal issues. *See, e.g., Estate of Silver*, 1 P.3d 358 (Mont. 2000) (safe deposit box lease does not establish title to contents); *Estate of Finkelstein*, 817 P.2d 617 (Colo. Ct. App. 1991) (distinguishing title to a safe deposit box from title to its contents). Personal property belonging to one person can be kept in a safe deposit box leased by a bank to another person. And, if a dispute as to ownership later arises, that dispute will have to be resolved based on documentary and other evidence of ownership of the contents of the leased box.

In this case, we have contemporaneous documents establishing an intent to transfer ownership of the cash – *i.e.*, a "Consent of Manager in Lieu of Special Meeting of Manager of [Heritage]" dated July 26, 2002, which resolves that the ownership of the contents of the box be transferred to Steadfast, and the written receipts for the cash signed by Kornman on behalf of Steadfast and Ettman Trust. In addition, Kornman controlled both the boxes and their contents. So, on whose behalf was Kornman exercising control over the boxes and/or their contents? Heritage, because the boxes were leased to it and Kornman was an officer of Heritage (for most

of the relevant time period), or Ettman Trust, because Kornman had acknowledged receipt of the cash as its Trustee and remained its Trustee throughout the relevant time period, or both?

After carefully considering these issues and the evidence, the Court concludes that the $4 million in U.S. currency was legally transferred (via constructive delivery coupled with an intent to transfer ownership) to Steadfast on July 26, 2002, who in turn transferred it to Ettman Trust on that same date, and that the Trustee of the Ettman Trust – *i.e.*, Kornman had control over the cash following the transfer. Accordingly, legal title to the cash passed to Ettman Trust on July 26, 2002.

Accordingly, this Court concludes that Heritage distributed a total of $46 million to its members from April 16, 2001 through February 18, 2003, of which $43.9 million was received by the Member Defendants. Specifically, during this time period, Steadfast received Transfers totaling $40.54 million, GMK Family received Transfers totaling $2.1 million, and Tikchik received Transfers totaling $1.26 million. Because Heritage made each of the Transfers with the actual intent to hinder or delay a Heritage creditor, the Transfers are avoidable by the Trustee.

Section 550(a) of the Bankruptcy Code permits the Trustee to recover the property transferred or its value from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." Section 550(b) provides a good faith defense to immediate or mediate transferees – but not to initial transferees or benefitted entities. Accordingly, the Trustee is entitled to recover the Transfers from the initial transferees – *i.e.*, Steadfast (to the extent of $40.54 million), GMK Family (to the extent of $2.1 million), and Tikchik (to the extent of $1.26 million). And, since the $4 million in U.S. currency in Heritage's safe deposit boxes was transferred from Heritage to

Steadfast to Ettman Trust, the Trustee may also recover that $4 million from Ettman Trust as a subsequent transferee.[45] *See* p. 72, *infra*.

However, the Trustee also seeks to recover the Transfers from "all . . . persons for whose benefit the transfers were made . . . ." *See* Second Amended Adversary Complaint, ¶ 56. The Trustee's Amended Proposed Findings of Fact and Conclusions of Law (the "Trustee's Amended Proposed Findings") assert that

> the Distributions resulted in property being transferred from one entity indirectly owned and controlled by Kornman to other entities under his ownership and control. Courts view 'control' for purposes of these fraudulent transfer claims with a substantive, equitable lens. For Kornman, the Distributions were essentially transfers from one pocket to another. Kornman directly or indirectly owned and controlled both the transferor and the transferees, therefore he effectively maintained possession and control of the property transferred.

Trustee's Amended Proposed Findings, pp. 46-47. Thus, according to the Trustee, judgment should be awarded "in the full amount of the Distributions against Defendants Steadfast, GMK Family and Tikchik, and to [sic] Kornman as the person for whose benefit such transfers were made." *Id*. at p. 54.

It is not always simple to determine who is an initial transferee or an entity for whose benefit a transfer was made. A party who receives a transfer directly from the debtor will not be considered the initial transferee unless that party gains dominion or control over the funds. *Matter of* Coutee, 984 F.2d 138 (5th Cir. 1993). In other words, when the entity acts merely as a conduit, and exercises no dominion or control over the funds while those funds are in its hands, it is not a transferee. The dominion and control required in order to make an entity a transferee, refers to "dominion and control over *the funds* after the disputed transfer, not dominion and

---

[45] Of course, § 550(d) prevents the Trustee from receiving a double recovery.

control over *the transferor* before the transfer." *Rupp v. Markgraf*, 95 F.3d 936, 940 (10th Cir. 1996).

The phrase "entity for whose benefit such transfer was made" does "not simply reference the next pair of hands; it references entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds." *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 57 (2d. Cir. 1997). As noted in the seminal case of *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir. 1988):

> The 'entity for whose benefit' is different from a transferee, 'immediate' or otherwise. The paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor – someone who receives the benefit but not the money . . . Section 550(a)(1) recognizes that debtors often pay money to A for the benefit of B; that B may indeed have arranged for the payment (likely so if B is an insider of the payor); that but for the payment B may have had to make good on the guarantee or pay off his own debt; and accordingly that B should be treated the same way initial recipients are treated. If B gave value to the bankrupt for the benefit, B will receive credit in the bankruptcy, and if not, B should be subject to recovery to the same extent as A – sometimes ahead of A, although § 550 does not make this distinction. Someone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a benefit from the initial transfer is within this language.

*Bonded*, 838 F.2d at 895-896. In other words, subsequent transferees cannot be an "entity for whose benefit" the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer. *In re Consolidated Capital Equities Corp.*, 175 B.R. 629 (Bankr. N.D. Tex. 1994). Moreover, as a general rule, initial transferees and entities for whose benefit the initial transfer was made are mutually exclusive, *In re Red Dot Scenic, Inc.*, 293 B.R. 116 (S.D.N.Y. 2003). Nor is an unquantifiable advantage the sort of "benefit" contemplated by § 550. *In re International Management Assoc.*, 399 F.3d 1288 (11th Cir. 2005). Rather, the common example of the sort of "benefit" contemplated by Congress in enacting § 550 is the benefit to a guarantor by the payment of the underlying debt of the debtor. *Id*.

Here, as noted previously, the Trustee seeks recovery of the Transfers from Kornman as the person for whose benefit such transfers were made or, in the alternative, as a subsequent transferee. The Trustee did not brief this application of § 550 in his many briefs filed both prior to and after trial. The Trustee cites,[46] however,

- evidence showing that Steadfast transferred $10.44 million to Kornman on July 20, 2001 (noted on the notation portion of the check as a "loan"), the same date that Steadfast received a distribution from Heritage in an identical amount;

- evidence showing that $600,000 was transferred from GMK Family to Kornman on July 20, 2001 (noted on the notation portion of the check as "distribution"), the same date that GMK Family got a distribution from Heritage in the identical amount;

- evidence showing that Ettman Trust received $4 million from Steadfast on the same date that Steadfast received a $4 million distribution from Heritage.

The Trustee also cites to certain of Kornman's trial testimony which establishes that (i) at various points in time, Steadfast transferred some funds to the Ettman Trust; (ii) Kornman owned or controlled 92% of Heritage and was the person who directed the Transfers; (iii) the major portion of Heritage's income ended up on Kornman's personal tax return, by way of various pass-through entities; and (iv) the bulk of Kornman's assets were in the Ettman Trust, of which Kornman was trustee.

However, none of this evidence supports a finding that Kornman was the "entity for whose benefit" the Transfers were made. There is simply no showing that Kornman received

---

[46] The Court was unable to locate any briefing with respect to the application of § 550 to Kornman (as the entity for whose benefit the Transfers were made), and thus e-mailed the parties, asking them to "point [the Court] to where we might locate such briefing?" The Trustee responded (also by e-mail) that no such briefing had been filed, but he proceeded to cite the Court to evidence in the record which he believed supported his proposed § 550 findings. Defendants were then given an opportunity to respond to the Trustee's e-mail.

**Memorandum Opinion**

any benefit at all from the initial transfers. *In re International Management Assoc.*, 399 F.3d 1288 (11th Cir. 2005) ("the fact that Reilly attained complete control over the debtors' assets does not give rise to a quantifiable benefit or one bearing the 'necessary correspondence to the value of the property transferred or received.'") (quoting *Mack v. Newton*, 737 F.2d 1343, 1359-60 (5th Cir. 1984)). The fact that Heritage's income passed through various entities and ended up on Kornman's personal tax return does nothing to change the analysis with respect to the Transfers at issue.

Accordingly, the Court concludes that the Transfers may not be recovered from Kornman as the person for whose benefit the Transfers were made.

However, the Trustee also seeks to recover the Transfers from Kornman as a subsequent transferee in accordance with § 550(a)(2) of the Bankruptcy Code. Two of the Transfers appear to be at issue here – *i.e.*, (i) the $600,000 transferred from Heritage to GMK Family and then on to Kornman on July 20, 2001, and (ii) the $10.44 million transferred from Heritage to Steadfast and then on to Kornman on that same date. Each will be addressed further below.

Subsequent transferees, as opposed to initial transferees, are entitled to assert protection as a good faith transferee for value under § 550(b). *Matter of Criswell*, 102 F.3d 1411 (5th Cir. 1997). Here, Kornman bears the burden of proving the requirements of § 550(b)(1) – *i.e.*, that he took "for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." *In re Consolidated Capital Equities Corp.*, 175 B.R. 629, 637 (Bankr. N.D. Tex. 1994).

As noted previously, neither side briefed the application of § 550. However, Kornman's counsel argues that the $10.44 million was a loan from Steadfast to Kornman to enable him to purchase an interest in Tikchik, which he then transferred to Steadfast to pay off the loan. As

such, Kornman's counsel asserts, without citation to any authority, that "obviously, a secured loan which was paid back to Steadfast LP was not a 'transfer' under Section 550." *See* e-mail from Brant Martin to H. Meister, 4/20/09 (on file with the Court).

It is true that the documentary evidence establishes that the $10.44 million was transferred to Kornman as a "loan." *See* P.Ex.6; D.Ex. 43. In exchange for the loan proceeds, Kornman executed a "Note and Security Agreement" in favor of Steadfast. D.Ex. 145. In satisfaction of the obligation to repay the note, Kornman entered into a Partnership Transfer Agreement which, among other things, recited that Kornman owed $10.44 million (plus interest) to Steadfast and, in partial payment thereof, Kornman transferred a 99.8% interest in Tikchik to Steadfast. D.Ex. 177.[47]

Thus, given these facts, this Court must first decide if Steadfast's loan to Kornman is a "transfer" under § 550. What constitutes a "transfer" is a matter of federal law. *Southmark v. Schulte, Roth & Zabel. L.L.P.,* 242 B.R. 330 (N.D. Tex.1999). The Bankruptcy Code defines a transfer as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54). As money was disbursed from Steadfast to Kornman, a transfer occurred. *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) (once a debtor, or drawer of a check, has directed the drawee bank to honor a check and the bank does so, the drawer of the check has implemented a mode of disposing of property under § 101(54)); *In re Equator Corp.*, 362 B.R. 326 (Bankr. S.D. Tex. 2007). Thus, the Court concludes, contrary to Kornman's argument, that there was in fact a subsequent

---

[47] Kornman testified that "basically, what happened was I borrowed money from Steadfast to buy – plus some of my own cash by buy the Tikchik interest from Mr. Mann's – we say his estate, it was a family trust. And then I – to pay off the loan I returned the interest that I had purchased along with whatever equity I had in the thing. I think I paid a couple of million dollars more, actually, I'm not sure of the terms. But, basically, Steadfast ended up owning Tikchik." Tr. 1/8/09 55:18-56:2.

"transfer" of the $10.44 million to Kornman which the Trustee may attempt to recover under § 550(a)(2).

> Kornman next argues that

> the exhibits establish that Gary Kornman gave value to Steadfast in the form of a promissory note, without knowledge at the time that the transfer was subject to voidability. In addition, Mr. Kornman used the proceeds to purchase the Mann interests in Heritage, and then transferred the Mann interests to Steadfast to satisfy the promissory note. Therefore, Mr. Kornman should not be liable for the $10.44 million pursuant to Section 550(b).

E-mail from Brant Martin to H. Meister, 4/20/09 (on file with the Court). The Court agrees that Kornman's execution of a promissory note in favor of Steadfast at the time he received the $10.44 million loan constitutes value. However, that is only one of the three elements of the § 550(b)(1) defense. Kornman must also prove that he received the transfer in good faith, and without knowledge of the voidability of the transfer avoided. The term "good faith" under § 550(b) "is an ordinary business transaction concept," and is "a separate concept from knowledge of the voidability of the transfer." *Southmark Corp. v. Shulte, Roth & Zabel,* 217 B.R. 499, 507 (Bankr. N.D. Tex. 1997), *rev'd on other grounds*, 242 B.R. 330 (N.D. Tex. 1999). A creditor can act in "good faith" even with knowledge that a transfer may be avoidable in the event of a bankruptcy. *Id.* The phrase "knowledge of the voidability of the transfer avoided" means that the transferee "knew facts that would lead a reasonable person to believe that the property transferred was recoverable. When in possession of facts which suggest the existence of others, a transferee may not close its eyes to the remaining facts and deny knowledge." *Id.* Further, the term "knowledge" does "not require 'complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable.'" *In re Consolidated Capital Equities Corp.*, 175 B.R. 629 (Bankr. N.D. Tex. 1994) (*quoting Bonded Fin'l Svcs., Inc. v. European American Bank*, 838 F.2d 890, 898 (7th Cir. 1988)).

Memorandum Opinion                                                                                                      76

As the Defendants admit, Kornman caused Heritage to make the Transfers at issue here. As previously found, Kornman did so at a time when he knew that (i) Canada, Bird, and Koshland/KFP were demanding that Heritage pay them millions of dollars in satisfaction of their disputed claims against Heritage, and (ii) the IRS was demanding that Heritage disclose the names of its clients who had implemented a 752 Transaction and thus, was threatening a substantial source of Heritage's ongoing business revenues. *See* pp. 39-41, *supra*. Moreover, on July 20, 2001, Kornman, as the Manager of GMK Family, caused it to distribute the $600,000 on to him that Heritage had just distributed to it. Finally, Kornman controlled Steadfast (through his control of Ettman Trust and Kornman Associates) and caused Steadfast to loan him the $10.44 million that Heritage had distributed to it on that same day. Obviously, when Kornman accepted the $600,000 distribution from GMK Family and the $10.44 million loan from Steadfast, he knew all of the facts that caused this Court to conclude that the underlying Transfers were made with the intent to at least hinder or delay a Heritage creditor and thus, were avoidable under § 544 and TUFTA. Therefore, the Court concludes that Kornman knew sufficient facts to put him on notice of the voidability of the Transfers. Moreover, Kornman's receipt of the funds was not in good faith. Accordingly, Kornman has failed to prove the statutory defense provided by § 550(b)(1).

And, under the Bankruptcy Code, that is the only defense available to subsequent transferees. The fact that Kornman repaid the Steadfast loan is irrelevant, as § 550 does not recognize a repayment defense. This makes sense because while Kornman's repayment of the loan may have made the initial transferee – *i.e.*, Steadfast – whole, it did nothing to restore lost value to the Heritage bankruptcy estate. In short, the Heritage bankruptcy estate, which is the intended beneficiary of any avoidance and recovery of the Transfers, was not benefitted by the

loan repayment, and the Trustee is entitled to recover the $10.44 million from Steadfast as the initial transferee and Kornman as the subsequent transferee. Of course, § 550(d) only permits the Trustee a single satisfaction.

Accordingly, the Court concludes that the Trustee is entitled to recover, from Kornman as a subsequent transferee in accordance with § 550(a)(2) of the Bankruptcy Code, the (i) $600,000 Heritage distributed to GMK Family on July 20, 2001, which funds were then distributed on to Kornman on that same date, and (ii) $10.44 million Heritage distributed to Steadfast on July 20, 2001, which funds were then loaned to Kornman on that same date.

### B. Preference Claims

#### 1. In General

The Trustee contends that certain transfers made to Kornman and the Supplier Defendants within the 90-days preceding the filing of the Case were preferential payments avoidable under § 547(b) of the Bankruptcy Code.[48] The Trustee has the benefit of the statutory presumption of insolvency during that 90-day period. 11 U.S.C. § 547(f).

In response, Kornman and the Supplier Defendants contend that they have rebutted the presumption of insolvency, thereby shifting the burden back to the Trustee to establish, by a preponderance of the evidence, Heritage's lack of solvency during that 90-day period. Moreover, Kornman and the Supplier Defendants contend that even if they did not successfully rebut the presumption of insolvency, the Trustee may not avoid at least certain of the challenged

---

[48]Initially, the Trustee sought to avoid transfers both within and without the 90-day period preceding the filing of the Case. However, following this Court's *Daubert* ruling (finding the testimony of the Trustee's solvency expert unreliable and therefore excluding such testimony), the Trustee agreed that he could only proceed to trial on his 90-day preference claims.

transfers because they were made in the ordinary course of business. *See* 11 U.S.C. § 547(c)(2).[49]

To prevail on his preference claims, the Trustee must prove that: (1) there was a transfer of an interest of Heritage in property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt owed by Heritage before such transfer was made, (4) made while Heritage was insolvent, and (5) the transfer enabled the creditor to receive more than such creditor would receive (i) if Heritage filed under Chapter 7, and (ii) the transfer had not been made. *See* 11 U.S.C. § 547(b); *see also Cage v. Wyo-Ben, Inc. (In re Ramba, Inc.)*, 437 F.3d 457, 459 (5th Cir. 2006). The only element of the Trustee's preference claims in dispute here is the solvency element. And, as noted previously, § 547(f) of the Bankruptcy Code provides that "[f]or the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f).

This "presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion." *Herod v. Louis Dreyfus Natural Gas Corp. (In re Gasmark Ltd.)*, 158 F.3d 312, 315 (5th Cir. 1998) (quoting FED. R. EVID. 301). In other words, the "effect of this presumption is to shift the burden to the transferee to produce evidence of the debtor's solvency as of the transfer date." *In re Ramba, Inc.*, 416 F.3d 394, 403 (5th Cir. 2005) (citing *Gasmark*, 158 F.3d at 315); *see also Smith v. KKM P'ship (In re Quality Woodwork Interiors, Inc.)*, Nos. 06-3032, 3033, 2007 WL 1662635, at *2 (Bankr. S.D.Tex. June 4, 2007) (the defendant is required to "prove solvency with respect to transfers made during the

---

[49] While the Defendants pled other statutory defenses to the Trustee's recovery of the alleged preference payments, their counsel admitted during closing arguments that they had not introduced evidence at trial necessary to prove the required elements of any other defense.

**Memorandum Opinion** 79

90-days preceding the petition date."). However, "mere speculative evidence of solvency is not enough." *Gasmark*, 158 F.3d at 315.

Kornman and the Supplier Defendants contend that they introduced sufficient evidence at trial to rebut the statutory presumption of insolvency, thus shifting the burden back to the Trustee to produce evidence of Heritage's insolvency on each of the applicable transfer dates. If the Defendants are correct and they have successfully rebutted the presumption of insolvency, the Trustee's preference claims fail as a matter of law because he offered no proof of insolvency. However, for the reasons explained more fully below, this Court concludes that Kornman and the Supplier Defendants failed to rebut the statutory presumption of insolvency.

### 2. Rebutting the Presumption of Insolvency

The Bankruptcy Code defines "insolvent" as "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ." 11 U.S.C. § 101(32)(A). Thus, in order to rebut the statutory presumption of insolvency, Kornman and the Supplier Defendants were required to produce non-speculative evidence that would support a finding that the "fair" value of Heritage's property exceeded Heritage's debts[50] on the relevant transfer dates.

So, what types of evidence have been found to be sufficient to rebut the statutory presumption of insolvency? In *In re Gasmark Ltd.*, 158 F.3d at 315-17, the Fifth Circuit found three items of evidence too speculative to rebut the statutory presumption of insolvency: (1) expert testimony that a potential purchaser would have attributed value to the debtor in excess of its liabilities, (2) a third party memo stating that the debtor produced a return on an investment,

---

[50] "Debt" is defined in the Bankruptcy Code as "liability on a claim." 11 U.S.C. § 101(12). In turn, "claim" is defined as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ." 11 U.S.C. § 101(5).

and (3) an investment banker's letter noting that the debtor's equity had a positive value in the merger market. Unpersuaded by such "solvency" evidence, the court affirmed a finding that the debtor was insolvent at the time of the transfer. *Id.*

Similarly, in *Cage v. Baker Hughes Oilfield Operations, Inc. (In re Ramba, Inc.)*, 416 F.3d 394 (5th Cir. 2005), the court held that an income statement showing positive operating income and an expenditures summary showing a small net loss does "not address [the debtor's] overall balance of debts and assets, and thus, [does] not raise genuine questions of fact as to [the debtor's] solvency." *Id.* at 403. Further, regarding positive balance sheets for periods of time prior to the transfer date, such evidence "does not create a genuine issue of fact as to whether a debtor was insolvent as of the transfer date." *Id.*

Conversely, the Eighth Circuit, on appeal from a judgment in favor of the preference defendant, found a "financial statement showing positive net worth [] sufficient to rebut the presumption of insolvency." *Jones Truck Lines, Inc. v. Full Serv. Leasing Corp.*, 83 F.3d 253, 258 (8th Cir. 1996) (citing *Chaitman v. Paisano Auto Liquids, Inc. (In re Almarc Mfg., Inc.)*, 60 B.R. 584, 586 (Bankr. N.D.Ill. 1986)); *see also Silverman Consulting, Inc. v. Hitachi Power Tools, U.S.A. Ltd. (In re Payless Cashways, Inc.)*, 290 B.R. 689, 698 n.10 (Bankr. W.D. Mo. 2003) (citing *Jones Truck Lines*, 83 F.3d at 258). However, unaudited financial statements have been found insufficient to rebut the presumption of insolvency because unaudited statements "do not reflect the 'fair valuation' of assets and do not include contingent liabilities." *Katz v. Wells (In re Wallace's Bookstores, Inc.*), 316 B.R. 254, 259 (Bankr. E.D.Ky. 2004) (citing cases) (holding that the financial statements offered by the preference defendant "are insufficient *per se* to rebut the presumption of insolvency").

Here, Kornman and the Supplier Defendants rely upon the trial testimony of Kornman and Walker, along with certain documentary evidence, to support their contention that they have successfully rebutted the presumption of insolvency. Specifically, through the testimony of Walker and Kornman and data from Heritage's quickbook financial records as turned over to the Trustee (the "QuickBooks"), P.Ex. 289, the Defendants created two solvency calculations for the 90-day period prior to Heritage's bankruptcy filing – *i.e.*, from February 17, 2004 through May 17, 2004. *See* D.Ex. 281. The first of those calculations compared the value of two categories of Heritage property – *i.e.*, cash plus client notes receivable – to Heritage's total liabilities (as shown on QuickBooks) plus the Canada arbitration award (in the amount ultimately entered on April 14, 2004). The second of those calculations compared the value of two different categories of Heritage property – *i.e.*, total assets (as shown on QuickBooks (which included the cash)) plus client notes receivable – to Heritage's total liabilities (as shown on QuickBooks) plus the Canada arbitration award (in the amount ultimately entered on April 14, 2004). Walker's testimony addressed the financial information from QuickBooks, the amount of the Canada award, and certain information regarding the client notes receivable, while Kornman's testimony purported to value the client notes receivable, which, for some reason, were not reflected on QuickBooks.[51] Through these solvency calculations, the Defendants contend that they have rebutted the presumption of insolvency during most, if not all, of the 90-day preference period. Specifically, the Defendants contend that (i) the first calculation (cash plus client notes receivable) shows Heritage to be solvent through April 27, 2004, and (ii) the second calculation (total book assets plus client notes receivable) shows Heritage to be solvent throughout the entire preference period.

---

[51] While Walker attempted to explain why the client notes receivable were not shown on QuickBooks, Testimony of Walker (1/13/09) 185:10-187:7, the Court did not completely understand her explanation.

So, the question becomes, did either of these calculations rebut the statutory presumption of insolvency, to which we now turn.  The second calculation (total book assets plus client notes receivable) can be quickly disposed of.  Those calculations are legally insufficient to rebut the statutory presumption that Heritage was insolvent for at least one reason.[52]  Specifically, there is no evidence that the book value of Heritage's "Total Assets" as shown on QuickBooks reflects the "fair" value of those assets.  And, as noted previously, to determine whether Heritage was solvent, the Bankruptcy Code requires that the "fair" value of Heritage's property exceed its debts.  *See* 11 U.S.C. § 101(32A); *see also* p. 79, *supra*.  The failure to fairly value property has led numerous courts to find that the statutory presumption of insolvency has not been rebutted.  *See, e.g., In re Wallace's Bookstores, Inc.*, 316 B.R. 254, 259 (Bankr. E.D.Ky. 2004) (citing cases); *Hoffinger*, 313 B.R. at 812.  As stated in *Devan v. The CIT Group* (*In re Merry-Go-Round Enters., Inc.*):

> The balance sheets do not satisfy [the plaintiff]'s burden for two reasons . . . First, the balance sheets do nor [sic] purport to value the Debtor's assets according to the fair valuation standard required by 11 U.S.C. [§] 101(32)(A).  Second, the balance sheets do not value all of the Debtor's debts to the extent that some of the Debtor's contingent liabilities are not assigned a dollar value.  Without evidence of the fair valuation of the Debtor's assets and of the sum of the Debtor's debts as defined by 11 U.S.C. § 101(12), the court cannot find either that there is no genuine issue of material fact or that [the defendant] is entitled to a judgment as a matter of law.

229 B.R. 337, 342 (Bankr. D. Md. 1999).

Turning next to the Defendants' first solvency calculation – *i.e.*, cash plus client notes receivable minus total book liabilities together with the Canada award, the Trustee contends that there are problems with this calculation on both sides of the hypothetical balance sheet.  Turning

---

[52] While there are other potential problems with the second calculation, those issues will be discussed in connection with the Court's analysis of the first calculation and whether it is legally sufficient to rebut the statutory presumption of insolvency.

first to the asset side, there is no dispute that the "fair" value of cash is its face amount. However, that assumes the cash is really Heritage's cash. Recall the $4 million in U.S. currency in the safe deposit boxes that Heritage attempted to distribute to Steadfast on July 26, 2002 as part of the $8.7 million distribution that we discussed in connection with the fraudulent transfer section of this Memorandum Opinion? *See* pp. 64-70, *supra*. As noted previously, Walker and Kornman contend that "ownership" of the safe deposit boxes and their contents was never transferred to Steadfast (or subsequently to Ettman Trust) in July 2002. Rather, they claim that the $4 million in U.S. currency remained in the safe deposit boxes in Heritage's name until April 28, 2004, when it was taken out of the safe deposit boxes, was deposited into Heritage's payroll account at the bank, and was used to purchase cashier's checks, which were, in turn, used to pay various Heritage debts. Testimony of Walker (1/14/09) 190:15-192:4. Thus, according to Walker and Kornman, the $4 million in U.S. currency remained Heritage property during most of the preference period – *i.e.*, from February 17, 2004 through April 27, 2004, and it is "fairly" valued at $4 million.

In response, the Trustee contends that QuickBooks, as maintained by Walker, overstates Heritage's cash position by $4 million during most of the preference period – *i.e.*, from February 17, 2004 through April 27, 2004 – because Walker accounted for the $4 million in U.S. currency in the safe deposit boxes as a Heritage asset when, in reality, it had been effectively transferred to Steadfast on July 26, 2002 as part of Heritage's $8.7 million distribution to Steadfast, and then transferred on to Ettman Trust by Steadfast on that same date. In addition, the Trustee contends that QuickBooks, as maintained by Walker, understate Heritage's liabilities by $4 million on and after April 28, 2004, because they fail to recognize what must have been a $4 million loan to Heritage by Ettman Trust on that date. In other words, the Trustee concludes that Walker should

never have "adjusted" the Heritage books to add $4 million as an "Investment" on February 18, 2003 (when the $4 million check was written to Steadfast), and should have instead recorded a $4 million liability to Ettman Trust when the currency was deposited into the Heritage payroll account on April 28, 2004 (because Ettman Trust was the owner of the currency on that date and must have loaned it to Heritage). Thus, as relevant here and according to the Trustee: (i) Heritage's assets were overstated on QuickBooks by $4 million from February 17, 2004 through April 27, 2004; and (ii) Heritage's liabilities should be increased by $4 million on and after April 28, 2004 to reflect the $4 million loan from Ettman Trust.

The Trustee also contends that no credible evidence of the "fair" value of the client notes receivable has been offered by the Defendants. As noted previously, the client notes receivable are not reflected on Heritage's books and records – *i.e.*, QuickBooks. However, in creating their solvency calculations, the Defendants add the client notes receivable to the asset side of their hypothetical balance sheet. The question thus becomes, at what "fair" value should the client notes receivable be reflected? According to Kornman, the client notes receivable are "fairly" valued at their face amount plus accrued interest and any costs of collection. *See, e.g.*, Testimony of Kornman (1/16/09) 58:11-15 (Berg note); 61:8-11 (Love note); 67:1-12 (Schuler note). However, on cross-examination, the Trustee established that many of the client notes were in default when the Case was filed and that the makers of all of the notes asserted various defenses to the collection of those notes. Testimony of Kornman (1/16/09) 79:25-81:3; P.Ex. 308. Notwithstanding the defaults and defenses, Kornman remained unwavering in his belief that the client notes receivable were worth their face amounts, plus interest and collection costs. *See, e.g.*, Testimony of Kornman (1/16/09) 81:25-82:8 (Love note); 83:13-16 (all notes – "[s]o the fact that I knew the notes were good, that I knew these people had the money, that I didn't

believe there were any defenses to any of these notes, made me think these notes had full value.").  So, according to the Trustee, Kornman's testimony about the value of the client notes receivable is simply incredible; and thus, is not sufficient, non-speculative evidence from which the Court can find the statutory presumption of insolvency rebutted.

The Trustee finds a further problem with the liability side of the Defendant's solvency calculations as well (in addition to failing to reflect the alleged $4 million loan from Ettman Trust on and after April 28, 2004).  Specifically, and relying on the unaudited financial statement cases as his legal authority, the Trustee contends that there are contingent client claims that have not been taken into account by the Defendants, rendering their solvency calculations legally insufficient evidence to rebut the statutory presumption of insolvency.[53]  At a minimum, the Trustee contends that Heritage's potential liability with respect to the Howard Jenkins ("Jenkins") lawsuit has to be accounted for in the Defendants' calculations.[54]

In response, the Defendants argue that they have adduced sufficient evidence to rebut the statutory presumption of insolvency, reminding the Court that they do not have to prove Heritage solvent in order to rebut the presumption, they are simply required to produce evidence of Heritage's solvency as of the transfer dates, which they believe they have done at least through April 27, 2004, which shifts the burden back to the Trustee to prove Heritage's lack of solvency.

---

[53] As stated in *Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.)*:

> Unlike assets, debts are measured at their face value and not at market value.  Debts are measured at face value because the language 'at fair valuation' in section 101(32)(A) applies only to the valuation of assets; it does not apply to the valuation of debts . . . Contingent liabilities must be included in total debt.

281 B.R. 535, 545-46 (Bankr. D. Del. 2002) (internal quotations omitted); *see also Hoffinger Indus., Inc. v. Leesa Bunch and McMasker Enters., Inc. (In re Hoffinger Indus., Inc.)*, 313 B.R. 812, 819-20 n.4 (Bankr. E.D. Ark. 2004) (fair market value of assets compared to face value of liabilities); *Silverman Consulting, Inv. v. Hitachi Power Tools, U.S.A., Ltd. et al. (In re Payless Cashways, Inc.)*, 290 B.R. 689, 700 n. 29 (Bankr. W.D. Mo. 2003) (same).

[54] While other former clients had not sued Heritage prior to its bankruptcy filing, a number of Client Claimants asserted claims in the Case, which claims were ultimately allowed in agreed upon amounts pursuant to the Trustee's settlement with the Client Claimants under the Plan.

With respect to the Jenkins claim and the other potential client claims, the Defendants contend that

> those claims were also without merit and not subject to valuation, based upon the existence of the risk disclosure, release, and indemnity language contained in each of the Client Agreements. Accordingly, there is no basis to assign any value to such claims prior to the time Heritage filed for bankruptcy relief.

Defendants' Post-Trial Brief at p. 47.

After carefully considering the parties' arguments and the evidence, and recognizing that "mere speculative evidence is not enough" to rebut the statutory presumption, *Gasmark*, 158 F.3d at 315, this Court concludes that the Defendants failed to rebut the statutory presumption of insolvency. The Court comes to this conclusion for two reasons.

First, the asset side of the Defendants' solvency calculation is overstated by the $4 million in cash, which this Court has concluded was legally transferred to Steadfast (and then to Ettman Trust) on July 26, 2002. *See* pp. 64-70, *supra*. So, the Defendant's solvency calculation from February 17, 2004 through April 27, 2004 must be reduced by the $4 million of cash which belonged to Ettman Trust during that entire period.

Second, Kornman's testimony regarding the "fair" value of the client notes receivable is not credible. Kornman's refusal to acknowledge that at least some discount off face value plus accrued interest and collection costs was appropriate (particularly given the fact that the notes were in default and the clients had numerous defenses to the collection of those notes), renders his testimony of "fair" value for the client notes receivable speculative at best and incredible at worst.[55]

---

[55] The Court discussed the clients' defenses to the Trustee's attempts to collect the client notes receivable in its Memorandum Opinion confirming the Plan and authorizing the Trustee to settle with the Client Claimants. *See In re Heritage Organization, L.L.C.*, 375 B.R. 230 (Bankr. N.D. Tex. 2007). While Kornman simply dismissed the

**Memorandum Opinion**

Accordingly, the Court concludes that the Defendants failed to rebut the statutory presumption of insolvency and that the Trustee has proven that Kornman and the Supplier Defendants received various preferences that will be quantified hereinafter. *See* pp. 94-95, *infra*.[56]

### 3. Ordinary Course of Business Defense

The Court must next address the Defendants' alleged defense to avoidance of certain of the challenged transfers under § 547(c)(2). The parties agree that the Defendants must prove their defense by a preponderance of the evidence, as they have the "burden of proving the nonavoidability of a transfer" under § 547(c). *See* 11 U.S.C. § 547(g). So, to prevail on their § 547(c)(2) ordinary course of business defense, Kornman and the Supplier Defendants were required to prove that the challenged transfers were:

> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms.

11 U.S.C. § 547(c).[57] *See also Matter of Gulf City Seafoods, Inc.*, 296 F.3d 363 (5th Cir. 2002) (holding that "the creditor must show that as between it and the debtor, the debt was both

---

clients' defenses out of hand, the Court, after having studied the legal issues raised by the clients, was unable to do so, finding approval of the settlements to be in the best interests of the Heritage estate.

[56]The Court does not need to reach the liability side of the Defendants' solvency calculation. However, to facilitate appellate review, the Court concludes that the Trustee's objections are not well taken. First, while Ettman Trust could have loaned the $4 million in cash to Heritage on April 28, 2004, the monies could also have been provided to Heritage as a capital contribution by Steadfast (after Steadfast received a loan from Ettman Trust). In other words, there is simply no evidence establishing the basis on which these funds were provided to Heritage. Second, (and regarding the Defendants' purported failure to account for the contingent client claims, including the Jenkins litigation claim), the Court is satisfied that the Defendants' evidence regarding the defenses available to Heritage in the client agreements is sufficient non-speculative evidence of a lack of value to those claims to satisfy their burden in this context.

[57]This lawsuit is governed by the pre-Bankruptcy Abuse Prevention and Consumer Protection Act version of the Bankruptcy Code because the Case was filed on May 17, 2004, prior to the effective date of the reform act. *See Chase Manhattan Mtg. Corp. v. Shapiro (In re Lee)*, 530 F.3d 458, 463 n.1 (6th Cir. 2008)(stating, regarding section

incurred and paid in the ordinary course of their business dealings *and* that the transfer of the debtor's funds to the creditor was made in an arrangement that conforms with ordinary business terms-a determination that turns the focus away from the parties to the practices followed in the industry." (emphasis in original)).  The Defendants bear the burden of proof with respect to all three elements.  *See* 11 U.S.C. § 547(g).

It is the third element of the ordinary course defense that is in dispute here.  As explained by the Fifth Circuit in *Gulf City*,

> [n]early all other circuits have held that a payment is "according to ordinary business terms" if the payment practices at issue comport with the standard of the industry.  Under the holdings of these cases, the relevant inquiry is "objective"; that is to say, we compare the credit arrangements between the other similarly situated debtors and creditors in the industry to see whether the payment practices at issue are consistent with what takes place in the industry.  By consistent, we do not necessary mean identical.

296 F.3d at 367-68 (citations omitted).  According to the *Gulf City* court, in order to satisfy the third element,

> [the creditor] should provide some evidence of credit arrangements of *other* creditors and debtors in the industry.  Following the Second, Sixth and Seventh Circuits, we hold that [the creditor] cannot meet its burden under this objective test by simply showing that (1) its arrangement with [the debtor] is similar to the credit arrangements [the creditor] has with other debtors, or (2) the arrangement is similar to [the debtor's] arrangements with other creditors.

296 F.3d at 368, n.5 (emphasis in original).  The test requires a focus "away from the parties," *Gulf City Foods,* 296. F3d at 367, and, as applied here, a focus instead on what Properties' competitors and what Heritage's competitors in the industry do.  *Id*.; *Fiber Lite Corp. v. Molded Acoustical Prods. Inc. (In re Molded Acoustical Prods. Inc.)*, 18 F.3d 217, 227 (3rd Cir. 1994)

---

547, "[b]ecause the Debtor filed his bankruptcy case prior to the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), the pre-amendment law applies.").

(section 547(c)(2)(C) requires the court to "look first at the range of terms on which firms comparable to [the creditor] on some level provide credit to firms comparable to the debtor on some level"); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*; 78 F.3d 30, 42 (2d Cir. 1996) (court should look at "those terms employed by similarly situated debtors and creditors facing the same or similar problems"); *Logan v. Basic Distributing Corp. (In re Fred Hawes Organization, Inc.)*, 957 F.2d 239, 245-46 (6th Cir. 1992) (affirming bankruptcy court's conclusion that creditor must adduce evidence as to similar and independent creditors' dealings with similar and independent customers).

While the Defendants asserted the ordinary course defense more broadly before trial, they now contend that they have introduced sufficient evidence to prove the ordinary course defense as to payments Heritage made to Agency and Properties during the 90-days prior to the filing of the Case.[58] Heritage's payments to Agency were for its sublease of office space in Dallas and Heritage's payments to Properties were for its lease of office space in Tennessee.

---

[58]In the Defendants' Post-Trial Brief, the Defendants only address the ordinary course defense with respect to payments Heritage made to Agency and Properties. Defendants' Post-Trial Brief at p. 48. However, in the Defendants' Proposed Amended Findings and Conclusions, the Defendants address the ordinary course defense with respect to two additional groups of payments – *i.e.*, to Kornman's credit card issuers and to Kornman's household employees. Defendants' Proposed Amended Findings and Conclusions at pp. 73-74, ¶¶ 234 & 235. The payments to credit card issuers were on Kornman's personal credit cards, which he and Walker testified were used for both Heritage business expenses and Kornman personal expenses. According to both Kornman and Walker, Heritage did not issue business credit cards to its employees; so, Kornman and others used Kornman's personal credit cards to pay for Heritage business expenses. Heritage would pay Kornman's credit card statements in full and then charge back the personal items to Kornman, which he would repay periodically. According to Walker and Kornman, the payments made by Heritage to Kornman's household employees reflected the fact that Kornman transacted significant business activities at his home and these employees were required to support those business activities. According to Walker and Kornman, the portion of the employee's salary not allocated to Heritage business was charged back to Kornman, which he would repay periodically.

At closing arguments, the Court understood counsel for the Defendants to agree that they had not put on evidence to satisfy the third element of the ordinary course defense as to the last two groups of payments – *i.e.*, to Kornman's credit cards issuers and household employees. However, if no such concession was made, the Court concludes that the Defendants failed to carry their burden of proof with respect to the third prong of the ordinary course defense as to those payments. The Defendants put on no evidence of credit arrangements of other creditors and debtors in the industry. In fact, the Defendants put on no evidence of what the relevant industry was.

In the Defendants' Proposed Amended Findings and Conclusions, they assert that the transfers to Agency for the sublease of office space were made in the ordinary course of business or financial affairs of Heritage and Agency and according to ordinary business terms. As evidentiary support for this statement, the Defendants cite the following trial testimony of Walker:

Q:      Was the entirety of the space that [Agency] leased before Heritage came into existence subleased to Heritage?

A:      I think I understand your question, and if I do, then answer would be yes. The space changed from time to time. There were additions or changes in which suites there were. But yes, when     Heritage, L.L.C. came into existence, it leased all of the space from Agency that Agency was leasing. Is that – is that what you're asking?

Q:      That's what I'm looking for . . . .

Testimony of Walker (1/13/09) 67:7-15. As evidentiary support for their assertion that the 10% markup over the prime lease on the sublease from Agency to Heritage is "ordinary for the relevant industry," Defendants' Proposed Amended Findings and Conclusions, ¶ 142, the Defendants cite solely to a summary of the transactions contained in Heritage's QuickBooks electronic records.

In the Defendants' Amended Proposed Findings and Conclusions, they also assert that the transfers to Properties for the lease of office space were made in the ordinary course of business or financial affairs of Heritage and Properties and according to ordinary business terms. As evidentiary support for this statement, the Defendants cite the following trial testimony of Walker:

Q:      All right. If you go further down the page to Heritage Properties, L.L.C., you see a series of four payments. Do you see those?

A:      Yes.

> Q:     Were those payments on account of amounts owed by the debtor to Heritage Properties, L.L.C.?
>
> A:     I would assume so.

Testimony of Walker (1/13/09) 93:2-8.

This evidence does not support a finding of ordinary business terms in the relevant industry.  Moreover, at trial, the Trustee's counsel asked Walker what experience she had in each of the industries in which the Supplier Defendants operated, other than her experience at Heritage, and in each case, her response was "none."  With respect to her specific experience in the leasing of office space, her testimony was as follows:

> Q:     Okay. Other than your experience in – with – between Heritage and Heritage Properties and THO Agency, what is your experience, if any, in leasing of office space?
>
> A:     Well, I've been involved in various lease negotiations with – for space with -- at different points in time with different companies.
>
> Q:     But is that on behalf of entities owned or controlled by Mr. Gary Kornman?
>
> A:     Yes, I believe so.

Audiotape of hearing held 1/13/09, 12:13:24-12:14:02 (on file with Court).[59]  Walker thus testified that her only experience in the leasing of office space was the experience she had with companies controlled by Kornman.

With respect to Heritage's payments to Agency, the only other evidence at trial regarding the third prong of the ordinary course defense is as follows:

> Q.    And was the manner in which Heritage paid and an agency [sic] received payment common in the industry?

---

[59]  The transcript of the hearing reflects that the Trustee's counsel's second question was "But I said on behalf of entities under control by Mr. Gary Kornman."  However, the Court listened to the actual audio recording of the testimony, and it is clear that the Trustee's counsel instead asked "but is that on behalf of entities owned or controlled by Mr. Gary Kornman?"

A.    Yes.

Q.    And how do you know that?

A.    Because that's my understanding of what industry standard is.

Testimony of Walker (1/14/09) 107:19-24.   Similarly, with respect to Heritage's payments to

Properties, the only other evidence in the trial record is as follows:

Q.    Ms. Walker, with respect to Properties, what was the protocol for how bills were paid, invoices sent from Properties and that invoice paid by Heritage?

A.    It would be on – around the 25th of the month an invoice would be sent for the coming month to Heritage and Heritage would pay the invoice shortly thereafter.

Q.    Was that conduct maintained both prior to and after February 17, 2004.

A.    Yes.

Q.    Ms. Walker, you just described various protocols with respect to . . . Properties . . . .

A.    Yes.

Q.    Based upon those protocols that you've stated, can you tell the Court whether or not those protocols were common in the industry in which each one of those business were operating?

A.    It is my understanding that they were.

Q.    And what do you base those opinions, and if separate, please state so.

A.    On the research that I did which – which I have – which I have previously discussed. . . . With respect to the office space leases, every office space lease that I've ever seen the rent is due on the 1st of the month for that month and that applies to commercial as well as residential, as I said, for everything I have ever seen. . . .

Q.    What experience do you have, aside from the research, that you believe enables you to state that the terms and the protocols were protocols that were industry standard?

**Memorandum Opinion**                                                                93

A.      As I said previously, every lease that I've ever seen, and I have executed a number of them in my lifetime, for real property the rent is due on the 1st. I've never seen anything different unless it's at the very first month when you start in the middle of the month and it's pro-rated. Thereafter, its' due on the 1st of the month. . . . Every office building that I've ever seen the lease for, it's due on the 1st of the month. So as to the leases for office space, I've never seen it done any differently.

Testimony of Walker (1/14/09) 112:25-113:8; 115:9-116:1; 116:25-117:12.

When this testimony is taken in context with her other testimony, it is clear that Walker's only experience with real property leases is in connection with a Kornman-controlled company. Walker does not address what other lessors of office space do, or what other lessees of office space do – she simply testified as to what a Kornman-controlled company does.[60] This testimony is insufficient to establish what arrangements are "ordinary" as between "other debtors and creditors in a similar market, both geographic and product." *Gulf City Foods*, 296 F.3d at 368 n.5.

After carefully considering the trial record, the Court concludes that the Defendants have failed to carry their burden of proof with respect to the third prong of the ordinary course defense.

### 4.      The Amount of Avoidance and Recovery

The Court must now decide the amount of the preferential payments made to each of the Supplier Defendants. Based upon the parties factual stipulations, during the 90-days prior to the filing of the Case: (i) XAC received payments totaling $197,822.60,[61] Pretrial Order, Stipulation

---

[60] The testimony regarding Properties originally came in on an offer of proof for all of the remaining Supplier Defendants, which offer of proof the Court admitted as to Properties without objection by the Trustee. A review of the offer of proof in its entirety makes it clear that the reference to "common in the industry in which each one of those businesses was operating" is a reference to Strategic's, Properties', Valiant's, Vehicle's, Air Crews', Aircraft Management's, and FMS's industries. *See* Testimony of Walker (1/14/09) 115:9-17.

[61] In the Pretrial Order, the parties stipulated to each of the individual payments made to Kornman and each of the Supplier Defendants during the 90-day period prior to Heritage's bankruptcy filing, which the Court has aggregated

116; P.Ex. 290; (ii) XAM received payments totaling $719,137.03, Pretrial Order, Stipulation 117; P.Ex. 291; (iii) FMS received payments totaling $63,643.89, Pretrial Order, Stipulation 118; P.Ex. 292; (iv) Properties received payments totaling $4,000.00, Pretrial Order, Stipulation 119; P.Ex. 294; (v) Strategic received payments totaling $42,829.40, Pretrial Order, Stipulation 120; P.Ex. 336; (vi) Agency received payments totaling $300,945.02, Pretrial Order, Stipulation 121; P.Ex. 296; (vii) Valiant received payments totaling $230,817.93, Pretrial Order, Stipulation 122; P.Ex. 337; (viii) Vehicle received payments totaling $7,920.00, Pretrial Order, Stipulation 123; P.Ex. 338; (ix) Heritage paid employees at Kornman's home a total of $19,697.08, Pretrial Order, Stipulation 124; P.Ex. 293; (x) Heritage paid $11,256.61 under the "wellness" account for vitamins, dietary supplements, and related health products and services for the benefit of Kornman, Pretrial Order, Stipulation 125; and (xi) Heritage paid $137,728.06 to credit card issuers on cards in Kornman's name, Pretrial Order, Stipulation 126; P.Ex. 293.

Each of the above payments was made by Heritage to the identified Defendant or third party on account of an antecedent debt while Heritage was insolvent and the payment enabled that entity to receive more than it would have received if Heritage had filed under Chapter 7 and the payment had not been made. Testimony of Trustee (1/15/09) 123:15-125:16. Accordingly, each of the above payments is avoided.

Because each of the above payments has been avoided, the Trustee is entitled to recover the payments from the Defendant who initially received it in accordance with § 550(a)(1) of the Bankruptcy Code. Moreover, the Trustee is entitled to recover the payments Heritage made to Kornman's credit card issuers and household employees, and under the "wellness account," from

---

here for the sake of simplicity. To be clear, however, the Court is adopting the parties' factual stipulations in their entirety.

Kornman as the person for whose benefit each of those transfers were made.  11 U.S.C. § 550(a)

(1); *Rupp v. Markgraf*, 95 F.3d 936, 940 (10th Cir. 1996).

The Trustee also asserts that he may recover payments to the Supplier Defendants from

Kornman, because Kornman was the entity for whose benefit those transfers were made.  In

support, the Trustee appears to assert that simply because the Supplier Defendants were entities

that were "set up" to further Kornman's estate planning goals, all payments to those entities must

have been of benefit to Kornman.  The Court rejects this argument as overbroad.  *In re*

*International Management Assoc.*, 399 F.3d 1288, 1292 (11th Cir. 2005) ("this sort of

unquantifiable advantage is not the sort of 'benefit' contemplated by" Section 550).

### C.    Veil Piercing Claims, Including Sham to Perpetrate Injustice

#### 1.    In General

The Trustee contends that

> Kornman operated Heritage and the Supplier Defendants as a single economic
> entity, moving revenue through Heritage to the Supplier Defendants, with the
> intent to leave Heritage creditors without effective redress.  In addition, Kornman
> controlled and dominated Heritage, its members, and the remaining entity
> Defendants.  Kornman used the entity Defendants as a façade for the purpose of
> perpetrating a fraud or injustice on Heritage, its clients, and creditors.  Kornman
> controlled these entities for the purpose of avoiding any financial liability for his
> promotion of unlawful tax shelters.  Heritage and the entity Defendants were
> merely alter egos of Kornman.[62]  Through these entities, the Trustee asserts that
> Kornman executed a scheme which maximized and protected proceeds from the
> 752 transactions.  Because Kornman used the nominal separateness of Heritage
> and the entity Defendants to engage in and profit from unlawful activities, he
> abused the corporate form.  Under principles of equity, Kornman and the entity
> Defendants are liable for the debts of Heritage.

Pretrial Order, pp. 5-6.

---

[62] This statement typifies a major flaw in the Trustee's veil piercing theories.  Alter ego is a theory pursuant to
which an entity's owner is held liable for the entity's debts.  While Kornman can be found to be the alter ego of an
entity that he owns (and perhaps vice versa – *see, e.g.*, *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 269,
n.12 (D. Del. 1989), the Trustee attempts to apply this theory to the various Kornman-controlled entities on an
oversimplified basis, as will be explained more fully hereinafter.

The Defendants deny these allegations. Rather, according to the Defendants, the "relationships between the Supplier Defendants and Heritage were extensively documented . . . and each of the separate companies had a separate business purpose, separate books and records, and separate revenue streams." *Id*. at p. 11. The Defendants also assert that the corporate formalities were maintained. While Kornman admits that he controlled all of the Entity Defendants except Leasecorp and Strategic, he denies that he misused the corporate form of any of the Entity Defendants. Rather, according to Kornman, each of the entities had a separate business purpose. Finally, Kornman contends that the Trustee has failed to satisfy his burden of proof to pierce any of the Entity Defendants' veil so as to impose liability on their respective owners or, ultimately, him.

The Court will begin its analysis with the requirements for the Trustee's veil-piercing theories under the applicable state law. Bankruptcy courts apply the choice-of-law rules of the forum in which they sit. *ASARCO LLC v. Am. Min. Corp.*, 382 B.R. 49, 60-61 (S.D. Tex. 2007). In Texas, when deciding which state's law to apply in determining the liability of an interest holder for a corporation's debts – *i.e.*, a veil piercing claim, the court looks to the law of the jurisdiction of formation. *See Alberto v. Diversified Group Inc.*, 55 F.3d 201, 203 (5th Cir. 1995); *The Richards Group, Inc. v. Brock*, No. 06-0799, 2008 WL 2787899, at *2 (N.D. Tex. July 18, 2008); *ASARCO LLC v. Am. Min. Corp.*, 382 B.R. 49, 64-65 (S.D. Tex. 2007); *see also*, Tex. Bus. Corp. Act Ann. § 8.02 ("only the laws of the jurisdiction of incorporation of a foreign corporation shall govern (1) the internal affairs of the foreign corporation . . . and (2) the liability, if any, of shareholders of the foreign corporation for the debts, liabilities, and obligations of the foreign corporation for which they are not otherwise liable by statute or

agreement."). Since Heritage and most of the Entity Defendants were formed in Delaware, the Court will apply Delaware law, except as to FMS (where Texas law applies) and Kornman Associates (where Tennessee law applies).

Two equitable doctrines form the basis for the Trustee's attempts to hold Kornman and the Entity Defendants liable for Heritage's debts – *i.e.*, alter ego and sham to perpetrate injustice. As this Court concluded in the Prior Memorandum Opinion, courts applying Delaware law have not separately recognized "sham to perpetrate injustice" as a veil piercing theory. Rather, courts applying Delaware law use the term "sham" when analyzing the alter ego theory. *See, e.g., Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. Supr. 2003) ("To state a 'veil-piercing claim,' the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors."); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, (Del. Ch. 1999) ("Piercing the corporate veil under the alter ego theory 'requires that the corporate structure cause fraud or similar injustice.' Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.") (quoting *Outokumpu Eng'g Enter., Inc. v. Kvaerner Enviropower, Inc.*, 685 A.2d 724, 729 (1996)).

As noted previously, Tennessee is the state of incorporation for Kornman Associates. Like Delaware, the term "sham" is used when analyzing an alter ego veil-piercing claim in Tennessee. *See, e.g., Boles v. Nat'l Development Co.,* 175 S.W.3d 226, 244-45 (Tenn. Ct. App. 2005) ("Our courts will disregard the corporation as a separate entity upon a showing that the corporation is a sham or dummy or such action is necessary to accomplish justice," and "[n]o one factor is conclusive in determining whether or not to disregard a corporate entity; rather, courts should rely upon a combination of factors in deciding such an issue.") (citing *VP*

**Memorandum Opinion**                                                                                          **98**

*Buildings, Inc. v. Polygon Group.*, No. M2001-00613, 2002 WL 15634, at *4-5 (Tenn. Ct. App. Jan. 8, 2002)).

And, as noted previously, Texas is the state of incorporation for FMS.  In contrast to Delaware and Tennessee law, the "sham to perpetuate injustice" (or "sham to perpetrate fraud") theory has been recognized in Texas as a distinct method by which to pierce the corporate veil. *See* 20 TEX. PRAC. BUSINESS ORGANIZATIONS § 26.17 (2d ed.) (citing Texas cases); *see Castleberry v. Branscum*, 721 S.W.2d 270, 273 (Tex. 1986), *superceded by statute as recognized in Western Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 68 (5th Cir. 1994)). Under Texas law, the sham theory "is an equitable doctrine, and Texas courts take a 'flexible fact-specific approach focusing on equity.'  The Texas Supreme Court has also noted that the variety of shams is infinite, and that the purpose of the doctrine should not be thwarted by adherence to any particular theory of liability." *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643-44 (5th Cir. 1991) (internal citations and quotations omitted); *see also Mims v. Brunswick Homes, LLC (In re Moore)*, 379 B.R. 284, 294 (Bankr. N.D. Tex. 2007) (Jernigan, B.J.) (discussing post-*Castleberry* Texas case law and noting Texas's recognition of sham to perpetrate a fraud as a separate theory).

Because all of the Entity Defendants, except FMS, are Delaware or Tennessee entities, requiring the application of Delaware or Tennessee law, and neither Delaware nor Tennessee recognizes a separate "sham to perpetrate injustice (or fraud)" theory of liability, the Court will address the Trustee's alter ego theory and "sham" theories together as a single veil-piercing claim with respect to those entities.  With respect to FMS, Texas law governs and both theories – *i.e.*, alter ego and sham to perpetuate injustice or fraud – apply and will be separately addressed.

Under the Trustee's alter ego veil piercing theory, the Court is asked to disregard the limited liability company or corporate entity to impose liability on the entity's owner(s). However, "persuading a Delaware Court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears." *Mason v. Network of Wilmington, Inc.*, No. 194340NC, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005) (citing *David v. Mast*, 1999 WL 135244, at * 2 (Del. Ch. March 2, 1999) (internal quotations omitted)). "Nonetheless, in appropriate circumstances, the distinction between the entity and its owners 'may be disregarded' to require an owner to answer for the entity's debts." *NetJets Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (hereinafter "*NetJets Aviation*") (citing *Pauley Petroleum Inc. v. Continental Oil Co*, 43 Del.Ch. 516, 239 A.2d 629, 633 (Del. 1968)). And, while Heritage is a Delaware limited liability company, not a corporation, "[g]iven the similar liability shields that are provided by corporations and LLCs to their respective owners, [e]merging case law illustrates that situations that result in a piercing of the limited liability veil are similar to those that warrant piercing the corporate veil." *NetJets Aviation*, 537 F.3d at 176 (internal quotations omitted) (citing J. Leet, J. Clarke, P. Nollkamper & P. Whynott, *The Limited Liability Company,* § 11.130, at 11-7, 11-9 (rev. ed. 2007) ("Every state that has enacted LLC piercing legislation has chosen to follow corporate law standards and not develop a separate LLC standard.")).

### 2.    Veil Piercing under Delaware Law

Delaware law provides clear requirements for veil piercing, and the case law reveals that to pierce the corporate veil based upon an alter ego theory, a plaintiff must demonstrate a misuse of the corporate form along with an overall element of injustice or unfairness. *NetJets Aviation*, 537 F.3d at 176 (citing *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1131, 1989 WL 110537,

at *4 (Del. Ch. Sept. 19, 1989)).   However, the plaintiff need not prove actual fraud – "the standard may be restated as whether the two entities operated as a single economic entity such that it would be inequitable for the Court to uphold a legal distinction between them." *Id.* at 177 (internal quotations omitted) (citing *Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, No. 8578, 1990 WL 44267, at *5 (Del. Ch. Apr. 12, 1990)).   In short, the test applied under Delaware law is two pronged: (i) whether the entities in question operated as a single economic entity, and (ii) whether there was an overall element of injustice or unfairness.   *See id.*; *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, No. Civ.A. 19760-NC, 2004 WL 415251, at *7 (Del. Ch. Mar. 4, 2004) (citing *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp 260, 265 (D. Del. 1989)); *Cf. Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205-06 (5th Cir. 1995).[63]   This two pronged test was recently described by the Second Circuit as follows:

> Stated generally, the inquiry initially focuses on whether those in control of a corporation did not treat the corporation as a distinct entity; and, if they did not, the court then seeks to evaluate the specific facts with a standard of fraud or misuse or some other general term of reproach in mind, such as whether the corporation was used to engage in conduct that was inequitable, or prohibited, or an unfair trade practice, or illegal.

*NetJets Aviation*, 537 F.3d at 178 (internal citations and quotations omitted) (citing and quoting *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260, 269 (D. Del. 1989); *David v. Mast*, No. 1369-K, 1999 WL 135244, at *2 (Del. Ch. Mar. 2, 1999); and *Martin v. D.B. Martin Co.*, 88 A. 612, 615 (1913)).

---

[63] In *Alberto v. Diversified Group, Inc.*, the Fifth Circuit stated that "Delaware law makes clear that to pierce the corporate veil on an alter ego theory, a plaintiff must demonstrate a 'misuse' of the corporate form **or** 'an overall element of injustice or unfairness.'" 55 F.3d 201, 205-06 (emphasis added) (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 989 (Del. 1987) and *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1131, 1989 WL 110537, at *5 (Del. Ch. Sept. 19, 1989)).   While the Fifth Circuit stated the test as disjunctive, both Delaware cases relied upon by the Fifth Circuit applied the test in the conjunctive.   Based upon this Court's review of current Delaware law, and those cases applying it, the test is conjunctive.   *See, e.g., NetJets Aviation,* 537 F.3d at 175-178.

Memorandum Opinion                                                                                                          **101**

With respect to the first prong of the veil piercing test – *i.e.*, whether the entities operated as a single economic entity, the factors to be considered in deciding this question include: (1) whether the entity was adequately capitalized for the corporate undertaking; (2) whether the entity was solvent; (3) whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (4) whether the dominant interest holder siphoned corporate funds; and (5) whether, in general, the corporation simply functioned as a facade for the dominant interest holder. *Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205 (5th Cir. 1995) (citing *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1131, 1989 WL 110537, at *5 (Del. Ch. Sept. 19, 1989)); *see also NetJets Aviation*, 537 F.3d at 177-78. No single factor can justify a decision to disregard the corporate entity, *see Harco*, 1989 Wl 110537, at *5, and Delaware law requires a "strong case to induce a court of equity to consider two corporations as one." *Alberto v. Diversified Group, Inc.*, 55 F.3d at 205 (citing *Martin v. D.B. Martin Co.*, 102 A. 373 (1913) and *Harco*, 1989 WL 110537, at *4). In applying an alter ego veil piercing analysis when one of the entities in question is a LLC, "somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required." *NetJets Aviation*, 537 F.3d at 178 (citing Delaware Limited Liability Company Act, Del. Code. Ann. tit. 6, § 18-101, *et seq.*). But, "if two entities with common ownership 'failed to follow legal formalities *when contracting with each other* it would be tantamount to declaring that they are indeed one in the same.'" *Id.* (quoting *Trustees of Village of Arden v. Unity Constr. Co.*, No. C.A. 15025, 2000 WL 130627, at *3 (Del. Ch. Jan. 26, 2000)).

And, with respect to the second prong of the alter ego veil piercing test – *i.e.*, whether there was an overall element of injustice or unfairness, the "'underlying cause of action, at least

by itself, does not supply the necessary fraud and injustice'." *Trevino v. Merscorp, Inc.*, 583 F.Supp.2d 521 (D. Del. Sept. 20, 2008) (quoting *In re Foxmeyer Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2008)). The party seeking to pierce the corporate veil "need not prove that the corporation was created with fraud or unfairness in mind. It is sufficient to prove that it was so used." *NetJets Aviation*, 537 F.3d at 177 (also stating that the "corporate form may be disregarded 'when used as a shield for fraudulent or other illegal acts, though it does not appear that the arrangement was originally intended to perpetrate a fraud.'" *Id.* (quoting *Sonne v. Sacks*, No. CIV.A 4416, 1979 WL 178497, at *2 (Del. Ch. June 12, 1979)). As explained by the Second Circuit in *NetJets Aviation*:

> the claimed injustice must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit: The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless. This proposition has been endorsed by the Delaware courts. But nothing prevents a court, in determining whether there is sufficient evidence of fraud or unfairness, from taking into account relevant evidence that is also pertinent to the question of whether the two entities in question functioned as one.

537 F.3d at 183 (internal citations and quotations omitted).

Applying the Delaware two-pronged test here reveals various problems with the Trustee's veil piercing claims. Significantly, the first problems are conceptual in nature. As noted previously, veil piercing theories seek, as the name implies, to pierce an entity's veil in order to hold the owners of that entity liable for the entity's debts. So, with respect to Heritage, a proper veil piercing claim would seek to hold Heritage's members – *i.e.*, Steadfast, Tikchik, and GMK Family, liable for Heritage's debts. Then, to the extent there was a basis upon which to pierce the entity veil of Steadfast, Tikchik, and/or GMK Family, a plaintiff could seek to hold the owners of Steadfast, Tikchik, and/or GMK Family liable for its respective debts. And, to the

extent that the owners of Steadfast, Tikchik, and GMK Family include other entities, the veils of

those entities could only be pierced so as to hold their respective owners liable if the Delaware

two-pronged test could be satisfied as to those entities.[64]   In other words, and assuming each of

the entities is a Delaware entity, the Delaware two-pronged test must be applied to, and satisfied

at, each level or layer of ownership applicable within the multi-faceted entity structure.

---

[64] Although not addressed by the parties at all, there is a further problem with the Trustee's alter ego claims with
respect to Steadfast and Tikchik.  Those entities are Delaware limited partnerships.  It is unclear if the alter ego
theory applies to limited partnerships in Delaware.  The Court's research did not find a single case in Delaware in
which the alter ego doctrine was applied to a limited partnership so as to hold its limited partners individually liable
for the partnership's debts.  Of course, as a matter of partnership law, the general partner of a limited partnership is
liable for the partnership's debts.  As a matter of statutory law in Delaware, a limited partner is liable for the debts
of the limited partnership where he or she participates in the control of the partnership and transacts business with
parties who reasonably believe, based upon the limited partner's conduct, that the limited partner is a general
partner.  Del. Code Ann. Tit. 6, § 17-303 (2008).

   Although not directly relevant, in *Pinebrook Properties, LTD v. Brookhaven Lake Property Owners Assoc.*, 77
S.W.3d 487 (Tex. App. -- Texarkana 2002), the court addressed the question of whether the alter ego theory applied
to a Texas limited partnership.  In concluding that it did not, the court explained:

> The trial court erred in its application of law.  The theory of alter ego, or piercing the corporate
> veil, is inapplicable to partnerships.  Under traditional general partnership law, each partner is
> liable jointly and severally for the liabilities of the partnership.  The Texas Legislature has altered
> this general scheme and statutorily created limited partnerships which are governed by [statute
> cites].  Under [the statute], 'a general partner of a limited partnership has the liabilities of a partner
> in a partnership without limited partners to persons other than the partnership and the other
> partners.'  Under the Texas Revised Partnership Act, 'all partners are liable jointly and severally
> for all debts and obligations of the partnership . . . .'  Therefore, in a limited partnership, the
> general partner is always liable for the debts and obligations of the partnership.  Limited partners
> are not liable for the obligations of a limited partnership unless the limited partner is also a general
> partner or, in addition to the exercise of a limited partner's rights and powers as a limited partner,
> the limited partner participates in the control of the business.  However, if the limited partner does
> participate in the control of the business, the limited partner is liable only to persons who transact
> business with the limited partnership reasonably believing, based on the limited partner's conduct,
> that the limited partner is a general partner.

*Id*. at  499 (citations omitted).  *See also*, *Asshauer v. Wells Fargo Foothill*, 263 S.W.3d 468 (Tex. App. -- Dallas
2008) (same holding).

   Similarly, under Delaware's limited partnership law, *see* Del. Code Ann. Tit. 6, § 17-303(a) (2008), a limited
partner's liability is limited to the amount of its investment.  However, if the limited partner participates in the
control of the limited partnership, it risks losing limited liability unless its activities fall within a statutory safe
harbor.  *See id*. § 17-303(b)(1)-(10).  If the safe harbor applies, the activities are deemed not to constitute
participation in control.  *Id*.  And, under Delaware's General Partnership Act, § 17-403(b), general partners always
remain fully liable for the partnership's obligations.

   The Texas courts' analysis of the application of veil piercing theories like alter ego to limited partnerships makes
sense.  Given the similarity of the Texas and Delaware statutory schemes for limited partnerships, this Court
concludes that the alter ego theory cannot be used to attempt to pierce the entity veil of Steadfast or Tikchik to reach
their respective limited partners.  However, the general partner(s) of Steadfast and Tikchik are liable for that entity's
debts.

**Memorandum Opinion**                                                                                              **104**

Here, however, the Trustee largely glosses over these details. Rather, the Trustee simply seeks the global application of alter ego to all of the Entity Defendants so as to collapse the Kornman-controlled empire into Kornman, thereby making all of those entities (including Kornman) liable for Heritage's debts, along with whatever debts each of those other entities has, if any, in its own right. However, from the Court's perspective, the alter ego theory relied upon by the Trustee does not work on such a global basis. Rather, even assuming that the Trustee proved his alter ego claims with respect to the first level of ownership of Heritage – *i.e.*, as to Steadfast, Tikchik, and GMK Family, which will be discussed further below, the Trustee offered no evidence with respect to the operations of Steadfast, Tikchik, and/or GMK Family from which this Court could conclude that (i) they operated as a single economic entity with their respective owners,[65] and (ii) there was an overall element of injustice or unfairness with respect to their operations. Accordingly, there is no basis in the record upon which the Court could possibly pierce the veil past Heritage's immediate members.

---

[65]Kornman testified at trial that Defendant Ettman Trust owns 99% of Steadfast, as a limited partner, and that Defendant Kornman Associates owns 1% of Steadfast. Testimony of Kornman (1/8/09) 63:23-64:23. In turn, the evidence at trial established that Kornman is the Trustee of Ettman Trust and a beneficiary of the trust, *see id*. at 14:17-15:6; 85:22-86:14, and that Kornman owns 100% of the stock of Kornman Associates, which is the general partner of Steadfast. *Id*. at 54:12-13; Pretrial Order, Stipulation 44. It is not clear if Kornman is the only beneficiary of the Ettman Trust. Since Steadfast is a Delaware limited partnership, however, this Court has concluded that veil piercing theories do not apply. *See* n.64, *supra*. However, under Delaware partnership law, Kornman Associates, as Steadfast's general partner, is liable for Steadfast's debts as a matter of law. Del. Code Ann. Tit. 6, § 17-403 (2008) ("a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law in effect on July 11, 1999 . . . to persons other than the partnership and the other partners. . . .); *Sandvik AB v. Advent Intern. Corp*., 83 F.Supp.2d 442, 448 (D. Del. 1999), *aff'd* 220 F.3d 99 (3rd Cir. 2000).

With respect to Tikchik, the evidence at trial establishes that Defendant Steadfast owns 98% of Tikchik, an entity referred to as MICC owns 1% of Tikchik, and Defendant GMK Corp. owns 1% of Tikchik. The owners of Steadfast are as found above. Kornman testified that MICC was a Mann entity that was acquired when Mann's interest in Tikchik was acquired, and that he thought that it had elected tax treatment as a S-corp and that if that was correct, it would be reported on his personal tax return, from which the Court infers that Kornman owns MICC, a corporation. *See* Testimony of Kornman (1/8/09) 66:1-67:5. Kornman also owns GMK Corp., which is the managing general partner of Tikchik. Testimony of Kornman (1/8/09) 66:1-20; Pretrial Order, Stipulation 44. But, on this record it is not clear if Steadfast and MICC are limited partners or general partners of Tikchik. As just noted, because Tikchik is a Delaware limited partnership, veil piercing theories do not apply.

Finally, with respect to GMK Family, there is no evidence in the record as to who its owners are. While there is evidence in the record that Kornman controlled GMK Family, control is different than ownership.

This same problem exists, along with some others, with respect to the Supplier Defendants. To pierce the corporate (or entity) veil of any of the Supplier Defendants so as to make its respective owner(s) liable for its debts, the Court would have to be able to identify who the direct owners of each of the Supplier Defendants are. However, with the exception of Kornman Associates,[66] there is no evidence in the record identifying the owners of each of the Supplier Defendants. Moreover, there is no evidence to suggest that each of the Supplier Defendants was operated as a single economic entity with its respective owners or that there was an overall element of injustice or unfairness with respect to its business operations.[67] As such, there is no basis upon which to pierce the veil of any of the Supplier Defendants so as to make its owner(s) liable for its respective debts. And, of course, to the extent that any of the Supplier Defendants' owner(s) are themselves entities, and the Trustee wishes to impose liability back to the next level or layer of ownership, he was required to satisfy the Delaware two-pronged test at each level or layer of ownership (assuming those entities are Delaware corporations), which he utterly failed to do.

The next conceptual problem with the Trustee's veil piercing claims is that the Trustee is attempting to hold non-owners of Heritage liable for Heritage's debts pursuant to an alter ego theory. For example, the Trustee seeks to hold the Supplier Defendants liable for Heritage's debts. However, no Supplier Defendant, except Kornman Associates, is a Heritage member, directly or indirectly, based upon the evidence at trial. The only connection that the Supplier Defendants, except Kornman Associates, have to Heritage based upon the trial record is that (i) they supplied goods and/or services to Heritage for which they were paid, and (ii) Kornman

---

[66] As noted previously, Kornman owns 100% of the stock of Kornman Associates. *See* p. 10, *supra*.
[67] One of the Supplier Defendants, Strategic, is a Delaware limited partnership. For the reasons explained above, this Court concludes that the Trustee's veil piercing claims against Strategic fail as a matter of law. *See* n. 64, *supra*.

controlled each of the entities, directly or indirectly. Neither connection is sufficient as a matter of law for a Supplier Defendant to be found to be Heritage's alter ego.

Finally, even assuming that Kornman is the ultimate *owner* of Heritage and each of the Supplier Defendants, which has not been established on this record,[68] in order to hold the Supplier Defendants liable to Heritage's creditors, the Trustee would first have to pierce the veils of the Supplier Defendants and the various entities who own the Supplier Defendants, directly or indirectly, up to Kornman's ultimate ownership of them, such that all of the entities in the chain were essentially collapsed into Kornman. Then, the Trustee would have to pierce Heritage's veil and the veils of the various entities who own Heritage, directly or indirectly, up to Kornman's ultimate ownership of them (assuming that Kornman is, in fact, the ultimate owner), such that all of the entities in the chain were essentially collapsed into Kornman as well. And, of course, the only way the Trustee could do this is if he was able to satisfy the Delaware two-pronged test (or other applicable test if a non-Delaware entity is in the ownership chain) at each level of ownership of the Supplier Defendants and Heritage, all the way up to the assumed ultimate owner, Kornman. Suffice it to say, the Trustee failed in his required proof.

For at least these reasons, the Trustee's alter ego claims against all of the Delaware Entity Defendants, except the Member Defendants, fail. The Court will next address the Trustee's alter ego claim against the Member Defendants. For the reasons explained more fully below, the Court concludes that the Trustee failed to carry his burden of proof under Delaware law with respect to the Member Defendants.

---

[68] While the parties' stipulated in the Pretrial Order that Kornman controlled, directly or indirectly, all of the Entity Defendants, except Strategic and Leasecorp, from the Court's perspective, that is different than being the ultimate owner of each of the entities. As noted previously, the Trustee did prove that Kornman owns Kornman Associates. While Kornman may be the ultimate owner of all of the Supplier Defendants, the Trustee failed to prove that fact at trial.

**Memorandum Opinion**                                                                                    **107**

With respect to the first prong of the Delaware veil piercing test – *i.e.*, whether Heritage and its members operated as a single economic entity, the Trustee failed to prove that (i) Heritage was inadequately capitalized, (ii) Heritage failed to keep corporate records, (iii) other formalities were not observed, and (iv) Steadfast (as Heritage's dominant member), Tikchik, GMK Family, and/or Kornman (as the alleged ultimate owner) siphoned[69] off Heritage funds. However, the Trustee did establish that McElwee (an officer of Heritage and between 50 and 100 other Kornman-controlled entities), failed to function properly. In short, McElwee essentially testified that she signed anything or did anything she was asked to sign or do by either Walker or Kornman, generally without question. She signed documents and checks without undertaking any due diligence or developing an understanding of why she was signing them, or what signing them meant for the entity on whose behalf she was signing. She had no idea what the business of the Member Defendants was, or if they had any day-to day business operations at all. So, as noted previously, while Kornman and Walker testified that all the "corporate" formalities were followed, that testimony is tarnished by McElwee's testimony. For example, while consent documents may have been signed (as Kornman and Walker testified), to the extent those consents were signed by McElwee, they are meaningless given her lack of diligence. However, there is insufficient evidence to suggest that Walker, Michael, and Kornman (the other officers of Heritage and/or the Member Defendants) were not sufficiently diligent in their performance on behalf of the relevant entities. And, while the Trustee presented some evidence that Heritage functioned as a facade for Kornman, that evidence was equivocal. Finally, the Trustee offered

---

[69] From the Court's perspective, siphoning funds is different than making distributions to members that are permitted by law. Siphoning suggests the improper taking of funds that the owner was not legally entitled to receive. Distributions to members are legally permissible. The fact that this Court has concluded that the distributions at issue here were fraudulent transfers does not make them unauthorized distributions from a corporate law standpoint. It simply means that the Trustee can avoid and recover them because they were made with the intent to hinder, delay or defraud Heritage creditors.

no evidence regarding Heritage's solvency or insolvency at any time prior to its bankruptcy filing.

Accordingly, after carefully considering the factors relevant to a determination of the single economic entity issue, and after weighing the evidence introduced at trial, the Court concludes that the Trustee failed to prove that Heritage and its members operated as a single economic entity.[70]

With respect to the second prong of the veil piercing test – *i.e.*, whether there was an overall element of injustice or unfairness with respect to Heritage's operations, the Court is unable to find that the Trustee carried his burden of proof here either. According to the Trustee, the alleged injustice or unfairness is that Heritage continued to promote "unlawful tax shelters" – *i.e.*, 752 Transactions. Pretrial Order at p. 5. Moreover, the Trustee asserts that "Kornman executed a scheme which maximized and protected proceeds from the 752 transactions. Because Kornman used the nominal separateness of Heritage and the entity Defendants to engage in and profit from unlawful activities, he abused the corporate form." *Id*. at p. 6. Or, as described in the Trustee's proposed findings of facts and conclusions of law,

> Kornman used Heritage and the Entity Defendants to perpetrate a fraud or injustice on creditors. Kornman caused Heritage to continue to sell the 752 Shelter, without disclosing material information to clients, and effectively stripped Heritage of the majority of its assets by transferring them to Kornman-controlled entities so that he could engage in and profit from unfair or fraudulent conduct.

Trustee's Proposed Amended Findings at pp. 57-58.

---

[70] Irrespective of the conceptual problems surrounding the alter ego claims against the Supplier Defendants, the Court finds that the Trustee failed to prove that any of the Supplier Defendants and its owners (*i.e.*, members or shareholders) operated as a single economic entity.

So, the Trustee asks this Court to find that Heritage's continued promotion of the 752 Transactions "perpetrate[d] a fraud or injustice on [Heritage] creditors." *Id*. The Court struggles with such a finding on this record for several reasons. First, the IRS never asserted a promoter penalty claim against Heritage in the Case.[71] In other words, Heritage has never been held liable to the IRS or anyone else for wrongful promotion of an illegal tax shelter. Second, the Heritage creditors to benefit from this finding are the Client Claimants (most of whom voluntarily chose to implement a 752 Transaction)[72] and Canada (who "sold" most of the Client Claimants on implementing the 752 Transaction). In other words, the Trustee asks this Court to decide that the Client Claimants were defrauded by Heritage, acting through Canada, Kornman, and/or Bird. Given (i) the terms of the client agreements, which include a variety of provisions that, if enforceable, would make such a conclusion legally impermissible,[73] (ii) the Trustee's prior position in the Case and related adversary proceedings that such provisions (of the client agreements) were enforceable against the Client Claimants precluding the allowance of their claims in the Case,[74] and (iii) the absence of any direct evidence in the trial record – *i.e.*,

---

[71] The Court is unaware of whether such a promoter penalty claim has been asserted by the IRS against Kornman. There is no evidence in the record with regard to this.

[72] The Sandwith/Mikron Industries claim relates to the implementation of an estate plan, not a 752 Transaction.

[73] The client agreements include provisions (i) making it clear that the clients were not obligated to implement a 752 Transaction, (ii) acknowledging the risks of implementation, including audit by the IRS and the possible disallowance of the large tax savings claimed from implementation, (iii) releasing Heritage (and others) from claims arising out of the implementation of the 752 Transaction and indemnifying such parties from such claims, and (iv) acknowledging that the clients were not relying on Heritage (and its affiliates) with respect to the decision to implement a 752 Transaction. *See* Pre-Trial Order, Stipulation 58.

[74] While the Client Claimants hold allowed claims in the Case, they do so by virtue of a settlement that the Trustee reached with them, which was approved by the Court along with the Plan. *In re The Heritage Organization, L.L.C.*, 375 B.R. 230 (Bankr. N.D. Tex. 2007). Accordingly, the Court never had to address the merits of the client claims and the Trustee's defenses to the allowance of those claims, which defenses Kornman and the Entity Defendants believe would have prevailed resulting in the disallowance of those claims in the Case. Needless to say, Kornman vigorously objected to confirmation of the Plan and the Trustee's proposed settlement with the Client Claimants.

testimony from a Client Claimant – regarding the alleged "fraud" or other alleged "inequitable" conduct,[75] it is difficult to come to such a conclusion here.

The Client Claimants were all extremely wealthy (and in some instances sophisticated) individuals who chose to implement an obviously risky tax strategy, thereby attempting to save themselves millions of dollars of tax liability to Uncle Sam – *i.e.*, the United States treasury. While it is true that Kornman should have told those clients who were considering the implementation of a 752 Transaction after February 2001 that the IRS had asked Heritage to disclose the names of its clients who had implemented such strategies, the record is clear that notwithstanding this failure, Kornman was diligent in discussing the relevant legal authorities with actual Heritage clients.[76] Even Canada so testified on cross-examination. Specifically, Canada testified that Kornman was more detailed than he was in going through the legal authorities with Heritage clients. Testimony of Canada (1/15/09) 91:20-24 ("Kornman did it whether they wanted to hear it or not. I played to the audience."). In fact, the clients acknowledged that they had been told of the risks of implementation and the possible need for court proceedings to defend the tax savings in the client agreements they chose to sign with Heritage. Pretrial Order, Stipulation 58 (specifically §§ 5.1 & 5.2 of the client agreements).

---

[75] The Trustee implicitly asserts that Heritage's prospective clients would not have paid Heritage for access to the secret strategies (or otherwise implemented the strategies) if they had known about the IRS investigation of Heritage. On this record, there is no evidence to support such a contention. While the Court agrees that the information should have been disclosed and was material, there is no testimony from even a single client that the client would have declined to proceed further with Heritage because of Heritage's likely disclosure of its name to the IRS. The fact that the IRS didn't like these types of transactions was well known to everyone – including the Client Claimants. Moreover, given the significant tax savings to be claimed by the clients, it seems unlikely that the clients truly expected to escape IRS scrutiny – whether through routine audit or Heritage disclosure of its name. Accordingly, it seems the real issue is whether the clients were prepared to litigate the validity of the strategies when challenged. The only evidence in this record is that the clients were told by Heritage not to implement the strategies unless they were prepared to litigate validity with the IRS. No client testified to the contrary.

[76] In connection with its fraudulent transfer analysis, the Court has found that Heritage engaged in sharp practices which included minimizing the risks of implementation and overstating Heritage's alleged "low profile" with the IRS. However, those sharp practices largely address Heritage's tactics with prospective clients. It appears that once the fish was hooked, Heritage was significantly more candid in disclosing the risky nature of the transactions and the likelihood that the IRS would challenge the substantial tax savings the clients were claiming from implementation.

**Memorandum Opinion** **111**

Obviously, the continued sale of the 752 Transactions by Heritage did not work an injustice on Canada. He profited substantially from the sale of those strategies, as his allowed claim in the Case, which arises from Heritage's sale of a 752 Transaction to Flinn, demonstrates.

While the Court does not condone Heritage's failure to disclose the IRS investigation of it to its prospective clients, having previously found that failure to constitute a "sharp practice," *see* p. 51-53, *supra*, the simple fact remains that there are no truly "innocent" creditors here and the Client Claimants were aware of the significant risks associated with implementation of a 752 Transaction.[77] In other words, from the Court's perspective, the Client Claimants hoped to avoid paying millions of dollars of tax liability they otherwise admittedly owed from a transaction that they were told had a 50.1% chance of working – *i.e*, was "more likely than not" to withstand scrutiny. While it is true that Heritage (and, indirectly, Kornman) profited from its client's hopeful thinking, it is also true that Kornman thought the 752 Transactions would withstand IRS challenge in the courts, as he chose to implement such a strategy himself.[78]

There is nothing inequitable or unfair about selling a risky product so long as the client is made aware of the risks. Here, the risks of this product were well-known. The clients were aware that the IRS believed basis boost transactions (like the 752 Transactions) to be invalid. Heritage told them this fact as did the lawyers providing them with the "more likely than not" opinion letters. Moreover, the risk of audit and potential disallowance was disclosed in both the Heritage client presentations and in the lawyer's opinion letters, which risk the clients acknowledged and assumed. For these reasons, the Court concludes that the Trustee failed to

---

[77] While there were a handful of other creditors in the Case, their claims were small and they were paid by the Trustee shortly after the Plan went effective. The only remaining creditors to benefit from a recovery here are the Client Claimants and Canada.

[78] Of course it did not withstand court scrutiny, but that was not known at the times relevant to this dispute. D.Ex. 5 (*Kornman & Assoc., Inc. v. U.S.*, 527 F.3d 443 (5th Cir. 2008)).

prove that there was an overall element of injustice or unfairness with respect to Heritage's continued sale of the 752 Transactions to its clients.

In sum, and as noted previously, to prevail on his alter ego claim against the Member Defendants, the Trustee had to prove that (i) Heritage and the Member Defendants operated as a single economic entity, and (ii) that there was an overall element of injustice or unfairness with respect to Heritage's continued sale of the 752 Transaction to its clients. The test is conjunctive – *i.e.*, both elements are required. Because the Trustee failed to prove either element here, the Trustee's alter ego claims against the Member Defendants fail.

### 3.    Veil Piercing under Tennessee Law

Turning next to the Trustee's alter ego claims against Kornman Associates, as noted previously, Tennessee law applies. In *Foster Wheeler Energy Corp. v. Metro. Knox Solid Waste Auth., Inc.*, 970 F.2d 199, 203 (6th Cir. 1992), the Sixth Circuit explained that an alter ego claim under Tennessee law applies "primarily to prevent fraud or other tortious wrongdoing." Moreover, in *Southeast Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666 (6th Cir. 2006), the Sixth Circuit noted that Tennessee courts gauge the necessity of piercing the corporate veil by using comparable factors to those applied under Delaware law. Specifically, the court listed the relevant factors under Tennessee law as:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

462 F.3d at 676. However, citing *Oceanic Schools, Inc. v. Barbour*, 112 S.W.3d 135 (Tenn.Ct. App. 2003), the *Southeast Texas Inns* court cautioned that "[i]t is not necessary that all of these factors weigh in a plaintiff's favor in order to justify the piercing of the corporate veil." 462 F.3d at 676.

Applying these factors here, the Court concludes that the Trustee has failed in his proof. At the outset, the Court finds that the Trustee failed to prove that (i) Kornman Associates failed to collect paid in capital; (ii) Kornman Associates was grossly undercapitalized; (iii) Kornman Associates failed to issue stock certificates; (iv) Kornman Associates was used as an instrumentality or business conduit for Kornman or another Kornman-controlled entity; (v) there was a diversion of Kornman Associates assets by or to Kornman or another Kornman-controlled entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (vi) Kornman Associates was used as a subterfuge in illegal transactions; (vii) Kornman Associates was formed and used to transfer to it the existing liability of another person or entity; and (viii) Kornman Associates failed to maintain arms length relationships among other Kornman-controlled entities.

The evidence regarding employees of Kornman Associates is virtually non-existent. While Walker testified that she worked for Kornman Associates from 1977-1980, Testimony of Walker (1/12/09) 180:4-5; 181:14-15, there is no other evidence in the record with respect to whether Kornman Associates had or has employees and/or who those employees might be. And, while the Trustee did prove that (i) Kornman owned 100% of the stock of Kornman Associates, and (ii) Kornman Associates used the same office or business location as Heritage, *compare* P.Ex. 178 at p. CRD 005731 (showing Kornman Associates address as "5001 Spring Valley Rd, Suite 800E, Dallas Tx 75244") *with* P.Ex. 257 (showing Heritage's address as the same), the

Court concludes that that is an insufficient basis upon which to pierce the corporate veil and hold Kornman liable for Kornman Associates' debts.[79]

Finally, even assuming that a legal basis exists to hold Kornman liable for Kornman Associates' debts, there is no basis upon which to hold Kornman Associates liable for Heritage's debts. Kornman Associates was not a member of Heritage; at most, it owned a 1% interest in Steadfast, one of Heritage's members.

### 4. Veil Piercing under Texas Law

Turning next to the Trustee's alter ego claims against FMS, as noted previously, Texas law applies. As explained by the Texas Supreme Court in *Lucas v. Texas Industries, Inc*., 696 S.W.2d 372 (Tex. 1984):

> Generally, a court will not disregard the corporate fiction and hold a corporation liable for the obligations of its subsidiary except where it appears the corporate entity of the subsidiary is being used as a sham to perpetrate a fraud, to avoid liability, to avoid the effect of a statute, or in other exceptional circumstances. There must be something more than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the alter ego of the parent and make the parent liable for the subsidiary's tort. The corporate entity of the subsidiary must have been used to 'bring about results which are condemned by the general statements of public policy which are enunciated by the courts as 'rules' which determine whether the courts will recognize their own child.' The plaintiff must prove that he has fallen victim to a basically unfair device by which a corporate entity has been used to achieve an inequitable result.

*Id*. at 374 (citations omitted). Or, as stated by the Texas Supreme Court in *Castleberry v. Branscum*, 721 S.W.2d 270 (Tex. 1986), *superseded on other grounds* by Tex.Bus.Corp.Act Ann. art 2.21A (West Supp. 1992):

> Alter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice. It is shown from the total dealings of the corporation and the individual, including the degree to which corporate

---

[79] There is no evidence in the record establishing what the business of Kornman Associates is, other than that it served as the manager of several of the Supplier Defendants. Pretrial Order, Stipulation 46.

formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. Alter ego's rationale is: 'if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors.'

*Id*. at 272 (citations omitted).

Applying these principles here, the Court concludes that the Trustee has failed in his proof for several reasons. First, there is no evidence in the record identifying the shareholder(s) of FMS. Second, there is insufficient evidence in the record to establish that FMS is being used to avoid liability, to avoid the effect of a statute, or to achieve an inequitable result. Third, it appears from the evidence in the record that the corporate formalities have been followed. Finally, even assuming that a legal basis exists to hold FMS's shareholder(s), who ever that may be, liable for its debts, there is no basis upon which to hold FMS liable for Heritage's debts, as FMS was not a member of Heritage.

Finally, turning to the Trustee's sham to perpetrate injustice claim against FMS, as noted previously, under Texas law, the sham theory is an equitable doctrine, and Texas courts take a flexible fact-specific approach focusing on equity; the variety of shams is infinite, and the purpose of the doctrine should not be thwarted by adherence to any particular theory of liability. *See* pp. 98-99, *supra*. As further explained by the Fifth Circuit in *Fidelity & Deposit Co. v. Casualty Consultants., Inc.*, 976 F.2d 272 (5th Cir. 1992),

[t]he focus under the sham to perpetrate a fraud theory is on injustice or unfairness to the claimant caused by the corporation and its owners. For a claimant to establish such unfairness, he must ordinarily demonstrate that he relied on the financial backing of the owners. 'Without reliance, the contract claimant cannot avoid the risk of insolvency that it originally accepted as part of the bargain.'

*Id.* at 275 (citation omitted).   So, notwithstanding the apparent broadness of this equitable doctrine under Texas law, it is still a theory upon which to disregard the corporate form and hold the owners of a corporation liable for the corporation's debts.

Here, even assuming that FMS's corporate form is a sham that was used to perpetrate an injustice, the Court does not know who to hold liable for that sham, since there is no evidence in the record as to who owns FMS.   Moreover, there is no evidence that the claimant here – *i.e.*, the Trustee (on behalf of Heritage) – relied on the financial backing of FMS' owners in deciding to do business with FMS.   In short, given the evidentiary record made at trial, this theory is simply inapplicable.

For all of these reasons, the Trustee's alter ego claims against Kornman and the Entity Defendants fail under Delaware, Tennessee and Texas law, as applicable, as does the Trustee's sham to perpetrate injustice claim under Texas law against FMS.

## III.        CONCLUSION

The Transfers were made with at least the actual intent to hinder or delay Heritage's creditors.   Accordingly, the Trustee is entitled to avoid the Transfers and recover them from (i) the initial transferees – *i.e.*, Steadfast (to the extent of $40.54 million), Tikchik (to the extent of $1.26 million), and GMK Family (to the extent of $2.1 million), as applicable; and (ii) the subsequent transferees – *i.e.*, Ettman Trust (to the extent of $4 million), and Kornman (to the extent of $600,000 and $10.44 million).

Moreover, the Trustee is entitled to avoid, as preferences, the payments made to, or for the benefit of, Kornman and/or the Supplier Defendants during the 90-day period prior to the filing of the Case.   Specifically, the Trustee is entitled to recover the payments Heritage made to each of the Supplier Defendants during this period from the applicable Supplier Defendant.   *See*

p. 95, *supra* (listing the aggregate amount of payments during the preference period to each Supplier Defendant).  Moreover, the Trustee is entitled to recover the payments Heritage made to (i) Kornman's credit card issuers (to the extent of $137,728.06), and (ii) Kornman's household employees (to the extent of $19,697.08) from Kornman, as the person for whose benefit the payments were made.  The Trustee is also entitled to recover the $11,256.61 Heritage paid under the "wellness" account from Kornman, as the person for whose benefit that payment(s) was made.

Finally, with regard to the Trustee's alter ego and sham to perpetrate injustice claims, those claims fail on the evidentiary record adduced at trial.

A separate Judgment will be entered based upon the findings of fact and conclusions of law contained in this Memorandum Opinion.

# # # END OF MEMORANDUM OPINION # # #