

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



**United States Bankruptcy Judge**

**Signed September 03, 2010**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| THE HERITAGE ORGANIZATION, L.L.C., | § | CASE NO. 04-35574-BJH-11 |
| | § | |
| Debtor. | § | |
| | § | |
| DENNIS FAULKNER, TRUSTEE, Plaintiff, | § | |
| | § | |
| | § | ADV. PRO. NO. 06-3377-BJH |
| - against - | § | |
| | § | |
| GARY M. KORNMAN, et al., Defendants. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is a Motion for Order Holding Judgment Debtors in Contempt of Court and

Brief in Support (the "Motion") filed by Dennis Faulkner, Trustee ("the Trustee").[1] The Motion is

---

[1] As a threshold matter, the Court notes that it is clear from the Motion that the Trustee is seeking an order of civil, and not criminal, contempt. *See* Motion, p. 4 ("in a civil contempt proceeding, the party seeking an order of contempt need only establish....", p. 8 (containing a request for an order finding "the Judgment Debtor Defendants to have committed a civil contempt of court"). Thus, the respondents' argument that "Plaintiff cannot satisfy the

**Memorandum Opinion and Order**

opposed by each of the persons and entities to which it is directed, who shall be collectively referred to as the "Judgment Debtors."[2]  The Motion alleges, in broad brush, non-compliance with an order entered by this Court on April 15, 2010 in connection with post-judgment discovery in aid of execution of the Trustee's judgment against the Judgment Debtors for over $45 million.

The Court held evidentiary hearings on the Motion on June 24, 2010 and August 6, 2010 (the "Initial Hearing" and "Continued Hearing," respectively). The Court heard the testimony of Aniza Rowe, Vickie Walker, Gary M. Kornman and M. David Bryant.  At the conclusion of the Continued Hearing, the Court took the matter under advisement.  This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law.  The Court has jurisdiction over the parties and the issues in accordance with 28 U.S.C. §§ 1334 and 157(b).

## I.    BACKGROUND

On August 5, 2009, the Trustee properly served Plaintiff's First Set of Post-Judgment Requests for Production of Documents and Tangible Things pursuant to Fed. R. Civ. P. 34 and 69(a)(2) (the "Discovery Request").  The Discovery Request sought production of 20 categories of documents and items of personalty at the office of Trustee's counsel "for copying and inspection" no later than September 8, 2009, unless otherwise agreed by the Trustee or his counsel.  The Judgment

---

requirements for criminal contempt," *see Br. Of Judgment-Debtor Defendants in Resp. To Mot. For Order Holding Judgment Debtors in Contempt of Court*, p. 7, is irrelevant.  Trustee's counsel has clarified in open court that the Trustee is not seeking a criminal contempt order, and this Court agrees that it lacks power to issue such an order.  *In re Hipp, Inc.*, 895 F.2d 1503 (5th Cir. 1990).

[2] The Judgment Debtors are those persons and entities against whom the Trustee obtained, after trial, a monetary judgment in the aggregate sum of over $45 million.  The Judgment Debtors are Steadfast Investments, L.P., Gary M. Kornman, Ettman Family Trust I, GMK Family Holdings, LLC, Tikchik Investment Partnership, L.P., Executive Aircraft Management, L.L.C., Executive Air Crews, L.L.C., Financial Marketing Services, Inc., Heritage Properties, L.L.C., Strategic Leasing, L.P., Heritage Organization Agency, Inc., Valiant Leasing, L.L.C., and Vehicle Leasing, L.L.C.  The judgment was entered on July 13, 2009, in accordance with this Court's Memorandum Opinion entered on May 11, 2009. Each of the Judgment Debtors is affiliated in some way with Gary M. Kornman or members of his family.

Debtors did not produce any of the items sought in the Discovery Request, and did not respond in any fashion to the Discovery Request.[3]

On October 2, 2009, the Trustee filed a Motion to Compel Production of Documents and Brief in Support (the "Motion to Compel") and noticed it for hearing on October 28, 2009 at 9:00 a.m. *See* Docket Nos. 644, 645, 649. The Judgment Debtors did not file opposition to the Motion to Compel. Instead, at 9:46 p.m. on October 27, 2009, the Judgment Debtors filed a Motion for Continuance of Hearings, *see* Docket No. 665, on the sole ground that their attorney had been "ordered to respond to the Trustee's Motion to Dismiss the Appeal by November 9, 2009."[4] Notwithstanding the late filing of the motion for continuance, and the failure to respond in writing to the Motion to Compel, the Court permitted the Judgment Debtors to argue both motions, although the Court ultimately denied the continuance request and the Motion to Compel proceeded on the merits. Counsel for the Judgment Debtors argued, *inter alia*, that the Discovery Request was over-broad. In part because the lawsuit resulting in the judgment commenced on May 16, 2006 and the Discovery Request sought documents dating back to 2001, the Court noted at the hearing that "I would like briefing on the question of the time period for this type of discovery." Audiotape of

---

[3] The Discovery Request was served on the Judgment Debtors' counsel of record, Emil Lippe, Esq., on August 5. On August 6, Mr. Lippe informed Trustee's counsel that Mr. Lippe was not "authorized to accept service of these discovery requests. We have only been retained at present for purposes of presentation of the motion for new trial and other post-trial motion practice relating to a potential appeal. I would recommend that you send the discovery matters directly to the clients, and you are hereby authorized to do so." *See* Motion, Ex. C. Trustee's counsel also mailed copies of the Discovery Requests to the Judgment Debtors at the addresses provided in an order allowing their prior attorney (not Mr. Lippe) to withdraw. In addition, Trustee's counsel personally delivered the Discovery Request to Gary M. Kornman on August 27, 2009.

[4] On September 11, 2009, eleven of the Judgment Debtors filed a notice of appeal of the Court's judgment after trial. The Trustee moved, in the United States District Court for the Northern District of Texas, to dismiss that appeal as a sanction for failure to timely file a statement of issues and appellate record designation. However, the District Court ultimately dismissed the appeal upon the Judgment Debtors' statement that they no longer wished to pursue the appeal for financial reasons.

**Memorandum Opinion and Order**                                                        **Page 3**

10/28/09 hearing at 9:47:35 (on file with Court).  Therefore, the Court orally granted the Motion to

Compel with respect to documents created after May 16, 2006, and gave both parties seven days (or

until November 4, 2009) to file briefs on the appropriate temporal limitation for post-judgment

discovery.[5]  The Court further orally directed that document production with respect to documents

created after May 16, 2006 begin no later than fourteen days after the hearing, and be completed no

later than thirty days after the hearing.[6]  The Court further asked Trustee's counsel to prepare an

order consistent with the Court's ruling and submit it to the Court.  Trustee's counsel timely filed his

brief on November 4, 2009.  The Judgment Debtors did not file any brief.

Trustee's counsel did not submit an order, however.  In part for that reason, the need for a

ruling on the balance of the Motion to Compel did not come to the Court's attention again until

March, 2010, when the Trustee filed the Trustee's Supplemental Motion in Support of Post-Judgment

Discovery and Brief in Support (the "Supplemental Motion").[7]  *See* Docket No. 695.  The Judgment

Debtors did not respond to the Supplemental Motion.  Accordingly, after a review of the Trustee's

---

[5]  Trustee's counsel offered to provide a brief within two days; counsel for the Judgment Debtors requested seven, and the Court granted that request.

[6]  The Court chose the thirty-day deadline for completion of production in part because the Court overheard Gary Kornman tell his counsel in open court that thirty days would be required in order to comply with the Discovery Request. Audiotape of hearing 10/28/09 at 9:57:55-9:59:53 (on file with Court).  The Court also noted that the Discovery Request had been outstanding since August, such that the Judgment Debtors should have already been making efforts to gather responsive documents.  Notwithstanding the service of the Discovery Request and the Judgment Debtors' failure to lodge any objections to their breadth prior to the October 28, 2009 hearing, Mr. Kornman told his counsel in Court on October 28 that the Judgment Debtors had not made any efforts to gather responsive documents.

[7]  The fault for this delay does not lie solely with the Trustee.  There were two other motions pending in this adversary proceeding, which were placed on the Court's "tickler" list together with the Motion to Compel.  When those two other motions were ultimately dismissed for want of prosecution, the Court inadvertently removed all three from the tickler list.  The submission of an Order by the Trustee, as requested by the Court, or the filing of a brief by the Judgment Debtors, or even the filing of the Supplemental Motion earlier than five months after the October hearing, would have alerted the Court to its oversight much earlier, however.

**Memorandum Opinion and Order**                                                                                    **Page 4**

November 4, 2009 brief and consideration of the relevant case law, the Court entered, on April 15,

2010, its Order for Post-Judgment Discovery (the "April 15 Order"). The April 15 Order provides:

> **ORDERED** that all Judgment Debtor Defendants shall, within fifteen days after the date of this Order, produce to the Trustee at the offices of his attorneys of record all documents and tangible things within their possession, custody or control that were requested in Plaintiff's first Set of Post-Judgment Requests for Production of Documents and Tangible Things. To the extent that such documents or tangible things were produced by the Judgment Debtor Defendants to the Trustee after the hearing herein on October 28, 2009, they need not be produced again at this time.

*See* Docket No. 699. Thus, the April 15 Order directed production of all documents responsive to

the Discovery Request (including those prepared prior to May 16, 2006) by April 30, 2010.

On April 30, 2010, the Judgment Debtors produced approximately 20 boxes of documents.

In addition, at 5:21 p.m. on that date, the Judgment Debtors filed a Motion for Extension of Time

and Reconsideration, seeking a thirty-one day extension of time for compliance with the April 15

Order and reconsideration of that order.[8] *See* Docket No. 702. That motion was heard on May 28,

2010, and denied for the reasons set forth on the record on that date.

On May 14, 2010, the Trustee filed the Motion, to which we now turn.

## II. LEGAL STANDARD

In a civil contempt proceeding, the party seeking an order of contempt need only show, by

clear and convincing evidence, that (1) a court order was in effect, (2) the order required certain

conduct by the respondent, and (3) the respondent failed to comply with the court's order. *Whitcraft*

*v. Brown*, 570 F.3d 268 (5th Cir. 2009); *FDIC v. LeGrand*, 43 F.3d 163, 170 (5th Cir.1995). The sole

---

[8] The filing of the motion for reconsideration did not excuse the Judgment Debtors' compliance with the April 15 Order. *Mannes v. Meyers*, 419 U.S. 449 (1975); *Rousseau v. 3 Eagles Aviation, Inc.*, 130 Fed. Appx. 687 (5th Cir. 2005) (unpublished disposition)*; American Airlines, Inc.v. Allied Pilots Ass'n*, 53 F. Supp. 2d 909, 939 (N.D. Tex. 1999), *aff'd* 228 F.3d 575 (5th Cir. 2000).

issue before the court in a civil contempt proceeding is the respondent's compliance with the court's order; any absence of willfulness is irrelevant. *American Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d 574 (5th Cir. 2000); *Petroleos Mexicanos v. Crawford Enters. Inc.*, 826 F.2d 392 (5th Cir. 1987); *NLRB v. Trailways, Inc.*, 729 F.2d 1013 (5th Cir. 1984).

Once the movant has established the failure to comply with an order, the respondent bears the burden of showing mitigating circumstances or that the respondent substantially complied with the court's order such that the court should withhold exercising its contempt power. *FDIC v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995); *Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir.1987); *U.S. Steel Corp. v. United Mine Workers of Am., Dist. 20*, 598 F.2d 363, 368 (5th Cir.1979).

## III.    LEGAL ANALYSIS

### A.    Are the Judgment Debtors in Contempt of the April 15 Order?

First, the Court agrees with the Judgment Debtors that a contempt is committed only if there is a violation of an order which requires "in specific and definite language that a person do or refrain from doing an act." *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992). Here, the Court concludes that the April 15 Order is sufficiently specific and definite to support a contempt finding, and the Judgment Debtors do not really assert otherwise. Rather, they assert that "[h]ere, the operative categories set forth in the document requests are vague and indefinite, and include numerous examples of requirements of a determination of 'control.' The terms utilized by Plaintiff in his document requests, including the phrase 'all documents relating to,' and the like, are clearly over broad and indefinite, and are tailor-made to invite over-expansive and ever-fluid demands." *See* Br. Of Judgment-Debtor Defs. In Resp. To Mot. For Order Holding Judgment Debtors in Contempt of Court, p. 4. Thus, the Judgment Debtors do not contend that the *April 15 Order* is vague - they

contend that the underlying Discovery Request is vague. As noted at the May 28 hearing, the time for making that argument has come and gone long ago. The Judgment Debtors failed to object to the Discovery Request when it was served. The Judgment Debtors failed to file any written response to the Motion to Compel. And, on May 28, 2010, this Court denied the Judgment Debtors' request for reconsideration of the April 15 Order on this, among other, grounds. The April 15 Order clearly and specifically directs the Judgment Debtors, within fifteen days after the date of the order, to "produce to the Trustee at the offices of his attorneys of record all documents and tangible things within their possession, custody or control that were requested in Plaintiff's first Set of Post-Judgment Requests for Production of Documents and Tangible Things." The Court concludes that this language is sufficient to support a contempt finding for violation of its terms.

Next, citing to four cases, the Judgment Debtors assert that a party can only be held in contempt for behavior clearly required or prohibited by a court order *within the four corners of the order*. Since the April 15 Order does not incorporate the Discovery Request by reference and does not attach a copy of the Discovery Request, the Judgment Debtors argue that they cannot be found in contempt of the April 15 Order. The Court disagrees. First, two of the Judgment Debtors' cases are completely inapposite, as they do not resolve the issue of contempt at all, but instead are cases involving statutory penalties for the "continuing failure or neglect to obey" consent decrees issued by the Federal Trade Commission in antitrust cases. As the Supreme Court explained, the rationale for the "four corners" rule is such cases is that

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation.

> Thus the decree itself cannot be said to have a purpose; rather, the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

*United States v. Armour & Co.*, 402 U.S. 673, 681-682 (1971). Of course, the rationale for the "four corners" rule in consent decree cases does not apply in the present case. The April 15 Order is not a negotiated resolution of any dispute and does not represent a compromise. No one has given up a right to litigate as a result of the April 15 Order. The April 15 Order *does* have a purpose – the enforcement of the Federal Rules of Civil Procedure.

The *Armour* decision was relied upon by the other FTC consent decree case cited by the Judgment Debtors, *United States v. ITT Continental Baking Co.*, 420 U.S. 223 (1975). Moreover, while the final two cases relied upon by the Judgment Debtors *do* involve contempt proceedings, neither are binding authority on this Court, and they too relied upon the *Armour* decision for their conclusions.[9] For the reasons set forth above, the Court does not find the analogy to the *Armour* line of cases persuasive in this context, and the Court respectfully declines to import and extend the *Armour* analysis in its consideration of the Motion.

Second, the Court rejects the Judgment Debtors' argument that because the April 15 Order

---

[9] The other two cases relied upon by the Judgment Debtors as support for the "four corners" rule are *Select Creations, Inc. v. Paliafito America, Inc.*, 906 F. Supp. 1251 (E.D. Wisc. 1995) and *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455 (7th Cir. 1993). The Court notes that while *D. Patrick* was a contempt case and not an FTC consent decree case, the *D. Patrick* case involved contempt *of a negotiated settlement agreement*, such that the *Armour* analysis arguably applied with equal force. The *only* case cited by the *Select Creations* court in support of its application of the "four corners" rule to a court order in a contempt case is the *D. Patrick* case.

**Memorandum Opinion and Order**                                                    **Page 8**

fails, when referring to the Discovery Request, to subsequently use the words "which is hereby incorporated by reference," it does not contain within its four corners a clear and unequivocal statement of the conduct required of the Judgment Debtors. The April 15 Order clearly identifies the Discovery Request and directs production of the documents requested therein. That is sufficient.

With the legal challenges to the sufficiency of the April 15 Order as the predicate for a contempt finding disposed of, the Court turns to the sufficiency of the Judgment Debtors' compliance with that Order. After a review of all of the evidence, the Court concludes that the Trustee has established, by clear and convincing evidence, that the Judgment Debtors have failed to comply with the April 15 Order. First, *after* the April 30 deadline for compliance, the Judgment Debtors produced another 42 boxes of responsive documents. *See* Trustee Ex. 9, 18 and 24.[10] Second, the Judgment Debtors' counsel conceded in open court at the Continued Hearing that "it is a fact that all the documents responsive to the Court's order of April 15th were not produced by April 30th, and it is further a fact that the Court denied our motion for extension of time . . .". Tr. 8/6/10, 11:2-5.[11] Third, Trustee Ex. 11A through 11Z and 12A through 12Z detail the deficiencies in the production in response to the Discovery Request through June 1, 2010.[12] Trustee Ex. 19A through 19Z and 20A

---

[10] Those exhibits establish that 16 boxes were produced on May 14, 17 boxes were produced on June 1, 7 boxes were produced on June 24, and testimony established that another 2 boxes were produced the evening before the Continued Hearing. In addition, Ms. Walker testified that there are *still* boxes she needs to review and that there may be responsive documents in those boxes. Moreover, Gary Kornman testified that there are two safes in his home which he has not yet searched because, although his wife has given him the combination, he has been unable to open those safes.

[11] Transcripts are cited by hearing date, page and line. Thus, the citation "Tr. 8/6/10, 11:2-5" refers to the transcript of the Continued Hearing at page 11, lines 2-5.

[12] Exhibits 11 and 12 do not include a review of the 7 boxes of documents produced immediately prior to the Initial Hearing.

**Memorandum Opinion and Order**                                               **Page 9**

through 20Z detail the deficiencies in the production through August 3, 2010.[13] The information summarized in those exhibits was amply established through the testimony of Aniza Rowe, the employee at Lain, Faulkner responsible for receiving the Judgment Debtors' responses to the Discovery Request, reviewing those documents, and making written logs of what was, and was not, produced.[14] For example, as of even June 1, Judgment Debtor Gary Kornman had not produced *any* documents responsive to Discovery Request Nos. 1, 2, 5, 6, 7, 8, 9, 10, 11, 15, 17, 19 or 20.[15] In addition, Ms.Walker conceded that as of April 30, 2010, the Judgment Debtors had not fully complied with the April 15 Order, and that the Judgment Debtors located many, many more boxes of responsive documents after that date. Tr. 6/24/10, 56:21 - 57:7.

Accordingly, the Court finds that the Judgment Debtors did not comply with the April 15

---

[13] Exhibits 19 and 20 do not include a review of the additional 2 boxes of documents produced the evening before the Continued Hearing.

[14] The Court notes that Ms. Rowe did not make a determination as to whether or not documents *should have been* produced in response to the Discovery Request. She simply logged what was produced, and noted those categories of the Discovery Request for which no documents were produced. The Judgment Debtors make much of the fact that the Discovery Request was not tailored individually for each Judgment Debtor, such that the entity defendants could not, for example, be expected to produce a will, which was called for in the Document Request. If those sorts of things were the only deficiencies in production, then the Judgment Debtors may have a point about the utility of the Trustee's exhibits. They were not, however, the only deficiencies in production, and some deficiencies were positively glaring.

[15] Many of those requests sought very basic information which an individual would be expected to have. Request No. 1 sought production of documents evidencing, describing, referring or pertaining to any interest in real property that Kornman or his wife own or lease or have owned or leased at any time since January 1, 2001, including deeds, leases, mortgages, deeds of trust, contracts, tax statements, appraisals, receipts for expenses pertaining to such interests, closing or settlement statements and documents regarding the disposition of money derived from the sale, lease or other use or disposition of the property. The evidence further shows that Mr. Kornman does, in fact, own real property. *See* Ex. C to Plaintiff's Ex. 17. Discovery Request No. 2 sought production of documents evidencing, describing, referring or pertaining to any tangible personal property that Kornman or his wife own or have owned at any time since January 1, 2001, with an estimated fair market value of $1,000 or more, including asset listings, title documents, bills of sale, receipts or evidence of purchase, appraisals, documents pertaining to the current location of such property, receipts for expenses pertaining for such property. In his prenuptial agreement which was produced, Kornman claimed ownership (as of 2003) in home furnishings valued at $1million, and then the following items with "value unknown" - jewelry and other items of personal adornment, loose precious gems, watches, firearms, coin collection, gold coins, household goods, works of art.

**Memorandum Opinion and Order** **Page 10**

Order and thus, unless they can establish a proper defense, they are in contempt of the April 15 Order and should be sanctioned for that contempt.[16]

### B.    The Judgment Debtors' Defenses.

Both the Court and the Trustee agree with the Judgment Debtors that both substantial compliance, and a present inability to comply, with a court order are proper defenses to a contempt finding. *U.S. v. Rylander*, 460 U.S. 752 (1983); *Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392 (5th Cir. 1987); *In re Galindo*, No. H-05-4384, 2006 WL 2168125 (S.D. Tex. July 31, 2006).  The party raising those defenses has the burden of production.  *Rylander*, 460 U.S. at 758; *Galindo*, 2006 WL 2168125 at *2.

### 1.    Substantial Compliance with the April 15 Order.

Here, the Judgment Debtors assert, in their response to the Motion on June 22, 2010, that they have substantially complied with the April 15 Order.  After that response was filed and shortly before the Initial Hearing, the Judgment Debtors produced another 7 boxes of responsive documents. The evening before the Continued Hearing, the Judgment Debtors produced another two boxes of documents.  Ms. Walker testified at the Continued Hearing that there are "a couple of boxes that I still need to review . . . so, could there be more? Yes."  Tr. 8/6/10, 37:18-25.  Under these

---

[16] The Judgment Debtors also assert that a court's disbelief of a witness's testimony is not sufficient to carry the plaintiff's burden of proof in a civil contempt case or to support the court's finding to the contrary, citing *TravelHost Inc. v. Blandford*, 68 F.3d 958 (5th Cir. 1995).  The *TravelHost* case involved an allegation that non-parties to an action participated in a scheme to violate an injunction.  There was testimony by four witnesses that an asset transfer was an arm's length transaction and not part of a scheme to violate an injunction.  The District Court expressly found that testimony incredible.  However, there was no *other* evidence of the scheme to violate the injunction besides the District Court's disbelief of the witnesses.  The Fifth Circuit ruled that the District Court's disbelief of the testimony was not sufficient evidence to carry the plaintiff's burden of proof or support a finding that there was a scheme to violate the injunction.  Here, there is ample evidence supporting the Court's finding that the Judgment Debtors did not comply with the April 15 Order, and the Court's findings do not rest solely on any credibility determinations.

circumstances, substantial compliance seems difficult to find.  However, there are additional reasons for the Court's ultimate conclusion that the Judgment Debtors have not carried their burden to show substantial compliance with the April 15 Order.

The evidence establishes that responsive documents were not produced with respect to certain Discovery Requests for which some responsive documents must exist.  The Court will discuss several examples in support of its findings.

As to Judgment Debtor Gary Kornman, the evidence is clear that compliance has not been "substantial."  First, at the time of the Initial Hearing, for example, Gary Kornman had not produced *any* documents pertaining to the ownership of real property by he and his spouse since 2001, *see* Plaintiff's Exs. 11A, 11B, 12A and 12B, and yet in 2003, Gary Kornman claimed ownership of a home in University Park, Texas valued at $2,100,000 and Mrs. Kornman claimed ownership of a home in Dallas, Texas valued at $160,000.  Plaintiff's Ex. 17.  By the time of the Continued Hearing, Gary Kornman had produced a printout from the Dallas County Appraisal District dated June 17, 2010 for the home in University Park and nothing else.

Second, as of the Initial Hearing, Gary Kornman had not produced *any* documents with respect to any tangible personal property that he or his spouse have owned since 2001 with an estimated fair market value of $1,000 or more.  Plaintiff's Ex. 11A, 11B, 12A, 12B.  However, in the 2003 Gary M. Kornman Marital Agreement (the "Marital Agreement"), Gary Kornman claimed ownership of home furnishings valued at $1,000,000, jewelry and other articles of personal adornment, loose precious gems, watches, firearms, a coin collection, gold coins, and works of art.  Plaintiff's Ex. 17.  Mrs. Kornman also claimed ownership of home furnishings, jewelry, furs, watches and works of art (all with an unknown value) in the Marital Agreement.  By the time of the Continued

Hearing, Gary Kornman still had not produced any responsive documents.[17]

Third, at the time of the Initial Hearing, Gary Kornman had produced *no* documents evidencing any "bank, brokerage, credit union, mutual fund, hedge fund, insurance, annuity, or other financial institution accounts" in either his name or his spouse's name for the period prior to May, 2006. Plaintiff's Ex. 11A, 12A. By the time of the Continued Hearing, Kornman produced some limited responsive documents. Plaintiff's Ex. 19A. At the Continued Hearing, Walker was asked whether the Judgment Debtors had produced any documents with respect to the $7.2 million in annuities, the jewelry, the precious gems and the coin collection identified in Exhibit C to the Marital Agreement, Plaintiff's Ex. 17. In each case, Ms. Walker testified that she turned over *what she had*. ("I can only tell you that all of the records for all of the annuities that I ever had or ever saw . . . were produced"; "If those came into my possession and I had those records, you got them"; "I gave you all of the records. So whatever was in there was in there."; "if I had any records that were relevant to this time period, 2001 to 2009, that were about any of this stuff you got them."; "If I had any records that were relative to that for this time period, then they were produced;" "If I had them you got them").[18] Tr. 8/6/10, 53: 21-23; 54:6-7; 54:15-16; 54:20-22; 56:8-10. Plaintiffs' Exhibit 19A and B establish that very limited documents were produced with respect to annuities,[19] and *no*

---

[17] Kornman testified at the Continued Hearing that he had hired someone to inventory and appraise the artwork in his home only three weeks earlier - *i.e.,* in mid-July. Tr. 8/6/10, 89:24 - 90:7. He had no memory of why he had not made any attempt to do so any earlier. Tr. 8/6/10, 92:13-18.

[18] Discovery Request No. 2 sought production of documents relating to, among other things, annuities, and Discovery Request No. 16 sought production of documents related to jewelry, precious metals, jewels, furs, watches, art or art objects, collective coins.

[19] As to the annuities identified as being owned and valued at $7.2 million on the Marital Agreement, Mr. Kornman was asked whether he had provided all documents related to those annuities in response to the Discovery Request. He testified, "[w]ell, obviously, this is a long period of time and I assume something could have gotten lost in transit or whatever, but anything I've gotten relating to those annuities has been and I've instructed somebody to relay that to Ms. Walker." Tr. 8/6/10, 96:17-20. When asked who had been instructed to relay the information to Ms.

documents were produced with respect to the jewelry, precious gems and coin collection which Kornman claimed ownership of in the Marital Agreement.

With respect to each of the other Judgment Debtors, the Court similarly finds that compliance has not been "substantial." For example, at the time of the Continued Hearing, Judgment Debtor Steadfast Investments, LP had not produced any documents with respect to, among other things (1) any real or personal property, (2) any bank accounts with signatory control, or (3) any attorney, accountant, bookkeeper, tax return preparer who had provided services since 2001. As Steadfast Investments, LP was the recipient of over $40 million in transfers between 2001 and 2003, it must have had accounts at financial institutions over which it had signatory control with withdrawal and deposit documents, and/or wire transfer records. *See* Discovery Request No. 9 and Plaintff's Exs. 19C, D and 20C, D. With respect to the Judgment Debtors which leased personal property to The Heritage Organization, L.L.C. (the "Debtor"), *i.e.* Strategic Leasing, L.P., Valiant Leasing, L.L.C., Vehicle Leasing, L.L.C., and Executive Aircraft Management, L.L.C., only limited responsive documents were produced. Executive Aircraft Management, L.L.C., which the Court has previously found leased aircraft to the Debtor, produced *only* 1997 invoices and expense documentation for certain equipment and a 2007 inventory list in response to Discovery Request No. 2, which asked for documents evidencing any tangible personal property owned at any time since 2001 with an estimated fair market value of $1,000 or more. Heritage Properties, L.L.C., which the Court has previously found owned a building and leased it to the Debtor, has produced *no* documents, for any time period, in response to Discovery Request No. 1, which requested all documents pertaining to any interest of

Walker, he stated "any of the many people that worked with me at the time. I couldn't identify any of them. I mean, it just – wouldn't know. Wouldn't remember." Tr. 8/6/10, 96:21-25. He also could not recall which of those annuities he still owns or how much money is in any of them. Tr. 8/6/10, 99:10-25.

any kind in real property owned or leased by the Judgment Debtor since 2001. Similarly, The Heritage Organization Agency, Inc., which the Court has previously found leased certain real property and sub-leased it to the Debtor, produced *no* documents in response to Discovery Request No. 1 (asking for documents concerning real property owned or leased since 2001). At the time of the Initial Hearing (which was over two months after responses to the Discovery Request were due), Judgment Debtor Ettman Family Trust had not produced documents for certain years with respect to 8 different accounts it held at banking institutions, which were produced by the time of the Continued Hearing. Plaintiff's Ex. 19E. By the time of the Continued Hearing, Judgment Debtor GMK Family Holdings, L.L.C. had not produced, for example, tax returns for 2004 or any year subsequent to 2006. Plaintiff's Ex. 19G, H.

The foregoing examples serve as an illustrative, but not exhaustive, compilation of the evidence with respect to the extent of the Judgment Debtors' compliance with the April 15 Order,[20] and undercuts the Judgment Debtors' assertion that they have substantially complied with that order.

In addition, the Judgment Debtors' argument that they have substantially complied with the April 15 Order is further eroded by Gary Kornman's testimony that there is much more work to be done. He testified:

> Q: Do you have any prediction as to how long, if the Court orders – if the Court finds the Judgment Debtors in contempt, it would take for them to comply with her order of April 15, 2010?

---

[20] The Court appreciates the Judgment Debtors' argument that the fact that documents were not produced in response to the Discovery Request does not necessarily mean that the Judgment Debtors have not complied with the April 15 Order, because the Trustee's Discovery Request was not individually tailored, as it should have been, to each Judgment Debtor. For example, the Discovery Request sought the "current will" of each entity defendant, which is nonsensical. Similarly, the Discovery Request sought documents with respect to "you and your spouse" and was directed to legal entities – also nonsensical. The Court has not, however, based its contempt finding on the failure to produce documents in response to those nonsensical requests. Trustee's counsel is cautioned, however, to exercise more care in drafting its discovery requests in the future.

A: We're working – there are people working as we speak trying to get all this stuff sorted out between the Judgment Debtors and other people. And so, I mean, we're going just as – Ms. Walker has been going as fast as she can. And until she got through with the document stuff, we couldn't start on the tangible items. And so, I mean, that's a 5,000 square foot – or, most of it; say, 4,000 square foot – warehouse that's stacked up. There's at least five rows of stuff. They're stacked three – some of them three high. There's stuff off in storage units I don't where they are – Vickie knows where they are – that have to be moved into there. I don't know that we – right now, we're prohibited form spending money. Obviously, you have to have movers and other things. So I don't have an answer to that question just because it's unknowable as far as I'm concerned. I mean, we can't – if you can't spend money.

Tr. 8/6/10, 105:15-106:9. Both Ms. Walker and Gary Kornman admitted that this warehouse contains property of the Judgment Debtors that would be responsive to the Discovery Request.[21]

For at least these reasons, the Court concludes that the Judgment Debtors have not satisfied their burden to show substantial compliance with the April 15 Order, even as of the date of the Continued Hearing.

### 2.. **Inability to Comply with the April 15 Order**.

The Judgment Debtors also assert that compliance with the April 15 Order is not possible. As their sole briefed argument, the Judgment Debtors assert that they are "not obligated, despite the 'wishful thinking' of [their] adversaries, to produce documents evidencing some presumed secret hoarde[sic] of cash sufficient to pay the massive judgment in this case, since such documents, and secret hoard, do not exist. Kornman cannot produce documents which do not exist." The Judgment Debtors complain that "Plaintiff has not demonstrated that it is possible for Kornman to produce any more documents than he has already, in response to proper, clear, definite categories set forth within the four corners of any Order of this Court." The Court disagrees, as explained below.

---

[21] For example, Discovery Request No. 16 directed the Judgment Debtors to produce all jewelry, precious metals, jewels, furs, watches, art or art objects. Kornman testified that the warehouse contains some of this property that is owned by the Judgment Debtors. *See, e.g.* Tr. 8/6/10, 112:23-24.

**Memorandum Opinion and Order**                                                              **Page 16**

First, this argument improperly shifts the burden of proof to the Trustee. It is not the Trustee's burden to identify missing documents and tangible things. In fact, it is impossible for the Trustee to know what might be missing.

Second, after that response was filed, the Judgment Debtors produced at least another 9 boxes of responsive documents, and Ms. Walker has testified that more will be forthcoming. This fact alone defeats the Judgment Debtors' asserted argument that no more documents exist and so cannot be produced.

Third, to show a present inability to comply with the April 15 Order, the Judgment Debtors must (1) explain categorically and in detail why, (2) show the inability was not self-induced; and (3) demonstrate it made in good faith all reasonable efforts to comply. *Galindo*, 2006 WL 2168125 at *2. Here, the Court concludes that they have not satisfied their burden. As an initial matter, the Court is unable to find that the Judgment Debtors have made, in good faith, all reasonable efforts to comply with the April 15 Order.

The testimony with respect to the Judgment Debtors' efforts to comply with the April 15 Order came in largely through Ms. Walker. Ms. Walker has worked for Gary Kornman and his entities since the 1980s. Her testimony was often equivocal with respect to her responsibilities for responding to the Discovery Request. The Trustee's first question for Ms. Walker, and her response at the Initial Hearing was as follows:

Q:    Okay. Have you been in charge of compliance with the Trustee's [Discovery Request] in this proceeding and the Court's order of April 15, 2010 related to those on behalf of all of the judgment debtors including, but not limited to, Gary M. Kornman?

A:    Well, it depends on what you mean by "in charge." I have been attempting to – ever since the order, I have been attempting to comply with the order and find *whatever documents that I have access to* and can find that are responsive

to the order.

> Q:     And to your understanding were you the primary person trying to do that during that period for the judgment Debtors?

> A:     Well, when you say the "judgment Debtors," I mean, that a list of 10/12 entities. I am the main record keeper *for most of them. I don't have all of the records for everyone.* But yes, I am the person that would be responsible for producing records, accounting records and those kinds of things for *at least the majority or all of the entities.*

Tr. 6/24/10, 53:12-54:6.  Further, Ms. Walker often carefully qualified her statements about the

Judgment Debtors' compliance with the Discovery Request:

> Q:     Okay. As of today, to the best the Judgment Debtor's ability, have the documents that you've been able to locate that are responsive to both orders of the Court been produced?

> A:     *Yes, the ones that I have located, yes . . .*

Tr.  8/6/10, 37:18-21.  Similarly:

> Q:     Ms. Walker, you testified about your efforts to bring about compliance with the Court's April 15, 2010 order on behalf of the Judgment Debtors. Were you in charge of that for all of the Judgment Debtors, including Mr. Kornman personally?

> A:     *As to the records that I was responsible for, yes.*

Tr. 8/6/10, 43:22-44:1.  As to the steps that anyone else had taken to comply with the April 15 Order,

including Gary Kornman, Ms. Walker testified that

> I can tell you that Mr. Kornman has given me things to be produced that have been produced.  Any more than that, you know, I've been looking for documents and going through records. I have not been watching what Mr. Kornman does.

Tr. 6/24/10, 60:1-4.  When asked if she had ever asked Mr. Kornman what documents or tangible

things he may have under his control that are responsive, she replied "Not that I recall." Tr. 6/24/10,

60:5-8.  When asked whether she made any efforts herself to determine what responsive documents

or tangible things Mr. Kornman might have had, she replied

> well, if you're asking me did I go rifling through his house looking for stuff, no, I did not. I went to find the documents that were within my control and that I was responsible for and that I had been involved with and prepared over the years. And if there was anything that was – that Mr. Kornman had that was responsive, you'd have to ask him about that . . .

Tr. 8/6/10, 46:4-11. Finally, Ms. Walker testified that she had never asked Gary Kornman whether he had provided to her all of the documents and tangible things that were responsive to the Discovery Request. Tr. 8/6/10, 46:12-17.

> For his part, Kornman testified that

> for 30 years, all of my financial matters were handled by Ms. Walker. Every time I basically got something, I mean, with probably a couple of exceptions or a few exceptions, she – it was tried to be transmitted to her. As so the extent that she's produced my tax returns, my financial records, my checkbooks, my deposits, whatever, whatever she's produced would include everything that I have, that I would normally have. I don't keep financial documents normally. I mean, I might keep for a short period of time, but I don't keep them for any long period of time. . . . anytime I found something that I thought was responsive, I had it sent to her.

Tr. 8/6/10, 83:6-17. At the Continued Hearing, Gary Kornman essentially "passed the buck" for compliance to Ms. Walker. However, as noted earlier, Ms. Walker repeatedly testified that she turned over *whatever she had*, and she was unwilling to testify that she maintains, or has access to, or is "responsible for" all of the records for all of the Judgment Debtors, or that she has located all of the responsive documents. Although Kornman did testify that he looked independently for documents (apparently, solely at his home and at a condominium he uses as an office), and when he found responsive documents, he gave them to Ms. Walker to turn over to Mr. Lippe, he had no memory of what he has given her, or when. Tr. 8/6/10, 93:7-14. He also kept no record of what he says he gave to Ms. Walker. Tr. 8/6/10, 85:20-24.

The Judgment Debtors introduced evidence at the hearings that their documents are in

disarray, scattered across multiple locations,[22] and are not filed in the manner in which the Discovery

Request is framed,[23] such that they must look through many, many boxes in multiple locations to

locate responsive documents, and that is a long a tedious process.[24]  Ms. Walker testified that she is

the *only* person able to do that job.[25]   While she conceded she could have hired people to locate the

documents, she asserted that it would not have helped "because all those 15 or 20 people could do

is get the boxes that I identified and bring them to me.  I'm still the one who has to go through them

and review them and determine if this is what I'm looking for."  Tr. 8/6/10, 36:2-7.  She testified that

---

[22] There was testimony that at some points since the 1990s, some records were in Dallas, and some were in Tennessee.  However, since 2005, all documents have been located in Dallas and its surrounding communities.  The sole documentary evidence introduced at the hearings by the Judgment Debtors consists of photographs of the contents of various warehouse locations, presumably introduced to show the chaotic state of the Judgment Debtors' books, records and personalty. That chaotic state, if it exists, is completely self-induced.  However, the Court notes that Ms. Walker testified to the manner in which she has kept the books and records for at least some of the Judgment Debtors – while they may not be kept in the order in which the Discovery Request is framed, they are organized. The Court rejects the Judgment Debtors' apparent contention that their records are so voluminous and so disorganized that they were and remain unable to comply with the April 15 Order.

[23] It does appear, however, that the records are organized and labeled.  Ms. Walker described her method of keeping records as follows. At the beginning of each year, she would go through the files and cull out the prior years' records.  "So, for example, in January of 2009, you would go through . . . all the bank files, and you would pull all the 2008 bank statements. And for each entity, for each bank account, you'd take those documents and you'd put them in an envelope. You'd label them what they were, and you'd put them in a box.  So, at the end of the year, you have many boxes full of bank statements.." Tr. 6/24/10, 68:22-69:6.  She testified at the Initial Hearing that she would file them by subject (ie., bank statements), then by year, then by company, then by subcategory.  "For example, 2001 bank statements. When you're closing files, we don't close by company.  We don't pull the records and file them and archive them by company. We pull them by what they are.  First, here are bank statements, and these are 2001 bank statements. And then, you continue to fill up boxes until you get to the end of all the bank statements." Tr. 6/24/10, 70:6-12.  As another example, she testified that "we would take all the bank records for all of the entities and we would take clasp envelopes . . . and we, for each bank account for each entity, we would take those bank records and put them in that envelope and we would label those: This is GMK Family Holdings' 2001 bank statements for Bank A.  Here is 2001 GMK Family Holdings' bank statements for Bank B.  And then those would go in a box and those would go, depending on here I was at various points in time and where our records storage facilities were, those boxes would go into storage." Tr. 8/6/10, 17:14-24.  However, at the Continued Hearing, she testified that "generally, it's first by year, then by type or category, then by company, then by subcategory for that."  Tr. 8/6/10, 20:5-6.

[24] Ms. Walker testified that prior to the Debtor's bankruptcy filing, she kept accounting records for some 400 entities, and that even today, there are more than 200 entities affiliated with Mr. Kornman for which she keeps some records.  Tr. 8/6/10, 20:12-14.

[25] She did not explain, however, *why* she is the only person able to do that job.

**Memorandum Opinion and Order**                                                                                    **Page 20**

she has worked three weekends, has cancelled trips and has worked extremely diligently to try to gather the records. Essentially, the gist of her testimony was that she has gathered documents, has turned over *what she has found*, will continue to look for additional documents, and, if any more are found, she will turn them over too. However, she never testified, and says she never will testify, that she has produced all responsive documents. Moreover, all of this testimony speaks to Ms. Walker's efforts to comply with the April 15 Order, and none of it speaks to the Judgment Debtors' efforts to comply. The Judgment Debtors cannot simply delegate their obligation to comply with the April 15 Order to Ms. Walker. *Cf. F.T.C. v. Kuykendall*, 371 F.3d 745, 761 (10th Cir. 2004) ("an individual who is responsible for insuring that a corporation complies with a court order cannot escape liability merely by removing himself from the day-to-day operations of the corporation and washing his hands of responsibility") (quoting *In re Voss*, 832 F.3d 1521, 1525-6 (10th Cir. 1996)).

Further, Ms. Walker conceded that although some of the Judgment Debtors' personal property is kept at several storage facilities, no one has made an effort to maintain or create an inventory of items belonging to the Judgment Debtors at those locations.[26]

Ms. Walker also testified, and the evidence bears this out, that the Judgment Debtors did not produce *any* documents between the Initial Hearing and 5:00 p.m. the evening before the Continued Hearing – some 42 days later. While the Judgment Debtors complain that they are now charged with

---

[26]When asked whether she has produced any documents that would tell the Trustee what personal property of the Judgment Debtors exists at the storage facility, she responded "if you're asking me have I gone through that storage unit and made an inventory list, the answer is no." Tr. 6/24/10, 64:7-8. When asked whether there is any personal property at the storage facility on Preston Road that belongs to the Judgment Debtors, she responded "I believe that there is a unit that contains some equipment and things that belong to Valiant and/or Strategic." Tr. 6/24/10, 64:21-25. The Trustee's counsel asked "Are there any documents that describe, or list, that property?" Ms. Walker responded "You're asking if there is a list that says these things are at this location? The answer is no." Tr. 6/24/10, 65:1-4.

**Memorandum Opinion and Order**                                                          **Page 21**

compliance with an Order entered by Judge Marvin Isgur, Chief Judge of the United States Bankruptcy Court for the Southern District of Texas (where the Trustee has commenced certain post-judgment actions), which they contend has hindered their ongoing efforts to comply with the April 15 Order, the Court notes that Judge Isgur's order was not entered until July 14, 2010. No documents were produced to the Trustee between the Initial Hearing date and July 14 either.[27] And, of course, compliance with the April 15 Order was due on April 30.

For the foregoing reasons, the Court concludes that the Judgment Debtors have not met their burden to establish that they have made, in good faith, all reasonable efforts to comply with the April 15 Order.

In addition, the Court finds that much of the Judgment Debtors' present inability to comply with the April 15 Order is self-induced. The Judgment Debtors essentially argue that they are unable to comply (1) because their books and records and other property are voluminous, stored in multiple locations and not organized in the same manner as the Discovery Request is framed, and (2) they are restricted in their ability to comply by virtue of Judge Isgur's July 14 Order. The Court is unpersuaded by either assertion. The Court notes that the Discovery Request was served *a year ago*. The Judgment Debtors chose to ignore it, and apparently made no efforts to even begin searching for, re-locating or organizing documents until faced with the Motion to Compel. Even after the Court's oral ruling on the Motion to Compel, the Judgment Debtors produced only limited responsive

---

[27] The Court notes that the only allegedly time-consuming burden imposed on the Judgment Debtors by Judge Isgur's July 14 Order is that they were directed to provide "a detailed listing of (i) all assets in which they have or claim an interest (ownership or otherwise); and (ii) all assets claimed to be exempt, their estimated value, and the basis of any such exemption."

**Memorandum Opinion and Order**                                    **Page 22**

documents prior to the entry of the April 15 Order.[28] Even after the entry of the April 15 Order, documents trickled in. By the time of the Continued Hearing (at which it was established that all responsive documents have still not been produced), the Judgment Debtors had had *a year* to search for and organize responsive documents. While the Judgment Debtors cannot be held in contempt for their actions prior to April 30, 2010,[29] their conduct prior to that date, and after the Discovery Request was served, is evidence that their present inability to comply with the April 15 Order is largely self-induced. For that same reason, the Court cannot find that the relatively recent entry of Judge Isgur's July 14 Order prevents their compliance with the April 15 Order. Finally, the Judgment Debtors presented no *specific* evidence of the costs that they would be required to incur in order to comply, and that they are unable to fund those costs in light of Judge Isgur's July 14 Order.

For these reasons, the Court finds and concludes, pursuant to 11 U.S.C. § 105, that the Judgment Debtors are in contempt of the April 15 Order and have not met their burden of proof with respect to their defenses.

### C.    What Sanctions are Appropriate Here?

In deciding what sanctions are appropriate for the Judgment Debtors' civil contempt, the Court will consider the following factors: (1) the harm from noncompliance with the April 15 Order, (2) the probable effectiveness of the sanction, (3) the financial resources of the Judgment Debtors and the burden that sanctions may impose, and (4) the willfulness of the Judgment Debtors in failing to comply with the April 15 Order. *In re Hughes*, No. 06-32726-SGJ-7, 2007 WL 1087784 (Bankr.

---

[28] By the time of the Initial Hearing, the Judgment Debtors had produced 84 boxes of documents. Only 31 of those were produced prior to entry of the April 15 Order. Plaintiff's Ex. 9.

[29] The Trustee has not argued that the Judgment Debtors may be held in contempt based upon the Court's October 28, 2009 *oral* direction to produce certain documents. However, the Fifth Circuit has found conduct prior to actual entry of an order to be contemptuous. *In re Bradley*, 588 F.3d 254 (5th Cir. 2009).

N.D. Tex. Apr. 4, 2007).  The Court is also mindful that an order of civil contempt can serve the dual purposes of coercing compliance with an order, and compensating the opposing party for losses or damages sustained as a result of the order's violation.  *In re Bradley*, 588 F.3d 254, 263 (5th Cir. 2009).

At the outset of its analysis the Court notes that the Trustee is entitled to this discovery.  He obtained a substantial judgment (over $45 million) against the Judgment Debtors well over a year ago.  He sought post-judgment discovery from the Judgment Debtors by filing the Discovery Request on August 5, 2009 and the Judgment Debtors simply ignored their obligations to timely and properly respond to the Discovery Request.  Thus, on October 2, 2009, the Motion to Compel was filed and, from that date forward until April 29, 2010, the Judgment Debtors could hardly be bothered to respond to either pleadings filed by the Trustee or requested by the Court, and they produced very little to the Trustee in response to the Discovery Request.  Since the due date of the production on April 30, 2010, documents have trickled in – generally on the eve of a continued Court hearing on the Trustee's request for a finding of civil contempt and sanctions.  To at least the date of the Continued Hearing, not a single tangible thing had been produced to the Trustee.  There can be no doubt that the Trustee has been harmed by the cavalier manner in which the Judgment Debtors have approached their obligations under the Federal Rules of Civil Procedure.  Moreover, based upon the record made at the Initial Hearing and the Continued Hearing, there is no doubt in the Court's mind that the Judgment Debtors have willfully failed to comply with the April 15 Order.    Thus, the Court will turn to the final two factors – *i.e.*, the probable effectiveness of the sanction and the Judgment Debtors' financial resources.  The Court finds that monetary sanctions in the form of an order fining the Judgment Debtors until all responsive documents and tangible things are produced

would likely be ineffective, since the Judgment Debtors have paid nothing on a $45 million judgment in over a year and they claim that they lack the funds (or assets) with which to satisfy the judgment, pay their counsel, or comply with the Discovery Request.[30] In addition, the Judgment Debtors are now under Judge Isgur's July 14 Order that imposes at least some spending restrictions upon them.

Accordingly, the Court concludes that some alternative form of sanction is appropriate. After carefully considering what sanction should be imposed here in order to induce the Judgment Debtors to fully comply with the April 15 Order, the Court concludes that the following measures are appropriate.

First, the Court directs that the two remaining boxes identified by Ms. Walker at the Continued Hearing as containing responsive documents be reviewed, and all responsive documents contained therein be produced to Trustee's counsel within seven days of the entry of this Order. Further, the Court directs that the two safes identified by Mr. Kornman at the Continued Hearing be

---

[30] The Court rejects, however, the Judgment Debtors' attempts to show inability to comply with the April 15 Order by virtue of their lack of financial wherewithal to do so. The Judgment Debtors argued at the Continued Hearing that Judge Isgur's July 14 Order prohibiting them from spending more than $9,000 per month also rendered compliance with this Court's order impossible:

> "The Debtors [sic] are prohibited from spending over $9,000. And to the extent that they want to do anything like copy documents in response to this Court's order, you've got to have copy paper, you've got to have toner cartridges. If the machine breaks down, somebody has got to repair it. You've got to put it in boxes, and they don't given them away free at Office Depot. You have to spend money."

Tr. 8/6/10, 6:19-7:1. The Court notes that the Discovery Request only required the Judgment Debtors to produce the responsive documents at the offices of Trustee's counsel, for copying and inspection. It did not require the Judgment Debtors to bear the financial burden of making copies. Further, the Judgment Debtors were not constrained by Judge Isgur's order on April 30, 2010, or even on the date of the Initial Hearing. Finally, Judge Isgur's Order permits the Judgment Debtors to seek relief from his order in order to expend sums in excess of $9,000. In fact, Judge Isgur's order specifically states that in considering any such relief, he will determine "whether the expenses were undertaken in furtherance of compliance with turnover obligations or other legal obligations arising from any court proceeding related to the Judgment Creditor or whether the expenses were for other purposes not reasonably likely to increase the collection of the judgment." It appears that Judge Isgur therefore contemplated that the Judgment Debtors may need relief from his order in order to comply with the April 15 Order.

searched, and all documents and tangible items responsive to the Discovery Request contained within those safes be produced to Trustee's counsel within seven days of the entry of this Order.

Second, each Judgment Debtor that is a legal entity (as opposed to a natural person) shall, within ten days of the entry of this Order, file with the Court a pleading that identifies its Chief Executive Officer and/or President, Trustee, General Partner, and/or Managing Member, as the case may be. Where the identified CEO/President, Trustee, General Partner or Managing Member is itself a legal entity (as opposed to a natural person), the Judgment Debtor shall identify *its* CEO/President, Trustee, General Partner or Managing Member, as the case may be, and shall continue to do the same until the pleading identifies a natural person associated with each entity Judgment Debtor who may be held accountable for compliance with the April 15 Order. The pleading shall identify such natural person for each entity Judgment Debtor as of three dates: August 5, 2009 (the date the Discovery Request was served), April 30, 2010 (the date production was due), and August 6, 2010 (the Continued Hearing date).

Third, the Judgment Debtors shall, within thirty days of the entry of this Order, complete their search for responsive documents and tangible things at all locations identified at the Initial Hearing and the Continued Hearing where responsive documents and tangible things may be kept, and at any other locations not previously disclosed, and shall produce all responsive documents and tangible things within thirty days of the entry of this Order. Gary Kornman and each natural person identified as acting on behalf of an entity Judgment Debtor in the pleading(s) filed in response to the preceding paragraph shall file with the Court, no later than the 30th day following the entry of this Order, a statement under penalty of perjury, in the form attached hereto as Exhibit A, certifying to the Court that he or she has searched, or caused to be searched, every location at which documents and tangible

things for the relevant entity were or are kept and that all documents or tangible things responsive to the Discovery Request have been produced to the Trustee's counsel.

Fourth, the failure of any Judgment Debtor to timely file the Exhibit A certification shall result in the Court issuing a warrant for the arrest of the person(s) failing to so certify, and such person(s) shall be held by the United States Marshall Service until such certification can be and is filed.

Fifth, the Judgment Debtors are jointly and severally liable for and shall pay the Trustee's attorneys' fees and expenses, which the Court expressly finds to be reasonable, within ten days of the entry of this Order in the amount of $7,759.25 in fees and $79.38 in expenses, for a total of $7,838.63. To the extent the Judgment Debtors are unable to pay such fees and expenses as a result of Judge Isgur's July 14 Order, then the Judgment Debtors shall apply to Judge Isgur for authority to pay such fees and expenses in accordance with paragraph six of Judge Isgur's July 14 Order within ten days of the entry of this Order and shall prosecute that application before Judge Isgur on as expedited a basis as he will permit.

If any Judgment Debtor asserts that he/it is unable to comply with *this Order* because *its* provisions are unclear, that Judgment Debtor is directed to seek clarification of any such provision within seven days of the entry of this Order by filing an expedited motion for clarification in accordance with our Local Rules. However, the filing of that expedited motion, by itself, will not extend any deadline for compliance set forth in this Order.

**SO ORDERED**.

# # # END OF MEMORANDUM OPINION AND ORDER # # #

EXHIBIT A

My name is _____ and I am providing this affidavit pursuant to the Court's Memorandum Opinion and Order entered on September 3, 2010 (the "Memorandum Opinion and Order"). I am filing this affidavit on behalf of the following Judgment Debtor:_____ (the "Judgment Debtor").

I have read the Discovery Request (as defined in the Memorandum Opinion and Order), the April 15 Order (as defined in the Memorandum Opinion and Order), and the Memorandum Opinion and Order.  I have met with counsel for the Judgment Debtor in order to (i) review the Discovery Request, the April 15 Order, and the Memorandum Opinion and Order, (ii) assess what documents and tangible things might be responsive to the Discovery Request, and (iii) identify where such documents and tangible things might be located.

I hereby certify that I have diligently searched, or caused to be diligently searched, every location at which such responsive documents and tangible things may be kept.  The search involved both physical and electronic materials.

I hereby further certify that I have diligently searched, or caused a diligent search, for the documents and tangible things that have been ordered to be produced in the April 15 Order, and that all such documents and tangible things have been located and turned over to the Judgment Debtor's counsel for production to the Trustee and/or have been located and turned over directly to the Trustee or his counsel.

I certify under penalty of perjury that the foregoing is true and correct on this ___ day of October 2010.


_____

[name of individual and relationship to Judgment Debtor]